# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> UNIVERSITY OF TEXAS AT AUSTIN; JAMES B. MILLIKEN, Chancellor of the University of Texas System in his Official Capacity; STEVEN LESLIE, Executive Vice Chancellor for Academic Affairs of the University of Texas System in his Official Capacity; DANIEL H. SHARPHORN, Vice Chancellor and General Counsel of the University of Texas System in his Official Capacity; JAY HARTZELL, President of the University of Texas at Austin in his Official Capacity; BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM; DAVID J. BECK, CHRISTINA MELTON CRAIN, KEVIN P. ELTIFE, R. STEVEN HICKS, JODIE LEE JILES, JANIECE LONGORIA, NOLAN PEREZ, KELCY L. WARREN, AND JAMES C. "RAD" WEAVER, as Members of the Board of Regents in Their Official Capacities; DANIEL JAFFE, Interim Executive Vice President and Provost; RACHELLE HERNANDEZ, Senior Vice Provost for Enrollment Management and Student Success; and MIGUEL WASIELEWSKI, Executive Director for Office of Admissions, <br><br> *Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:20-cv-763-RP <br><br><br><br> **AMENDED COMPLAINT** |

Plaintiff, Students for Fair Admissions, Inc., brings this action to obtain, among other relief, a declaratory judgment that Defendants racially discriminate in their administration of the undergraduate admissions program at the University of Texas at Austin ("UT-Austin"). That

discrimination violates the Equal Protection Clause of the U.S. Constitution; 42 U.S.C. §1981; 42 U.S.C. §1983; and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.* UT-Austin's undergraduate admissions policies have injured and continue to injure Plaintiff's members.

## I.      Jurisdiction and Venue

1.      This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1343.

2.      Venue is proper in the Western District of Texas under 28 U.S.C. §1391 because the events giving rise to Plaintiff's claims occurred in the Western District of Texas.

## II.      The Parties

### A.      Plaintiff

3.      Students for Fair Admissions, Inc. ("SFFA") is an Internal Revenue Code Section 501(c)(3), voluntary membership organization formed for the purpose of defending human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and other lawful means. More specifically, SFFA promotes and protects the right of the public to be free from discrimination on the basis of race in higher-education admissions.

4.      SFFA is a nonprofit membership group of more than 20,000 students, parents, and others who believe that racial classifications and preferences in college admissions are unfair, unnecessary, and unconstitutional. SFFA has members in Texas and throughout the country.

5.      SFFA has at least two members ("Applicants") who applied for and were denied admission to UT-Austin's 2018 and 2019 entering classes.

6.      Applicants, who are white, were denied the opportunity to compete for admission to UT-Austin on equal footing with other applicants on the basis of race or ethnicity because of UT-Austin's discriminatory admissions policies.

7.      Applicants were accepted to and enrolled at another university in Texas.

8.      Applicants are ready and able to apply to transfer to UT-Austin when it stops discriminating against applicants on the basis of race and ethnicity.

**B.      Defendants**

9.      UT-Austin is a public educational institution authorized by Article 7, section 10 of the Texas Constitution and is funded by the State of Texas and the Federal Government. As a recipient of direct and indirect financial assistance from the Federal Government, UT-Austin, as well as all of its programs and activities, are subject to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et. seq.*

10.      The Board of Regents of the University of Texas System is responsible for the central management and coordination of the University of Texas System's component institutions. The Board of Regents promulgates regulations that authorize the colleges, departments, and other programs in the University of Texas System to develop and implement undergraduate admissions policies.

11.      David J. Beck, Christina Melton Crain, Kevin P. Eltife, R. Steven Hicks, Jodie Lee Jiles, Janiece Longoria, Nolan Perez, Kelcy L. Warren, and James C. "Rad" Weaver are the nine members of the Board of Regents, the governing body of the University of Texas System. The members of the Board of Regents are all named defendants in their official capacities.

12.      James B. Milliken is the Chancellor of the University of Texas System. As Chancellor, Milliken serves as the chief executive officer of the University of Texas System charged with instituting the policies and procedures of the Board of Regents. Milliken is responsible for all aspects of the University of Texas System's operations, including oversight and implementation of the admissions policy at UT-Austin. Milliken is sued in his official capacity.

13.      Steven Leslie is the Executive Vice Chancellor for Academic Affairs of the University of Texas System. According to the Rules and Regulations of the Board of Regents, Leslie is responsible for the review and approval of any proposal for admissions policies. He is sued in his official capacity.

14.     Daniel H. Sharphorn is the Vice Chancellor and General Counsel of the University of Texas System. According to the Rules and Regulations of the Board of Regents, Sharphorn is responsible for the review and approval of any proposal for admissions policies. He is sued in his official capacity.

15.     Jay Hartzell is the President of UT-Austin. As President, Hartzell is responsible for the implementation and administration of undergraduate admissions at the UT-Austin. He is sued in his official capacity.

16.     Daniel Jaffe is the Interim Executive Vice President and Provost of UT-Austin. In this role, Jaffe coordinates the academic mission of the university, managing all aspects of the academic experience for students, including undergraduate enrollment and curriculum management. He is sued in his official capacity.

17.     Rachelle Hernandez is the Senior Vice Provost for Enrollment Management and Student Success at UT-Austin. In this role, she oversees, among other things, admissions, enrollment, and financial aid programs. She is sued in her official capacity.

18.     Miguel Wasielewski is the Executive Director for Office of Admissions at UT-Austin. Wasielewski administers UT Austin's undergraduate admissions office and implements the undergraduate admissions policies promulgated by the University System. Wasielewski is sued in his official capacity.

## III.    The History of UT-Austin's Race-Based Admissions Policies

### A.    Pre-1997: UT-Austin's Race-Based Admissions Before *Hopwood*

19.     Before 1997, UT-Austin used race as part of the general admissions process, and it was frequently a controlling factor in the university's admissions decisions.

20.     UT-Austin used two criteria when evaluating applicants: (1) the applicant's Academic Index ("AI"), which was computed from standardized test scores and high school class rank; and (2) the applicant's race.

21.     In 1996, the last year UT-Austin used this particular race-based system, 4.1% of the enrolled freshmen were African American, 14.7% were Asian American, and 14.5% were Hispanic.

**B.      1997: UT-Austin's Race-Neutral AI/PAI Plan After *Hopwood***

22.     In 1996, the U.S. Court of Appeals for the Fifth Circuit issued its decision in *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996), which held that the University of Texas School of Law could not use race as a factor in deciding which applicants to admit.

23.     In response to *Hopwood*, UT-Austin ceased using race as a factor in its undergraduate admissions decisions.

24.     Instead, for the 1997 admissions cycle, UT-Austin instituted a race-neutral "holistic review" process in which it considered an applicant's AI score as well as a Personal Achievement Index ("PAI").

25.     The PAI was a composite of scores from two essays and a personal achievement score. The personal achievement score, in turn, was based on a "holistic" review of an applicant's leadership qualities, extracurricular activities, honors and awards, work experience, community service, and special circumstances, such as whether the applicant came from a poor family, a single-parent household, or a home in which a language other than English was customarily spoken.

26.     This new race-neutral admissions process was known as the "AI/PAI Plan."

27.     Because the AI/PAI Plan gave an admissions preference to disadvantaged students, it had the effect of disproportionately benefiting minority applicants.

28.     In 1997, under the AI/PAI Plan, 2.7% of the enrolled freshmen were African American, 15.9% were Asian American, and 12.6% were Hispanic.

**C.**    **1998-2004: UT-Austin's Race-Neutral Admissions Policy (Top Ten Percent Plan Plus the AI/PAI Plan) Before Grutter**

29.    In 1997, the Texas Legislature adopted a law known as the "Top Ten Percent Plan," which mandated that UT-Austin admit all Texas seniors who rank in the top 10% of their high school classes. See House Bill 588, Tex. Educ. Code §51.803 (1997).

30.    In 1998, UT-Austin began admitting all applicants who were in the top 10% of their high school classes, as required by the Top Ten Percent Plan.

31.    Because applicants admitted pursuant to the Top Ten Percent Plan did not fill UT-Austin's entire incoming freshman class, UT-Austin continued to use the race-neutral AI/PAI Plan to fill the remainder of its incoming freshman class.

32.    From 1998-2004, UT-Austin admitted applicants under this race-neutral system.

33.    UT-Austin repeatedly acknowledged that, during this time period, its race-neutral admissions process created a more racially diverse environment than existed under the race-based admissions process it used before *Hopwood*.

34.    In 2000, UT-Austin announced that its "enrollment levels for African American and Hispanic freshmen ha[d] returned to those of 1996, the year before the *Hopwood* decision prohibited the consideration of race in admissions policies."

35.    In 2003, UT-Austin proclaimed that it had "effectively compensated for the loss of affirmative action" by bringing "a higher number of freshman minority students—African Americans, Hispanics, and Asian-Americans—to the campus than were enrolled in 1996, the year a court ruling ended the use of affirmative action in the university's enrollment process."

36.    By 2004—the last year that UT-Austin used this race-neutral system—the entering freshman class was 4.5% African American, 17.9% Asian American, and 16.9% Hispanic.

