# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC.,<br><br>   *Plaintiff*,<br><br>v.<br><br>UNIVERSITY OF TEXAS AT AUSTIN; JAMES B. MILLIKEN, Chancellor of the University of Texas System in his Official Capacity; STEVEN LESLIE, Executive Vice Chancellor for Academic Affairs of the University of Texas System in his Official Capacity; DANIEL H. SHARPHORN, Vice Chancellor and General Counsel of the University of Texas System in his Official Capacity; JAY HARTZELL, Interim President of the University of Texas at Austin in his Official Capacity; BOARD OF REGENTS OF THE TEXAS STATE UNIVERSITY SYSTEM; DAVID J. BECK, CHRISTINA MELTON CRAIN, KEVIN P. ELTIFE, R. STEVEN HICKS, JODIE LEE JILES, JANIECE LONGORIA, NOLAN PEREZ, KELCY L. WARREN, AND JAMES C. "RAD" WEAVER, as Members of the Board of Regents in Their Official Capacities; DANIEL JAFFE, Interim Executive Vice President and Provost; RACHELLE HERNANDEZ, Senior Vice Provost for Enrollment Management and Student Success; and MIGUEL WASIELEWSKI, Executive Director for Office of Admissions,<br><br>   *Defendants*. | Case No. 1:20-cv-763<br><br><br><br><br><br><br><br>**Declaration of Gary Bledsoe**, on behalf of the Texas State Conference of the National Association for the Advancement of Colored People (NAACP) |

I, Gary L. Bledsoe, pursuant to 28 U.S.C. § 1746, declare the following:

1

1. The facts set forth in this declaration are based on my personal first-hand knowledge, and if called as a witness, I could and would competently testify to the following matters under oath.

2. I am a National Board Member of the NAACP and President of the Texas State Conference of the National Association for the Advancement of Colored People ("Texas NAACP"), a proposed intervenor in the above-captioned matter. I am authorized to provide this declaration on behalf of the Texas NAACP. I have held the position of President since first being elected to the position in 1991.

3. The Texas NAACP coordinates the Texas branches of the NAACP.

4. The NAACP is the nation's oldest and largest civil rights organization. Founded in 1909, the NAACP's mission is "to secure the political educational, social, and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons." To advance this mission, the NAACP's principal objectives are to ensure the political, educational, social and economic equality of all citizens; to achieve equality of rights and eliminate racial prejudice among the citizens of the United States; to remove all barriers of racial discrimination through democratic, legal, educational, economic, and social processes; to seek enactment and enforcement of federal, state and local laws securing civil rights; to inform the public of the adverse effects of racial discrimination and to seek its elimination; and to educate persons as to their constitutional rights and to take all lawful action to secure the exercise thereof.

5. To support this mission, the NAACP's key goals include educational advocacy to ensure that all students have access to a quality, integrated public education. To my

knowledge, the NAACP has been at the forefront of virtually every major advance in ensuring integration at every level of the nation's public schools.

6. The Texas NAACP implements the mission of the NAACP at the state level. The Texas NAACP includes approximately 100 units statewide, and more than 10,000 individual dues-paying members who reside in Texas, a substantial number of whom are students who plan to attend the University of Texas at Austin (UT-Austin), currently attend UT-Austin, or are alumni of UT-Austin (including myself). The Texas NAACP's membership consists largely of African-Americans, and it aims to support all people of color and members of underrepresented and vulnerable populations; regardless of membership in the Texas NAACP.

7. The Texas NAACP's members and chapters actively participate in the NAACP's Youth & College Division. Created in 1936 to develop future leaders, the NAACP's Youth & College Division's mission is to "inform youth of the problems affecting African Americans and other racial and ethnic minorities; to advance the economic, educational, social and political status of African Americans and other racial and ethnic minorities and their harmonious cooperation with other peoples; to stimulate an appreciation of the African Diaspora and other people of color's contribution to civilization; and to develop an intelligent, effective youth leadership." The primary focus of the College and Youth Division include the following issues: (i) Education, (ii) Voting Rights and Political Representation, (iii) Economic Sustainability, (iv) Health, and (v) Juvenile Justice.

