## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS,<br><br>*Plaintiff*,<br><br>v.<br><br>UNIVERSITY OF TEXAS AT AUSTIN; JAMES B. MILLIKEN, Chancellor of the University of Texas System in his Official Capacity; STEVEN LESLIE, Executive Vice Chancellor for Academic Affairs of the University of Texas System in his Official Capacity; DANIEL H. SHARPHORN, Vice Chancellor and General Counsel of the University of Texas System in his Official Capacity; JAY HARTZELL, Interim President of the University of Texas at Austin in his Official Capacity; BOARD OF REGENTS OF THE TEXAS STATE UNIVERSITY SYSTEM; DAVID J. BECK, CHRISTINA MELTON CRAIN, KEVIN P. ELTIFE, R. STEVEN HICKS, JODIE LEE JILES, JANIECE LONGORIA, NOLAN PEREZ, KELCY L. WARREN, AND JAMES C. "RAD" WEAVER, as Members of the Board of Regents in Their Official Capacities; DANIEL JAFFE, Interim Executive Vice President and Provost; RACHELLE HERNANDEZ, Senior Vice Provost for Enrollment Management and Student Success; and MIGUEL WASIELEWSKI, Executive Director for Office of Admissions,<br><br>*Defendants*. | Case No. 1:20-cv-00763-RP |

## MEMORANDUM IN SUPPORT OF PROPOSED DEFENDANT-INTERVENORS' MOTION TO INTERVENE

Movants and Proposed Defendant-Intervenors consist of eight University of Texas at Austin ("UT") students of color ("student Movants"), as well as three organizations—the Texas National Association for the Advancement of Colored People ("Texas NAACP"), the Black Student Alliance ("BSA"), and the Texas Orange Jackets (together, "organizational Movants")—who satisfy the requirements for intervention as of right under Fed. R. Civ. P. 24(a)(2).

Movants have significant, concrete, personalized, and legally protectable interests in the integrity of UT's race-conscious admissions policy—interests that would be impaired if Plaintiff Students for Fair Admissions ("SFFA") prevails or UT settles. Chief among them are Movants' interests in: educational benefits that flow from a racially diverse student body; an admissions program that allows students to express their race and to contextualize their achievements and strengths; and obtaining sufficient numbers of Black, Latinx, and other underrepresented and marginalized groups (collectively herein, "students of color") at UT to combat racial hostility and discrimination on campus and across Texas. SFFA's far-reaching claims directly threaten these interests, and require considering facts and arguments that Movants—as students and organizations—are uniquely capable of presenting.

Movants also are not adequately represented by UT, which faces pressure from internal and external factors that limit its defense. Movants have no such complicating pressures and can vigorously defend against SFFA's claims that implicate politically sensitive issues, particularly those targeting UT's admissions practices reflected in the Kroll Report. Further, Movants intend to introduce arguments that UT is unlikely to raise: for example, that UT's race-conscious policy is necessary, in part, to counteract biases against students of color throughout the admissions process, including biases in standardized testing; that campus racial tensions persist; and that UT has not yet achieved meaningful representation of certain racial and ethnic groups.

This case is part of SFFA's larger strategy of challenging race-conscious admissions at multiple universities with the goal of overturning over forty years of precedent. Given these stakes, the district court in *SFFA v. University of North Carolina at Chapel Hill* recently permitted students to intervene and defend UNC's race-conscious policy against SFFA's claims. *See* 319 F.R.D. 490, 497 (M.D.N.C. 2017). Intervention allows students and student groups to both protect their respective interests and aid the court by presenting distinct evidence and legal arguments on critical issues at the heart of these cases.

Alternatively, Movants respectfully request that the Court grant permissive intervention under Rule 24(b). Movants share common issues of fact and law with UT, and intervention is timely and will cause no prejudice. Indeed, it will assist the Court by contributing the perspective of the students who will most directly suffer should SFFA prevail.

## I.     BACKGROUND

UT has a holistic admissions policy for incoming students (the "Policy") that considers several important factors of student achievement and personal characteristics, including the applicant's race. In 2016, the Supreme Court upheld the Policy following an eight-year challenge under the equal protection clause of the U.S. Constitution and Title VI of the Civil Rights Act of 1964. *Fisher v. Univ. of Tex. at Austin*, 579 U.S. __, 136 S. Ct. 2198 (2016) ("*Fisher II*").

