# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS

STUDENTS FOR FAIR ADMISSIONS,

*Plaintiff,*

v.

UNIVERSITY OF TEXAS AT AUSTIN; JAMES B.
MILLIKEN, Chancellor of the University of Texas
System in his Official Capacity; STEVEN LESLIE,
Executive Vice Chancellor for Academic Affairs of the
University of Texas System in his Official Capacity;
DANIEL H. SHARPHORN, Vice Chancellor and
General Counsel of the University of Texas System in
his Official Capacity; JAY HARTZELL, Interim
President of the University of Texas at Austin in his
Official Capacity; BOARD OF REGENTS OF THE
TEXAS STATE UNIVERSITY SYSTEM; DAVID J.
BECK, CHRISTINA MELTON CRAIN, KEVIN P.
ELTIFE, R. STEVEN HICKS, JODIE LEE JILES,
JANIECE LONGORIA, NOLAN PEREZ, KELCY L.
WARREN, AND JAMES C. "RAD" WEAVER, as
Members of the Board of Regents in Their Official
Capacities; DANIEL JAFFE, Interim Executive Vice
President and Provost; RACHELLE HERNANDEZ,
Senior Vice Provost for Enrollment Management and
Student Success; and MIGUEL WASIELEWSKI,
Executive Director for Office of Admissions,

*Defendants,*

and

TEXAS NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
BLACK STUDENT ALLIANCE, TEXAS ORANGE
JACKETS, ADAYLIN ALVAREZ, MORGAN
BENNETT, BRIANNA MALLORIE MCBRIDE, LIZ
KUFOUR, DESIREE ORTEGA-SANTIAGO, NIMA
RAHMAN, ALEXANDRA TRUJILLO, and
ROSALEEN XIONG,

*Defendant-Intervenors.*

Case No. 1:20-cv-00763-RP

**DEFENDANT-INTERVENORS'
MOTION TO DISMISS FOR
LACK OF STANDING AND
JOINDER ON RES JUDICATA**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ...................................................................................................1

II.    ARGUMENT ..........................................................................................................3

    a.    To establish standing, SFFA must establish that for each of its claims its Standing Members suffered and are likely to suffer again a concrete, tangible injury that is redressable by SFFA's proposed relief. ..................................................................3

        i.    The requirements for Article III standing are well settled. ..........................3

        ii.    The traditional standing analysis applies here because UT uses a holistic admissions program of which race is only a "factor of a factor of a factor," and students are permitted to compete for all non-TTP seats. .....................5

    b.    SFFA has failed to satisfy its burden under Article III to demonstrate standing with clear allegations supporting each claim. ...........................................................7

        i.    Count I: Failure to Use Race Merely as a Plus Factor ................................9

        ii.    Count II: Race-Neutral Alternatives ........................................................10

        iii.    Count III: Racial Balancing ......................................................................12

        iv.    Count IV: Any Use of Race as a Factor for Admissions ...........................13

    c.    SFFA Does Not Have Standing To Pursue Its Sweeping Claim For Relief That Would Shield Students From Disclosing Their Race In Their UT Applications. .14

III.    CONCLUSION......................................................................................................17

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Alabama v. U.S. Army Corps of Eng'rs*,
    424 F.3d 1117 (11th Cir. 2005) ................................................................15

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ...........................................................................................4

*Davis v. Federal Election Comm'n*,
    554 U.S. 724 (2008) ......................................................................................14

*Diamond v. Charles*,
    476 U.S. 54 (1986).............................................................................................3

*Donald J. Trump for President, Inc. v. Booker*,
    No. 4:20-cv-2078, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020)..........................15

*Fisher v. University of Texas*,
    758 F.3d 633 (5th Cir. 2014) .....................................................................6, 13

*Fisher v. University of Texas (Fisher II)*,
    136 S. Ct. 2198 (2016)..........................................................................2, 5, 6

*Garcia v. eHealthScreenings, LLC*,
    No. 12-cv-1213, 2014 WL 517484 (W.D. Tex. Feb. 7, 2014) ...............................17

*In re Gee*,
    941 F.3d 153 (5th Cir. 2019) ......................................................................9, 15

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018).....................................................................................15

*Gratz v. Bollinger*,
    539 U.S. 244 (2003).............................................................................................6

*Grutter v. Bollinger*,
    539 U.S. 306 (2003)...........................................................................................7

*Hunt v. Washington State Apple Advertising Commission*,
    432 U.S. 333 (1977)...............................................................................1, 4, 15

*James v. City of Dallas, Tex.*,
    254 F.3d 551 (5th Cir. 2001) .........................................................................15

*Klay v. United Healthgroup Inc.*,
    376 F.3d 1092 (11th Cir. 2004) .....................................................................15

*Latitude Solutions v. DeJoria*,
    922 F.3d 690 (5th Cir. 2019) ...................................................................................14

*Legacy Cmty. Health Servs., Inc. v. Smith*,
    881 F. 3d 358 (5th Cir. 2018) ....................................................................................4

