IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Cause No. 1:20-cv-763-RP |
| UNIVERSITY OF TEXAS AT AUSTIN, et al., | § § § | |
| Defendants. | § | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR DISMISSAL
BASED ON LACK OF STANDING, RES JUDICATA, AND COLLATERAL ESTOPPEL**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................... iii

TABLE OF EXHIBITS ........................................................................................viii

I.      OVERVIEW ...........................................................................................1

II.     BACKGROUND.....................................................................................3

    A.   Introduction .................................................................................3

    B.   The *Fisher* Litigation .................................................................4

    C.   SFFA founding, structure, and membership ...........................7

    D.   The current lawsuit ...................................................................12

III.    ARGUMENT..........................................................................................13

    A.   SFFA bears the burden to show standing ..............................13

    B.   SFFA cannot demonstrate "associational standing."..............15

        1.   SFFA is not a "traditional membership" organization ...............16

        2.   SFFA fails the "indicia of membership" test ...................18

        3.   SFFA does not serve a "specialized segment" of the population ...................23

    C.   SFFA's claims are barred by res judicata ...............................24

        1.   Identity of parties or those in privity ..............................25

        2.   Jurisdiction ......................................................................29

        3.   Final judgment on the merits ..........................................29

        4.   Same claim or cause of action .........................................29

    D.   SFFA's claims are barred by collateral estoppel ...................31

IV.     PRAYER ...............................................................................................33

CERTIFICATE OF SERVICE................................................................................34

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*AARP v. United States Equal Emp't Opportunity Comm'n,*
  226 F. Supp. 3d 7 (D.D.C. 2016) ................................................................... 21, 24

*Adams v. City of Indianapolis,*
  742 F.3d 720 (7th Cir. 2014) ............................................................................30

*Advocacy Ctr. for Elderly & Disabled v. Louisiana Dep't of Health & Hosps.,*
  731 F. Supp. 2d 583 (E.D. La. 2010) ...............................................................19

*Air All. Houston v. U.S. Chem. & Safety Hazard Investigation Bd.,*
  365 F. Supp. 3d 118 (D.D.C. 2019) .................................................................23

*Allen v. McCurry,*
  449 U.S. 90 (1980) ...........................................................................................24

*Am. Legal Found. v. F.C.C.,*
  808 F.2d 84 (D.C. Cir. 1987) ...........................................................................19

*Am. Postal Workers Union Columbus Area Local v. U.S. Postal Service,*
  736 F.2d 317 (6th Cir. 1984) ................................................................... 28 n. 4

*Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees,*
  19 F.3d 241 (5th Cir. 1994) ..........................................................................19,

*Cahill v. Arthur Andersen & Co.,*
  659 F. Supp. 1115 (S.D.N.Y.), aff'd, 822 F.2d 14 (2d Cir. 1987) ...................25

*Cichocki v. Mass. Bay Cmty. Coll.,*
  199 F. Supp. 3d 431 (D. Mass. 2016) ..............................................................26

*Compare Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.,*
  686 F. Supp. 2d 663 (E.D. La. 2010) ...............................................................22

*Ctr. for Biological Diversity v. United States Envt'l Prot. Agency,*
  937 F.3d 533 (5th Cir. 2019) ...........................................................................15

*Diamond v. Charles,*
  476 U.S. 54 (1986) ..................................................................................... 14, 23

*Ferris v. Cuevas,*
  118 F.3d 122 (2d Cir. 1997) ............................................................................28

*Fisher v. Univ. of Tex. at Austin,*
  136 S. Ct. 2198 (2016) ............................................................... 3, 7, 29, 30, 32

*Fisher v. Univ. of Texas at Austin,*
   570 U.S. 297 (2013) ..................................................................................... 7, 29, 32

*Fisher v. Univ. of Texas at Austin,*
   631 F.3d 213 (5th Cir. 2011) .................................................................................. 7

*Fisher v. Univ. of Texas at Austin,*
   645 F. Supp. 2d 587 (W.D. Tex. 2009) .................................................................. 7

*Fisher v. Univ. of Tex. at Austin,*
   758 F.3d 633 (5th Cir. 2014) ............................................................................7, 28

*Flyers Rights Educ. Fund, Inc. v. United States Dep't of Transp.,*
   957 F.3d 1359 (D.C. Cir. 2020) ..................................................................... 21, 22

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
   129 F.3d 826 (5th Cir. 1997) ....................................................... 14, 16, 18, 19

*Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.,*
   95 F.3d 358 (5th Cir. 1996) ............................................................... 13, 19, 22

*Fund Democracy, LLC v. S.E.C.,*
   278 F.3d 21 (D.C. Cir. 2002) ......................................................................... 18, 20

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l,*
   695 F.3d 330 (5th Cir. 2012) ................................................................................ 19

*Gonzalez v. Banco Cent. Corp.,*
   27 F.3d 751 (1st Cir. 1994) .....................................................................26, 28 n.4

*Grant v. Harris County,*
   794 F. App'x 352 (5th Cir. 2019) ........................................................................ 24

*Group Health Plan, Inc. v. Philip Morris, Inc.,*
   86 F. Supp. 2d 912 (D. Minn. 2000) ............................................................. 19, 22

*Grutter v. Bollinger,*
   539 U.S. 306 (2003) .............................................................................................. 29

*Grynberg v. BP, P.L.C.,*
   527 F. App'x 278 (5th Cir. 2013) ........................................................................ 26

*Havercombe v. Dep't of Educ. of Com. of P.R.,*
   250 F.3d 1 (1st Cir. 2001) .................................................................................... 30

*Hopwood v. Texas,*
   78 F.3d 932 (5th Cir. 1996) ................................................................................. 29

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ............................................................... 15, 18, 19, 23, 24

*In re Ark–La–Tex Timber Co., Inc.*,
  482 F.3d 319 (5th Cir. 2007) ................................................................ 24

*In re Baudoin*,
  981 F.2d 736 (5th Cir. 1993) ................................................................ 29

*In re Howe*,
  913 F.2d 1138 (5th Cir. 1990) ............................................................... 29

*In re Joseph P. Conte Toyota, Inc.*,
  167 F.3d 537 (5th Cir. 1998) ................................................................ 26

*In re Southmark Corp.*,
  163 F.3d 925 (5th Cir. 1999) ............................................................ 24, 29

*Keystone Shipping Co. v. New England Power Co.*,
  109 F.3d 46 (1st Cir. 1997) .................................................................. 32

*Knowledge Ecology Int'l v. Nat'l Institutes of Health*,
  2019 WL 1585285 (D. Md. Apr. 11, 2019) ................................................. 23

*Leon v. Martin*,
  79 Va. Cir. 434 (2009) ........................................................................ 17

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................... 13

*Mandarino v. Pollard*,
  718 F.2d 845 (7th Cir. 1983) ................................................................ 25

*N.A.A.C.P. v. City of Kyle, Tex.*,
  626 F.3d 233 (5th Cir. 2010) ................................................................ 14

*Pace v. Bogalusa City Sch. Bd.*,
  403 F.3d 272 (5th Cir. 2005) ................................................................ 31

*Package Shop, Inc. v. Anheuser-Busch, Inc.*,
  1984 WL 6618 (D.N.J. Sept. 25, 1984) ................................................ 20, 21

*Pelletier v. Zweifel*,
  921 F.2d 1465 (11th Cir. 1991) .............................................................. 25

*Pharm. Research & Mfrs. Am. v. Thompson*,
  362 F.3d 817 (D.C. Cir. 2004) .............................................................. 24

*Pharm. Research & Mfrs. of Am. v. Thompson,*
259 F. Supp. 2d 39 (D.D.C. 2003) ...................................................................................24

*Pub. Emps. for Envtl. Responsibility v. U.S. Chem. Safety & Hazard Investigation Bd.,*
2019 WL 4565521 (D.C. Cir. Aug. 26, 2019) ..................................................................23

*Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.,*
123 F.3d 111 (3d Cir. 1997) ................................................................................16, 17, 26

*Ramallo Bros. Printing, Inc. v. El Dia, Inc.,*
490 F.3d 86 (1st Cir. 2007)...............................................................................................32

*Robin Singh Educ. Servs. Inc. v. Excel Test Prep Inc.,*
274 F. App'x 399 (5th Cir. 2008) .....................................................................................31

*Russell v. SunAmerica Sec. Inc.,*
962 F.2d 1169 (5th Cir. 1992)...............................................................................25, 26, 28

*Shults v. Tex.,*
762 F.2d 449 (5th Cir. 1985) ............................................................................................31

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
980 F.3d 157 (1st Cir. 2020)..............................................................................................17

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
261 F. Supp. 3d 99 (D. Mass. 2017)..................................................................................17

*Students for Fair Admissions, Inc. v. Univ. of N. Carolina,*
2018 WL 4688388 (M.D.N.C. Sept. 29, 2018) .................................................................17

*Students for Fair Admissions, Inc. v. Yale Univ.,*
3:21-CV241-KAD ..............................................................................................................14

*Swate v. Hartwell,*
99 F.3d 1282 (5th Cir. 1996) ............................................................................................24

*Taylor v. Sturgell,*
553 U.S. 880 (2008) ...............................................................................................26, 27, 28

*Tex. Cable & Telecomms. Ass'n v. Hudson,*
265 F. App'x 210 (5th Cir. 2008) .....................................................................................13

*Texas Democratic Party v. Benkiser,*
459 F.3d 582 (5th Cir. 2006) ............................................................................................15

*Tex. Indigenous Council v. Simpkins,*
2014 WL 252024 (W.D. Tex. Jan. 22, 2014)....................................................................22

*Walgreen Co. v. La. Dep't of Health & Hosps.,*
    220 F. App'x 309 (5th Cir. 2007) ..................................................................................31

*Wash. Legal Found. v. Leavitt,*
    477 F. Supp. 2d 202 (D.D.C. 2007) ....................................................................... 18, 19