37.     The 2004 entering freshman class, in other words, had a higher percentage of African Americans, Asian Americans, and Hispanics than the class that entered in 1996 when UT-Austin last used racial preferences.

**D.     2004-2008: UT-Austin's Race-Based Admissions Policy After *Grutter***

38.     Despite this success, UT-Austin reflexively jumped at the first chance to reinsert race into its admissions process.

39.     On June 23, 2003, the U.S. Supreme Court decided *Grutter v. Bollinger*, 539 U.S. 306 (2003), which upheld the University of Michigan Law School's race-based admissions system under the Equal Protection Clause of the Fourteenth Amendment. The Supreme Court held that "student body diversity is a compelling state interest that can justify the use of race in university admissions," Grutter, 539 U.S. at 325, and enrolling a "'critical mass' of underrepresented minorities is necessary to further [a university's] compelling interest in securing the educational benefits of a diverse student body," *id.* at 333.

40.     The Supreme Court warned, however, that a university contemplating the use of race as a factor in admissions must engage in "serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." *Id.* at 339.

41.     Nevertheless, on the very same day that *Grutter* was decided, UT-Austin's president announced that "[t]he University of Texas at Austin will modify its admissions procedures" in light of *Grutter*, including by "implementing procedures at the undergraduate level that combine the benefits of the Top 10 Percent Law with affirmative action programs."

42.     In June 2004, UT-Austin formally adopted a policy to reintroduce race into the admissions process, starting with applicants in the 2004-2005 admissions cycle.

43.     Under the new admissions system, UT-Austin continued to admit applicants under the Top Ten Percent Plan and to fill the remaining seats based on an applicant's AI and PAI scores.

44.     Unlike the year before, however, an applicant's AI/PAI score was not calculated based on race-neutral criteria. UT-Austin instead began to use an applicant's race as a factor in his or her PAI score. Under UT-Austin's system, an applicant's race appeared on the front of every application file and reviewers were aware of it throughout the evaluation.

45.     UT-Austin began using this new race-based admissions system to benefit African-American and Hispanic applicants (groups it considered "underrepresented") over applicants of other races, including Whites and Asian Americans. UT-Austin did so even though there were fewer Asian-Americans than Hispanics enrolled at the university. UT-Austin deemed Asian-Americans "overrepresented" based on state demographics. At the same time, UT-Austin continued to recognize Asian Americans as a minority in its diversity statistics, marketing materials, and in analyzing classroom diversity.

46.     UT-Austin offered two reasons for why it needed to grant a preference to African-American and Hispanic applicants to achieve student-body diversity. First, it claimed a lack of "sufficient diversity" at the classroom level. Second, it pointed to "significant differences between the racial and ethnic makeup of the University's undergraduate population and the state's population."

47.     UT-Austin did not project a date when it would stop using race in admissions decisions. Instead, UT-Austin committed to review its policy in five years.

**E.     2008-2016: The *Fisher* Litigation**

48.     In the spring of 2008, Abigail Fisher, a white high school student from Sugar Land, Texas, was denied admission to UT-Austin.

49.     Shortly thereafter, Ms. Fisher sued UT-Austin in this Court, claiming that UT-Austin's use of race in admissions violated her rights under the Equal Protection Clause and Title VI. Ms. Fisher did not seek to overturn the Supreme Court's precedent that universities have a compelling interest in using race as a factor in admissions decisions to pursue "diversity."

50.     During the litigation, UT-Austin conceded that "it is undisputed that race is a meaningful factor that can make a difference in the evaluation of a student's application."

51.     UT-Austin claimed, however, that its use of race was narrowly tailored to pursue a compelling interest in racial diversity. In particular, UT-Austin claimed that it needed to use race in the admissions process to achieve a "critical mass" because its enrollment of African Americans and Hispanics lagged behind each group's segment of Texas's population, and because a significant number of its small classes did not have at least two African Americans, two Hispanics, and two Asian Americans.

52.     UT-Austin further argued that its use of race was "narrowly tailored" to advance these interests because its admissions program was holistic, was not a quota, and included a plan to review the need for racial preferences every five years.

53.     This Court granted UT-Austin summary judgment, and the U.S. Court of Appeals for the Fifth Circuit affirmed. The U.S. Supreme Court, however, granted certiorari and vacated the Fifth Circuit's decision. The Supreme Court held that the court of appeals had failed to apply the correct standard of strict scrutiny. *See Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013) ("*Fisher I*").

54.     In a majority opinion authored by Justice Kennedy and joined by seven Justices, the Supreme Court instructed the Fifth Circuit on remand to review the summary-judgment record under traditional strict scrutiny, which required a determination of "whether the University has offered sufficient evidence that would prove that its admissions program is narrowly tailored to obtain the educational benefits of diversity." *Id.* at 314.

55.     The Court explained that "strict scrutiny" required UT-Austin "to demonstrate with clarity that its 'purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary ... to the accomplishment of that purpose.'" *Id.* at 309. That meant the reviewing court must "verify that it is 'necessary' for [UT-Austin] to use race to achieve the

educational benefits of diversity," and demand proof from UT-Austin that "no workable race-neutral alternatives would produce the educational benefits of diversity." *Id.* at 312.

56.     Justice Scalia concurred, noting that Ms. Fisher had not "ask[ed] us to overrule Grutter's holding that a 'compelling interest' in the educational benefits of diversity can justify racial preferences in university admissions" and stressing his view that "[t]he Constitution proscribes government discrimination on the basis of race, and state-provided education is no exception." *Id.* at 315 (Scalia, J., concurring).

57.     Justice Thomas also concurred, writing separately to explain that he would overrule *Grutter*, find UT-Austin's admissions policies unconstitutional, and hold that "a State's use of race in higher education admissions decisions is categorically prohibited by the Equal Protection Clause." *Id.* (Thomas, J., concurring).

58.     Justice Ginsburg dissented. Justice Ginsburg would have affirmed on the basis that UT-Austin's admissions policies were narrowly tailored to achieve a compelling interest of student-body diversity.

59.     On remand, UT-Austin abandoned its claimed interests in "demographic parity" and "classroom diversity" and forwarded a new defense: intra-racial diversity. According to UT-Austin, it needed to use racial preferences to enroll underrepresented minorities that come from "an integrated community" and who are "not the first in their family to attend college." More specifically, UT-Austin claimed that it needed to enroll underrepresented minorities who, unlike those admitted via the Top Ten Percent Plan, do not reinforce stereotypes that Hispanics come from "the valley or African-Americans from the inner city." In short, UT-Austin claimed that racial preferences were needed not to ensure a critical mass of underrepresented minorities, but to ensure it enrolls enough minorities with "a different set of experiences and backgrounds" from those admitted through the Top Ten Percent Plan.

60. Over Judge Garza's dissent, the Fifth Circuit again affirmed the grant of summary judgment to UT-Austin, and the U.S. Supreme Court again granted certiorari. In a 4-3 decision, the U.S. Supreme Court affirmed. *See Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198 (2016) ("*Fisher II*").

61. Writing for the majority, Justice Kennedy ruled that UT-Austin's use of racial classifications and admissions preferences—as implemented in 2008—satisfied strict scrutiny. The Supreme Court warned, however, that "affirmance of the University's admissions policy today does not necessarily mean the University may rely on that same policy without refinement." *Id.* at 2215. UT-Austin has an "ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies." *Id.*

62. In particular, the Court stressed that "studies undertaken over the eight years since" 2008, when Ms. Fisher applied to UT-Austin, "may be of significant value in determining the constitutionality of the University's current admissions policy." *Id.* at 2209. Unlike the record before the Court, which was "almost devoid of information about the students who secured admission to the University through the [Top Ten Percent] Plan," future courts would be able to assess "how students admitted solely based on their class rank differ in their contribution to diversity from students admitted through holistic review." *Id.*

63. Thus, the Court cautioned, "[t]he type of data collected [since 2008], and the manner in which it is considered, will have a significant bearing on how [UT-Austin] must shape its admissions policy to satisfy strict scrutiny in the years to come." *Id.* at 2210. UT-Austin's admissions policies would survive strict scrutiny only if the university "tailor[ed] its approach in light of changing circumstances, ensuring that race plays no greater role than is necessary to meet its compelling interest," and used the "valuable data" it collected to "scrutinize the fairness of its admissions program; to assess whether changing demographics have undermined the need for a race-conscious policy; and

to identify the effects, both positive and negative, of the affirmative-action measures it deems necessary." *Id.* at 2210, 2214-15.

64.     Justice Thomas dissented, writing separately to reiterate that the Court should overrule *Grutter*, hold "that a State's use of race in higher education admissions decisions is categorically prohibited by the Equal Protection Clause," and find UT-Austin's admissions system unconstitutional. *Id.* at 2215 (Thomas, J., dissenting).

65.     According to Justice Thomas, "[t]he Constitution abhors classifications based on race because every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all. That constitutional imperative does not change in the face of a 'faddish theory' that racial discrimination may produce 'educational benefits.'" *Id.*

66.     Justice Alito also dissented, concluding that UT-Austin's admissions system could not satisfy strict scrutiny because the university had not defined any of its alleged interests— "educational benefits of diversity," "demographic parity," "classroom diversity," "intraracial diversity," and "avoiding racial isolation"—with clarity, and had failed to demonstrate that its program was narrowly tailored to achieve any of these interests. *Id.* at 2224 (Alito, J., dissenting).