8. As part of its Youth & College Division, the Texas NAACP has approximately 6 active Youth Chapters, whose members are under 25 and pay dues. For example, the Austin NAACP Youth Council has approximately 50 youth members (ages 5-25) who participate in the local youth chapter.

3

9. As part of its Youth Chapters, the Texas NAACP's members include high school students of color, some of whom do not fall within the top 6% of their high school class but who are incredibly talented, exhibit tremendous leadership potential, and demonstrate a strong commitment to contributing to their local communities and improving the lives of fellow Texans.

10. The Texas NAACP has one or more African American members who have applied or intend to apply to UT-Austin, who are competitive candidates for admission, who must reference their race to fully portray their achievements and aspirations, and who desire attending a university that is academically excellent, well-resourced, and racially diverse with the educational benefits that flow from a diverse student body.

11. Ending UT-Austin's race-conscious admissions policy—a result that the plaintiff, Students for Fair Admissions, seeks—would irreparably harm Texas NAACP's high school members and numerous other students of color who we also represent or consider as our constituents because it would prohibit UT-Austin from appreciating critical contextual information related to their race that sheds light on such members' remarkable accomplishments, strengths, perspectives, and capacity to contribute in college and after graduation. Importantly, UT-Austin's race-conscious admissions policy serves as a limited counter to the biases in admissions tests and the current and past Texas system of education.

12. Moreover, banning all consideration of race in admissions poses a significant risk of reducing the number of Black students and other students of color at UT-Austin. It also signals to students of color that they are not welcome and will encounter a racially hostile campus climate, particularly when the university has a very recent history of racial exclusion by both law and practice. As the Texas NAACP experienced following

4

*Hopwood*, when the number of Black students at UT-Austin declined, this reduction also harms the Texas NAACP's high school members since, without a critical mass of same-race and racially diverse students at UT-Austin, such high schoolers feel less encouraged and welcome to apply for admission to UT-Austin. Additionally, removing all consideration of race would work to further cement vestiges of white privilege (and therefore the contingent disparate absence of privilege for students of color) that continue to exist in our society and are to be found in other traditional admissions criteria such as standardized testing, resulting to fewer examples of success from within communities of color.

13. The Texas NAACP also has approximately 18 active college chapters, including a UT-Austin college chapter. Similar to other college chapters, the UT-NAACP Chapter strives to advance the mission of the NAACP by providing support and training for Black students and other students of color on campus and by coordinating between many different student groups and community partners towards the shared goal of promoting racial and social equity.

14. Our Youth and College Division President has stated that UT-NAACP's African American members have expressed that, at times, they continue to feel isolated and alienated on UT's predominantly white campus that continues to bear the names of segregationist leaders and engage in practices rooted in UT's segregationist past, such as the school's use of SATs in admissions and the school's spirit song "The Eyes of Texas" which debuted as part of minstrel shows.[1] As documented by news media or social media reports, Black athletes receiving scholarships have been openly criticized by alumni for

---

[1] Minstrel shows originated in the early 19th century while slavery still legally existed and featured white performers in black-face depicting black people in disparaging ways.

5

their positions on the racist history of the song, or simply their criticisms of the police murder of George Floyd and the need for criminal justice reform. Members of the UT family including alumni and at least one member of the Board of Regents have come out in support of the song. Recently a wealthy and influential donor to the University from Dallas was found to have taken action that raised questions about his racial bias, yet the University decided to stand by him. White UT students have conducted "affirmative action" bake sales where they mock Black and Latinx students by charging them less than White and Asian American students. UT-NAACP's members have also expressed that a sufficient number of students of color on campus is essential for sustaining and expanding UT-NAACP's mission-critical work. News media and social media reports have also documented how minority students have been struck by balloons full of water and other hate incidents. Reports have also documented how on a number of occasions there was criminal mischief against the Martin Luther King Jr. statute located on the campus.