SFFA, whose founder Edward Blum supported the *Fisher* litigation, is an organization that aims to eliminate the consideration of race and ethnicity in admissions. *See* "About," https://rb.gy/fm9j78 (last visited Dec. 15, 2020). It claims to have two members who were "denied the opportunity to compete for admission to UT on equal footing with other applicants on the basis of race or ethnicity." Am. Compl. ¶¶ 5-6.

SFFA's claims target the admission of students of color by alleging that UT considers

race as more than a "plus factor," fails to adopt race-neutral alternatives, and racially balances African American students. *Id.* ¶ 198. SFFA asks this Court to "requir[e] [UT] to conduct all admissions in a manner that does not permit those engaged in the decisional process to ***be aware of or learn*** the race or ethnicity of any applicant for admission." *Id.* ¶ 244(d) (emphasis added).

## II.    MOVANTS

The student Movants were admitted to UT either under the Policy or UT's percentage plan, which automatically admits the top percentage of Texas high school graduates:

1. Movant Adaylin Alvarez is a senior studying English and Biology who identifies as Mexican-American. Ex. B, ¶¶ 2-3 (hereafter "Alvarez Decl.") (fully incorporated herein).

2. Movant Morgan Bennett is a senior studying Radio, Television and Film who identifies as Black. Ex. C, ¶¶ 2-3 (hereafter "Bennett Decl.") (fully incorporated herein).

3. Movant Liz Kufour is a senior double majoring in Business Management and African & African Diaspora studies who identifies as a Black, Ghanaian-American. Ex. D, ¶¶ 2-3 (hereafter "Kufour Decl.") (fully incorporated herein).

4. Movant Brianna McBride is a senior double majoring in Communications and Leadership, and Government who identifies as African American. Ex. E, ¶¶ 2-3 (hereafter "McBride Decl.") (fully incorporated herein).

5. Movant Desiree Ortega is a senior studying Neuroscience and Mexican-American Studies at UT who identifies as Mexican American, Puerto Rican American, and Latina. Ex. F, ¶¶ 2-3 (hereafter "Ortega Decl.") (fully incorporated herein).

6. Movant Nima Rahman is a senior double majoring in Neuroscience and Plan II (an interdisciplinary honors program) who identifies as an Asian American, Pakistani American, and Muslim woman. Ex. G, ¶¶ 2-3 (hereafter "Rahman Decl.") (fully incorporated herein).

7.      Movant Alexandra Trujillo is a senior majoring in Advertising, with minors in Business and in African and African Diaspora Studies, who identifies as Venezuelan and Latinx. Ex. H, ¶¶ 2-3 (hereafter "Trujillo Decl.") (fully incorporated herein).

8.      Movant Rosaleen Xiong is a senior majoring in Computer Science who identifies as Asian American. Ex. I, ¶¶ 2-3 (hereafter "Xiong Decl.") (fully incorporated herein).

Movant Texas NAACP coordinates the Texas branches of the NAACP, whose principal objectives include achieving equal rights; eliminating racial prejudice; and seeking enactment and enforcement of federal, state, and local civil rights laws. Ex. J, Decl. of Texas NAACP, ¶ 4 (fully incorporated herein). Texas NAACP has African American members who have applied or intend to apply to UT, who are competitive candidates, who must reference their race to fully portray their achievements, and who desire attending a university that is academically excellent and racially diverse. *Id.* ¶ 10. Texas NAACP has a chapter at UT that relies on Black students to carry out its mission. *Id.* ¶¶ 13-14.

Movant BSA is a student organization "committed to uplifting and empowering the Black community at UT…with the ultimate goal of developing extraordinary leaders and promoting unity." Ex. K, Decl. of BSA, ¶ 3 (fully incorporated herein). BSA supports the academic and leadership growth of its members by facilitating weekly programming and an orientation for incoming Black students to foster belonging. *Id.* ¶¶ 5-7. BSA relies on sufficient Black enrollment to fulfill its mission and build an inclusive campus. *Id.* ¶¶ 8-10.

Movant Texas Orange Jackets is the oldest women's honorary service organization on campus, and serves as the official host for UT. Ex. L, Decl. of Texas Orange Jackets, ¶¶ 3-4 (fully incorporated herein). Its members are women and nonbinary individuals of diverse racial and ethnic backgrounds, including Black, Indigenous, Latinx, and Asian American. *Id.* ¶¶ 3, 7. It

seeks to better UT, empower everyone to be leaders in their communities, and promote four core tenets: service, leadership, scholarship, and community. *Id*. ¶ 3.