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..........................................................................................3, 4, 5

*Machete Prods., LLC v. Page*,
    809 F.3d 281 (5th Cir. 2015) ....................................................................................7

*McMahon v. Fenves*,
    323 F. Supp. 3d 874 (W.D. Tex. 2018)......................................................................5

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
    366 F.3d 930 (D.C. Cir. 2004) .................................................................................14

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) ...................................................................................17

*Perry Capital LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) .................................................................................14

*Perry v. Brassell*,
    No. 18-cv-62, 2018 WL 5733173 ..............................................................................9

*Regents of Univ. of Ca. v. Bakke*,
    438 U.S. 265 (1978)..............................................................................................6, 7

*Reyes v. N. Tex. Tollway Auth.*,
    861 F.3d 558 (5th Cir. 2017) ...................................................................................15

*Riley v. Houston Nw. Operating Co., LLC*,
    No. 19-2496, 2020 WL 3103899 ..............................................................................14

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976)....................................................................................................9

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)...........................................................................................5, 9

*Stukenberg v. Perry*,
    675 F.3d 832 (5th Cir. 2012) ...................................................................................15

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)..................................................................................................3

*Tenth Street Residential Assoc. v. City of Dallas, Tex.*,
   968 F.3d 492 (5th Cir. 2020) ....................................................................15

*Tex. Democratic Party v. Benkiser*,
   459 F.3d 582 (5th Cir. 2006) ..................................................................1, 4

*Tex. Low Income Housing Info. Serv. v. Carson*,
   427 F. Supp. 3d 43 (D.D.C. 2019) ............................................................14

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) .......................................................................2, 4, 14

*Valley Forge Christian Coll. v. Americans United for Separation of Church &*
   *State, Inc.*,
   454 U.S. 464 (1982) ....................................................................................3

*Warth v. Seldin*,
   422 U.S. 490 (1975) ....................................................................................4

## Other Authorities

Federal Rules of Civil Procedure Rule 12(b)(1) ......................................3, 17

U.S. Constitution Article III.................................................................. *passim*

## I.      <u>INTRODUCTION</u>

Edward Blum, the founder and president of Plaintiff Students for Fair Admissions, Inc. ("SFFA"), is a staunch ideological opponent of race-conscious university admissions policies. SFFA was formed for the sole purpose of trying to provide Mr. Blum standing through third-party students, recruited specifically to join SFFA, to litigate his generalized grievances about race-conscious admissions. His repeated attempts to do so fly in the face of well-established standing jurisprudence. As discussed in Defendant University of Texas at Austin's ("UT") motion to dismiss, SFFA has not established that it may invoke associational standing due to its single-focused mission in bringing lawsuits and the nominal role played by its members who are restricted to electing only one of five board members. But even if SFFA is allowed to invoke the possibility of associational standing, it has not established, as required by *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 342 (1977), that it has members who have standing to sue UT in their own right under the claims asserted.

First, SFFA has failed to allege facts demonstrating that its associational members have been harmed by the challenged actions of UT under each claim, or how those injuries would be redressed by a favorable decision on each of SFFA's claims. Under its four counts, SFFA generally alleges harm from UT's use of race as more than a plus factor (Count I); the failure to consider race-neutral alternatives (Count II); impermissible racial balancing (Count III); and, seeking to overturn Supreme Court precedent, the consideration of race at all (Count IV). However, SFFA's Complaint is devoid of any allegations demonstrating the attending injury-in-fact, the traceability of injury, and redressability for even one of these claims, and for even one of SFFA's members. Mere general grievances with UT's holistic admissions process and policy disputes with affirmative action, which plague SFFA's Complaint, do not suffice. *See, e.g.*, *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (requiring at least one of

organization's members to "independently meet the Article III standing requirements"); *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (requiring that Article III standing elements be satisfied "for each claim [it] seeks to press and for each form of relief that is sought"). Accordingly, the Court must dismiss this case.

Second, the "equal footing" standing showing in affirmative-action cases first promulgated in *Bakke* does not apply. That standard was never intended to allow any plaintiff to assert any challenge to any affirmative-action program, irrespective of the harm caused to the plaintiff. In *Bakke* and other related affirmative-action cases addressing standing, the alleged "injury in fact" resulting from the mere inability to compete on equal footing was intended to address claims where there were seats set aside specifically for racially diverse students, separate tracks of admission for racial groups, or automatic bonus points for one race over another. Here, SFFA alleges no such facts. To allow SFFA to obviate standing requirements and proceed on its bare allegations—its members' rejection plus their desire to transfer—in a holistic admissions case where race is merely a "factor of a factor of a factor," *see Fisher v. University of Texas*, 136 S. Ct. 2198, 2207 (2016) ("*Fisher II*"), would invite, and indeed has invited, endless challenges to diversity admissions plans by SFFA and its rejected student members recruited specifically for bringing litigation. *See* Ex. A (SFFA 30(b)(6) Dep.), 128:25-129:6; 132:2-133:4. Instead, SFFA bears the pleading burden of establishing that it has members who were (and have a future imminent threat of again being) injured in fact, that their alleged injury is traceable to UT's use of race as a factor in admissions for each claim asserted, and that their injuries will be redressed if SFFA prevails on its various counts and claims for relief. No such showing has been made.