*Williamson v. Tucker,*
    645 F.2d 404 (5th Cir. 1981) ......................................................................................13

## RULES AND STATUTES

FED. R. CIV. P. § 12(h)(3) ......................................................................................................1

FED. R. CIV. P. § 56 ..............................................................................................................1

42 U.S.C. § 1981 .....................................................................................................1, 13, 25, 31

42 U.S.C. § 1983 .....................................................................................................1, 7, 25, 31

42 U.S.C. § 2000d .....................................................................................................1, 7

VA. CODE § 13.1-819(E) ......................................................................................................17

VA. CODE § 13.1-837 ...........................................................................................................12

VA. CODE § 13.1-932(C) ......................................................................................................12

VA. CODE § 13.1-933(B)(3) ..............................................................................................2, 12

VA. CODE § 13.1-933 (D) ......................................................................................................2

FED. PRAC. & PROC.: JURISDICTION § 4449 (1981)
    18 C. WRIGHT, A. MILLER & E. COOPER .........................................................................25

# TABLE OF EXHIBITS

A.      Excerpts from the 2018 Deposition of Blum, as corporate representative for SFFA

B.      Excerpts from the 2021 Deposition of Blum, as corporate representative for SFFA

C.      Original Petition in *SFFA v. University of Texas*, Cause No. D-1-GN-17-002930, in the 53rd Judicial District Court for Travis County, Texas

D.      Order of Dismissal in *SFFA v. University of Texas*, Cause No. D-1-GN-17-002930, in the 53rd Judicial District Court for Travis County, Texas

E.      Dismissal of Appeal from *SFFA v. University of Texas*, Cause No. D-1-GN-17-002930, in the 53rd Judicial District Court for Travis County, Texas

F.      Original Petition in *SFFA v. University of Texas*, Cause No. D-1-GN-19-002739, in the 53rd Judicial District Court for Travis County, Texas

G.      Notice of Nonsuit in *SFFA v. University of Texas*, Cause No. D-1-GN-19-002739, in the 53rd Judicial District Court for Travis County, Texas

H.      Second Amended Original Complaint, *Fisher v. University of Texas at Austin*, 1:08CV263-SS, in the United States District Court for the Western District of Texas

I.      "One Man Standing Against Race-Based Laws," *New York Times*, 2/23/12 [Dep ex 12]

J.      SFFA Articles of Incorporation

K.      Project on Fair Representation "Our Cases" webpage [Dep ex 25]

L.      Unanimous Written Consent in Lieu of Meeting, Adopting SFFA Bylaws (8/6/2014)

M.      Unanimous Written Consent in Lieu of Meeting, Amending SFFA Bylaws (6/19/2015)

N.      SFFA Form 990 for 2019 (excerpted) [Dep ex 27]

O.      SFFA's Second Supplemental Objections and Responses to Defendants' First Set of Interrogatories, Cause No. D-1-GN-17-002930, in the 53rd Judicial District Court for Travis County, Texas

P.      SFFA's Objections and Responses to Defendants' First Set of Interrogatories in this suit (excerpted)

Q.      Standing Member No. 1 Deposition Transcript (excerpted and redacted)

R.      Standing Member No. 2 Deposition Transcript (excerpted and redacted)

S.      Final Judgment, *Fisher v. Univ. of Tex. at Austin*, 1:08CV263-SS, in the United States District Court for the Western District of Texas

T.      Declaration of Matthew C. Powers

TO THE HONORABLE COURT:

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants move for summary judgment based on Plaintiff's lack of standing, and in the alternative, based on res judicata and collateral estoppel.  If the Court were to identify any factual issues that preclude Rule 56 judgment on standing, Defendants ask that the Court consider this jurisdictional motion as a motion to dismiss under Rule 12(h)(3) and conduct an evidentiary hearing as to any such factual issues.

## I.    OVERVIEW

In its First Amended Original Complaint, Plaintiff Students for Fair Admissions, Inc. ("SFFA") asserts claims for declaratory and injunctive relief against the University of Texas at Austin ("UT Austin"), the Board of Regents of the University of Texas System ("the UT System Board of Regents"), and sixteen of their individual officials (collectively, "Defendants"), alleging Defendants improperly consider race as a factor in the undergraduate admissions process, contrary to the Fourteenth Amendment of the United States Constitution, Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*), and 42 U.S.C. §§ 1981 and 1983.  This motion seeks dismissal or summary judgment based on two threshold issues: standing and res judicata/collateral estoppel.

**SFFA's complaint fails for lack of standing.**  SFFA relies on associational standing to bring its claims in a representative capacity on behalf of its "members."  Though SFFA has prevailed on that assertion in other cases, it should not prevail here for at least three reasons.

First, those courts siding with SFFA did not cite, and gave no apparent consideration to, the fact that SFFA's articles of incorporation establish SFFA as a *non-membership* entity under the Virginia law under which SFFA was formed.  Those articles of incorporation have never been amended, and they trump any contrary provisions concerning membership in SFFA's bylaws.  Under controlling precedent, by definition, SFFA is thus not a "traditional membership organization."

Second, SFFA's choice to charter itself as a statutory non-membership organization was strategic and purposeful.  It wished to avoid the mandatory statutory requirements of a Virginia membership organization that would have required SFFA to allow its members to know who each other are. *See* VA. CODE § 13.1-933(B)(3) and (D).  SFFA's request to be treated as a membership association for standing purposes stands in stark contrast to its choice to have no true members under its law of formation, as well as its choice to deny its so-called "members" any right or ability to associate with one another.  Indeed, because its "members" have no meaningful role to play in election of leadership, service in the organization, or financing of its activities—all of which have been tightly controlled by SFFA's founder and president, Edward Blum—SFFA is neither a traditional membership organization, nor its functional equivalent.

Last, this is the first case SFFA has filed that will be decided under the precedents of the Fifth Circuit.  As compared to the decisions of courts in other circuits on which SFFA has relied elsewhere, the Fifth Circuit has embraced a more robust incorporation of the Supreme Court's associational standing and "indicia of membership" tests.  SFFA's claim of standing fails under the Fifth Circuit's articulation of those tests.

**SFFA's claims are also barred by the twin doctrines of res judicata and collateral estoppel.**  First, under traditional res judicata principles, a final judgment in a lawsuit between two parties bars either party—or, as here, parties with whom the first parties are in "privity"—from filing a second lawsuit involving the same claims.  Below, Defendants show that SFFA is in privity with the plaintiff in *Fisher v. University of Texas at Austin*, for claim preclusion purposes, and also that the claims arise out of the same nucleus of operative facts, thus barring SFFA's attempt to re-litigate the legality of UT-Austin's undergraduate admissions program.

Second, under the doctrine of collateral estoppel, SFFA is bound by prior, adverse rulings against this party in privity.  Because SFFA is in privity with Fisher, SFFA may not ask this Court to

reconsider issues already passed on by the United States Supreme Court and other courts, contrary to the rulings of those courts. Those prior rulings are binding on SFFA and require judgment in Defendants' favor.

## II.    BACKGROUND

### A.    Introduction.

On June 23, 2016, the United States Supreme Court issued the second of its two opinions in *Fisher*, concluding more than eight years of litigation over the permissibility of UT-Austin's considering race among many other factors in the holistic review process that UT-Austin uses in its undergraduate admissions program. Though not himself a plaintiff, Edward Blum—the self-proclaimed "architect" of the lawsuit—had hand-picked Abigail Fisher to serve as the lawsuit's plaintiff, connected her with lawyers of his choosing, and coordinated the lawsuit's funding through the Project on Fair Representation ("POFR"), a political advocacy organization for which he was president, executive director, and co-founder. (Exhibit A, Blum 2018 Tr. at 53:6-54:6, 106:4-9, 111:5-8, 111:22-113:1, 117:25-118:17, 119:16-120:4; Exhibit B, Blum 2021 Tr. at 15:9-17:2, 24:17-20, 113:9-115:13).[1] After years of litigation, the United States Supreme Court ruled against Fisher and upheld UT-Austin's limited consideration of race in undergraduate admissions. *Fisher v. Univ. of Tex. at Austin*, 579 U.S. ___, 136 S. Ct. 2198 (2016) ("*Fisher II*").

While Blum and Fisher were disappointed, they were not deterred. On the very day that the Court delivered the *Fisher* opinion, Blum began planning a new lawsuit. (Exhibit A, Blum 2018 Tr. at 137:12-138:9; Exhibit B, Blum 2021 Tr. at 20:9-21:20). Rather than accept the ruling that the Court had just issued as final, Blum chose to pursue renewed litigation against Defendants in hopes for a

---

[1] Notwithstanding the confidentiality markings on the deposition transcripts, Plaintiff has agreed to withdraw those designations for purposes of the excerpts filed with this motion.

different result, this time using SFFA (which Blum also founded) as the plaintiff.  (Exhibit A, Blum 2018 Tr. at 17:3-11, 27:4-20, 137:12-138:9; Exhibit B, Blum 2021 Tr. at 20:9-21:20).

Roughly a year later, SFFA filed in state court the first of what are now three successive lawsuits against UT-Austin.  (Exhibit B, Blum 2021 Tr. at 8:11-15, 10:11-11:6, 21:21-22:2; Exhibit C).  SFFA and Blum acknowledge that their ultimate goal and purpose is to overturn the loss that Fisher and Blum suffered when the United States Supreme Court approved UT-Austin's use of holistic review in admissions and the limited consideration UT-Austin gives to race.  (Exhibit A, Blum 2018 Tr. at 17:3-20:18).