67.     "What is at stake," according to Justice Alito, "is whether university administrators may justify systematic racial discrimination simply by asserting that such discrimination is necessary to achieve 'the educational benefits of diversity,' without explaining—much less proving—why the discrimination is needed or how the discriminatory plan is well crafted to serve its objectives. Even though UT has never provided any coherent explanation for its asserted need to discriminate on the basis of race, and even though UT's position relies on a series of unsupported and noxious racial assumptions, the majority concludes that UT has met its heavy burden. This conclusion is remarkable—and remarkably wrong." *Id.* at 2242-43.

**F.      The Kroll Report: Uncovering Admissions Preferences for the Privileged**

68.     UT-Austin has described its "holistic" admissions process as an objective evaluation in which "trained admissions officers" evaluate each applicant as a "whole person" to determine whether he or she has "a genuine commitment to [the university's] core values—learning, discovery, freedom, leadership, individual opportunity and responsibility." UT-Austin claims that it uses this process to, among other things, admit underrepresented minorities who have qualities that underrepresented minorities admitted under the Top Ten Percent Law uniquely lack.

69.     The reality, however, is that UT-Austin has used the latitude created by this process to allow politically connected individuals—such as donors, alumni, legislators, members of the Board of Regents, and UT-Austin officials and faculty—to get family members and other friends admitted to UT-Austin, despite having grades and standardized test scores substantially below the median for admitted students.

70.     UT-Austin never disclosed this secret admissions process during the *Fisher* litigation.

71.     The secret practice came to light only because a former admissions officer became a whistleblower, and then public pressure forced UT-Austin to independently investigate this surreptitious practice.

72.     Known as the "Kroll Report," the investigation revealed that UT-Austin's "holistic review" process is regularly overridden through application "holds" placed at the request of the university's president.

73.     The Kroll Report was published during the *Fisher II* litigation, but given the late timing, the *Fisher II* majority declined to consider it in that case. *See* 136 S. Ct. at 2211-12; *see also id.* at 2240 & n.18 (Alito, J., dissenting).

74.     The Kroll Report found that UT-Austin's president, William Powers, placed "holds" on about 150 to 300 in-state applicants each year from 2009 to 2014. If a student received a "hold,"

UT-Austin's admissions office could not deny the student admission to the university without first speaking with President Powers.

75.    The Kroll Report found that most "holds" were "based on requests from Texas legislators and members of the Board of Regents." For example, in one "brazen" incident, a former elected official emailed UT-Austin to say a member of an "important" committee had a strong interest in seeing a student admitted and that there were "political and funding implications" tied to the student's admission. The student was then admitted.

76.    These well-connected individuals had an incredibly strong chance of receiving admission to UT-Austin. In particular, the Kroll Report found that UT-Austin admitted 73 percent of the applicants who received presidential "holds" and who did not qualify for automatic admission under the Top Ten Percent Plan. This acceptance rate was significantly higher than the acceptance rate for applicants undergoing "holistic review" during a similar period.

77.    Many of these well-connected "holds" secured admission despite grades and test scores substantially below the median for admitted students. For example, two underqualified applicants were admitted because they had "close ties to state legislators," despite having "very low high school grades (GPA range of 1.8 to 2.2) combined with SAT scores in the 800s (combined math and verbal)" and no "other obvious holistic attributes, other than positive letters of recommendation referencing the applicants' ties to the legislators."

78.    The Kroll Report found that UT-Austin's admissions office admitted these "holds" because of "frequent pressure placed on [it] to admit certain applicants." Indeed, in numerous cases, when the admissions office hesitated, President Powers overrode the "holistic review" process and ordered the applicants "admitted over the objection of the Admissions Office." For example, when the admissions director objected that one student was "so bad for so many reasons, there is no way I can admit this student," President Powers intervened and ordered that the student be admitted.

79.     The Kroll investigation also found that race was a central consideration in many of these admissions decisions. Investigators conducted detailed reviews of 73 applicants who were admitted "despite grades and test scores substantially below the median for admitted students" and found that "[i]n approximately 29%, or 21 of the 73 files reviewed, the contents of the files suggest that ethnic, racial, and state geographical diversity may have been an important consideration."

80.     By all indications, then, UT-Austin uses its "diversity" rationale primarily as pretext to justify the admission of underqualified, well-connected applicants.

81.     Despite the damning evidence contained in the Kroll Report, President Powers defended his admissions decisions. Admitting these well-connected applicants was appropriate, President Powers believed, because "relationships matter" and because the number of these students admitted was relatively small given the size of UT-Austin. According to Powers, "a similar process exists at virtually every selective university in America, and it does so because it serves the best interests of the institutions."

82.     There is no indication that UT-Austin has discontinued its policy of providing special admissions preferences to underqualified, well-connected applicants.

83.     Following the embarrassing Kroll Report, UT-Austin purported to enact "reforms" to prevent this favoritism. But the new policies still allow UT-Austin leadership to override admissions decisions and admit students who otherwise would have been considered unqualified.

84.     According to a former member of the Board of Regents, UT-Austin's admissions policies are a "joke" and "don't have the appropriate safeguards in place to ensure the wealthy and powerful can't short circuit the normal admissions process."

85.     And the university president is not the only one with the demonstrated power to play favorites or to exert undue influence on the admissions process. In 2019, UT-Austin was part of the scandal in which school administrators, athletics officials, and coaches were accused of accepting

bribes in order to circumvent the admissions process. The investigation found that then-UT-Austin's men's tennis coach had accepted a bribe to admit a student under the guise of recruiting him.

### G.   Post-*Fisher II*: UT-Austin Continues to Rely on Race-Based Admissions

86.    Since *Fisher II* was decided, UT-Austin has repeatedly acknowledged that it continues to use race in the admissions process.

87.    On June 23, 2016, the same day *Fisher II* was issued, UT-Austin's President, Gregory Fenves, applauded the decision, claiming that the Court had recognized "the university's right to continue using race and ethnicity as one factor in our holistic admissions process."

88.    In March 2017, UT-Austin released its "University Diversity and Inclusion Action Plan" ("UDIAP"), in which it outlined its plan to continue using race in its admissions decisions as a result of "the university's successful defense of its admissions policy in the *Fisher* case." The UDIAP's discussion of the need for race-based admissions was less than one page.

89.    In the UDIAP, UT-Austin acknowledged that its student body (which is admitted largely through the race-neutral Top Ten Percent Plan) consists of "a majority of non-white students."

90.    Nevertheless, the UDIAP stated that UT-Austin still needed to use race in its admissions decisions because certain minorities "are underrepresented in certain areas of study, including business, engineering, and the sciences" and there was a "need to include diversity within groups to break down stereotypes." UT-Austin's ultimate goal, according to the UDIAP, was to "achieve a level of enrollment whereby students from underrepresented groups no longer feel isolated." The UDIAP did not identify the level of enrollment necessary to ensure that these groups did not "feel isolated." Despite claiming in 2004 that it would systematically study and review the need for racial preferences every five years, there is no indication that UT-Austin has conducted another study.

91.     For recent admissions cycles, UT-Austin has continued to ask students to classify themselves from among a select group of broad racial categories on the application, *see Fisher I*, 570 U.S. at 306, and it still discriminates on the basis of race in admitting the portion of the freshman class enrolled outside the operation of the Top Ten Percent Plan.

92.     In other words, UT-Austin gives special preference to applicants who fall within racial categories that the university considers "underrepresented." Given the limited number of spaces in UT-Austin's freshman class, granting a racial preference to African American and Hispanic applicants diminishes the chances of admission for White and Asian-American applicants. *Cf. Fisher II*, 136 S. Ct. at 2227 (Alito, J., dissenting) ("[T]he UT plan discriminates *against* Asian–American students.").

93.     In 2009, the Texas Legislature authorized UT-Austin to cap the number of students it admitted through the Top Ten Percent Plan at 75% of the entering class. *See* Tex. Educ. Code §51.803(a-1). In practice, this means that students now must be ranked higher than the top ten percent of their graduating classes to be admitted through the Top Ten Percent Plan. For example, in the most recent class, the Top Ten Percent Plan provided automatic admission to Texas students in the top 6% of their graduating high school classes.

94.     Since 2010, the Top Ten Percent Plan has given automatic admission to students in the follow percentages of their graduating classes:

| Admitted Class | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rank Needed for Auto Admission | Top 10% | Top 8% | Top 9% | Top 8% | Top 7% | Top 7% | Top 8% | Top 7% | Top 7% | Top 6% | Top 6% |

95.     Under Texas law, the 75% cap on admissions under the Top Ten Percent Plan will be removed if "a final court order applicable to the institution prohibits the institution from considering an applicant's race or ethnicity as a factor in the institution's decisions relating to first-time undergraduate admissions." Tex. Educ. Code §51.803(k)(1).

96.     UT-Austin has been transparent about its continued—indeed, its *increased*—reliance on race in other ways as well.