15. Fewer students of color on UT's campus, and fewer Black students in particular, would harm UT-NAACP's membership and capacity to carry forward its work. It would almost inevitably reduce the number of dues-paying members of UT-NAACP, which would diminish UT-NAACP's ability to support its own members through peer networks and its ability to lead initiatives for ensuring the political, educational, social and economic equality of all people. Moreover, UT-NAACP engages in cross-coalitional efforts with various other racial affinity groups. Fewer students of color would weaken these multiracial, coalitional efforts that have, in recent years, resulted in improvements for the entire campus community. Further, there is reason to believe that the impact of such a decision to eliminate race from the application process would go far beyond just the

University of Texas.

16. In addition, Our Youth and College Division President has shared with me that Texas NAACP's Youth and College Chapters have provided mentorship for high school students across Texas, particularly for students of color who are highly talented but who have less access to college preparatory resources. For example, some college chapters have offered tutoring programs to high schoolers and middle schoolers attending lower-resourced schools—students who are predominantly Black, Latinx, and Indigenous—to ensure such students are equally competitive for college admissions and equal access to the opportunities college affords. College chapters have also offered weekend SAT preparation courses for high school students. Texas NAACP members believe that tests do not define you and, in many cases, may be a poor measurement of scholarly potential. But the SAT continues to play a role in college admissions, including UT-Austin's holistic admissions program. As a result, Texas NAACP units have had to invest their resources in preparing students to do better on such tests, which are notorious for underpredicting the potential of Black students and students with less wealth.

17. Ending UT-Austin's race-conscious admissions policy would cause other factors in UT-Austin's holistic policy—including UT-Austin's reliance on standardized test scores—to assume greater weight in the process, with even less contextual information to provide counterbalancing information about the student's potential to overcome setbacks and thrive. It is my opinion that Justice O'Connor's opinion in *Grutter* expressly allows for such an admissions policy. To fulfill its mission of expanding educational access, the Texas NAACP's chapters would have to divert significant resources, including staff time, to additional tutoring programs and SAT/ACT preparation courses for high schoolers living in less-resourced, high-minority neighborhoods. The Texas NAACP

7

would also have to expend significantly more resources to provide support and mental health resources to Black students and other students of color attending UT-Austin who, in the wake of race-blind admissions and a drop in racial diversity, would feel even more isolated and more unwelcome on UT-Austin's campus.

18. UT-Austin's admissions policy must be considered in the context, and against the backdrop, of Texas's long, recent, and continuing history of state-sponsored racial discrimination, and the continued racial segregation of Texas. Prior to 1955, the Texas Constitution specifically required separate schools for "white" and "colored" children. After the courts ruled racially separate school systems violated the 14th Amendment, Texas adopted an official policy of resistance to integration of its public schools. Throughout the 1980s, more than 70% of black students lived in metropolitan areas that courts and the U.S. Department of Justice (DOJ) had determined were unconstitutionally segregated. By May 1994, desegregation lawsuits were still pending against more than forty Texas school districts. As recently as 2010, the Texas State Conference of NAACP and Texas League of United Latin American Citizens (LULAC) requested that the Office of Civil Rights conduct a compliance review of the State with respect to African American and Latino K-12th grade public school students in the State of Texas. Racially segregated elementary and secondary public schools persist today throughout Texas, and have stymied many Black students and other students of color from meaningful opportunities to accumulate the type of credentials and access to college counselors, Advanced Placement courses, and academic resources that are disproportionately available to their white peers. Race-conscious admissions is one important, essential method for accounting for this uneven playing field that directly flows from Texas's legacy of segregation and ensures that talented, persistent Black students who overcome

barriers in the educational system are identified, admitted, and enrolled at UT-Austin.

19. Access to and graduation from our state's flagship universities, especially to the best-resourced university in the Texas higher education system, also creates unprecedented pathways to future leadership as the UT alumni base is the largest in the state and one of the largest in the country.