### III.   ARGUMENT

As beneficiaries of the Policy whose interests are not adequately represented by UT, Movants are entitled to intervene as a matter of right under Rule 24(a)(2). The Fifth Circuit looks to four factors under Rule 24(a)(2): (1) the application must be timely; (2) the applicant must claim an interest in the subject matter of the action; (3) the applicant must show that disposition of the action may impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by existing parties to the litigation. *Wal–Mart Stores v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 566 (5th Cir. 2016). "[T]he inquiry under subsection (a)(2) is a flexible one, which focuses on the particular facts and circumstances . . . [and] must be measured by a practical rather than a technical yardstick." *United States v. Tex. E. Transmission Corp.*, 923 F.2d 410, 413 (5th Cir. 1991). "Federal courts should allow intervention where no one would be hurt and the greater justice could be attained." *Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416, 422 (5th Cir. 2002).

**A. The Motion to Intervene Is Timely and No Prejudice Will Inure to the Parties.**

Factors relevant to timeliness include (1) how long the intervenor knew or should have known of their stake in the case; (2) prejudice, if any, the existing parties may suffer because the intervenor failed to intervene earlier; (3) prejudice, if any, the intervenor may suffer if not permitted to intervene; and (4) any unusual circumstances. *See Stallworth v. Monsanto Co.*, 558 F.2d 257, 264-66 (5th Cir. 1977). The timeliness inquiry is "concerned only with the prejudice caused by the applicants' delay, not that prejudice which may result if intervention is allowed." *Edwards v. City of Houston*, 78 F.3d 983, 1002 (5th Cir. 1996).

Here, Movants acted as soon as it was apparent that UT could not adequately represent their stake in the case. UT filed its original Answer on October 16 and its Amended Answer on November 30 (ECF No. 13). There will be no prejudice to the parties caused by this timing, as, based on information and belief, no discovery has been propounded nor have any conferences occurred. But substantial prejudice will result if intervention is denied.

## B. Each Movant Has a Sufficient Interest in Preservation of the Policy.

### 1. The Fifth Circuit recognizes a Rule 24(a)(2) interest in educational opportunities, the benefits that flow from diversity, and the First Amendment.

Movants have substantial and judiciable interests in preserving UT's race-conscious admissions policy. Although "there is not any clear definition of the nature of the interest that is required for intervention of right," the key inquiry is whether the interest alleged is "legally protectable." *New Orleans Pub. Serv. v. United Gas Pipe Line Co.*, 732 F.2d 452, 464 (5th Cir. 1984). "[A]n interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim." *Texas v. United States*, 805 F.3d 653, 659 (5th Cir. 2015).

First, Rule 24(a)(2) is satisfied by Movants' interest in the "educational benefits that flow from a diverse student body," benefits that the Supreme Court has emphasized are "substantial" and repeatedly recognized as a compelling interest. *Grutter*, 539 U.S. at 330-33; *see also Fisher II*, 136 S. Ct. at 2210-11 (citations omitted); *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013) ("*Fisher I*"); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 306 (1978).

Interests in educational and advancement opportunities also can justify intervention under Rule 24(a)(2). In *Brumfield v. Dodd*, the Fifth Circuit allowed parents whose children received school vouchers to intervene in litigation between Louisiana and the federal government based on "'*a prospective interference* with educational opportunities." 749 F.3d 339, 341-43 (5th Cir.

2014) (emphasis added). In *Black Fire Fighters Ass'n of Dallas v. City of Dallas*, the Fifth Circuit allowed non-Black firefighters to intervene to claim that a decree providing promotions to Black officers interfered with their own promotion opportunities. 19 F.3d 992, 994 (5th Cir. 1994). Although the intervenors had no legally enforceable right to a promotion, the Fifth Circuit held that "prospective interference with promotion opportunities can justify intervention." *Id.; see also Edwards*, 78 F.3d at 995 (same); *Texas*, 805 F.3d at 661 (undocumented intervenors had sufficient interest in preservation of DAPA because they were its intended beneficiaries).