Finally, SFFA alleges no facts supporting any of its claims for relief, most notably Paragraph (d) on page 49 of the Complaint—that admissions officers be shielded from "be[ing] aware of or learn[ing] the race or ethnicity of any applicant for admission." *See* ECF No. 13

(hereafter "Am. Compl."). There are no facts alleged showing how any actions of UT are traceable to its associational members' alleged injury, nor do SFFA or its members claim that their alleged injuries were caused by UT's **knowledge** of applicants' race (as opposed to its use of race as a factor in admissions). This remedy is untethered to the harm allegedly suffered, and SFFA does not have standing to make such a sweeping request.

Defendant-Intervenors Texas NAACP, et al., respectfully request that SFFA's claims be dismissed for lack of standing under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Defendant-Intervenors further join UT's motion seeking to dismiss SFFA's lawsuit on res judicata grounds.

## II.     ARGUMENT

a.   **To establish standing, SFFA must demonstrate that for each of its claims its Standing Members suffered and are likely to suffer again a concrete, tangible injury that is redressable by SFFA's proposed relief.**

i.     **The requirements for Article III standing are well settled.**

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for "lack of subject matter jurisdiction." Article III of the U.S. Constitution limits the exercise of judicial power to the "resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). Standing to bring suit is an "essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). By requiring that the judicial power be invoked only to "redress or prevent actual or imminently threatened injury" particular to the plaintiff, *see Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009), Article III's standing requirement ensures that the remedial power of federal courts is "placed in the hands of those who have a direct stake in the outcome," rather than "'in the hands of concerned bystanders,' who will use it simply as a 'vehicle for the vindication of value interests.'" *Diamond v. Charles*, 476 U.S. 54, 62

(1986) (citations omitted). In other words, federal courts are not, and were never intended to be, national forums for airing "generalized grievances." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

The elements of standing doctrine are straightforward: (1) "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court;" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (citations omitted). If a plaintiff seeks injunctive relief, it must also show "a real and immediate threat of repeated injury." *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983) (citation omitted).

The Supreme Court has explained how an organization can establish "association" standing to bring suit on behalf of its members. *See Hunt*, 432 U.S. at 342. To do so, the organization must demonstrate first that it is a genuine membership organization, and second that: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose; and" (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343. The first element requires at least one of the organization's members, called a "Standing Member," to "independently meet the Article III standing requirements." *Tex. Democratic Party*, 459 F.3d at 587. The organization must establish the elements of standing "for each claim [it] seeks to press and for each form of relief that is sought." *Town of Chester*, 137 S. Ct. at 1650; *see also Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F. 3d 358, 366 (5th Cir. 2018) ("Standing is not dispensed in gross; a party must have standing to challenge each particular inadequacy [at issue].")

- 4 -

The party invoking federal jurisdiction bears the burden of establishing that the three elements of standing—injury in fact, traceability, and redressability—are met. *Lujan*, 504 U.S. at 561. "The plaintiff bears the burden of establishing each of these elements 'with the manner and degree of evidence required at the successive stages of the litigation.'" *McMahon v. Fenves*, 323 F. Supp. 3d 874, 878 (W.D. Tex. 2018) (quoting *Lujan*, 504 U.S. at 561). Thus, "[a]t the motion-to-dismiss stage 'the plaintiff must clearly allege facts demonstrating each element" of standing. *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

ii.     **The traditional standing analysis applies here because UT uses a holistic admissions program of which race is only a "factor of a factor of a factor," and students are permitted to compete for all non-TTP seats.**

As set forth in SFFA's Complaint, UT offers a dual admissions system. First, under its Top Ten Percent ("TTP") Plan, UT fills 75% of its freshman class by automatically admitting Texas high school seniors who rank at the top of their graduating class. Although the TTP Plan initially aimed to admit all students in the top 10% of their graduating class, it was later amended to cap the program at 75% of the entering UT freshman class, resulting in automatic admission only to students in the top 6-7% of their graduating class in recent years. Am. Compl. ¶ 19, 93. The remaining 25% of the seats in the incoming freshman class are filled using a "holistic, full-file review" that combines the applicant's "Academic Index"—a combination of standardized test scores and high school rank—with a "Personal Achievement Index" ("PAI") score—a number based on the student's essays and a holistic review of his or her leadership qualities, honors and awards, extracurricular activities, work experience, community service, and other "special circumstances" about the student's background. *Id.* ¶¶ 25, 41-44; *Fisher II*, 136 S. Ct. at 2206. The "special circumstances" include "the socioeconomic status of the applicant's family, the socioeconomic status of the applicant's school, the applicant's family responsibilities, whether the applicant lives in a single-parent home, the applicant's SAT score in relation to the

average SAT score at the applicant's school, the language spoken at the applicant's home, and, finally, the applicant's race." *Fisher II*, 136 S. Ct. at 2206.