SFFA's 2017 state court suit against UT-Austin was dismissed for lack of standing after SFFA failed to demonstrate it had any members who would have been able to show standing on an individual basis.  (Exhibit D).  SFFA appealed the dismissal but voluntarily dismissed its appeal before briefing.  (Exhibit E).  SFFA then brought a second state-court suit against UT-Austin in 2019 but nonsuited it in 2020 before Defendants' standing or res judicata challenges could be decided.  (Exhibit F; Exhibit G).

## B.    The *Fisher* Litigation.

Abigail Fisher brought suit in federal court in 2008 challenging UT-Austin's limited consideration of race in undergraduate admissions through holistic review (the "*Fisher* Litigation").  (Exhibit H).

The *Fisher* Litigation was funded exclusively by POFR, an organization formed and controlled by Edward Blum.  (Exhibit A, Blum 2018 Tr. at 53:6-54:6; Exhibit B, Blum 2021 Tr. at 22:3-24, 24:17-20).

Blum considers himself "Yenta the Matchmaker" and an "architect" for identifying a legal issue of interest to him, selecting a suitable plaintiff to litigate the issue, pairing that litigant with lawyers, funding the litigation, and assisting in whatever manner he can in prosecuting the lawsuit.

(Exhibit A, Blum 2018 Tr. at 7:22-8:15; 111:22-113:13; Exhibit B, Blum 2021 Tr. at 15:9-18:15).  Blum summarizes his role as this: "I find the plaintiff, I find the lawyer, and I put them together, and then I worry about it for four years."  (Exhibit A, Blum 2018 Tr. at 123:6-124:9; Exhibit I [Dep ex 12] at 2).  Blum characterizes his selection of attorneys and plaintiffs in personal terms: "I hire counsel to help me achieve that goal."  (Exhibit A, Blum 2018 Tr. at 112:1-19).

In recruiting plaintiffs to litigate the causes Blum had identified, Blum would say: "I want to represent her."  (Exhibit A, Blum 2018 Tr. at 128:12-129:10).  He has performed this role on more than 30 occasions since 1993.  (Exhibit A, Blum 2018 Tr. at 9:8-10:8; Exhibit B, Blum 2021 Tr. at 17:17-20).  Although he generally talks about his involvement in those lawsuits using first-person pronouns, his involvement is often through an entity rather than himself personally.  (Exhibit A, Blum 2018 Tr. at 11:1-13).  One such entity is SFFA.  (*Id.*).

For the 2008 lawsuit against UT-Austin, Blum was the person who: (1) identified the basic issues to be litigated; (2) selected the individual(s) to be the "friendly face" of the case as plaintiff; (3) selected and communicated with the attorneys to represent Blum's hand-picked plaintiff, Abigail Fisher; and (4) coordinated fundraising efforts to finance the litigation through his organization, POFR.  (Exhibit A, Blum 2018 Tr. at 53:6-8, 117:25-118:3, 120:2-4, 182:5-183:15; Exhibit B, Blum 2021 Tr. at 116:1-117:23).  Blum "wanted the supreme court to strike down UT's admissions policies[;] that was our hope and that was the intention of the lawsuit."  (Exhibit A, Blum 2018 Tr. at 15:5-16:10).

It took Blum nearly three years to find Fisher to serve as a plaintiff in the lawsuit he conceived to challenge UT-Austin's admissions practices.  (Exhibit A, Blum 2018 Tr. at 117:25-118:3; Blum 2021 Tr. at 114:18-24).  Blum has known her father, Richard Fisher, since the 1980s through professional interaction.  (Exhibit A, Blum 2018 Tr. at 33:12-22).  For many years, Blum and Richard Fisher have

spoken on an almost daily basis, including about investments in which they are co-investors.  (Exhibit A, Blum 2018 Tr. at 35:17-36:19).

Blum substantially controlled the *Fisher* Litigation, notwithstanding that it was prosecuted in the name of Abigail Fisher, his hand-picked plaintiff.  While Blum is not a lawyer (Exhibit A, Blum 2018 Tr. at 26:2-3), he was Fisher's "representative for purpose of facilitating and receiving legal communications for her benefit" in the *Fisher* Litigation for the period 2008 through 2016.  (Exhibit A, Blum 2018 Tr. at 183:8-15).  He served as "her representative in *making and helping with decisions* and communicating with counsel."  (Exhibit A, Blum 2018 Tr. at 182:10-13 (emphasis added)).  When referring to significant events in the *Fisher* Litigation, Blum describes himself as having a personal role: "After the lawsuit was filed, … *we* amended *our* complaint to add another plaintiff."  (Exhibit A, Blum 2018 Tr. at 118:11-14 (emphasis added)).  Blum personally had discussions with the trial and appellate lawyers in the *Fisher* lawsuit at the district court stage, at the court of appeals stage, and at the United States Supreme Court stage.  (Exhibit A, Blum 2018 Tr. at 179:7-20).  Because of his special role in the lawsuit, Blum considered his communications to be privileged, (Exhibit A, Blum 2018 Tr. at 190:16-25), and SFFA has asserted "attorney-client privilege" to prevent any questioning about Blum's communications with Fisher or with her counsel in the *Fisher* Litigation.  (Exhibit A, Blum 2018 Tr. at 179:21-180:8).

The *Fisher* Litigation challenged UT-Austin's allegedly "racially discriminatory policies and procedures in administering the undergraduate admissions program."  (Exhibit H, *Fisher* Second Am. Compl. ¶ 1).  As is the case here, the defendants in the *Fisher* Litigation included UT-Austin, UT-Austin's President and Director of Undergraduate Admissions, and the Chancellor and Regents of The University of Texas System (in their official capacities).  (*Id.* ¶¶ 18-24).  Fisher alleged that UT-Austin's policies and procedures discriminated against her based on her race—namely, that she, a white applicant, had been rejected because UT-Austin "employed an admissions plan relying on race-

based affirmative action in order to increase the number of African-American and Hispanic students admitted to UT Austin." (*Id.* ¶¶ 1, 7, 31).  She claimed that UT-Austin's computation of a Personal Achievement Index resulted in her being "rejected … on account of [her] race" and violated (i) the Equal Protection Clause of the Fourteenth Amendment, (ii) 42 U.S.C. § 1981, (iii) 42 U.S.C. § 1983, and (iv) 42 U.S.C. § 2000d *et seq.* (*Id.* at pages 28-31).

The United States District Court for the Western District of Texas ruled against Fisher.  *Fisher v. Univ. of Texas at Austin*, 645 F. Supp. 2d 587 (W.D. Tex. 2009).  Fisher appealed.  The Fifth Circuit ruled against Fisher.  631 F.3d 213 (5th Cir. 2011).

The United States Supreme Court issued its first opinion in the *Fisher* Litigation on June 24, 2013, remanding the matter.  570 U.S. 297 (2013) ("*Fisher I*").

On remand, once again, the Fifth Circuit ruled against Fisher.  758 F.3d 633 (5th Cir. 2014).  Fisher again sought review by the United States Supreme Court.

On June 23, 2016, the United States Supreme Court issued its second opinion in the *Fisher* Litigation, approving UT-Austin's use of holistic review in admissions and approving the limited consideration the university gives to race as one of many factors in its review.  579 U.S. ___, 136 S. Ct. 2198 (2016) ("*Fisher II*").

On the very day that the Supreme Court announced its ruling against Fisher and in favor of UT-Austin —June 23, 2016—Blum decided to file a state-court lawsuit to challenge UT-Austin's use of holistic review in undergraduate admissions.  (Exhibit A, Blum 2018 Tr. at 137:12-138:9).  This time, he chose SFFA as the vehicle for his new legal challenge against UT-Austin's admissions program.  (Exhibit A, Blum 2018 Tr. at 17:3-11).

**C.     SFFA founding, structure, and membership.**

SFFA is a nonprofit corporation that was formed under Virginia law on July 30, 2014. (Exhibit J).

SFFA was formed by Edward Blum alone, with the ultimate goal to have the United States Supreme Court revisit prior decisions and end any consideration of race and ethnicity in college admissions.  (Exhibit A, Blum 2018 Tr. at 17:3-11).  In forming SFFA and choosing its governance structure, Blum sought the opinions and involvement exclusively of scholars, law professors, think-tank fellows, and counsel.  (Exhibit B, Blum 2021 Tr. at 34:1-37:18, 41:5-10).  None of the individuals Blum consulted fell within the category of people SFFA was purportedly meant to serve (*i.e.*, none were seeking, nor had been denied, admission to any college or university).  (*Id.*).

In October 2014, SFFA filed two lawsuits challenging the admissions policies and practices of Harvard College and the University of North Carolina, respectively.  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 1:14CV14176; *Students for Fair Admissions, Inc. v. Univ. of N. Carolina*, 1:14CV954.

The initial funding for SFFA was provided by Blum's other nonprofit, POFR, which had funded the *Fisher* Litigation.  (Exhibit A, Blum 2018 Tr. at 52:23-54:8; Exhibit B, Blum 2021 Tr. at 24:17-25:2).  On its website, POFR characterizes each of SFFA's lawsuits, as well as the *Fisher* Litigation and other lawsuits, as "Our Cases."  (Exhibit K [Dep ex 25]).  Blum wrote the "Our Cases" section, with input from the litigation counsel he had selected.  (Exhibit A, Blum 2018 Tr. at 155:20-157:21, 158:8-159:9).

SFFA's Articles of Incorporation provide that SFFA "shall have no members."  (Exhibit J).  SFFA has never amended its Articles of Incorporation.  (Exhibit B, Blum 2021 Tr. at 50:21-51:8).  It was Blum's decision that there would be no voting members.  (Exhibit A, Blum 2018 Tr. at 22:21-23:3, 27:4-29:10, 39:19-22).

SFFA's original bylaws stated: "The Corporation shall have no members within the meaning of the [Virginia Nonstock Corporation] Act."  (Exhibit L § 3.01).  The original bylaws provided for "one class of affiliate members," who "have no voting rights and are not members within the meaning

of the Act." (*Id.* § 3.02; Exhibit A, Blum 2018 Tr. at 37:14-39:2; Exhibit B, Blum 2021 Tr. at 55:12-57:12).