97.     From 2008 through 2017, UT-Austin publicly reported that "racial/ethnic status" was a factor that was merely "considered" in the admissions process. Other factors, such as class rank and the rigor of the student's academic record, were "very important" in the admissions process and thus given more weight in the admissions process.

98.     Feeling liberated by *Fisher II*, however, UT-Austin has increased its reliance on race. UT-Austin now reports that an applicant's "racial/ethnic status" is a "very important" factor in UT-Austin's admissions decisions. Thus, to UT-Austin, a student's skin color is equally important to admissions as class rank, test scores, extracurricular activities, and other accomplishments.

## IV.    UT-Austin's Race-Neutral Alternatives to Achieve Student Body Diversity

### A.     The Combination of the Top Ten Percent Plan and Race-Neutral Holistic Admissions Can Achieve Student Body Diversity on UT-Austin's Campus.

99.     Things have changed dramatically since 2008 when Abigail Fisher was rejected by UT-Austin and filed her lawsuit.

100.    As the following chart shows, there has been a steady increase in racial diversity since 2008:

| Year (Class Entering in Summer/ Fall) | Race/Ethnicity of Applicant | | | |
|---|---|---|---|---|
| | White | Hispanic | African American | Asian |
| **2008** | 51% | 21% | 6% | 18% |
| **2009** | 51% | 21% | 5% | 19% |
| **2010** | 49% | 23% | 5% | 17% |

*University of Texas at Austin Admissions Share of Total Students Admitted by Race*

| | | | | |
|---|---|---|---|---|
| **2011** | 48% | 22% | 5% | 19% |
| **2012** | 45% | 25% | 5% | 18% |
| **2013** | 45% | 24% | 5% | 19% |
| **2014** | 43% | 23% | 5% | 21% |
| **2015** | 40% | 24% | 5% | 22% |
| **2016** | 38% | 26% | 5% | 21% |
| **2017** | 38% | 27% | 5% | 22% |
| **2018** | 36% | 27% | 6% | 23% |

101.    As the data show, in 2008, the majority of those admitted to UT-Austin (51%) were white. Only 21% of admitted students were Hispanic and 18% of admitted students were Asian.

102.    By 2018, however, barely a third of those admitted to UT-Austin (36%) were white. But the Hispanic and Asian share of the admitted class had increased to 27% and 23%, respectively.

103.    The race-neutral Top Ten Percent Plan has driven this increased diversity. The following chart shows the racial makeup of those students admitted through the Top Ten Percent Plan:

| University of Texas at Austin Admissions Share of Students Admitted Via Top Ten Percent Plan by Race | | | | |
|---|---|---|---|---|
| **Year (Class Entering in Summer/Fall)** | **Race/Ethnicity of Applicant** | | | |
| | **White** | **Hispanic** | **African American** | **Asian** |
| **2010** | 44% | 28% | 6% | 17% |
| **2011** | 41% | 29% | 6% | 19% |
| **2012** | 39% | 31% | 6% | 18% |
| **2013** | 38% | 31% | 5% | 20% |
| **2014** | 36% | 30% | 5% | 22% |

| | | | | |
|---|---|---|---|---|
| **2015** | 34% | 33% | 7% | 21% |
| **2016** | 33% | 34% | 6% | 21% |
| **2017** | 33% | 34% | 6% | 21% |
| **2018** | 30% | 35% | 6% | 23% |

104.    As the data show, in 2010, among those students admitted through the Top Ten Percent Plan, 44% were white, but only 28% were Hispanic and 17% were Asian.

105.    By 2018, however, those numbers had changed dramatically. Among those students admitted through the Top Ten Percent Plan, 35% were Hispanic, 30% were white, and 23% were Asian.

106.    The racial makeup of those admitted through the Top Ten Percent Plan contrasts starkly with the makeup of the rest of the admitted students. The following chart shows the racial makeup of those students admitted outside of the Top Ten Percent Plan:

| University of Texas at Austin Admissions<br>Share of Students Admitted Outside the Top Ten Percent Plan by Race | | | | |
|---|---|---|---|---|
| **Year<br>(Class Entering in Summer/Fall)** | **Race/Ethnicity of Applicant** | | | |
| | **White** | **Hispanic** | **African American** | **Asian** |
| **2010** | 62% | 10% | 3% | 17% |
| **2011** | 60% | 11% | 4% | 18% |
| **2012** | 57% | 13% | 4% | 17% |
| **2013** | 58% | 11% | 4% | 19% |
| **2014** | 54% | 12% | 4% | 20% |
| **2015** | 50% | 11% | 3% | 24% |
| **2016** | 47% | 13% | 4% | 22% |

| | | | | |
|---|---|---|---|---|
| **2017** | 47% | 15% | 5% | 24% |
| **2018** | 45% | 15% | 5% | 24% |

107.     As the data show, in 2018, there were *three times as many* white students than Hispanics (45% v. 15%) who were admitted outside of the Top Ten Percent Plan. Indeed, more white students were admitted outside of the Top Ten Percent Plan than were Hispanics, African Americans and Asians *combined* (45% v. 44%).

108.     Ironically, then, UT-Austin's use of "holistic review" actually *diminishes* racial diversity in the aggregate, given the success of the Top Ten Percent Plan.

109.     In the most recent admissions cycle (2019), this pattern has continued. The following chart shows the share of students from Texas admitted to UT-Austin by race and automatic admission status:

| 2019 Admitted Students from Texas by Race and Automatic Admission Status | | | | |
|---|---|---|---|---|
| **Method of Admission** | **Race/Ethnicity of Applicant** | | | |
| | **White** | **Hispanic** | **African American** | **Asian** |
| **Admitted Via Top Ten Percent Plan** | 29% | 36% | 6% | 24% |
| **Admitted Outside the Top Ten Percent Plan** | 42% | 22% | 6% | 24% |

110.     Moreover, many of the underrepresented minority students admitted through "holistic review" would have been admitted regardless of whether UT-Austin used race as a factor in admissions, due to their academic achievements, extracurricular activities, and other non-race-based factors.

111.     Thus, UT-Austin has a ready-made formula for achieving racial diversity—maintain or increase the use of the Top Ten Percent Plan and admit the rest through race-neutral means.

112.     UT-Austin does not need to continue its odious reliance on race in order to achieve a diverse class.

**B.      UT-Austin Has Additional Race-Neutral Alternatives Available That Can Achieve Racial Diversity.**

113.     The Top Ten Percent Plan is not the only race-neutral alternative available to UT-Austin.

114.     UT-Austin could achieve racial diversity by employing race-neutral alternatives *in addition to* the Top Ten Percent Plan.

115.     UT-Austin also could achieve racial diversity by eliminating the Top Ten Percent Plan and adopting new race-neutral admissions policies.

116.     Available race-neutral alternatives include but are not limited to: increased use of non-racial preferences; increased use of financial aid, scholarships, and recruitment to attract and enroll minority applicants; and elimination of admissions policies and practices that operate to the disadvantage of minority applicants.

117.     Furthermore, eliminating racial preferences at UT-Austin will alleviate the substantial harm that these discriminatory policies cause to those minority applicants who receive admissions preferences, to the Texas community, and to society as a whole.

**1.      UT-Austin Can Achieve Student Body Diversity Without Using Race as a Factor in Admissions Decisions by Making Greater Use of Non-Racial Preferences.**

118.     Colleges and universities that have eliminated race-based admissions have maintained or increased their student body diversity by placing greater emphasis on socioeconomic factors, which often strongly correlate with race but are not exclusively reserved for applicants of a particular race or ethnicity. Using socioeconomic preferences thus increases racial diversity *and* achieves the broader diversity that UT-Austin claims to seek by opening the door of opportunity for poor students of all races.

119.     In one study of ten leading public universities that ended race-based admissions preferences, researchers found that seven of these schools maintained or increased their enrollment of African-American and Hispanic students by adopting strategies that target socioeconomic inequality. *See* Halley Potter, *Transitioning to Race-Neutral Admissions: An Overview of Experiences in States Where Affirmative Action Has Been Banned*, The Future of Affirmative Action (2014).

120.     For example, the University of Colorado has devised an admissions formula that gives a significant preference to students from socioeconomically disadvantaged backgrounds. This refined formula considers numerous socioeconomic factors, including single-parent status, parents' education level, family income, native language, the number of dependents in the family, whether the applicant attended a rural high school, the percentage of students from the applicant's high school who are eligible for free or reduced-price lunch, the school-wide student-to-teacher ratio, and the size of the twelfth-grade class.

121.     Under this admissions program, the University of Colorado increased not only the socioeconomic diversity of its incoming class but also its racial and ethnic diversity. African-American and Hispanic acceptance rates to the University of Colorado increased from 56 percent under race-based admissions to 65 percent under class-based admissions. *See* Matthew N. Gaertner, *Advancing College Access with Class-Based Affirmative Action*, The Future of Affirmative Action (2014).