20. The Texas NAACP has long championed race-conscious admissions programs, including at UT-Austin. In *Hopwood v. Texas*, we submitted briefs defending the UT-Austin School of Law's consideration of race for admissions purposes. Following the Fifth Circuit's decision overturning the use of race in *Hopwood* and the Attorney General's subsequent opinion prohibiting universities in Texas from considering race for admissions, the Texas NAACP supported the Texas Top Ten Percent law, whereby students graduating in the top ten percent of their high school would be automatically admitted into a Texas college or university of their choosing. Following the Supreme Court's decision upholding race-conscious admissions programs in *Grutter v. Bollinger*, we encouraged UT-Austin to revisit race conscious admissions program since the Top Ten Percent law had not fully opened the doors for many talented Black students. We have had a number of meetings over the years with UT to try and have them continue their commitment to the Top 10 percent program (now the top 6 percent program) and their affirmative action program. We have worked with a variety of groups on these issues during different legislative sessions, including LULAC and the Rural Republicans.

21. Thereafter, the Texas NAACP fully supported a blended admissions program that included the Top Ten Percent law and race-conscious admissions. Beginning around 2009, UT-Austin had begun its efforts to scale back on percentage plan admits. However, because we felt that UT-Austin had not fully committed to its race-conscious

9

holistic admissions plan, we actively opposed UT-Austin's efforts both independently and as part of the Texas Legislative Education Equity Coalition (formerly, Texas Latino Education Coalition) and have continued to do so in the Texas Legislature through the present day. We also actively support the Texas law that would lift the 75 percent cap on percentage plan admits at UT-Austin in the event that its race-conscious admissions program is held unlawful. UT-Austin can and should do a better job of recruiting, admitting, enrolling and graduating Black students and other students of color—who are among the direct beneficiaries of the admissions program—and utilizing its race-conscious admissions program more effectively is one essential way to increase the educational benefits that flow from a diverse student body. From my observations over the years, UT-Austin has had many administrators that are very much committed to diversity, but too often progress is stifled by undue pressures from conservative and powerful alumni that do not share those same values.

22. The Texas NAACP understands that UT-Austin has many competing interests impacting its admissions program compared to the Texas NAACP's more focused race-equity interests. One example is UT-Austin's handling of admissions for certain well-connected, privileged applicants according to the Kroll Report, referenced in SFFA's complaint. The Texas NAACP strongly believes that students should not be admitted because of their strong connections, as opposed to their merit, qualifications and experiences. If the Court is inclined to consider the Kroll report, the Texas NAACP would offer a vigorous critique of the practices exposed by the Kroll report while underscoring how such practices are entirely disconnected and distinct from UT's race-conscious policies in holistic admissions. UT-Austin's publicly reported reactions to the Kroll Report do not signal such a vigorous defense on these grounds.

23. Another example of UT-Austin's competing interest with the Texas NAACP is the university's consideration of several aspects of diversity. While important, SFFA is not challenging UT-Austin's consideration of generalized diversity interests (such as recruiting an oboe player), only the university's consideration of racial diversity. In its complaint, SFFA has placed a target on each Black student and prospective Black student at UT-Austin, suggesting that they are undeserving, unqualified and an ill-fit for UT-Austin's high academic standards. It is critical that this Court hear from our organization and allow us an opportunity to cross-examine SFFA's witnesses and present our own defenses and experts in this case to counter such far-reaching and ill-founded allegations.

24. The Texas NAACP and its members will be greatly impacted by the outcome of this lawsuit, which will directly and significantly affect the ability of students of color in Texas to access UT-Austin—one of the state's premier, best-resourced institutions—and affect the depth and breadth of racial diversity at UT-Austin, which is essential for tackling the issues facing our multi-racial, increasingly diverse state and moving forward the Texas NAACP's mission to secure equal political, educational, social, and economic rights for all Texans. Moreover, a substantial decline in diversity at UT-Austin would negatively impact students of all races and ethnicities and the entire state of Texas. Exposure to diversity in higher education is a critical component of a 21st century education—it is essential for training the next generation of leaders who must communicate and collaborate across difference to effectively serve and positively transform our state and social institutions. These goals are even more important today as the university and its students, the state, and the country reckon with systemic barriers to racial justice and equality while there has been a recent resurgence of white supremacist activity and rhetoric.

I certify under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. Executed in Texas this 16th day of December, 2020.

_____
Gary Bledsoe