Finally, "students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" including in higher education. *Marinello v. Bushby*, 163 F.3d 1356, 1998 WL 857879, at *2 (5th Cir. Nov. 17, 1998) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). Like all private speakers, college applicants have a protected interest in fully expressing themselves and revealing, as necessary, their talents, attributes, and past and present experiences in the context of their race. *See Grutter*, 539 U.S. at 333 ("Just as growing up in a particular region or having particular professional experiences is likely to affect an individual's views, so too is one's own, unique experience of being a racial minority in a society, like our own, in which race unfortunately still matters."); *Bakke*, 438 U.S. at 317 n.51 ("[R]ace can be helpful information in enabling the admission officer to understand more fully what a particular candidate has accomplished - and against what odds.").

### 2. Movants are the beneficiaries of UT's race-conscious admissions policy, and organizational Movants have judiciable interests in their own right.

#### a. Student Movants

Student Movants experience the vast educational benefits that flow from a diverse student body resulting from the Policy. For example, they testify to how they benefit from cross-racial interactions and how such interactions allow them to better understand different cultures. *See,*

- 7 -

*e.g.*, Alvarez Decl. (Ex. B) ¶ 14; Bennett Decl. (Ex. C) ¶ 15. They also note the positive effects of such diversity on critical thinking skills and social interactions at UT. *See, e.g.*, Ortega Decl. (Ex. F) ¶¶ 14, 19; Rahman Decl. (Ex. G) ¶¶ 7, 9; Trujillo Decl. (Ex. H) ¶ 9. Critically, they also share how reductions in racial diversity would negatively impact the campus environment and exacerbate the perception that UT is unwelcoming to underrepresented students of color. *See* Kufour Decl. (Ex. D) ¶ 12; McBride Decl. (Ex. E) ¶¶ 18-19; Xiong Decl. (Ex. I) ¶ 9. If SFFA prevails and the Policy is enjoined, Movants' interests will be directly and negatively affected.

### b. Organizational Movants

Organizational Movants have justiciable interests both as organizations and on behalf of their members. Elimination of the Policy would irreparably harm them and their members and exacerbate the racial isolation and vestiges of discrimination at UT.

**Texas NAACP.** Texas NAACP relies on UT's race-conscious, holistic admissions to allow its high school members to share how racialized experiences have impacted their lives and fully express their aspirations. Ex. J, ¶¶ 9-11 (ending race-conscious admissions "would prohibit UT from appreciating critical contextual information related to their race that sheds light on such members' remarkable accomplishments, strengths, perspectives, and capacity to contribute in college and after graduation"). Banning the Policy would signal "that they are not welcome and will encounter a racially hostile campus climate, particularly when the university has a very recent history of racial exclusion by both law and practice." *Id.* ¶ 12. Its members have also "expressed that, at times, they continue to feel isolated and alienated on UT's predominantly white campus that continues to bear the names of segregationist leaders and engage in practices rooted in UT's segregationist past, such as the school's use of SATs in admissions." *Id.* ¶ 14.

**BSA.** BSA relies on the Policy to create a diverse student body with sufficient numbers

of Black students from varied backgrounds to help them feel safe at UT and foster their academic and leadership growth. Ex. K, ¶¶ 5-8. To these ends, BSA hosts Black Student Orientation, facilitates civic participation and leadership events with outside groups, holds bi-weekly meetings, encourages mentorship, and engages with the administration to address lingering effects of racial discrimination at UT. *Id.* ¶¶ 5-10. Fewer Black students at UT would stymie BSA's ability to uphold its mission and leave the student body with less capacity to address lingering effects of racial discrimination. *Id*. ¶¶ 8, 10.

**Texas Orange Jackets.** Texas Orange Jackets relies on a diverse student body to allow it to advance its core mission of making incoming students feel welcomed on UT's campus. Ex. L, ¶¶ 5-11, 14-17. This requires having diverse members who can connect with students from many backgrounds. *Id.* ¶¶ 7-9, 11. The organization also institutes a service agenda for incoming students of underrepresented identities. *Id.* ¶¶ 13-14. Additionally, its members individually benefit from the diversity cultivated by the Policy since it enriches their educational growth and reduces racial isolation for members of color. *Id.* ¶¶ 11, 16.

### C. Elimination of the Policy Will Impair Movants from Protecting Their Interests.

Movants are "so situated that the disposition of the action may as a practical matter impair or impede [their] ability to protect [their] interest." Fed. R. Civ. P. 24(a)(2). Impairment "does not demand that the movant be bound by a possible future judgment, and the current requirement is a great liberalization of the prior rule." *Brumfield*, 749 F.3d at 344. A prospective intervenor "must demonstrate only that the disposition of the action 'may' impair or impede their ability to protect their interests." *Id.* at 344; *see also Grutter*, 188 F.3d at 399.