The individual PAI considerations are not assigned explicit numerical values, but rather are reviewed together on a "full-file" basis. *See id.* Race, therefore, does not "operate as a mechanical plus factor for underrepresented minorities." *Id.* As noted in *Fisher II*, "there can be no dispute that race is but a 'factor of a factor of a factor' in [UT's] holistic-review calculus." *Id.* And "because race is a factor considered in the unique context of each applicant's entire experience, it may be a beneficial factor for a minority or a non-minority student." *Fisher*, 758 F.3d at 638. In fact, it is difficult to determine how white students are harmed under this approach where each year white students comprise a *greater* percentage of students admitted through the holistic admissions process than they do under the race-neutral TTP Plan. Am. Compl. ¶¶ 103-09.

In these ways, UT's holistic policy lies in stark contrast to race-conscious policies that have created separate admissions tracks for minority applicants by setting aside specific seats or giving automatic bonus points to minority applicants. When set asides or mechanical preferences are involved, the Supreme Court has held that the "injury in fact" is the inability to compete on an equal footing in the admissions process, rather than the denial of a specific outcome. *Cf. Regents of Univ. of Ca. v. Bakke*, 438 U.S. 265, 316-18 (1978) (contrasting Harvard's race-conscious holistic admissions process with University of California at Davis Medical School's automatic exclusion of non-minority candidates from competition for fixed number of seats set aside for minority applicants); *Gratz v. Bollinger*, 539 U.S. 244, 261-62 (2003) (applicants from underrepresented groups automatically awarded 20 of 100 points needed to guarantee admission analogized to set-aside program). However, this standard has never been applied – nor was it intended to be applied – to a holistic admissions process that involves no automatic points, set-

asides, or other separate tracks for minority applicants but instead is "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and ***to place them on the same footing for consideration***, although not necessarily according them the same weight." *Grutter v. Bollinger*, 539 U.S. 306, 309 (2003) (citing *Bakke,* 438 U.S. at 334) (emphasis added). Accordingly, traditional standing principles apply to each of SFFA's four counts and claims for relief.

**b.      SFFA has failed to satisfy its burden under Article III to demonstrate standing with clear allegations supporting each claim.**

In support of its Standing Members' ability to otherwise bring its claims, SFFA offers three substantive allegations: (1) that its members "applied for and were denied admissions to UT-Austin's 2018 and 2019 entering classes;" (2) that these members were "denied the opportunity to compete for admission to UT-Austin on equal footing with other applicants on the basis of race or ethnicity because of UT-Austin's discriminatory admissions policies;" and (3) that these members "are ready and able to apply to transfer to UT-Austin when it stops discriminating against applicants on the basis of race and ethnicity." Am. Compl. ¶¶ 5-8. The Standing Members' white race and their status as rejected applicants and prospective transfer students to UT is not, and cannot be, enough to establish standing.

First, in order to establish standing to seek injunctive relief, SFFA must establish that its Standing Members who allegedly have been injured in fact by UT's race-conscious admissions policy face "a real and immediate threat that [they] w[ill] again suffer similar injury in the future." *Machete Prods., LLC v. Page*, 809 F.3d 281, 288 (5th Cir. 2015). Here, SFFA alleges that its members were and could again be denied admission because of their race based on four claims: UT's alleged use of race as more than a plus factor (Count I); UT's failure to consider race-neutral alternatives (Count II); UT's impermissible racial balancing (Count III); and any

consideration of race by UT is unlawful (Count IV). However, SFFA has not satisfied its burden of establishing standing because it has failed to allege any clear facts showing how its Standing Members have been harmed by such actions or how this Court's injunctive relief would redress their injury.

Instead, SFFA rests on only six allegations—appearing as Paragraphs 3-8 of the Complaint—to establish its standing.[1] Those allegations do not concern or address its four claims but only identify the party, SFFA, and its two white members who were denied admission into UT. Am. Compl. ¶¶ 3-8. While those facts are not irrelevant to the standing questions, they certainly do not fully satisfy the standing requirements for each of the four claims asserted by SFFA.