SFFA's original Board of Directors consisted of three directors: Edward Blum, Abigail Fisher, and Richard Fisher. (Exhibit L at 4). Each has continued to serve as a director from SFFA's inception through the present time. (Exhibit A, Blum 2018 Tr. at 32:10-33:11; Exhibit B, Blum 2021 Tr. at 41:23-42:5). SFFA's three officers were—both originally and at all subsequent times—Edward Blum (president), Abigail Fisher (secretary), and Richard Fisher (treasurer). (*Id.*; Exhibit L at 1).

In 2015, SFFA adopted amended bylaws. (Exhibit M). Although the Articles of Incorporation continue to provide that "[t]he Corporation shall have no members," the amended bylaws state (i) that the Corporation "shall have one class of members, referred to as General Members, which shall not be 'members' within the meaning of the Act," and (ii) that the non-statutory "General Members" shall have "the right to vote for one (1) Member-Elected Director." (*Id.* §§ 3.01, 3.02; Exhibit B, Blum 2021 Tr. at 61:14-62:22).

The 2015 amended bylaws enlarged the number of directors from three to five. (Exhibit M § 4.02; Exhibit A, Blum 2018 Tr. at 65:9-11). Four director seats are board-selected, meaning four-fifths of the board can be, and has been, entirely self-perpetuating. (Exhibit M §§ 4.02, 4.04; Exhibit A, Blum 2018 Tr. at 65:4-14). The one remaining director is elected by the non-statutory "General Members." (Exhibit M § 4.04(b); Exhibit A, Blum 2018 Tr. at 65:4-8). Thus, the non-statutory "General Members" have no power to vote for the positions held by Blum, Abigail Fisher, or her father Richard Fisher, or a fourth director—all of whom are elected (and repeatedly re-elected) solely by the five-person board. (Exhibit B, Blum 2021 Tr. at 66:16-22).

Blum has testified that he regards himself, Abigail Fisher, and Richard Fisher as permanent directors and officers. (Exhibit A, Blum 2018 Tr. at 79:24-80:5, 89:22-25, 93:20-94:3; Exhibit B, Blum Tr. 2021 at 29:24-32:5). A fourth director was initially Edward Chen, whom Blum—in his self-

described "Yenta the Matchmaker" role—had, on three prior occasions, identified and funded to become a plaintiff in lawsuits addressing political issues that Blum wished to litigate. (Exhibit A, Blum 2018 Tr. at 10:9-20, 69:25-72:23). Chen was a director from late 2015 through 2016, when he resigned. (Exhibit A, Blum 2018 Tr. at 65:15-66:3). The initial fifth director, elected by non-statutory "General Members" in December 2015, was J.Z. "Joe" Zhou. (Exhibit A, Blum 2018 Tr. at 69:13-21). Alex Chen (unrelated to Edward Chen) was later elected as the non-statutory "General Member" selection, followed by Eva Guo, who currently serves in that role. (Exhibit A, Blum 2018 Tr. at 89:8-18; Exhibit B, Blum 2021 Tr. at 41:23:-42:5).

SFFA has declined to furnish any evidence concerning the proportion of its more-than 22,000 "General Members" who participated in the elections for the fifth director and will not even confirm whether as many as 500 "General Members" participated in any election. (Exhibit A, Blum 2018 Tr. at 90:25-91:16; Exhibit B, Blum 2021 Tr. at 82:3-83:12).

Edward Blum is SFFA's President and is responsible for the day-to-day operations of SFFA, operating it out of his several homes. (Exhibit A, Blum 2018 at 13:16-14:17, 45:14-20; Exhibit B, Blum 2021 Tr. at 29:1-30:5). Blum has served as SFFA's President since its formation. SFFA pays a "stipend" to Blum, which he says is not a salary. (Exhibit A, Blum 2018 Tr. at 41:12-42:9). SFFA has no employees. (Id.). SFFA gives the IRS an address which is a "mail drop service," but SFFA has no physical location. (Exhibit A, Blum 2018 Tr. at 44:11-45:20).

Individuals join SFFA as "General Members" by providing a name and paying a one-time assessment of $10. (Exhibit B, Blum 2021 Tr. at 58:11-19, 65:21-24). The $10 one-time assessment can be, and often has been, waived. (Exhibit A, Blum 2018 Tr. at 63:15-64:25). Fewer than 5 percent of the "General Members" have paid the one-time $10 assessment. (Exhibit B, Blum 2021 Tr. at 46:7-10, 104:22-105:7). Beyond this, SFFA's non-statutory "General Members" have no responsibilities in, or duties to, the organization. Blum testified that "there are no activities that we ask our 20,000

members—or 22,000 members to—to perform." (Exhibit A, Blum 2018 Tr. at 82:15-24). Blum asserts that the rights of those non-statutory "General Members" are (i) to elect one of the five board members, (ii) "to participate in our conference calls," and (iii) "the right to resign if they object to the direction of SFFA." Blum summarized: "I think that's it." (Exhibit A, Blum 2018 Tr. at 82:25-83:5; *see also* Exhibit B, Blum 2021 Tr. at 62:23-63:14).

SFFA has no committees for SFFA's non-statutory "General Members" to join and serve nor any activities in which to participate. (Exhibit B, Blum 2021 Tr. at 76:6-11). As for the conference calls, Blum admits to their perfunctory nature. The calls typically last less than an hour each, and consist of a presentation by Blum, the primary speaker, followed by time for any questions the audience has about Blum's presentation. (Exhibit B, Blum 2021 Tr. at 71:2-72:25).

Membership dues—the one-time $10 assessment—comprise only a tiny fraction of SFFA's revenues. (Exhibit N, SFFA Form 990 for 2019). Most of SFFA's revenues come from outside institutional donors. As of November 1, 2017, SFFA received only $110,823.89 in financial support from 1,178 individual members but received $3,073,441.28 from nine institutional donors. (Exhibit O).[2] Thus, based on the most recent data it has been willing to share, more than 96 percent of the financial support for SFFA and its litigation has come from nine institutional donors. The money is used primarily to pay legal fees and related expenses. As an example, in 2019 SFFA paid $910,100 for legal fees and related expenses, while bringing in $1,107,022 in revenue that year from institutional contributions. (Exhibit N). In fact, 20,843 of SFFA's 22,021 non-statutory "General

---

[2] The detailed information discussed here is only current through November 1, 2017 because SFFA has asserted privilege and declined to furnish any information in response to an interrogatory in this lawsuit seeking it (despite having furnished substantive responses to the same interrogatory in prior litigation between the parties). (Exhibit P). Any doubts over the effects of the passage of time on these numbers should be resolved against SFFA, as the party who is both in possession of the information and on whom the burden of proof rests.

Members" have never made any financial contribution to SFFA.  (Exhibit O).  Blum never paid the $10 membership fee, and there is no evidence that any of the other officers of SFFA have ever paid that assessment.  (Exhibit A, Blum 2018 Tr. at 57:17-58:4; Exhibit B, Blum 2021 Tr. at 45:9-46:6).

SFFA had the option of chartering itself as a membership nonstock corporation or as a non-membership nonstock corporation.  VA. CODE § 13.1-837.  It chose to be a Virginia non-membership organization.  The difference is meaningful.  For membership nonstock corporations, Virginia gives members a power to inspect corporate records.  *Id.* § 13.1-933.  This includes the right to inspect membership records.  *Id.* § 13.1-933(B)(3).  Inspection of membership records would allow any member to learn the names and addresses of all other members.  *See Id.* § 13.1-932(C).  But it is an intentional decision on Blum's part that "members" should *not* be able to determine who the other members are.  (Exhibit B, Blum 2021 Tr. at 75:20-76:11).  Thus, for example, the two—and only two—"members" of SFFA whose "membership" purports to justify SFFA's associational standing in this case do *not* have access to names and addresses of other "members."  (Exhibit Q at 52:16-19, 52:23-25; Exhibit R at 21:14-19; Exhibit B, Blum 2021 Tr. at 68:8-69:4).

### D.     The current lawsuit.

In both the *Fisher* Litigation and in this lawsuit (as with all of SFFA's lawsuits), Blum was the person who made each of the decisions that a plaintiff ordinarily faces:  what issues to sue about; what persons to sue; what relief to seek; what lawyers to use; and how to pay the legal fees and expenses for the lawsuit.  (Exhibit A, Blum 2018 Tr. at 7:22-8:15, 111:22-113:13; Exhibit B, Blum 2021 Tr. at 15:9-18:15).

Though its focus is on the entering classes for 2018 and 2019, the essence of SFFA's complaint is that UT-Austin "*continues* to use race in the admissions process."  (Am. Compl. [ECF 13] ¶ 86 (emphasis added)).  UT-Austin does so because, despite progress with respect to diversity and its educational benefits (as SFFA's complaint allegations show), there is still meaningful progress to be

made.  (*Id.* ¶ 100 (identifying overall freshman admissions of black students as remaining within a range from 5% to 6% from 2008 through 2018)).  Other than the addition of a claim under Title VI (which is based on the same facts), the constitutional and statutory provisions on which SFFA bases its claims in this lawsuit are the same here as they were in *Fisher*, and the focus on UT-Austin's use of holistic review remains the same in both suits.  (Exhibit H ¶¶ 27, 35, 39, 49, 68, 76-80, 142-164; Am. Compl. [ECF 13] ¶¶ 19, 22, 29-31, 39, 42-45, 176-243).