122.     Similarly, researchers conducted a national simulation of elite universities to determine whether the use of socioeconomic preferences could achieve student body diversity without the use of racial preferences. *See* Anthony P. Carnevale, Stephen J. Rose, Jeff Strohl, *Achieving Racial and Economic Diversity with Race-Blind Admissions Policy*, The Future of Affirmative Action (2014). The study simulated various admissions models at the top-rated 193 colleges and universities "because the dialogue about affirmative action often implies that it is access to these schools and the opportunities they provide in business, social and career advancement that truly matters." The study examined,

among other things, the effect of substituting socioeconomic preferences for race-based preferences at America's elite college and universities using test scores and high-school grades as measures of merit.

123.   The national simulation ultimately found that "it is possible to achieve both racial and economic diversity in selective colleges without using race *per se* as an admissions criterion" and, importantly, that it could be achieved consistent with the understanding "that affirmative action models ought to promote racial diversity as an educational benefit instead of promoting racial diversity for its own sake."

124.   Another study found that increased focus on parental education and wealth—as opposed to income—as a measure of socioeconomic status also can help achieve student body diversity without the use of racial preferences. *See* Dalton Conley, *The Why, What, and How of Class-Based Admissions Policy*, The Future of Affirmative Action (2014). The study found that "the most important factor in predicting individual academic success is the education of a parent" and the "economic factor" that mattered most was "parental net worth (that is, wealth) and not income." Indeed, "wealth conceptually captures the legacy of historical inequalities of opportunity better than aspects of class that cannot be literally transferred directly from one generation to the next by signing a check (or a deed or a will)." While African Americans make on the order of 60 to 70 percent of what whites make in income, the median African-American family wealth is just 10 percent of median white family wealth.

125.   Finally, placing greater emphasis on community-based preferences—via the Top Ten Percent Plan that UT-Austin already has in place, or other means—would promote greater socioeconomic, geographic, and racial diversity in the student body. UT-Austin's own data, as well as the studies of scholars and universities, support this principle.

126.    Community-based preferences result in the admission of more socioeconomically disadvantaged students. *See* Sheryll Cashin, *Place, Not Race: A New Vision of Opportunity in America* (2014). African Americans and Hispanics are much more likely to live in neighborhoods with concentrated poverty than whites. *See* John R. Logan, *Separate and Unequal: The Neighborhood Gap for Blacks, Hispanics, and Asians in Metropolitan America* (2011), Table 2.

127.    In addition to statewide percentage plans, a university can achieve student body diversity by granting a preference based on only community metrics, such as an applicant's zip code. *See* Danielle Allen, *Talent Is Everywhere: Using Zip Codes and Merit to Enhance Diversity*, The Future of Affirmative Action (2014).

128.    Studies show that students admitted based on socioeconomic as opposed to racial criteria regularly outperform all other admitted students. These students drop out at lower rates, graduate in shorter time periods, and receive better grades.

129.    Indeed, one benefit of UT-Austin's Top Ten Percent Plan is that it broadens racial and socioeconomic diversity, which can be reinforcing. In 2019, for example, Texas students admitted through the Top Ten Percent Plan were far more likely to be socioeconomically disadvantaged than those admitted outside of the Plan:

| University of Texas at Austin Admissions 2019 Admitted Students from Texas | | |
|---|---|---|
| **Annual Household Income** | **Admitted via Top Ten Percent Plan** | **Admitted Outside Top Ten Percent Plan** |
| **Less than $20,000** | 7% | 3% |
| **$20,000 - $39,999** | 12% | 6% |
| **$40,000 - $59,999** | 10% | 5% |
| **$60,000 - $79,999** | 7% | 5% |
| **$80,000 - $99,999** | 7% | 5% |

| $100,000 - $149,999 | 14% | 12% |
| $150,000 - $199,999 | 8% | 9% |
| **More than $200,000** | 15% | 28% |

130.    As the data show, the Top Ten Percent Plan admits *more than twice* as many students coming from households reporting less than $60,000 than those admitted through "holistic review" (29% v. 14%). By contrast, *nearly twice as many* students coming from households making more than $200,000 are admitted through "holistic review" (28% v. 15%).

131.    By increasing the weight given to an applicant's socioeconomic status or community of origin, UT-Austin can achieve broader student body diversity (including broader intra-racial diversity), without resorting to the disfavored tool of racial preferences.

> **2.    UT-Austin Can Achieve Student Body Diversity Without Using Race as a Factor in Admissions Decisions by Making Greater Use of Financial Aid and Scholarships to Attract Minority Candidates.**

132.    To ensure that underprivileged minorities that benefit from socioeconomic preferences are in a position to accept an offer of admission and enroll, UT-Austin can also increase its use of financial aid and scholarships.

133.    Colleges and universities that have eliminated racial preferences have maintained or increased student body diversity by offering more financial aid to socioeconomically disadvantaged students. For example, the University of California system, which does not use race-based preferences, covers tuition for students from families with incomes below $80,000.

134.    The UT-System has a $31 *billion* endowment. This is the second largest endowment in the United States. Only Harvard's is larger.

135.    As the director of the Center for College Affordability and Productivity has explained, "UT is one of the most well endowed universities…. But if you look at the use of the funds, very little of that money is used for financial aid." *See* Maria Mendez, *Balancing UT's Budget and Rising Tuition:*

*Where Does the University's Money Come From and Where Does It Go?*, Daily Texan (Feb. 23, 2018), https://bit.ly/3cvfE0r.

136.    UT-Austin has the economic resources to increase its financial aid far beyond current levels. Doing so would make it possible for underprivileged minorities, especially those in the lower middle class and those who may have slightly higher income levels but less wealth, admitted to UT-Austin through the increased use of socioeconomic preferences (as opposed to the affluent minorities currently being admitted due to racial preferences) to be in a position to accept an offer of admission and enroll at UT-Austin.

### 3. UT-Austin Can Achieve Student Body Diversity Without Using Race as a Factor in Admissions Decisions Through Increased Recruitment and Other Steps Designed to Encourage More Qualified Minority Students to Apply for Admission.

137.    UT-Austin can achieve student body diversity by bringing more highly qualified, socioeconomically disadvantaged minorities into its applicant pool. Across the country, there are tens of thousands of socioeconomically disadvantaged, high-achieving minorities who fail to even apply to selective schools, including UT-Austin. If they applied, they would likely be admitted and would enroll if offered sufficient financial aid.

138.    One study found that between 25,000 and 35,000 socioeconomically disadvantaged high school seniors obtained an SAT or ACT in the 90th percentile or higher and have a GPA of A- or better. Nearly 6 percent of this group is African American and nearly 8 percent is Hispanic. A great many of these socioeconomically disadvantaged students "undermatch" by applying to and enrolling at colleges and universities less selective than the ones to which they could have been admitted. *See* Caroline Hoxby, Christopher Avery, *The Missing "One-Offs": The Hidden Supply of High Achieving, Low-Income Students*, Brookings Papers on Economic Activity (Spring 2013).

139.     Another way to reach potential applicants both inside and outside of Texas is by mailing a well-designed, targeted brochure to high-achieving, socioeconomically disadvantaged students. *See* Sheryll Cashin, *Place, Not Race, A New Vision of Opportunity in America* 49 (2014).

140.     Universities also have achieved student body diversity by aggressively recruiting high-achieving community college students, who are more likely to be African American or Hispanic. For example, in 1997, after California banned racial preferences, the University of California substantially increased its recruitment and enrollment of community college students. As a result of its efforts, by 2012, about 29 percent of new students enrolling in the University of California system were transfers from community colleges. *See* Preparing California for Its Future: Enhancing Community College Student Transfer to the University of California (2014).

141.     Though UT-Austin has engaged in community college partnerships, it can do far more to recruit high-achieving socioeconomically disadvantaged minority students or high-achieving community college students. For example, in the 2009-2010 academic year, UT-Austin admissions staff attended 58 Texas Community College Fairs. But by 2018-2019, UT-Austin staff attended only 38 Texas Community College Fairs, more than a 34% drop in recruitment of such students.

142.     UT-Austin could achieve student body diversity without the use of racial preferences by improving its recruitment of socioeconomically disadvantaged, high-achieving minorities and community college students.

###     4.     UT-Austin Can Achieve Student Body Diversity Without Using Race as a Factor in Admissions Decisions Through Elimination of Admissions Policies and Practices That Harm Minorities.

143.     UT-Austin employs admissions practices and policies that make it more difficult for socioeconomically disadvantaged minorities to gain admission. Eliminating these practices and policies would allow UT-Austin to achieve greater student body diversity without using racial preferences.

144.    UT-Austin purports not to grant admissions preferences based on legacy status. Yet the Kroll Report exposes that UT-Austin uses the latitude created by the cover of "holistic review" to allow politically connected individuals to get family members and other friends admitted to UT-Austin. UT-Austin claims to have reduced this practice, yet it concedes that such favoritism to the well-connected still occurs.

145.    At most universities throughout the country, children of alums and the well-connected are less likely to be socioeconomically disadvantaged or racial minorities than the rest of the student body. Thus, colleges and universities that grant admissions preferences to legacies and well-connected students give a competitive advantage to mainly white, wealthy applicants, while undermining the chances for admission of socioeconomically disadvantaged and minority applicants. *See* John Brittain and Eric L. Bloom, *Admitting the Truth: The Effect of Affirmative Action Legacy Preferences, and the Meritocratic Ideal on Students of Color in College Admissions*, Affirmative Action for the Rich (2010).