Precluding UT from considering race in admissions will likely reduce diversity on

campus, directly threatening Movants' interests in a diverse student body.[1] *See Fisher II*, 136 S. Ct. at 2212 (showing stagnant Black student population at UT prior to adoption of race in holistic admissions); *see also Grutter*, 188 F.3d at 400 (finding likelihood that "access to the University for African-American and Latino/a students will be impaired to some extent" and this probability "is more than sufficient to meet the minimal requirements of the impairment element").

Moreover, SFFA has directly challenged the qualifications of Black and Latinx students admitted under holistic admissions, suggesting the Policy stigmatizes such students and sets them up for failure. *See* Am. Compl. ¶¶ 31-32. SFFA's disparaging allegations implicate the reputation, honor, and integrity of Movants, not UT. Movants are best situated to refute these allegations with not only social science research, but also their own testimony and evidence.

The consequences for Movants reach far beyond UT. SFFA seeks to bar consideration of race altogether. Am. Compl. ¶ 244(b). This would catastrophically impair Movants' access to higher education at *any* public or private university receiving federal funds. *See Brumfield*, 749 F.3d at 344 (recognizing the relief sought would put students' parents' interests at risk).

Furthermore, Movants are especially qualified to present evidence on the importance of a blended admissions plan. In the *Fisher II* dissent, upon which SFFA extensively relies in its Complaint, Justice Alito criticized UT for its approach in "favoring" students of color admitted under the Policy compared to students admitted under its percentage plan. 136 S. Ct. at 2228. Movants, who include students admitted under both policies, can more fully develop a clear record on the benefits of having a blended admissions plan.

Finally, SFFA seeks a blanket prohibition on Movants' right to reveal their race in

---

[1] *See also* P. Hinrichs, "The effects of affirmative action bans on college enrollment, educational attainment, and the demographic composition of universities," *Review of Econ. and Stats.* 94.3 (2012): 712-22 (in states banning affirmative action, underrepresented minority enrollment decreased at selective colleges).

college applications, including in their essays—where applicants speak to their backgrounds, passions, and formative experiences—as well as in their lists of accomplishments. *See* Am. Compl. ¶ 244(d). Granting such relief would effectively prohibit discussions of race that are at the heart of speech protected by the First Amendment. In *Fisher II*, amici explained that such "censorial approaches" would deprive admissions officers of "valuable and relevant information," "stifle [the speech of] applicants, recommenders, and faculty," and be "at odds with our nation's traditions of freedom of expression and academic freedom." Amici Br. of Dean R. Post & Dean M. Minow, *Fisher II*, 136 S. Ct. 2198 (2016) (No. 14-981). These harms are illustrated by Ms. Trujillo's application to UT, in which she spoke about how her Venezuelan identity impacted "how I see the world," making her a "more empathetic person" committed to creating a society where "everyone feels welcome, seen, and valued." Ex. H, ¶¶ 4-5, 7. She carried this perspective to UT where she contributes to organizations that "strive for racial equity" and to classroom discussions to "highlight the complexity of identity." *Id.* ¶¶ 9, 12. SFFA's efforts to silence references to race in admissions would severely impair Movants' constitutionally protected right to expression and their access to higher education since they could no longer fully convey their strengths, identities, and accomplishments.

### D. UT Will Not and Cannot Adequately Represent Movants' Interests.

UT's interests in this case diverge from Movants' in significant ways. In *Entergy Gulf States La. v. E.P.A.*, the Fifth Circuit explained, "The applicant has the burden of demonstrating inadequate representation, but this burden is minimal." 817 F.3d 198, 203 (5th Cir. 2016) (citing *Brumfield*, 749 F.3d at 345). In *Brumfield*, the Fifth Circuit found the parents showed divergent interests with the state because "[t]he state has many interests in this case—maintaining not only the Scholarship Program but also its relationship with the federal government and with the courts

that have continuing desegregation jurisdiction. The parents do not have the latter two interests; their only concern is keeping their vouchers." 749 F.3d at 346. The court concluded, "[w]e cannot say for sure that the state's more extensive interests will *in fact* result in inadequate representation, but surely they might, which is all that the rule requires." *Id.*

Under the Policy, UT must balance racial and ethnic diversity against other goals and factors. In contrast, Movants can advocate for the constitutionality of the race-conscious aspects of the Policy without competing considerations. *Cf. Christa McAuliffe Intermediate Sch. PTO v. DeBlasio*, No. 18-11657, 2020 WL 1432213, at *7 (S.D.N.Y. Mar. 24, 2020) (students allowed to intervene in part because defendant may be "reticent to present all colorable contentions").