Conclusory allegations and general grievances about the use of race are simply not enough to satisfy the elements of standing for each claim for SFFA's associational members. *See*

---

[1] Ex. A, 161:15-17 (SFFA's Counsel, "Now, the paragraphs in the complaint that are about standing are the paragraphs from three to eight at the front end."). SFFA is so convinced that it need not present additional facts or provide surrounding context for the allegations supporting its standing that it refused, at its corporate representative's deposition, to allow Defendant-Intervenors to probe the basis for each of SFFA's four claims and one form of relief. The deposition notice included twenty-one topics including the "basis for any claim that any individual member of SFFA or SFFA has or would have standing to raise the challenges asserted by SFFA in the present lawsuit." Ex. B (SFFA 30(b)(6) Notice), at Exhibit A ¶ 11. As reflected in the attached deposition excerpts, when Defendant-Intervenors' counsel began inquiring into SFFA's allegations supporting its standing for each of the claims asserted, SFFA's counsel lodged several objections—in spite of the relevance to the jurisdictional issues and topics in the notice—and instructed the deponent: (1) not to answer questions to the extent they sought a legal conclusion, to which the deponent complied; and (2) not to answer questions because, in SFFA counsel's opinion, the questions were not relevant to the issues of standing and claim preclusion and exceeded the scope of the Court's Scheduling Order. *See, e.g.*, Ex. A, at 141:16-148:25; 158:2-12; 158:25-160:13; 162:25-166:1; 166:13-169:5; 169:19-174:12 174:16-175:19; 175:23-176:18; 177:3-180:25. SFFA did not object to the deposition notice nor did it seek a protective order. Should SFFA attempt to assert any facts outside of Paragraphs 3-8 in its response, Defendant-Intervenors reserve their right to move to strike such testimony due to the conduct of SFFA and its counsel and reserve their right to reopen the corporate representative's deposition as necessary.

*In re Gee*, 941 F.3d 153, 164 (5th Cir. 2019) ("'[U]nadorned speculation will not suffice to

invoke the federal judicial power.'") (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26,

44 (1976)); *Perry v. Brassell*, No. 18-cv-62, 2018 WL 5733173, at *2 (W.D. Tex. Oct. 18, 2018)

("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not

suffice to prevent a motion to dismiss.") (internal citation omitted). SFFA's threadbare recital of

its members' status as previously denied admission and "ready and able to apply to transfer" is

insufficient to give rise to a plausible claim of constitutional standing.

### i.     Count I: Failure to Use Race Merely as a Plus Factor

In Count I, SFFA alleges that UT discriminates on the basis of race by "employing an

undergraduate admissions policy that does not merely use race as a 'plus' factor in admissions

decisions to achieve student body diversity." Am. Compl. ¶ 200. It then suggests that "Statistical

and other evidence shows that UT-Austin can no longer justify using race at all, or at least must

justify it differently." *Id.* ¶ 201. However, that allegation has nothing to do with whether either of

the Standing Members were injured in fact or how UT's alleged use of race as more than a plus

factor harmed its members. It is merely a general grievance that UT uses race when SFFA thinks

it should not or should use it differently. SFFA continues in the next paragraph to suggest that

"each applicant is not evaluated as an individual. Instead, race or ethnicity is the defining feature

of the application. Only using race or ethnicity as a dominate factor in admissions decisions

could account for the decision to admit certain African-American and Hispanic applicants and

deny admission to certain white and Asian-American applicants." *Id.* ¶ 202.

At the pleading stage, a plaintiff is required to "clearly . . . allege facts demonstrating"

each element of Article III standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)

(vacating and remanding case to determine whether the particular procedural violations alleged

in the case entail a degree of risk sufficient to meet the concreteness requirement of injury-in-

fact). It has failed to do so. Nowhere in the complaint does SFFA clearly allege facts demonstrating how its injury is caused by UT's alleged use of race as more than a plus factor. If anything, the allegations in the Complaint belie SFFA's "more than a plus" claim. As noted earlier, SFFA's Amended Complaint shows that UT admits a much higher percentage of white students than Black and Latinx students under its race-conscious admissions plan compared to its race-neutral TTP Plan. For the two years when SFFA's Standing Members applied, white students constituted 45% (2018) and 42% (2019) of holistic admits compared to 30% (2018) and 29% (2019) of TTP admits. Am. Compl. ¶¶ 103, 107, 109. These alleged facts do not support SFFA's standing under this claim.

      **ii.**     **Count II: Race-Neutral Alternatives**

Under Count II, SFFA claims that UT discriminates on the basis of race "by employing racial preferences in undergraduate admissions when there are available race-neutral alternatives capable of achieving student body diversity, as its own practices already demonstrate." Am. Compl. ¶ 209. Plaintiff goes on to allege how nonracial alternatives—including its increased use of the TTP Plan, increased financial aid and recruitment, and elimination of admissions policies and practices that negatively affect minority applicants—would achieve UT's interest in student body diversity about as well as a race-based approach. *Id.* ¶ 212. Applying the traditional standing analysis, it is apparent that the Standing Members do not have standing to make such a claim, because the injury they have allegedly suffered—inability to compete for UT's admission seats on an equal footing—is not supported by any allegations demonstrating how their injury is traceable to UT's alleged failure to properly consider race-neutral plans nor how their purported injuries would be redressed by the relief therein proposed by SFFA.