## III.    ARGUMENT

### A.    SFFA bears the burden to show standing.

"Standing is an issue upon which the party invoking federal jurisdiction, the plaintiff, bears the burden of persuasion." *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 361-62 (5th Cir. 1996); *see also Tex. Cable & Telecomms. Ass'n v. Hudson*, 265 F. App'x 210, 216 (5th Cir. 2008) ("The burden of establishing the elements of standing is on the party seeking jurisdiction in the federal courts.") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Tex. Cable & Telecomms. Ass'n*, 265 F. App'x at 216.  "[G]eneral allegations will not suffice for summary judgment; specific facts must be adduced instead."  *Id.*;  *Friends of the Earth*, 95 F.3d at 361-62 ("Because FOE did not offer competent summary judgment evidence . . . , it does not have standing as a representational organization . . . .").

If the Court determines there are factual issues precluding a standing dismissal under the summary judgment standard, it should "hear [the] conflicting written and oral evidence and decide for itself the factual issues which determine jurisdiction." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).  Any such factual determinations are subject to "clear error" review in the court of appeals. *Id.*

The standing requirement recognizes that the right to invoke judicial power "must be placed in the hands of those who have a direct stake in the outcome," rather than "in the hands of 'concerned bystanders,' who will use it simply as a 'vehicle for the vindication of value interests.'" *Diamond v. Charles*, 476 U.S. 54, 62 (1986). Further, the standing requirement shields the courts from having to decide disputes "in the rarified atmosphere of a debating society," instead ensuring they remain in "the hands of those who have a direct stake in the outcome." *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 827 (5th Cir. 1997).

SFFA's founder Edward Blum is—to use the label in *Diamond v. Charles*—a "concerned bystander." His passion about many public policy issues is undeniable. Indeed, his "Yenta the Matchmaker" role has resulted in his initiating and financing more than 30 lawsuits—in the names of plaintiffs of his choosing and using counsel of his choosing—to address various public policy issues of his choosing. This litigation is among the latest of many attempts by him to advance his view that race should not play a role in higher-education admissions. Indeed, there are three other pending cases making their way through the federal courts in which Blum, through SFFA, has challenged race-conscious university admissions programs. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 1:14CV14176; *Students for Fair Admissions, Inc. v. Univ. of N. Carolina*, 1:14CV954; *Students for Fair Admissions, Inc. v. Yale Univ.*, 3:21-CV241-KAD. This Court should decline the invitation to be the fourth. Neither the organization Blum created—nor the persons it claims to represent as members—have a sufficiently direct stake in the outcome of this case to meet the constitutional standing requirements necessary to invoke this Court's subject matter jurisdiction. *See N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010) ("Article III standing is a jurisdictional requirement.").

**B.      SFFA cannot demonstrate "associational standing."**

SFFA does not claim any injury to itself as an organization from UT-Austin's admissions policies.  Therefore, SFFA must bring suit, if at all, under the doctrine of "associational" standing.  *Id.* (distinguishing associational and organizational standing).

To successfully assert associational standing, a membership organization must make each of the following required showings:

(1)      "the association's members would independently meet the Article III standing requirements";

(2)      "the interests the association seeks to protect are germane to the purpose of the organization"; and

(3)      "neither the claim asserted nor the relief requested requires participation of individual members."

*Ctr. for Biological Diversity v. United States Envt'l Prot. Agency*, 937 F.3d 533, 536 (5th Cir. 2019) (citing *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006), *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

A threshold inquiry, however, requires SFFA to show it *is* a membership organization.  To satisfy this requirement, it must either demonstrate it is a "traditional membership organization" or the functional equivalent of such an organization, a matter decided under the "indicia of membership" test.  *Friends of the Earth*, 129 F.3d at 828 (discussing *Hunt*, 432 U.S.at 344-45).  In addition, SFFA must demonstrate that it serves a "specialized segment" of the population.

SFFA cannot satisfy its burden of proof on these required showings.

### 1.    SFFA is not a "traditional membership" organization.

SFFA's articles of incorporation state: "The Corporation shall have no members."  (Exhibit J § 3.01).   Without statutorily authorized members, SFFA cannot be a "traditional membership organization" for purposes of associational standing.   Indeed, it is ironic for SFFA to allege that it is eligible for associational standing; it intentionally and strategically denies its so-called "General Members" access to the names and addresses of other "members" and thus denies them the very capacity to associate with one another.  (Exhibit B, Blum 2021 Tr. at 75:20-76:5).

The court in *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 119 (3d Cir. 1997) ("*PIRG*") was faced with the same circumstances as those presented here. There, the plaintiffs were two nonprofits whose charters, like SFFA's, prohibited them from having members.  *Id.*  The Third Circuit panel in that case (which included then-Judge Alito) held the plaintiffs would need to "prove that their members possess the 'indicia of membership' in their organizations." *Id.*

The Fifth Circuit later faced a similar situation in *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d at 827.   There, the defendant asserted the plaintiff "had no legal members under the corporate laws" under which it was formed, because the plaintiff's "bylaws provide[d] that membership requirements shall be set by the board of directors," and the board had never taken action to set those requirements.  *Id.*  The Fifth Circuit agreed with the Third Circuit's ruling in *PIRG*: "the 'indicia of membership' test is the correct one to apply to determine whether a purported corporation,

despite the failure to meet state law requirements, has 'members' whose interests it can represent in federal court." *Id.* at 829. [3]

Thus, under controlling Fifth Circuit precedent, an organization like SFFA that has no statutory members can enjoy associational standing only if it proves—using the "indicia of membership" test—it is the functional equivalent of a traditional membership organization.

Despite the clarity of the rulings in *PIRG* and *Friends of the Earth*—as well as the unambiguous language in SFFA's charter—SFFA has persuaded three other courts that it is in fact a "traditional membership organization" and that it should thus be allowed to avoid the "indicia of membership" test. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157, 184 (1st Cir. 2020) ("*Harvard 2*"); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. ("Harvard 1")*, 261 F. Supp. 3d 99, 111 (D. Mass. 2017); *Students for Fair Admissions, Inc. v. Univ. of N. Carolina*, 1:14CV954, 2018 WL 4688388, at *4 (M.D.N.C. Sept. 29, 2018) ("*UNC*").

This Court is not bound by those three rulings and should decline to follow them. First, and perhaps most important, the text of those three rulings gives no indication that the *Harvard 1, Harvard 2*, and *UNC* courts ever considered SFFA's articles of incorporation or their dispositive impact. All three opinions discussed SFFA's bylaws, but none mentioned its articles of incorporation. *Harvard 2*, 980 F.3d at 164 (1st Cir. 2020); *Harvard 1*, 261 F. Supp. 3d at 111; *UNC*, 2018 WL 4688388, at *1. The distinction is significant, because the unambiguous statement in SFFA's articles of incorporation that SFFA "shall have no members" controls as a matter of law over any conflicting provision in the bylaws. *See* VA. CODE § 13.1-819(E) ("[W]henever a provision of the articles of incorporation is

---

[3] Though the courts in *PIRG* and *Friends of the Earth* ultimately held that the plaintiffs in each case met the "indicia of membership" test, the relevant question in this first step of the analysis is whether the plaintiff is a "traditional membership organization" or instead must show indicia of membership. These cases show that an organization whose charter provides it will have no members cannot be a traditional membership organization and thus must satisfy the indicia of membership test.

inconsistent with a bylaw, the provision of the articles of incorporation shall be controlling."). Virginia law is unambiguous on this point: "[w]hen a bylaw conflicts with the articles of incorporation, *the articles will trump the bylaw and the bylaw will be considered void.*" *Leon v. Martin*, 79 Va. Cir. 434, at *2 (2009) (emphasis added).

Second, this is the first and only court to assess SFFA's standing that is bound to follow Fifth Circuit precedent. In the face of the Fifth Circuit's holding in *Friends of the Earth* that "the 'indicia of membership' test is the correct one to apply" when an organization has no members under the law of the state in which it is incorporated, SFFA cannot avoid that test here, regardless of any rulings it has obtained in other cases. *Friends of the Earth*, 129 F.3d at 829. To the extent there is any conflict in the caselaw or outcomes, the Fifth Circuit's precedent controls.

### 2. SFFA fails the "indicia of membership" test.

An organization without traditional members may still have standing to sue, but only if the organization is the "functional equivalent" of a traditional membership organization. *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002). In *Hunt*, for example, the U.S. Supreme Court held that a State commission charged with advocating on behalf of the State's apple growers and dealers functioned like a private trade association, and thus was the equivalent of a traditional membership organization. In reaching this conclusion, the Supreme Court focused on members' participation in the election of leadership, service in the organization, and financing of its activities:

> [W]hile the apple growers and dealers are not "members" of the Commission in the traditional trade association sense, they possess all of the indicia of membership in an organization. They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them.

*Hunt*, 432 U.S. at 344-45; *see also Wash. Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007) (holding that an organization seeking associational standing "must represent individuals that have all the 'indicia of membership' including (i) electing the entity's leadership, (ii) serving in the entity, and

(iii) financing the entity's activities").  The Supreme Court concluded that "[i]n a very real sense . . . the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests."  *Hunt*, 432 U.S. at 345.

Applying *Hunt*, the Fifth Circuit requires an organization seeking associational standing to prove "indicia of membership" through participation in voting, service in leadership, and financial support of the organization:

> If the association seeking standing does not have traditional members, as here, the association establishes its standing by proving that it has "indicia of membership": its members elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs.

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l,* 695 F.3d 330, 344 n.9 (5th Cir. 2012); *see also Friends of the Earth*, 129 F.3d at 829 (discussing *Hunt*, 432 U.S. at 344-45) (explaining that "[t]he Court in *Hunt* looked to who elected the governing body of the organization and who financed its activities"); *Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) ("*ARC*") (rejecting associational standing because the plaintiff's "members" were "unable to participate in and guide the organization's efforts"); *compare Advocacy Ctr. for Elderly & Disabled v. Louisiana Dep't of Health & Hosps.*, 731 F. Supp. 2d 583, 587 (E.D. La. 2010) (approving associational standing for "Advocacy Center …[,] a network of organizations established under federal law to advocate on behalf of people with disabilities," because unlike in *ARC*, Advocacy Center's constituents played "a central role in its management and activities").