146.    As a consequence, eliminating connection preferences—be they legacy, donor, political, or other—in conjunction with other race-neutral admissions policies can achieve greater student body diversity.

### 5.    Achieving Student Body Diversity Through Race-Neutral Means Eliminates the Serious Harms Caused by Racial Preferences.

147.    Any assessment of the feasibility of race-neutral alternatives must also take into account the heavy costs of *not* employing them. The costs of continuing to use racial preferences when workable race-neutral alternatives exist are high.

148.    "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher I*, 570 U.S. at 309. As a result, the Fourteenth Amendment, and therefore Title VI, "forbids the use even of narrowly drawn racial classifications except as a last resort." *Croson*, 488 U.S. at 519 (Kennedy, J., concurring in part and concurring in the judgment).

149.    UT-Austin's practice of labeling all applicants with broad racial categories illustrates why such classifications are pernicious and always create the "danger that a racial classification is merely the product of unthinking stereotypes or a form of racial politics." *Croson*, 488 U.S. at 510.

150.    These racial categories lump students together in categories such as "Black or African American" or "Hispanic" or "Asian," even though students in these categories come from vastly different cultures, experiences, and backgrounds.

151.    For example, UT-Austin's category of "Asian" comprises roughly 60 percent of the world's population, including individuals of Chinese, Japanese, Korean, Vietnamese, Cambodian, Hmong, and Indian descent.

152.    While many Asian Americans have been in the United States for generations, others are recent immigrants or children of immigrants. Some Asian Americans came to the United States to escape communism, authoritarianism, war, and poverty, while others simply sought out greater opportunities. Some Asian Americans came from highly educated families, but many others did not. Asian Americans also have a wide range of religious beliefs, including Christianity, Islam, Buddhism, Judaism, Hinduism, and many others.

153.    Indian-American students are different from Chinese-American students, for example; and students from Mainland China, Hong Kong, and Taiwan all have unique perspectives and cultural experiences. *Cf. Fisher II*, 136 S. Ct. at 2229 (Alito, J., dissenting) ("It would be ludicrous to suggest that all of these students have similar backgrounds and similar ideas and experiences to share.").

154.    Similar diversity exists within broad categorical labels like "Black or African American" and "Hispanic."

155.    Given this diversity, it is lamentable that UT-Austin lumps broad racial groups together in the admissions process. Yet this categorization is the inevitable byproduct of using group-

based racial classifications instead of employing race-neutral alternatives that are able to account for the vast differences among applicants.

156.    Racial classifications also have a stigmatizing effect on the supposed beneficiaries of these policies. Irrespective of whether an individual Black or Hispanic applicant is admitted to UT-Austin because of racial preferences, so long as racial preferences exist it will often be assumed that race is the reason for the applicant's admission. This stigma can have a devasting effect on the psyche of young adults.

157.    For example, according to one African-American student who attended an elite liberal arts college, upon arriving at school, "I was immediately stereotyped and put into a box because I was African American. And that made it harder to perform…. There was a general feeling that all blacks on campus were there either because they were athletes or they came through a minority-recruitment program and might not really belong there." Shaken by the experience, the student dropped out after his freshman year.

158.    Additionally, the Department of Justice recently completed a two-year investigation of Yale University's admissions practices and concluded that "Yale's race discrimination imposes undue and unlawful penalties on racially-disfavored applicants, including in particular Asian American and White applicants." U.S. Dep't of Justice, *Notice of Violation of Civil Rights Act of 1964*, DJ 169-14-30 (Aug. 13, 2020). The Department also faulted Yale for using race in a "standardless" manner and doing "virtually nothing to cabin, limit, or define its use of race during the Yale College admissions process." *Id.*

159.    UT-Austin can eliminate the harmful effects that these unfair stereotypes cause by using race-neutral alternatives.

160.    Finally, the "mismatch effect" of racial preferences far too frequently puts the supposed beneficiaries of race-based admissions policies in a position where they cannot succeed academically in order to fulfill the university's social-engineering vision.

161.    This "mismatch" effect happens when a school employs such a large admissions preference that the student is academically harmed in a variety of ways by being placed in an academic environment where most of the student's peers have substantially stronger levels of academic preparation.

162.    The "mismatch effect" has been documented in dozens of studies. *See, e.g.*, Peter Arcidiacono, Esteban M. Aucejo, and Ken Spenner, *What Happens After Enrollment? An Analysis of the Time Path of Racial Differences in GPA and Major Choice* (2012); U.S. Commission on Civil Rights, *Encouraging Minority Students to Pursue Science, Technology, Engineering and Math Careers*, Briefing Report (October 2010); Richard Sander and Roger Bolus, *Do Credential Gaps in College Reduce the Number of Minority Science Graduates?* (2009); Richard Sander, *A Systemic Analysis of Affirmative Action in American Law Schools*, 57 Stan. L. Rev. 367 (2004); Stephen Cole and Elinor Barber, *Increasing Faculty Diversity* (2003); Roger Elliot, A. Christopher Strenta, Russell Adair, Michael Matier, and Jannah Scott, *The Role of Ethnicity in Choosing and Leaving Science in Highly Selective Institutions*, 37 Res. Higher Educ. 681 (1996).

163.    As this research demonstrates, African-American college freshman are more likely to aspire to science or engineering careers than are white freshmen, but mismatch causes African Americans to abandon these fields at twice the rate of whites.

164.    As a consequence, African Americans who start college interested in pursuing a doctorate and an academic career are twice as likely to be derailed from this path if they attend a school where they are mismatched.

165.    Mismatch also creates social problems on campus. The academic research shows that interracial friendships are more likely to form among students with relatively similar levels of academic

preparation; thus, African Americans and Hispanics are more socially integrated on campuses where they are less academically mismatched.

166.    UT-Austin has experienced and continues to experience the "mismatch effect." For example, the four-year graduation rates of Black students and Hispanic students trail significantly behind the graduation rate of white students.

167.    UT-Austin can eliminate this harmful mismatch and allow students to excel at schools for which they are most prepared by eliminating the use of racial preferences and employing race-neutral alternatives that bring high-performing socioeconomically disadvantage minorities into the applicant pool.

## V.    UT-Austin Is Engaging in Racial Balancing.

168.    Not only does UT-Austin discriminate on the basis of race in its admissions decisions, but it racially balances its entering freshman class to ensure a specific proportional representation of African-American students.

169.    UT-Austin's system of racial balancing is evident from direct statistical evidence. This evidence confirms that UT-Austin is not using racial preference to pursue a "critical mass" or any other diversity goal the Supreme Court has ever found permissible. It is using racial preferences instead to achieve a quota of African-American students.

170.    As shown in the following table, the representation of African-American students among admitted and enrolled students remained remarkably stable over the past decade.

| University of Texas at Austin Admissions Share of Total Students Admitted Who Are African American | |
|---|---|
| Year (Class Entering in Summer/Fall) | African American |
| 2009 | 5% |
| 2010 | 5% |
| 2011 | 5% |
| 2012 | 5% |
| 2013 | 5% |
| 2014 | 5% |
| 2015 | 5% |
| 2016 | 5% |
| 2017 | 5% |
| 2018 | 6% |

171.   As the data show, UT-Austin's admission of African-American students has been remarkably stable. Indeed, UT-Austin's admitted class was 5% African American in *nine out of the past ten years*. The only exception was 2018, when UT-Austin's admitted class was 6% African American.

172.   This uniform consistency in the admission of African-American students does not happen by accident.

173.   Indeed, there is evidence to suggest that UT-Austin uses its holistic admissions process to ensure that its admitted class of African Americans never strays from this historic range.

174.   For example, in 2015, when the Top Ten Percent Plan caused the admission of an uncharacteristically high percentage of African-American admissions (7%), UT-Austin correspondingly admitted its lowest ever percentage of African Americans outside of the Top Ten

Percent Plan (3%). Not surprisingly, the total share of African-American admits balanced out to 5% of the total admissions.

175.    The minor and often non-existent year-to-year deviations in admission numbers demonstrate UT-Austin's commitment to maintaining racial stability among African Americans, which is a distinct impermissible purpose from pursing diversity.

## VI.    Governing Law

176.    The Fourteenth Amendment provides, in relevant part, that no person shall be denied "the equal protection of the laws."

177.    Section 1981 of Title 42 of the U.S. Code provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

178.    Section 1983 of Title 42 of the U.S. Code provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

179.    Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

180.     Under Title VI, "the term 'program or activity' and the term 'program' mean all of the operations … of a college, university, or other postsecondary institution, or a public system of higher education … any part of which is extended Federal financial assistance." 42 U.S.C. §2000d-4a.

181.     An institution that accepts federal funds violates Title VI when it engages in racial or ethnic discrimination that violates the Equal Protection Clause. *See Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) ("We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." (citing *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001)).

182.     The "central mandate" of equal protection is "racial neutrality" by the government or institution subject to the Fourteenth Amendment. *Miller v. Johnson*, 515 U.S. 900, 904 (1995). "[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229-30 (1995).