Movants, moreover, will present unique evidence showing that the Policy is necessary, in part, because it helps counteract the present-day effects of Texas's long history of segregation and discrimination, including within UT itself. *See, e.g.*, *Grutter*, 539 U.S. at 316 (describing school's "longstanding commitment to 'one particular type of diversity,' that is, 'racial and ethnic diversity with special reference to the inclusion of students from groups which have been historically discriminated against, like African–Americans, Hispanics and Native Americans, who without this commitment might not be represented in our student body in meaningful numbers'"); A. Price, *A Secret 1950s Strategy to Keep Out Black Students*, The Atlantic, Sept. 19, 2019 (discussing UT history of using admissions factors to keep out Black students).

By way of example, Movants are best positioned to argue that the Policy is narrowly tailored because it helps counteract the discriminatory effects of UT's historical and ongoing reliance on standardized test scores. Use of such scores have roots in post-*Brown* attempts to preserve segregated schools in Texas. *Id.* Moreover, research shows such tests underestimate the

abilities and potential of students of color.[2] UT likely will not discuss the shortcomings of such criteria in the Policy, making Movants' arguments both a contrast to UT's position and a direct foil to SFFA's arguments. *Cf. Cotter v. Mass. Ass'n of Minority Law Enforcement Officers*, 219 F.3d 31, 35-36 (1st Cir. 2000) (allowing intervention where movants would defend racial criteria as a remedial measure to counter past and current discrimination, because defendants had reason "to resist a defense premised on a showing that its tests are currently in violation of law").

Movants will also present evidence related to continuing racial tensions on campus, which reflect the ongoing need for increased, diverse perspectives and underrepresented racial backgrounds. *See, e.g.*, Rahman Decl. (Ex. G) ¶ 14 ("Maintaining the current level of racial diversity at UT is important" but UT should "fully remove the legacy of racism on campus."); McBride Decl. (Ex. E) ¶¶ 16-17; Ortega Decl. (Ex. F) ¶¶ 18-19; Alvarez Decl. (Ex. B) ¶¶ 18-25.

UT's reticence to develop defenses that draw attention to its history of discrimination, ongoing problems with race relations, or racial biases inherent to other admissions criteria is evident in its Amended Answer, which opens with a Preliminary Statement enumerating the benefits of "student body diversity." ECF No. 13, at 2-5. Not once does UT mention its historic or current discriminatory admissions practices, its student-body composition and race relations, or First Amendment concerns. UT's position on such issues will be informed by public perception and the need to serve myriad constituencies. Movants do not shoulder such burdens.

Movants will also offer different evidence than UT to contest the allegations involving the discretionary admission holds exposed by the Kroll Report. SFFA suggests "race was a central consideration in many of these admissions decisions." Am. Compl. ¶ 79. While UT may

---

[2] *See, e.g.*, G. Walton & S. Spencer, Latent Ability: Grades and Test Scores Systematically Underestimate the Intellectual Ability of Negatively Stereotyped Students, *Psychological Science*, Vol. 20 No. 1, 1132-1139 (2009).

contest the relevance of such allegations, should this Court permit such evidence, Movants have a concrete interest in directly refuting them with evidence distinguishing race-conscious admissions from the practices found in the Kroll Report. Further, Movants will argue that practices like those reflected in the report are even further proof that race-conscious admissions are warranted at UT. *Cf. Brumfield*, 749 F.3d at 346 ("The lack of unity in all objectives, combined with real and legitimate additional or contrary arguments, is sufficient to demonstrate that the representation *may* be inadequate").