In fact, like in Count I, SFFA's alleged facts contradict its claim that the Standing Members have been and will continue to be injured by UT's alleged failure to consider and

implement race-neutral alternatives. First, SFFA suggests that UT should be required to "maintain or increase the use of the Top Ten Percent Plan," because "[t]he race-neutral Top Ten Percent Plan has driven [] increased diversity" at UT over the past decade. *See id.* ¶¶ 103, 106, 111, 129, 212. However, there are no allegations in the Complaint demonstrating how SFFA's members have been harmed by UT's failure to lift the 75% cap on the TTP Plan and sworn testimony from both Standing Members shows they were not harmed. During depositions, both Standing Members admitted that they did not graduate in the top ten percent of their graduating class. *See* Ex. C (Standing Member No. 1 Dep.), 68:11-15; Ex. D (Standing Member No. 2 Dep.), 10:9-14. Thus, even if UT lifted the 75% cap on TTP Plan admits to include the full top ten percent of admits as requested by SFFA, neither Standing Member would benefit.

SFFA's other proposed race-neutral alternatives (increased financial aid and recruitment and elimination of factors biased against minority applicants) are similarly unsupported by any factual allegations of how its Standing Members have been harmed by UT's alleged failure to consider such alternatives. In fact, if UT increased financial aid and recruitment for minority applicants and eliminated factors that negatively affect minority applicants, Plaintiff's Standing Members likewise would not see an increased likelihood of admission to UT if these nonracial approaches were adopted or given more weight in UT's holistic admissions process. The Standing Members, both of whom identify as white and non-Hispanic, grew up in English-speaking households with two caregivers and parental income exceeding $100,000 per year, and attended private secondary schools without need-based financial aid.[2] Count II must be dismissed for failure to establish traceability or redressability for the Standing Members' alleged injuries.

---

[2] *See generally* Ex. C, 83:3-90:2; Ex. D, 30:19-23, 57:13-58:8, 60:2-15, 61:8-62:13, 67:21-68:8.

### iii.    <u>Count III: Racial Balancing</u>

Under Count III, Defendants allege that UT discriminates on the basis of race "by employing an undergraduate admissions policy that balances the class according to its racial or ethnic composition." Am. Compl. ¶ 220. SFFA next generally avers that UT "uses its admissions system to pursue quotas or proportional representation of racial or ethnic groups" and conclusively asserts that the "remarkable stability of UT-Austin's admissions figures for African-American students demonstrates that UT-Austin is seeking proportional representation of African Americans and is engaged in racial balancing." *Id.* ¶¶ 221-22. SFFA concludes, again without any clear facts in support, that there "is no non-discriminatory reason that could justify admissions figures this stable year after year given the unique characteristics of each applicant for admission." *Id.* ¶ 223. Like Counts I and II, SFFA has not satisfied its pleading burden to allege clear supporting facts demonstrating how the Standing Members have been harmed by this alleged racial balancing, what the quota is, and how Standing Members' injuries would be redressed by the discontinuance of racial balancing of African American students at UT.

In fact, according to SFFA's Complaint, the African American admits outside of the TTP Plan have fluctuated between 3% and 5% between 2010 and 2018, a fluctuating difference of 67%. *Id.* ¶ 106. Again, this only accounts for 25% of the admission slots since the race-neutral TTP Plan is the main driver for overall admission rates, accounting for the other 75% of admissions. Under the TTP Plan, for the same years, 2010-2018, African American admits have comprised between 5% and 7%. *Id.* ¶ 103. SFFA alleges that in *one year*, 2015, the TTP admits for African American students was 7% and the holistic admissions African American admits went down from 4% to 3% and that somehow evidences racial balancing. *Id.* ¶¶ 106, 174. Those allegations hardly suggest any facts indicating an illegal quota system for African American

students, let alone a system that harms Standing Members who applied in 2018 and 2019. Accordingly, Count III must be dismissed.

### iv.    <u>Count IV: Any Use of Race as a Factor for Admissions</u>

In Count IV, SFFA alleges that UT discriminates on the basis of race "by employing an undergraduate admissions policy that uses race as a factor in admissions." *Id.* ¶ 231. As SFFA admits, this claim asks the Court to overrule over 40 years of Supreme Court precedent authorizing universities to consider race holistically in the admissions process when pursuing the educational benefits of diversity, including racial diversity, through a system that meets the tenets of strict scrutiny. *Id.* ¶¶ 230-243. Like in Counts I-III, SFFA has failed to demonstrate with any facts, much less clear facts, how its Standing Members have been harmed by the lawful consideration of race, and how that harm would be redressed by an injunction.

SFFA has not alleged any facts demonstrating how, for example, its Standing Members would have been admitted to UT absent its race-conscious admissions policy; or that the consideration of race was an outcome-determinative factor in UT's decision to deny admission to the Standing Members. Having failed to allege a concrete and tangible harm not in conflict with its own allegations elsewhere, SFFA has not established the requisite injury-in-fact or traceability elements to support standing.