The individuals whom SFFA describes as its "members" do not possess the "indicia of membership" as in *Hunt*, nor does SFFA express their "collective views" or protect their "collective interests."  SFFA is instead operated and controlled by its founder, Edward Blum, as a vehicle to continue his quest to eliminate the consideration of race in college admissions policies.  *See* Section II, *supra.*  Since *Hunt*, courts consider the role that "members" play in the selection of the plaintiff

organization's leadership, their ability to guide the plaintiff's activities, and their role in financing those activities. *Wash. Legal Found.*, 477 F. Supp. 2d at 211; *see also Am. Legal Found. v. F.C.C.*, 808 F.2d 84, 90 (D.C. Cir. 1987) (rejecting associational standing for organization that did not have "a definable membership body *whose resources and wishes help steer the organization's course*") (emphasis added); *Group Health Plan, Inc. v. Philip Morris, Inc.*, 86 F. Supp. 2d 912, 918 (D. Minn. 2000) ("In order to meet this "indicia of membership" test, the constituents of an organization must exercise a certain measure of control over the organization."); *Fund Democracy, LLC*, 278 F.3d at 26 (an organization controlled by one person and which received no funding from purported members does not have associational standing because "it may have reasons for instituting suit other than to assert the rights of these alleged supporters"). An examination of these same factors here—who elects the leadership, who serves in guiding the organization and its day-to-day activities, and who finances the organization's activities— demonstrates that SFFA is not the "functional equivalent" of a membership organization.

**Electing leadership**. SFFA's non-statutory "General Members" do not elect SFFA's leadership. In a frail effort to satisfy one indicium of membership, SFFA amended its bylaws to allow its "members" to vote—but only for one of the five directors on SFFA's board. (Exhibit B, Blum 2021 Tr. at 66:16-22). The "members" have no power to elect, or vote upon, SFFA's dominant leader Blum—who described his presidency and directorship as "permanent"; nor to elect, or vote upon, the other two "permanent" officers and directors, Abigail Fisher and her father; nor to elect, or vote upon, the fourth, board-elected director. (Exhibit A, Blum 2018 Tr. at 40:14-41:11, 89:22-90:4). Those four director seats are effectively self-appointed and self-perpetuating. *See Package Shop, Inc. v. Anheuser-Busch, Inc.*, CIV.A. 83-513, 1984 WL 6618, at *40-41 (D.N.J. Sept. 25, 1984) ("The organization essentially is run by people who are self-appointed, a fact which weighs heavily against its being considered a membership organization.").

SFFA's amended bylaws provide that a quorum is a majority of the board and that all votes carry by a majority of directors present.  (Exhibit M § 4.08). This means that the single "member"-elected director can do nothing on his or her own.  (Exhibit A, Blum 2018 Tr. at 80:6-9).  The self-perpetuating directors, who are never subject to any vote by the "members," can always out-vote the single "member"-elected director; and they have the power to appoint themselves officers even if there were objection by the single "member"-elected director.  (Exhibit A, Blum 2018 Tr. at 79:18-80:15.)  Indeed, the two "standing members"—the only two persons within the alleged 20,000 "members" of SFFA who actually applied to and were rejected by UT-Austin in the two relevant years—did not vote and cannot even recall whether they were invited to vote.  (Exhibit Q at 45:3-46:1; Exhibit R at 42:20-25, 44:17-19).

**Serving in the organization.**  Rank-and-file members have no opportunity to serve on committees, nor are they polled for their opinions on policy matters or actions to be taken, nor have they ever petitioned SFFA's leadership concerning any policy or action.  (Exhibit B, Blum 2021 Tr. at 75:20-76:6).  Blum controls all day-to-day affairs, operating SFFA out of his various homes.  (Exhibit A, Blum 2018 Tr.  at 45:5-20).  While he may solicit views from "members" from time to time, one cannot characterize the "members" as having any meaningful opportunity to participate in SFFA's operations.  (Blum 2021 Tr. at 75:20-76:6 ("The only way that an individual can make suggestions about the direction or activities of SFFA is to contact or go to me directly.")); *see Package Shop, Inc. v. Anheuser-Busch, Inc., supra,* at *40-41 (rejecting associational standing where it did not "appear that the membership can control the actions of the officers and trustees, most of whom they did not elect"); *cf. AARP v. United States Equal Emp't Opportunity Comm'n*, 226 F. Supp. 3d 7, 17 (D.D.C. 2016) ("AARP's members play a role in guiding AARP activities by participating in various annual opinion polls and surveys, which are designed to solicit member input on AARP policy positions, and through participation in AARP's various policy committees"); *Flyers Rights Educ. Fund, Inc. v. United*

*States Dep't of Transp.*, 957 F.3d 1359, 1362 (D.C. Cir. 2020) ("FlyersRights frequently polls its airline passenger members in order to determine which policy issues and types of actions FlyersRights will pursue . . . . FlyersRights' leadership also considers the petitions members have signed when determining issues and policies to pursue on their behalf . . . . The structure of the organization enables FlyersRights members to have direct input, and member input guides the organization's activity. Further, a majority of FlyersRights' funding comes directly from its members . . . ."). Indeed, SFFA's members have no way of even identifying one another, so any coordinated effort by members to collectively affect the direction of the organization is, as a practical matter, impossible.

**Financing**.  SFFA's "members" do not play a substantial role in financing its activities generally, let alone the financing of this litigation.  *See Funeral Consumers All.*, 695 F.3d at 344 n.9 ("If the association seeking standing does not have traditional members, as here, the association establishes its standing by proving that … its members… finance the organization's activities, including the case's litigation costs.").

Membership dues comprise only a tiny fraction of SFFA's revenues.  (Exhibit B, Blum 2021 Tr. at 46:7-10 (agreeing that "the vast majority of members of SFFA have not paid [membership] dues"); Exhibit O (showing over 96% of SFFA's funding through November 1, 2017—the last date for which SFFA has disclosed the breakdown of its funding sources—came from nine "institutional donors"); Exhibit N (showing membership dues made up $2,600 out of $1,539,694—*i.e.*, 0.17%—of SFFA's annual revenue in 2019)).  SFFA's amendment of its bylaws in 2015 to create a one-time $10 assessment—frequently waived—is another frail effort to fit within the indicia of membership test. (Exhibit A, Blum 2018 Tr. at 63:15-64:25; Exhibit B, Blum 2021 Tr. at 46:7-10, 104:22-105:7).  It is not a genuine indicium.  The overwhelming majority of SFFA's revenue instead comes from outside, institutional donors.  (Exhibit N; Exhibit O).

This case thus stands in stark contrast to those within the Fifth Circuit that have approved standing for associational plaintiffs and instead fits in the category of cases rejecting it under the indicia of membership analysis. *Compare Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 676-77 (E.D. La. 2010) (noting that the organizational plaintiff's operations were "entirely dependent on members' contributions, volunteer efforts and continued good-will") *with Tex. Indigenous Council v. Simpkins*, SA-11-CV-315-XR, 2014 WL 252024, at *3-4 (W.D. Tex. Jan. 22, 2014) (rejecting associational standing where the "members" did "not appear to have a voice in steering the direction of the group" and did "not appear to finance group activities").

### 3.     SFFA does not serve a "specialized segment" of the population.

In addition to its failure to show "indicia of membership," SFFA also cannot make the required showing that it serves a "specialized segment" of the population. *See Air All. Houston v. U.S. Chem. & Safety Hazard Investigation Bd.*, 365 F. Supp. 3d 118, 128 (D.D.C. 2019), *appeal dismissed sub nom. Pub. Emps. for Envtl. Responsibility v. U.S. Chem. Safety & Hazard Investigation Bd.*, 19-5089, 2019 WL 4565521 (D.C. Cir. Aug. 26, 2019) (noting *Hunt's* reliance on the fact that the plaintiff "served a 'specialized segment' of the population").

Here, SFFA's membership is open to anyone willing to complete an application form and (at least in theory, if not in practice) submit a $10 dues payment.  (Exhibit B, Blum 2021 Tr. at 58:15-60:2).  SFFA's membership is *not* limited to individuals who have been denied admission to a college or university, nor to those with plans to seek admission.  Nor are SFFA's officers and directors comprised of people in that group, except Abigail Fisher, who litigated and lost her complaints about UT-Austin's admissions process.   (Exhibit A, Blum 2018 Tr. at 164:6-16).   Instead, SFFA's membership consists of (and purports to serve the interests of) the general population, and not any specialized segment.  The "members" are people whose commonality is that they have a view on a matter of public policy—"concerned bystanders," to use the label in *Diamond v. Charles*. (Exhibit B,

Blum 2021 Tr. at 96:3-17).  If SFFA in fact has more than 20,000 "members" as it alleges, 99.99 percent of them would not be eligible in their own names to serve as a plaintiff in this case.  As such, SFFA cannot meet the requirements of associational standing under *Hunt*.  *See Knowledge Ecology Int'l v. Nat'l Institutes of Health*, CV PJM 18-1130, 2019 WL 1585285, at *6 (D. Md. Apr. 11, 2019) ("[A]ssuming the functional equivalency test applies, KEI provides no information about what specific segment of the community of interests it represents; indeed, it purports to bring this case on behalf of 'adversely affected patients and taxpayers,' a group which could arguably include an unlimited number of persons throughout the country."); *cf. AARP*, 226 F. Supp. 3d at 17 ("AARP serves a 'discrete, stable membership with a definable set of common interests,'—i.e., individuals over age 50"); *Pharm. Research & Mfrs. of Am. v. Thompson*, 259 F. Supp. 2d 39, 54 (D.D.C. 2003), *aff'd sub nom. Pharm. Research & Mfrs. Am. v. Thompson*, 362 F.3d 817 (D.C. Cir. 2004) ("NUIC may bring a claim on behalf of AIS and other urban Indian Center 'members.'  Like the organization in *Hunt*, NUIC serves a 'specialized segment of the state's . . . community,'—urban Indian Centers—and its constituents possess certain 'indicia of membership,' namely, Executive Directors of urban Indian Centers serve as NUIC's President and Vice President.") (cleaned up).