183.     "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher I*, 570 U.S. at 309 (cleaned up). Thus, "any official action that treats a person differently on account of race or ethnic origin is inherently suspect." *Id.* at 310. In other words, "because racial classifications so seldom provide a relevant basis for disparate treatment, the Equal Protection Clause demands that racial classifications be subjected to the most rigid scrutiny." *Id.* at 309-10 (cleaned up).

184.     "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227. "Strict scrutiny is a searching examination, and it is the government that bears the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fisher I*, 570 U.S. at 310 (cleaned up). Strict scrutiny thus requires a

"detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed." *Adarand*, 515 U.S. at 227.

185.    In particular, strict scrutiny requires a "detailed examination, both as to ends and to means." *Id.* at 236. When governmental institutions implement policies and practices that "touch upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest." *Fisher I*, 570 U.S. at 307-08. Racial "classifications are constitutional only if they are narrowly tailored to further compelling governmental interests." *Grutter*, 539 U.S. at 326.

186.    "Strict scrutiny requires the university to demonstrate with clarity that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary to the accomplishment of its purpose." *Fisher I*, 570 U.S. at 309 (cleaned up).

187.    To meet strict scrutiny, the end must be "compelling"—not merely legitimate or important. To be narrowly tailored, "the means chosen" must "fit" the unmet compelling interest "so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493. In other words, "racial classification, however compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands." *Grutter*, 539 U.S. at 342.

188.    "To survive strict scrutiny," moreover, the institution "must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992). The government must establish the necessity of using race by a "strong basis in evidence" because "the mere recitation" of a compelling interest is "not an automatic shield which protects against any inquiry" into the justification for race-based action. *Croson*, 488 U.S. at 495, 500. Strict scrutiny "forbids the use even of narrowly drawn racial classifications except as a last resort." *Id.* at 519 (Kennedy, J., concurring in part and concurring in the judgment).

189.     Racial quotas violate the Fourteenth Amendment. In the educational setting, then, "universities cannot establish quotas for members of certain racial groups or put members of those groups on separate admissions tracks. Nor can universities insulate applicants who belong to certain racial or ethnic groups from the competition for admission." *Grutter*, 539 U.S. at 334 (citation omitted).

190.     Moreover, a university's policy violates the Fourteenth Amendment if it amounts to "racial balancing, which is patently unconstitutional." *Id.* at 330. Racial balancing is a program designed "to assure within [the school's] student body some specified percentage of a particular group merely because of its race or ethnic origin." *Id.* at 329. "[P]roportional representation" is never a constitutional "rationale for programs of preferential treatment." *Id.* at 343.

191.     The only interest in using racial preferences in higher education that the Supreme Court has accepted as "compelling" is the interest "in obtaining the educational benefits that flow from a diverse student body." *Id.* Redressing past discrimination does "not serve as a compelling interest, because a university's broad mission of education is incompatible with making the judicial, legislative, or administrative findings of constitutional or statutory violations necessary to justify remedial racial classification." *Fisher I*, 570 U.S. at 308 (cleaned up).

192.     The interest in student body diversity the Supreme Court has found compelling "is not an interest in simply ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students." *Id.* "[C]ritical mass is defined by reference to the educational benefits that diversity is designed to produce." *Grutter*, 539 U.S. at 330.

193.     Even in the pursuit of critical mass, the Supreme Court has permitted race to be used only as a "plus" factor in admissions decisions. *Id.* at 334. "[I]t remains at all times the University's obligation to demonstrate, and the Judiciary's obligation to determine, that admissions processes 'ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race

or ethnicity the defining feature of his or her application.'" *Fisher I*, 570 U.S. at 311-12 (quoting *Grutter*, 539 U.S. at 337). Thus, even if "the University has established that its goal of diversity is consistent with strict scrutiny, … there must still be a further judicial determination that the admissions process meets strict scrutiny in its implementation. The University must prove that the means chosen by the University to attain diversity are narrowly tailored to that goal." *Id.* at 311.

194.    "Narrow tailoring also requires that the reviewing court verify that it is 'necessary' for a university to use race to achieve the educational benefits of diversity. This involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications." *Id.* at 312. Accordingly, strict scrutiny "require[s] a court to examine with care, and not to defer to, a university's 'serious, good faith consideration of workable race-neutral alternatives.'" *Id.* (quoting *Grutter*, 539 U.S. at 339-40).

195.    "Consideration by the university is of course necessary, but it is not sufficient to satisfy strict scrutiny: The reviewing court must ultimately be satisfied that no workable race-neutral alternative would produce the educational benefits of diversity. If a nonracial approach ... could promote the substantial interest about as well and at tolerable administrative expense, then the university may not consider race." *Id.* (cleaned up).

196.    As a consequence, "strict scrutiny imposes on the university the ultimate burden of demonstrating, *before turning to racial classifications*, that available, workable race-neutral alternatives do not suffice." *Id.* (emphasis added).

197.    Moreover, that burden is "ongoing." *Fisher II*, 136 S. Ct. at 2215.

## VII.    Claims for Relief

198.    UT-Austin's use of racial preferences in admissions violates the Fourteenth Amendment and federal civil rights laws for multiple reasons.

*First*, UT-Austin's use of racial preferences is not narrowly tailored because UT-Austin is not pursuing the critical-mass interest found permissible in *Grutter* by failing to use race merely as a "plus" factor and by failing to continually justify the need for using race at all.

*Second*, UT-Austin is not fully utilizing a number of race-neutral alternatives that can achieve student body diversity.

*Third*, UT-Austin is engaging in impermissible racial balancing.

*Fourth*, whether or not UT-Austin is acting permissibly under Supreme Court precedent, the Supreme Court should overrule any decision holding that the Fourteenth Amendment or federal civil rights law ever permit the use of racial preferences to achieve "diversity."

### COUNT I
**Violation of the Fourteenth Amendment and 42 U.S.C. §§1981, 1983, and 2000d *et seq.***
**(Failure to Use Race Merely as a "Plus" Factor in Admissions Decisions and Failure to Continually Reevaluate the Basis for Relying on Race)**

199.    Plaintiff reincorporates and realleges all prior allegations.

200.    Defendants have intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of the Fourteenth Amendment and 42 U.S.C. §§1981, 1983, and §2000d *et seq.*, by employing an undergraduate admissions policy that does not merely use race as a "plus" factor in admissions decisions to achieve student body diversity.

201.    Statistical and other evidence shows that UT-Austin can no longer justify using race at all, or at least must justify it differently, which it has failed to do.

202.    Statistical and other evidence shows that each applicant is not evaluated as an individual. Instead, race or ethnicity is the defining feature of the application. Only using race or ethnicity as a dominate factor in admissions decisions could account for the decision to admit certain African-American and Hispanic applicants and deny admission to certain white and Asian-American applicants.

203.   Plaintiff's members have been and will continue to be injured because UT-Austin's intentionally discriminatory admissions policies and procedures continue to deny them the opportunity to compete for admission to UT-Austin on equal footing with other applicants on the basis of race or ethnicity.

204.   Defendants acted under color of law in developing and implementing race-based policies that led UT-Austin to deny Plaintiff's members equal protection of the laws and to discriminate against them in violation of the Fourteenth Amendment and 42 U.S.C. §§1981, 1983, and §2000d *et seq.*

205.   Plaintiff is entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent UT-Austin from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

206.   Plaintiff brings this count against UT-Austin and the Board of Regents under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*, and against the state official defendants under 42 U.S.C. §§1981, 1983.

207.   Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988.

## <u>COUNT II</u>
**Violation of the Fourteenth Amendment and 42 U.S.C. §§1981, 1983, and 2000d *et seq.* (Race-Neutral Alternatives)**

208.   Plaintiff reincorporates and realleges all prior allegations.

209.   Defendants have intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of the Fourteenth Amendment and 42 U.S.C. §§1981, 1983, and §2000d et seq., by employing racial preferences in undergraduate admissions when

there are available race-neutral alternatives capable of achieving student body diversity, as its own practices already demonstrate.

210.    Defendants' use of racial preferences is narrowly tailored only if using them is necessary to achieve student body diversity. If Defendants can achieve student body diversity without resorting to racial preferences, they are required to do so as a matter of law. Moreover, Defendants must have a strong basis in evidence that a non-racial approach will not work about as well as a race-based approach before turning to the use of racial preferences. And they must continually reevaluate that evidence as it changes.

211.    There is no evidence that Defendants studied all of the available race-neutral alternatives and had a strong basis in evidence that none would work about as well *before* turning to racial preferences.

212.    Whether Defendants considered them or not, there are a host of race-neutral alternatives that if implemented can achieve student body diversity without resorting to racial preferences. Among these alternatives, both individually and collectively, are (a) increased use of non-racial preferences, including increased use of the percentage plan UT-Austin already has in place, (b) increased financial aid, scholarships, and recruitment efforts, and (c) elimination of admissions policies and practices that negatively affect minority applicants.

213.    The use of race-neutral alternatives instead of racial preferences would not only achieve student body diversity, it would eliminate the heavy costs that using race as a factor in admissions decisions imposes on minority applicants who receive such admissions preferences, on the Texas community, and on society as a whole.