A comprehensive record that includes student testimony is essential in race-conscious admissions cases. In *Grutter*, student-intervenors participated fully in discovery and at trial, and contributed more evidence than any other party. *See* W. Kidder, *Affirmative Action in Higher Education: Recent Developments in Litigation, Admissions, and Diversity Research*, 12 Berkeley La Raza L.J. 173, 176 & n.14 (2001). In *Harvard*, the court relied on evidence from students of color in upholding the policy. *See* 397 F. Supp. 3d at 178, 194-95 ("[a]s the court has *seen and heard*, race can profoundly influence applicants' sense of self and outward perspective") (emphasis added); *see also Harvard*, 980 F.3d at 195 & n.33, 200-01 & n.40. And in *UNC*, students intervened and participated at trial to offer evidence about the history of discrimination at UNC and in North Carolina, and the effect of existing, and proposed, admissions processes on the critical mass of diverse students at UNC. 319 F.R.D. at 497. Student involvement is critical in protecting the constitutionally recognized interest in racial diversity on campus.

### E. In the Alternative, the Court Should Grant Permissive Intervention.

Rule 24(b) provides for permissive intervention when "(1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) the intervention will not unduly delay or prejudice the adjudication of

the rights of the original parties." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185,189 n.2 (5th Cir. 1989). In analyzing the second factor, courts primarily consider "whether the [proposed intervenors] are likely to contribute significantly to the development of the underlying factual issues." *Id.* at 189.

Because Movants meet the Rule 24(b) criteria and will assist the Court by developing a fully formed record, the Court should grant permissive intervention. Movants share common issues of law and fact with UT, as the dispute directly bears on Movants' substantial interests in the benefits of student body diversity and UT's holistic admissions process described herein. In addition, Movants are uniquely positioned to pursue lines of defense that UT is unlikely to raise or pursue vigorously. *See generally* Part D, *supra*. Cf. *Second Baptist Church v. City of San Antonio*, No. 5:20-cv-29, 2020 WL 8621324, at *6 (W.D. Tex. Apr. 17, 2020).

Prejudice related to timeliness is "measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation." *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994). As discussed in Part A, *supra*, the case is in its initial stages. With discovery yet to commence, Movants' contributions will not cause prejudice and can be made without prolonging discovery or delaying resolution of this case. Much of the evidence Movants seek to introduce will take the form of declarations, depositions, and expert testimony, rather than written or document discovery. As a district court recognized in other SFFA litigation involving race-conscious admissions, such discovery is "a small price to pay when issues of this magnitude are before the Court." *UNC*, 319 F.R.D. at 496.

## IV.   CONCLUSION

For the foregoing reasons, Movants respectfully request intervention as of right pursuant to Rule 24(a) or in the alternative permissive intervention pursuant to Rule 24(b).

So dated this 16th day of December, 2020.

*/s/ Brian C. Pidcock*
Brian C. Pidcock
State Bar No. 24074895
**HUNTON ANDREWS KURTH LLP**
600 Travis St.
Houston, TX 77002
Tel. (713) 220-4200
brianpidcock@HuntonAK.com

David Hinojosa
State Bar No. 24010689
(*W.D. Tex. application pending submission*)
Genevieve Bonadies Torres*
**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
1500 K Street, NW, Suite 900
Washington, DC 20005
Tel. (202) 662-8600
dhinojosa@lawyerscommittee.org
gbonadies@lawyerscommittee.org

Ryan P. Phair*
Carter C. Simpson*
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue, NW
Washington, D.C. 20037
Tel. (202) 955-1500
rphair@huntonak.com
csimpson@huntonak.com

Alan R. Kabat*
Bernabei & Kabat, PLLC
1400 - 16th Street, N.W., Suite 500
Washington, D.C. 20036-2223
Tel. (202) 745-1942 (ext. 242)
Kabat@BernabeiPLLC.com

**Pro hac vice* application pending

*Attorneys for proposed Student and Organizational Defendant-Intervenors*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served on counsel of record for Plaintiff via the Court's electronic filing and service system and also via email service as indicated below, on this the 16th day of December, 2020, as follows:

William S. Consovoy
Cameron T. Norris
Steven C. Begakis
**CONSOVOY MCCARTHY PLLC**
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
will@consovoymccarthy.com
cam@consovoymccarthy.com
steven@consovoymccarthy.com

John J. McKetta, III
Matthew C. Powers
William Christian
Marianne W. Nitsch
**GRAVES DOUGHERTY, HEARON & MOODY, P.C.**
401 Congress Avenue, Suite 2700
Austin, Texas 78701
(512) 480-5725 (phone)
(512) 539-9938 (fax)
mmcketta@gdhm.com
mpowers@gdhm.com
wchristian@gdhm.com
mnitsch@gdhm.com

*/s/ Brian C. Pidcock*
Brian C. Pidcock