Additionally, SFFA has made no allegation concerning how the relief it seeks, *see id.* at 49, ¶¶ (a)-(f), will redress the Standing Members' alleged injuries. *See Fisher*, 758 F.3d at 640 ("Fisher argues only that she had suffered an 'injury in fact.' . . . Regardless of the district court's bifurcation of merits and remedies, the redressability of an injury is integral to the standing inquiry."). In the same way that it fails to allege that race played a role in UT's denial of the Standing Members' applications for admission, it also fails to allege facts showing that, if UT

were to abandon its race-conscious admissions policy, the Standing Members would be any more likely to gain admission to UT.[3] Count IV should be dismissed.

**c.**    **SFFA Does Not Have Standing To Pursue Its Sweeping Claim For Relief That Would Shield Students From Disclosing Their Race In Their UT Applications.**

Finally, SFFA does not have standing to pursue its claim for relief that would "requir[e] [UT] to conduct all admissions in a manner that does not permit those engaged in the decisional process to *be aware of or learn* the race or ethnicity of any applicant for admission." Am. Compl. at 49, ¶ (d) (emphasis added). This extraordinary injunctive remedy—untethered from any allegation in SFFA's complaint and undermined by SFFA's own Standing Members—is not alleged to have caused the purported injury, nor is it aimed at redressing the particular injury alleged.

The Supreme Court has recently, and repeatedly, confirmed that a plaintiff must establish standing "for each claim he seeks to press and for *each form of relief that is sought*." *Town of Chester*, 137 S. Ct. at 1650 (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)) (emphasis added); *see also Latitude Solutions v. DeJoria*, 922 F.3d 690, 695 (5th Cir. 2019) ("[A] plaintiff must . . . have "standing separately for each form of relief sought.") (internal citation omitted); *Riley v. Houston Nw. Operating Co., LLC*, No. 19-2496, 2020 WL 3103899, at *5 (N.D. Tex. June 11, 2020) (dismissing certain, but not all, categories of plaintiff's requested declaratory and injunctive relief because not all relief was aimed at redressing the plaintiff's alleged injury-in-fact). And as noted earlier, SFFA's associational standing turns, in

---

[3] *See also Tex. Low Income Housing Info. Serv. v. Carson*, 427 F. Supp. 3d 43, 59-60 (D.D.C. 2019) (finding that proposed relief that would "*make it far easier*" to advocate for affordable housing revealed "the speculative nature of [the plaintiff's] theory of relief") (emphasis in original); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 939 (D.C. Cir. 2004), *abrogated on other grounds by Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017)) (concluding that "a quest for ill-defined 'better odds' is not close to what is required to satisfy the redressability prong of Article III").

part, on whether "its members would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343.

Article III does not authorize relief that is untethered to concrete harm allegedly suffered by a plaintiff. *See Tenth Street Residential Assoc. v. City of Dallas, Tex.*, 968 F.3d 492, 503 (5th Cir. 2020) (citing *James v. City of Dallas, Tex.*, 254 F.3d 551, 567 (5th Cir. 2001) (rejecting plaintiff's standing where requested relief would "do nothing to help save additional homes from decrepitude or restore current decrepit conditions"), *abrogated on other grounds by M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 839-41 (5th Cir. 2012) (finding "traceability wanting where 'the broad relief requested [] does not address the particular injury suffered by these [] Plaintiffs'")); *see also In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019) (remarking that plaintiffs cannot "identify one injury and then bootstrap it to complain about other[]" practices that are not traceable to that injury); *Donald J. Trump for President, Inc. v. Booker*, No. 4:20-cv-2078, 2020 WL 6821992, at *12 (M.D. Pa. Nov. 21, 2020) ("Though every injury must have its proper redress, a court may not prescribe a remedy unhinged from the underlying right being asserted.") (citing *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.")). Moreover, a plaintiff seeking injunctive relief must "make a showing that some independent legal right is being infringed," which the equitable relief is designed to redress. *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) (quoting *Klay v. United Healthgroup Inc.*, 376 F.3d 1092, 1098 (11th Cir. 2004)); *see also*, *e.g.*, *Reyes v. N. Tex. Tollway Auth.*, 861 F.3d 558, 565 n.9 (5th Cir. 2017) (stating that a claim for injunctive relief is not "freestanding" and "must be supported by some underlying cause of action").

SFFA's Complaint is devoid of allegations that tie the relief requested in Paragraph (d)—an admissions process that shields officers from knowing the candidate's race—from the injury

alleged. In fact, not once in the 51-page complaint does SFFA mention harm, effects, or rights associated with UT's mere awareness of a candidate's race. Nor does SFFA allege an underlying legal right that is infringed by UT's awareness of a candidate's race. Instead, SFFA attributes its members' injury—i.e., "deni[al of] the opportunity compete for admission to [UT] on equal footing"—to "discriminatory admissions policies" that include "racial preferences," "racial balancing," and the "use of race as a factor in admissions." *See* Am. Compl. ¶¶ 6, 200, 203-04, 209, 214-15, 220, 225-26, 231, 240. Even before its Standing Members' deposition testimony is taken into account, SFFA has not established injury or traceability to pursue the relief sought in Paragraph (d).