    **C.**    **SFFA's claims are barred by res judicata.**

    The doctrine of res judicata, also known as claim preclusion, "bars the subsequent litigation of claims that have been litigated or should have been raised in an earlier suit." *In re Ark–La–Tex Timber Co., Inc.*, 482 F.3d 319, 330 (5th Cir. 2007).  Res judicata, like the doctrine of collateral estoppel, serves important policy goals, including "reliev[ing] parties of the cost and vexation of multiple lawsuits, conserv[ing] judicial resources, and, by preventing inconsistent decisions, encourag[ing] reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).  "[A] motion for summary judgment … is the proper vehicle for raising a res judicata defense."  *Grant v. Harris County*, 794 F. App'x 352, 361 n.6 (5th Cir. 2019).

Res judicata requires proof of four elements:

(1) The parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded to a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions.

*In re Southmark Corp.*, 163 F.3d 925, 934 (5th Cir. 1999) (quoting *Swate v. Hartwell*, 99 F.3d 1282, 1286 (5th Cir. 1996)).  Each of the elements is present here.

### 1.    Identity of parties or those in privity.

The defendants in this suit—including UT-Austin, UT-Austin's President, and the Chancellor and Regents of the University of Texas System (all in their official capacities)—were also defendants in *Fisher*.  And although SFFA was not a party to the prior *Fisher* suit, the evidence shows that SFFA is in privity with Abigail Fisher—both through Blum's role in each lawsuit and through Fisher's role in each lawsuit.  This satisfies the first element of res judicata.

As the Fifth Circuit has explained, "'Privity' is recognized as a broad concept, which requires [courts] to look to the surrounding circumstances to determine whether claim preclusion is justified." *Russell v. SunAmerica Sec. Inc.*, 962 F.2d 1169, 1173 (5th Cir. 1992).  Although "[o]lder definitions of privity were very narrow[,] … [a]s the preclusive effects of judgments have been expanded to include nonparties in more and more situations, … it has come to be recognized that the privity label simply expresses a conclusion that preclusion is proper." *Id.* (quoting 18 C. WRIGHT, A. MILLER & E. COOPER, FED. PRAC. & PROC.: JURISDICTION § 4449, at 418-19 (1981)).

Although the privity inquiry is "particularly fact-based," *id.* at 1174, certain formal relationships in particular give rise to a finding of privity.  These include the principal-agent relationship, *id.* (citing *Pelletier v. Zweifel*, 921 F.2d 1465, 1502 (11th Cir. 1991)), and the relationship between a corporation and its officers and directors.  *Id.* (citing *Mandarino v. Pollard*, 718 F.2d 845, 850 (7th Cir. 1983); *Cahill v. Arthur Andersen & Co.*, 659 F. Supp. 1115, 1122 (S.D.N.Y.), *aff'd*, 822 F.2d 14 (2d Cir. 1987)); *see also*

*In re Joseph P. Conte Toyota, Inc.*, 167 F.3d 537, at *2 (5th Cir. 1998) (table op.) (holding corporate officers, directors, and shareholders of a corporation were in privity with a corporation for purposes of determining the preclusive effect of a bankruptcy court's injunction); *Grynberg v. BP, P.L.C.*, 527 F. App'x 278, 282 (5th Cir. 2013) ("BP, and Statoil were parties to the Arbitration and Browne, as Chief Executive Officer of one of the BP entities during the underlying events, is in privity with BP.").

Other relevant considerations that support extending claim preclusion to nonparties through privity include the principles that "a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy," and that "a nonparty is bound by a judgment if she 'assume[d] control' over the litigation in which that judgment was rendered . . . "[b]ecause such a person has . . . already 'had his day in court' even though he was not a formal party to the litigation." *Taylor v. Sturgell*, 553 U.S. 880, 895 (2008); *see also Cichocki v. Mass. Bay Cmty. Coll.*, 199 F. Supp. 3d 431, 441 (D. Mass. 2016) ("[P]rivity exists (and, therefore, nonparty preclusion potentially obtains) if a nonparty either substantially controlled a party's involvement in the initial litigation or, conversely, permitted a party to the initial litigation to function as his de facto representative.") (quoting *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 758 (1st Cir. 1994)).

The facts in this case demonstrate privity between Fisher and SFFA. First, Fisher herself is both an officer and a director of SFFA. (Exhibit A, Blum 2018 Tr. at 32:10-33:11; Exhibit B, Blum 2021 Tr. at 41:23-42:5). Under the Fifth Circuit caselaw that governs the final judgment rendered against her, that legal relationship alone is enough to establish privity for claim preclusion purposes. *See Russell*, 962 F.2d at 1173-76. Fisher, in other words, cannot lose a federal lawsuit, then re-file that suit in state court through a corporation of which she is an officer and director. Second, the particular facts surrounding the relationship between Fisher, Blum, and SFFA warrant treating Fisher and SFFA as being in privity. Blum—as the architect of the *Fisher* litigation—"had his day in court" when the

U.S. Supreme Court decided that case on the merits. *Taylor*, 553 U.S. at 895.  He may not relitigate those same claims through another vehicle, such as SFFA.

The undisputed facts establish Blum's orchestration of both *Fisher* and this lawsuit.  Blum is the founder and president of both SFFA and POFR.  (Exhibit B, Blum 2021 Tr. at 22:3-18).  Through Blum's management and direction, POFR funded the *Fisher* lawsuit, and it also provided the initial seed money for SFFA's formation.  (Exhibit A, Blum 2018 Tr. at 52:23-53:8; Exhibit B, Blum 2021 Tr. at 22:3-24, 24:17-26:3).  Both SFFA and POFR are political advocacy organizations that use litigation in pursuit of the policy goal of ending the consideration of race in higher education admissions decisions.  (Exhibit B, Blum 2021 Tr. at 23:1-24:20).  SFFA was formed prior to the conclusion of Fisher's lawsuit.  (Exhibit A, Blum 2018 Tr. at 137:12-138:9; Exhibit B, Blum 2021 Tr. at 20:9-21:20).  As soon as the Supreme Court finally rejected Fisher's claims, Blum made the decision to use SFFA to continue the litigation that he and Fisher had been driving for the previous eight years. (Exhibit A, Blum 2018 Tr. at 137:12-138:9).

Blum has played an instrumental role in the lawsuits of both Fisher and SFFA.  In each case, Blum has been personally involved in and responsible for: (1) identifying the basic issues to be litigated; (2) selecting the plaintiff (and in this case, the so-called "standing member") to be the face of the case; (3) selecting and communicating with the attorneys who represent the plaintiff; (4) acting as a "representative" for the plaintiff and, based on that role, asserting attorney-client privilege when asked about the *Fisher* lawsuit; and (5) coordinating fundraising efforts to support the litigation.  (Exhibit A, Blum 2018 Tr. at 7:22-8:15; 111:22-113:13; Exhibit B, Blum 2021 Tr. at 15:9-18:15).

In explaining why he called himself the "architect" of the *Fisher* case and other cases, Blum testified:

> [T]he process by which I go about supporting and fulfilling the mission of these organizations is to identify an area of the law that *I* believe needs revising or needs to be overturned completely.  *I* hire counsel to help *me* achieve that goal.  *I* reach out and

find individuals, or individuals reach out and find me who would be plaintiffs in a case that would further our mission. *So architect seemed to be the – the kind of general term that most people can understand.*

(Exhibit A, Blum 2018 Tr. at 112:7-19 (emphases added)).

Having litigated unsuccessfully through a chosen designee in the prior suit, Blum cannot now re-litigate through a new plaintiff that he controls.  *See Taylor*, at 880, 894-95 & n.6 (categorizing six circumstances giving rise to nonparty preclusion—including nonparty control of litigation and litigation by proxy—and noting that the list was "not [intended] to establish a definitive taxonomy"); *see also Ferris v. Cuevas*, 118 F.3d 122, 128 (2d Cir. 1997) (privity applies to prevent "one controlling person or entity from bringing multiple suits in the names of different plaintiffs, and controlling the litigation from the shadows").[4]

Instead, Blum's status as the decision-maker in both the prior federal litigation as well as the present state court litigation supports the conclusion that Fisher is in privity with SFFA for res judicata purposes.  Otherwise, there will be no limit on Blum's ability to continue his campaign of lawsuits against UT-Austin over the same admissions policy.  If Blum is permitted to continue to prosecute this lawsuit through his personally controlled organization (SFFA) and loses, then his next lawsuit against UT-Austin might be in the name of a new personally controlled entity SFFB, and then SFFC. The myriad, overlapping connections between SFFA, Blum, and the Fishers in pursuing these lawsuits point to the necessary conclusion that, in this case, "preclusion is proper."  *Russell*, 962 F.2d at 1173.

---

[4] "Control" does not imply that the nonparty is the only person involved.  Rather, courts hold control is present where a nonparty exercises the degree of participation and control one might "reasonably expect[ ] from a co-party."  *Am. Postal Workers Union Columbus Area Local v. U.S. Postal Service*, 736 F.2d 317, 319 (6th Cir. 1984); *compare Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 758 (1st Cir. 1994) (privity exists where "availability of a significant degree of effective control in the prosecution or defense of the case—what one might term, in the vernacular, the power—whether exercised or not—to call the shots").