214.    Plaintiff's members have been and will continue to be injured because Defendants have and will continue to deny them the opportunity to compete for admission to UT-Austin on equal

footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

215.    Defendants acted under color of law in developing and implementing race-based policies that led UT-Austin to deny Plaintiff's members equal protection of the laws and to discriminate against them in violation of the Fourteenth Amendment and 42 U.S.C. §§1981, 1983, and §2000d *et seq.*

216.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendants from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment and federal civil rights laws and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

217.    Plaintiff brings this count against UT-Austin and the Board of Regents under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*, and against the state official defendants under 42 U.S.C. §§1981, 1983.

218.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988.

<u>**COUNT III**</u>
**Violation of the Fourteenth Amendment and 42 U.S.C. §§1981, 1983, and 2000d *et seq.*
(Racial Balancing)**

219.    Plaintiff reincorporates and realleges all prior allegations.

220.    Defendants have intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of the Fourteenth Amendment and 42 U.S.C. §§1981, 1983, and §2000d et seq., by employing an undergraduate admissions policy that balances the class according to its racial or ethnic composition.

221.    A university that uses its admissions system to pursue quotas or proportional representation of racial or ethnic groups either in the entering class or in the overall student body violates the Fourteenth Amendment and therefore violates Title VI.

222.    The remarkable stability of UT-Austin's admissions figures for African-American students demonstrates that UT-Austin is seeking proportional representation of African Americans and is engaged in racial balancing.

223.    There is no non-discriminatory reason that could justify admissions figures this stable year after year given the unique characteristics of each applicant for admission. If UT-Austin were truly treating each applicant for admission as an individual, as it professes to do, "[o]ne would expect the percentage of [African-American] enrollees produced by such a system to vacillate widely from year to year, reflecting changes in each year's applicant pool." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 382 n.13 (1979). That is not happening.

224.    The pursuit of "critical mass" could never justify admissions figures this stable.

225.    Plaintiff's members have been and will continue to be injured because UT-Austin has and will continue to deny them the opportunity to compete for admissions to UT-Austin on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

226.    Defendants acted under color of law in developing and implementing race-based policies that led UT-Austin to deny Plaintiff's members equal protection of the laws and to discriminate against them in violation of the Fourteenth Amendment and 42 U.S.C. §§1981, 1983, and §2000d *et seq.*

227.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent

UT-Austin from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment and federal civil rights laws and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

228.    Plaintiff brings this count against UT-Austin and the Board of Regents under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*, and against the state official defendants under 42 U.S.C. §§1981, 1983.

229.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988.

## <u>COUNT IV</u>
### Violation of the Fourteenth Amendment and 42 U.S.C §§1981, 1983, and 2000d *et seq.* (Any Use of Race as a Factor in Admissions)

230.    Plaintiff incorporates the allegations and averments contained in the prior paragraphs as if fully set forth herein.

231.    Defendants have intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of the Fourteenth Amendment and 42 U.S.C. §§1981, 1983, and §2000d *et seq.*, by employing an undergraduate admissions policy that uses race as a factor in admissions.

232.    The Supreme Court's decisions holding that there is a compelling government interest in using race as a factor in admissions decisions in pursuit of "diversity" should be overruled. Those decisions were wrongly decided at the time they were issued, and they remain wrong today. "Diversity" is not an interest that could ever justify the use of racial preferences under the Fourteenth Amendment and federal civil rights laws.

233.    Even if there were a compelling government interest in "diversity" in the abstract, however, the use of racial preferences in the educational setting nevertheless should be forbidden for several important reasons.

234.    The Supreme Court's jurisprudence in this area has been built on mistakes of fact and law. The Supreme Court first accepted the use of racial preferences in admissions on the assumption that they would be used consistent with the "Harvard Plan," which purported to use race merely as a contextual factor in filling the final few places in the entering class. But the Harvard Plan itself was created in order to hide racial and ethnic discrimination. Thus, it is far from certain that Harvard itself *ever* used race in this fashion. "The raison d'être for race-specific affirmative action programs has simply never been diversity for the sake of education." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 407 (1979). It is instead "a clever post facto justification for increasing the number of minority group students in the student body." *Id.* The results of the Department of Justice's recently concluded two-year instigation into Yale University bears this out. *See* U.S. Dep't of Justice, *Notice of Violation of Civil Rights Act of 1964*, DJ 169-14-30 (Aug. 13, 2020) ("The totality of the information produced by Yale demonstrates that Yale's multi-decade use of race continues unabated without any serious effort by Yale to consider an admissions process that is free of race discrimination.").

235.    In any event, neither Harvard nor Yale nor UT-Austin nor any other college or university uses race in this manner now. Indeed, UT-Austin denies that it uses race as a "tie breaker" to fill the remaining few seats in the entering class. Instead, college and universities, including UT-Austin, claim to use race in order to pursue a "critical mass" of underrepresented minorities in the student body. But UT-Austin is not pursuing this interest. Even when this interest is actually being pursued, moreover, it is nothing more than racial balancing because it necessarily seeks to ensure a proportional number of students of certain races or ethnicities in the entering class. Critical mass is a formula for ensuring "a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students." *Bakke*, 438 U.S. at 315 (Powell, J.).

236.    Ultimately, there is overwhelming evidence that colleges and universities will take advantage of any leeway given by the Supreme Court to use the dangerous tool of racial preferences in inappropriate ways. Colleges and universities, if given the chance, will use racial preferences "for the ostensible purpose of enhancing education diversity of the student body" with the true "goal of simply increasing the number of minority persons in the universities and in the professions that these universities feed." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979). Indeed, as discussed above, the Department of Justice recently determined that Yale University employs racial preferences to engage in precisely this type of prohibited racial discrimination. *See* U.S. Dep't of Justice, *Notice of Violation of Civil Rights Act of 1964*, DJ 169-14-30 (Aug. 13, 2020) ("Yale grants substantial, and often determinative, preferences based on race to certain racially-favored applicants and relatively and significantly disfavors other applicants because of their race. Yale's race discrimination imposes undue and unlawful penalties on racially-disfavored applicants, including in particular Asian American and White applicants.").

237.    There simply is no practical way to ensure that colleges and universities will use race in their admissions processes in any way that would meet the narrow tailoring requirement. The strong medicine of strict scrutiny has proven insufficient to ensure that the Fourteenth Amendment and federal civil rights laws operate in conformity with racial neutrality except in those rare circumstances that justify the use of this disfavored remedy. Time after time, courts have been either unwilling or unable to force these colleges and university to provide a strong evidentiary basis for their conclusion that use of racial preferences is necessary to achieve diversity. Nor have they been willing to engage in the close review of admissions programs to ensure that schools are treating each applicant as an individual.

238.    There also have been important factual developments since this question was last considered by the Supreme Court. There is now much evidence that race-neutral alternatives can achieve the benefits of diversity. This is crucially important in light of the equally compelling evidence that racial preferences impose significant costs on the university community, society in general, and the very minority students these programs are purported to benefit.

239.    In the end, the costs of allowing racial preferences in admissions decisions—even in a limited way—far exceed any rapidly diminishing benefits. No principle of *stare decisis* counsels in favor of retaining decisions allowing their use. Those decisions were not well reasoned, were predicated on mistakes of fact, have been undermined by more recent developments, and have proven to be unworkable. Any decision allowing the use of racial preferences in the educational setting should be overruled.

240.    Plaintiff's members have been and will continue to be injured because Defendants have and will continue to deny them the opportunity to compete for admission to UT-Austin on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

241.    Defendants acted under color of law in developing and implementing race-based policies that led UT-Austin to deny Plaintiff's members equal protection of the laws and to discriminate against them in violation of the Fourteenth Amendment and 42 U.S.C. §§1981, 1983, and §2000d *et seq*.

242.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendants from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

243.    Plaintiff brings this count against UT-Austin and the Board of Regents under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*, and against the state official defendants under 42 U.S.C. §§1981, 1983.

244.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988.

**WHEREFORE**, SFFA prays for the following relief as to all counts:

a.    A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, that Defendants' admissions policies and procedures violate the Fourteenth Amendment of the U.S. Constitution, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*, and federal civil rights statutes 42 U.S.C. §§1981 and 1983;

b.    A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, that any use of race or ethnicity in admissions in the educational setting violates the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d *et seq.*, and federal civil rights statutes 42 U.S.C. §§1981 and 1983;

c.    A permanent injunction barring Defendants from using race as a factor in future undergraduate admissions decisions at UT-Austin;

d.    A permanent injunction requiring Defendants to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission;

e.    Attorneys' fees and costs pursuant to 42 U.S.C. §1988 and any other applicable legal authority; and

f.    All other relief this Court finds appropriate and just.

Respectfully submitted,

*/s/ J. Michael Connolly*

William S. Consovoy (*pro hac vice*)
J. Michael Connolly
Cameron T. Norris
Steven C. Begakis (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
steven@consovoymccarthy.com

Dated: November 16, 2020          *Counsel for Plaintiff Students for Fair Admissions, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served on counsel of record for Defendants via the Court's electronic filing and service on November 16, 2020.

/s/ J. Michael Connolly

J. Michael Connolly
*Counsel for Students for Fair Admissions*