The Standing Members upon whom SFFA relies for its associational standing confirmed at their depositions that neither supports the relief sought in Paragraph (d), and neither views UT's ***awareness*** of applicants' race as the cause of his alleged harm. Specifically, Standing Member No. 2 made clear his belief that college applicants should not be barred from "describ[ing] an experience that somehow reveals his or her race in the essay portion" or from "disclos[ing] his or her race when listing student organizations, leadership positions, or awards," nor should "that portion [] then be redacted by the admissions department before its review of the application." *See* Ex. D, 63:8-66:8. Asked whether he took issue generally with "students being able to disclose their race in their applications," he summarized: "[Applications are] a lot like an interview. You can't hide your race in an interview." *Id.* 66:9-16.

Like his classmate, Standing Member No. 1 disavowed the notion that UT should censor students' ability to identify with their race and share race-related experiences and achievements in their college applications. *See* Ex. C, 96:22-97:5 ("Through this lawsuit, you're not to trying to censor [Defendant-Intervenor] Ms. Trujillo or other students from being able to freely describe their own talents and experiences as it relates to their race and ethnicity, correct? . . . Witness:

No"), 103:17-23 ("And to be clear, you're not asking a federal court to step in, in this case and start censoring applications of students like [Defendant-Intervenors] Ms. Trujillo and Ms. McBride from even discussing their race or ethnicity in their applications, correct? . . . Witness: That's correct").

In sum, it is clear from both Standing Members' testimony that neither considers his past or future alleged injuries to have been caused by or to be traceable to UT's ***awareness*** of applicants' race. Likewise, it is clear that neither seeks nor supports the request for relief in Paragraph (d). SFFA is bound by this testimony, as its standing in this case is entirely derivative of that of its Standing Members' independent ability to bring suit. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) ("'Associational standing' is derivative of the standing of the association's members."). If either Standing Member had filed this case on his own, each would lack standing to pursue a remedy that he had expressly disavowed. *See, e.g.*, *Garcia v. eHealthScreenings, LLC*, No. 12-cv-1213, 2014 WL 517484, at *4 (W.D. Tex. Feb. 7, 2014) (deposition testimony regarding the basis of a plaintiff's claim constitutes judicial admission where "[t]he admission [was] clear, unambiguous, and intentional"). For this reason, and because the relief sought in Paragraph (d) is not traceable to or attributed as a cause of the alleged harm in the Complaint or elsewhere, SFFA has not established standing to pursue this claim for relief and it should be dismissed under Rule 12(b)(1).

### III.   CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that the Court dismiss SFFA's claims in their entirety, or as appropriate, individual claims, and its claims for relief, for lack of standing under Rule 12(b)(1).

Dated this 8th day of March, 2021.

/s/ Brian C. Pidcock
Brian C. Pidcock
State Bar No. 24074895
**HUNTON ANDREWS KURTH LLP**
600 Travis St.
Houston, TX 77002
Tel. (713) 220-4200
brianpidcock@HuntonAK.com

David Hinojosa*
State Bar No. 24010689
Genevieve Bonadies Torres (*pro hac vice*)
**LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW**
1500 K Street, NW, Suite 900
Washington, DC 20005
Tel. (202) 662-8600
dhinojosa@lawyerscommittee.org
gbonadies@lawyerscommittee.org
*W.D. Texas Application Pending

Ryan P. Phair (*pro hac vice*)
Carter C. Simpson (*pro hac vice*)
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Avenue, NW
Washington, D.C. 20037
Tel. (202) 955-1500
rphair@huntonak.com
csimpson@huntonak.com

Alan R. Kabat (*pro hac vice*)
Bernabei & Kabat, PLLC
1400 - 16th Street, N.W., Suite 500
Washington, D.C. 20036-2223
Tel. (202) 745-1942 (ext. 242)
Kabat@BernabeiPLLC.com

*Attorneys for Defendant-Intervenors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served on the

below counsel of record via the Court's electronic case filing and service system on this 8th day

of March, 2021.

William S. Consovoy
J. Michael Connolly
Cameron T. Norris
Steven C. Begakis
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
will@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
steven@consovoymccarthy.com

*Attorneys for Plaintiff*

John J. McKetta, III
Matthew C. Powers
William Christian
Marianne W. Nitsch
GRAVES DOUGHERTY HEARON & MOODY PC
401 Congress Avenue, Suite 2700
Austin, Texas 78701
mmcketta@gdhm.com
mpowers@gdhm.com
wchristian@gdhm.com
mnitsch@gdhm.com

*Attorneys for Defendants*

*/s/ Brian C. Pidcock*
Brian C. Pidcock