### 2.      Jurisdiction.

As to the second element of res judicata: Fisher affirmatively invoked the jurisdiction of the federal court in her case, and at every level of the litigation, Fisher's claims withstood the defendants' jurisdictional challenges.  *E.g.*, *Fisher v. Univ. of Tex. at Austin*, 758 F.3d 633, 640 (5th Cir. 2014).

### 3.      Final judgment on the merits.

As to the third element of res judicata: the trial court rendered a take-nothing judgment in favor of Defendants in *Fisher*.  (Exhibit S).  The case thereafter went to the United States Supreme Court twice and concluded there with a final judgment on the merits in favor of the defendants.  *Fisher I*, 570 U.S. at 315; *Fisher II*, 136 S. Ct. at 2215.

### 4.      Same claim or cause of action.

The fourth and final element of res judicata—the same claim or cause of action in both suits— is satisfied as well.  The test is "whether the two actions under consideration are based on 'the same nucleus of operative facts.'"  *In re Southmark Corp.*, 163 F.3d at 934 (quoting *In re Baudoin*, 981 F.2d 736, 743 (5th Cir. 1993) and *In re Howe*, 913 F.2d 1138, 1144 (5th Cir. 1990)).

A comparison of the pleadings in *Fisher* and this case shows that they both arise from the same nucleus of operative facts.  The two pleadings each recount the same history of UT's evolving admissions policy that:

- before 1996, UT considered race in making admissions decisions;

- UT stopped doing so in 1996, following the Fifth Circuit's decision in *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996);

- in 1997, UT began using "holistic review" but without permitting the race of an applicant to be considered in the process;

- also in 1997, the Texas Legislature passed what has become known as the Top Ten Percent Law;

- in 2003, the Supreme Court decided *Grutter v. Bollinger*, 539 U.S. 306 (2003), which effectively abrogated the Fifth Circuit's earlier decision in *Hopwood*;

- beginning in 2004, UT added race to the various diversity factors that were already being considered as part of the holistic review process for undergraduate admissions; and

- in the plaintiff's view, the decision to add race to holistic review was both discriminatory and unnecessary.

(Exhibit H ¶¶ 27, 35, 39, 49, 68, 76-80, 142-164; Am. Compl. [ECF 13] ¶¶ 19, 22, 29-31, 39, 42-45, 176-243). SFFA's pleadings acknowledge that SFFA challenges the same admissions program at issue in the prior litigation. (*See* Am. Compl. [ECF 13] ¶ 86 ("Since *Fisher II* was decided, UT-Austin has repeatedly acknowledged that it continues to use race in the admissions process.")). Both pleadings seek injunctive relief to prevent UT-Austin from using race as a factor in admissions decisions. (Exhibit H at p. 32; Am. Compl. [ECF 13] at p. 49).

The fact that SFFA's pleadings focus on UT-Austin's Fall 2018 and 2019 class does not prevent the application of res judicata based on Fisher's earlier lawsuit. Judgments bar litigation over later occurring events, where the substance of the alleged discrimination is the same and "all of [the] events were directly related to each other in terms of motivation and common purpose . . . ." *Havercombe v. Dep't of Educ. of Com. of P.R.*, 250 F.3d 1, 6 (1st Cir. 2001). That is the case here. SFFA alleges the exact same kind of purported discrimination as it did when it filed the *Fisher* case, and when *Fisher* was decided.

The case of *Adams v. City of Indianapolis*, 742 F.3d 720 (7th Cir. 2014) is particularly instructive. There, 36 Indianapolis police officers and firefighters alleged illegal discrimination in the city's promotion processes between 2007 and 2009. *Id.* at 723-24. After the plaintiffs' claims were dismissed by the district court, a subset of the plaintiffs brought a second suit alleging that the same underlying discriminatory process that had caused them to be passed over for promotions from 2007 through 2009 caused them to be passed over for promotions again in 2010 and 2011. *Id.* The court held that the second suit was barred by res judicata: "[A]lthough the challenged promotion decisions occurred

at different times, the second suit raises the same core of factual allegations as the first." *Id.*; *see also Walgreen Co. v. La. Dep't of Health & Hosps.*, 220 F. App'x 309, 312 (5th Cir. 2007) ("[T]he 2000 litigation established that the regulation was facially valid such that future applications of the regulations are legal.  The only way to establish the unlawful application of these regulations in these circumstances is to directly challenge the outcome of the 2000 litigation, the precise situation that res judicata is designed to avoid."); *Shults v. Tex.*, 762 F.2d 449, 452 (5th Cir. 1985) ("[T]he primary right asserted . . . and the primary wrong complained of . . . are the same in both actions.  That the pertinent provisions of the 1983 amendments at issue here are not identical in other respects to the pertinent provisions of the 1981 amendments at issue in [the prior case] is irrelevant.").

Here, given that the two lawsuits at issue (1) both attack any consideration of race in UT's holistic review, (2) both allege discrimination and assert equal protection violations, and (3) both look to the same history of UT admissions from 1996 forward; they share a common nucleus of operative facts, and they should be treated as the same for purposes of applying res judicata.

### D.     SFFA's claims are barred by collateral estoppel.

Even if this lawsuit were not entirely barred by res judicata, SFFA's claims are subject to the doctrine of collateral estoppel.

Under federal law, collateral estoppel bars a plaintiff from re-litigating an issue when: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005).  Like res judicata, collateral estoppel also bars re-litigation by parties in privity with those who directly participated in the prior litigation.  *Robin Singh Educ. Servs. Inc. v. Excel Test Prep Inc.*, 274 F. App'x 399, 401 n.1 (5th Cir. 2008).  Likewise, courts will not permit a plaintiff to advance "new theories in an attempt to resurrect the already-decided issue," and they properly disregard "changed

factual circumstances that are immaterial to the underlying legal issue." *See Ramallo Bros. Printing, Inc. v. El Dia, Inc.*, 490 F.3d 86, 92 (1st Cir. 2007). Each element is present here.

SFFA seeks here to re-litigate whether UT-Austin's interest in "student body diversity" is a sufficiently clear and compelling interest that it satisfies strict scrutiny. (Am. Compl. [ECF 13] ¶¶ 232-239). This question was squarely raised in the *Fisher* litigation, and it was resolved in favor of UT-Austin. *See Fisher II*, 136 S. Ct. at 2210 (rejecting Fisher's argument "that the University has not articulated its compelling interest with sufficient clarity" and identifying the interest as "the educational benefits that flow from student body diversity"); *see also Fisher I*, 570 U.S. at 309 ("[O]btaining the educational benefits of 'student body diversity is a compelling state interest that can justify the use of race in university admissions.'").

UT-Austin could not have prevailed if it had failed to demonstrate with clarity its compelling interest. *Fisher II*, 136 S. Ct. at 2208 ("Strict scrutiny requires the university to demonstrate with clarity that 'its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary . . . to the accomplishment of its purpose.'"). As such, the determination in UT-Austin's favor on that issue was necessary to the decision. Collateral estoppel "bars relitigation of any factual or legal issue that was actually decided in previous litigation 'between the parties, whether on the same or a different claim.'" *Keystone Shipping Co. v. New England Power Co.*, 109 F.3d 46, 51 (1st Cir. 1997) (citation omitted).

SFFA likewise asserts that UT-Austin has already achieved a "critical mass" of students from historically underrepresented groups. As Fisher did in the prior litigation, SFFA bases its argument on the premise that the overall percentage of non-white students at UT is high enough that, in the opinion of Blum and the Fishers, there is "enough diversity." (Am. Compl., sec. IV.) The United States Supreme Court, however, found significant evidence justifying UT-Austin's inclusion of race as a factor in its holistic admissions program. *Fisher II*, 136 S. Ct. at 2211-12.

Each of these determinations were actually litigated in *Fisher*, they were decided against Fisher, and taken individually and in the aggregate, they were necessary to the judgment rendered in favor of Defendants.  And as explained above in connection with res judicata, SFFA is in privity with Fisher. This Court should therefore hold collateral estoppel bars the re-litigation of the dispositive issues in this case.

## IV.   PRAYER

The Court should grant this motion and dismiss the case for lack of subject matter jurisdiction. In the alternative, the Court should render a take-nothing judgment on the affirmative defenses of res judicata, collateral estoppel, or both.  Finally, Defendants pray for such further and additional relief to which they may show themselves to be justly entitled.

Respectfully Submitted,

GRAVES DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas  78701
(512) 480-5725 (phone)
(512) 539-9938 (fax)

By:  */s/ Matthew C. Powers*
John J. McKetta, III
Texas State Bar No. 13711500
mmcketta@gdhm.com
Matthew C. Powers
Texas State Bar No. 24046650
mpowers@gdhm.com
William Christian
State Bar No. 00793505
wchristian@gdhm.com
Marianne W. Nitsch
Texas State Bar No. 24098182
mnitsch@gdhm.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on counsel of record for Plaintiff via the Court's electronic filing and service system and also via email service as indicated below, on this the 8th day of March, 2021:

William S. Consovoy
J. Michael Connolly
Cameron T. Norris
Steven C. Begakis
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
will@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
steven@consovoymccarthy.com

**ATTORNEYS FOR PLAINTIFF**

Brian C. Pidcock
HUNTON ANDREWS KURTH LLP
600 Travis St.
Houston, TX 77002
brianpidcock@HuntonAK.com

David Hinojosa
Genevieve Bonadies Torres
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW, Suite 900 Washington, DC 20005
dhinojosa@lawyerscommittee.org
gbonadies@lawyerscommittee.org

Ryan P. Phair
Carter C. Simpson
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, D.C. 20037
rphair@huntonak.com
csimpson@huntonak.com

Alan R. Kabat
BERNABEI & KABAT, PLLC
1400 - 16th Street, N.W., Suite 500
Washington, D.C. 20036-2223
Kabat@BernabeiPLLC.com

**ATTORNEYS FOR INTERVENORS**

*/s/ Matthew C. Powers*
Matthew C. Powers

3698716.v1