Edward Blum
January 10, 2018                                                      1

1               CAUSE NO. D-1-GN-17-002930

2   STUDENTS FOR FAIR          )   IN THE DISTRICT COURT OF
    ADMISSIONS INC.            )
3                              )
         Plaintiff             )
4                              )
    VS.                        )
5                              )
    UNIVERSITY OF TEXAS AT     )
6   AUSTIN; WILLIAM MCRAVEN,   )
    in his official capacity   )
7   as Chancellor of the       )
    University of Texas        )
8   System; GREGORY L. FENVES, )   TRAVIS COUNTY, TEXAS
    in his official capacity   )
9   as the President o the     )
    University of Texas at     )
10  Austin; and ERNEST         )
    ALISEDA, DAVID J. BECK,    )
11  KEVIN P. ELTIFE, PAU L.    )
    FOSTER, R. STEVEN HICKS    )
12  JEFFREY D. HILDEBRAND,     )
    JANIECE LONGORIA, SARA     )
13  MARTINEZ TUCKER, and JAMES )
    CONRAD WEVER, in their     )
14  official capacities as     )
    Members o the Board of     )
15  Regents of the University  )
    of Texas Systems,,         )   53RD JUDICIAL DISTRICT
16                             )
         Defendants

17

18

19          ---------------------------------------

20              ORAL/VIDEOTAPED DEPOSITION OF

21                      EDWARD BLUM

22                   JANUARY 10, 2018

23          ---------------------------------------

24

25

EXHIBIT A, PAGE 1

```
 1            ORAL/VIDEOTAPED DEPOSITION OF EDWARD BLUM,

 2   produced as a witness at the instance of DEFENDANTS, and

 3   duly sworn, was taken in the above-styled and numbered

 4   cause on January 10, 2018, from 9:06 a.m. to 2:48 p.m.,

 5   before Michelle Rodriguez, CSR in and for the State of

 6   Texas, recorded by machine shorthand, at the offices of

 7   1701 Brun Street, Suite 200, Houston, Texas 77019,

 8   pursuant to the Texas Rules of Civil Procedure and the

 9   provisions stated on the record or attached hereto; that

10   the deposition shall be read and signed before any

11   notary public

12

13

14

15

16

17

18

19

20

21

22

23

24

25                      JOB NO. 1-HOU-258482
```

EXHIBIT A, PAGE 2

```
 1                  A P P E A R A N C E S

 2   FOR PLAINTIFF:

 3        Mr. Patrick Strawbridge
          CONSOVOY MCCARTHY PARK PLLC
 4        3033 Wilson Boulevard, Suite 700
          Arlington, Virginia  22201
 5        (701) 243-9423
          Patrick@consovoymccarthy.com
 6
     FOR DEFENDANTS:
 7
          Mr. John J. McKetta, III
 8        GRAVES DOUGHERTY, HEARON & MOODY, P.C.
          401 Congress Avenue, Suite 2200
 9        Austin, Texas  79701
          (512) 480-5616
10        Mmcketta@gdhm.com

11

     VIDEOGRAPHER:
12        Nigel Clarke

13

     ALSO PRESENT:
14        Patricia Ohlendorf

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT A, PAGE 3

Edward Blum
January 10, 2018                                    4

```
1            E X A M I N A T I O N   I N D E X

2    WITNESS:  EDWARD BLUM

3    EXAMINATION                              PAGE

4        BY MR. McKETTA                        6
         BY MR. STRAWBRIDGE                    184
5
     FURTHER EXAMINATION
6
         BY MR. McKETTA                        192
7        BY MR. STRAWBRIDGE                    195

8    SIGNATURE REQUESTED                       197
     REPORTER'S CERTIFICATION                  198
9

10           E X H I B I T   I N D E X

11   EXHIBIT 1                                 21
         Articles of Incorporation
12   EXHIBIT 2                                 32
         Written Consent
13   EXHIBIT 3                                 37
         Wiley Rein document
14   EXHIBIT 4                                 64
         Written Consent document
15   EXHIBIT 5                                 96
         Remittance Form
16   EXHIBIT 6                                 97
         Wiley Rein document
17   EXHIBIT 7                                 97
         2015 990 Form
18   EXHIBIT 8                                 100
         2016 990 Form
19   EXHIBIT 9                                 n/a
         2014 990-EZ Form
20   EXHIBIT 10                                135
         2015 990 Form
21   EXHIBIT 11                                114
         Mother Jones document
22   EXHIBIT 12                                123
         NYT Article
23   EXHIBIT 13                                124
         The price of Admission document
24   EXHIBIT 14                                126
         National Review Article
25   EXHIBIT 15                                126
         Joan Biskupic Article
```

EXHIBIT A, PAGE 4

Edward Blum
January 10, 2018                                              5

1
   EXHIBIT 16                                    127
2        Reuters Article
   EXHIBIT 17                                    129
3        Ab Fisher Article
   EXHIBIT 18                                    131
4        Matt Watkins Article
   EXHIBIT 19                                    134
5        Conservative Impact Article
   EXHIBIT 20                                    n/a
6        National Review Article
   EXHIBIT 21                                    136
7        UT Not Fair Article
   EXHIBIT 22                                    144
8        UT Not Fair Article
   EXHIBIT 23                                    146
9        Twitter Account document
   EXHIBIT 24                                    147
10       Website printout
   EXHIBIT 25                                    154
11       POFR website printout
   EXHIBIT 26                                    159
12       POFR website in the "Our Cases" section printout

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A, PAGE 5

Edward Blum
January 10, 2018                                    6

1           THE VIDEOGRAPHER:  All right.  Today is

2   Wednesday, January 10, 2018.  We're on the record at

3   9:06 a.m.

4           MR. MCKETTA:  Very good.  Before we -- yes,

5   of course.

6                   EDWARD BLUM,

7   having been first duly sworn, testified as follows:

8                   EXAMINATION

9   BY MR. MCKETTA:

10          MR. MCKETTA:  Before we start, did you want

11  to comment at all about your process?

12          MR. STRAWBRIDGE:  Yes, I just want to note

13  for the record that SFFA has asserted claims of

14  associational and First Amendment privilege in this

15  case.  The parties have worked and discussed ways in

16  which to limit some of the discovery requests, and SFFA

17  has been willing to provide certain information in an

18  attempt to kind of reach an agreement.

19          That said, by providing the information

20  SFFA is providing, it is not waiving its right to assert

21  the associational privilege going forward and during

22  this deposition, and the parties have agreed that if

23  necessary we'll leave the record open and pursue relief

24  with the court for further -- as necessary with respect

25  to that issue.

EXHIBIT A, PAGE 6

Edward Blum
January 10, 2018                                                        7

```
1                    MR. MCKETTA:  Yes, thank you for you

2    professionalism in those prior arrangements.

3         Q.  (BY MR. MCKETTA)  Mr. Blum, there were in a

4    deposition notice 20 topics that were designated for

5    SFFA to testify about today.

6                    Are you the designated person to testify on

7    each of those 20 topics subject to your objections, or

8    are there some topics for which you are not the

9    designated representative?

10        A.  I'm the designated individual to address all

11   the topics.

12        Q.  Okay.  And in advance of the deposition, am --

13   am I right that you have taken the time to familiarize

14   yourself with what those 20 topics ask about so that you

15   could be prepared to be responsive today subject to

16   Mr. Strawbridge's objections?

17        A.  Yes.

18        Q.  Thank you.  There is a self-description that I

19   once read about Yenta the matchmaker.  Do you remember

20   that?

21        A.  I do.

22        Q.  Could you describe what you meant when you

23   described yourself as kind of a Yenta the matchmaker.

24                    MR. STRAWBRIDGE:  Object to the form of the

25   question.  You may answer.
```

EXHIBIT A, PAGE 7

Edward Blum
January 10, 2018                                    8

```
 1        A.  For those who are familiar with the old
 2   Broadway play, Fiddler on the Roof, Yenta was a
 3   character in a small Russian village whose job it was to
 4   match prospective brides and grooms, and my role as
 5   Yenta the matchmaker is to match -- in the capacity that
 6   that story was written -- individuals who feel that they
 7   have been unfairly and unconstitutionally discriminated
 8   against because of their race and match them with
 9   lawyers willing to represent them.
10        Q.  And that's what you meant by the phrase that
11   you self-described on one occasion -- maybe on several
12   occasions as Yenta the matchmaker?
13              MR. STRAWBRIDGE:  Object to the form of the
14   question.
15        A.  Yes.
16        Q.  (BY MR. MCKETTA)  What's the earliest
17   litigation you recall serving any role of identifying an
18   issue, identifying a plaintiff for whom that issue was
19   an appropriate one to litigate, pairing that litigant
20   with lawyers, and then assisting in whatever form
21   appropriate with their lawsuit?  What was the first
22   occasion?
23        A.  That took place in early 1993.  The -- the case
24   that was eventually filed was styled Vera vs. Richards.
25   That was filed in 19 -- I think late '93 or early '94.
```

Edward Blum
January 10, 2018                                                    9

```
 1        Q.  When Governor Anne Richards was still governor?

 2        A.  Correct.

 3        Q.  All right.  And what was the subject matter of

 4   that first lawsuit in which you performed that role?

 5        A.  That was a challenge to the constitutionality

 6   of the 1992 Texas redistricting -- congressional

 7   redistricting plan.

 8        Q.  Then from that time forward there have been a

 9   number of additional occasions where you've identified

10   an issue of public import, identified one or more

11   persons as potential plaintiffs to litigate that issue,

12   paired them with lawyers, and assisted as appropriate

13   for that lawsuit?

14               MR. STRAWBRIDGE:  Object to the form of the

15   question.

16        A.  Yes.

17        Q.  (BY MR. MCKETTA)  Could you estimate how many

18   additional lawsuits?

19               MR. STRAWBRIDGE:  You asked about --

20               MR. MCKETTA:  A number -- a number is all

21   I'm asking.

22               MR. STRAWBRIDGE:  When you say -- just to

23   clarify, are you asking about lawsuits that were filed?

24               MR. MCKETTA:  Yes.

25        Q.  (BY MR. MCKETTA)  If there were additional ones
```

EXHIBIT A, PAGE 9

Edward Blum
January 10, 2018                                    10

1    that you considered filing but did not file, that's not

2    what I'm now asking you about.

3                    MR. MCKETTA:   Thank you.   Thank you,

4    Patrick.

5        A.  Mr. McKetta, it's somewhere between 25 and 30.

6    I've been asked that question by others, and once I --

7    about three years ago I quantified it, and now it's --

8    but it's over two dozen I would say.

9        Q.  Okay.  Now, one of the plaintiffs in a lawsuit

10   that you assisted in spotting an issue, identifying

11   plaintiff, match him with lawyers, was Edward Chen.

12       A.  Yes.

13       Q.  Another was Abigail Fisher.

14       A.  Yes.

15       Q.  Right.  Did the Chen lawsuit involve political

16   processes and the Fisher lawsuit involve college

17   admissions?

18                    MR. STRAWBRIDGE:   Object to the form of the

19   question.

20       A.  Yes.

21       Q.  (BY MR. MCKETTA)  Okay.  Now, you've been asked

22   on many occasions to give interviews to allow the public

23   to know both about the important public issues being

24   litigated and about your involvement from time to time.

25       A.  Yes.

Edward Blum
January 10, 2018                                          11

1        Q.   And when interviewed on those occasions when

2    you talk about your involvement, am I right that

3    sometimes your involvement is through an entity rather

4    than yourself personally?

5        A.   Yes.

6        Q.   For example, even though colloquially in an

7    interview you might talk about your involvement, on some

8    occasions is the involvement of the project on Fair

9    Representation Inc.?

10       A.   Correct.

11       Q.   And on some occasions the involvement of

12   Students For Fair Admissions Inc.?

13       A.   Correct.

14       Q.   Any other entities that you have used as you've

15   had that kind of involvement?

16            MR. STRAWBRIDGE:   And, again, just to

17   clarify, the question is related to litigation that's

18   been filed?

19            MR. MCKETTA:   That's correct.  Thank you,

20   Patrick.

21       A.   In the early days of my legal endeavors, there

22   were cases that I was involved in that didn't include

23   either of those two organizations --

24       Q.   Right.

25       A.   -- because they didn't exist at that time.

Edward Blum
January 10, 2018                                    13

1   district.

2        A.   Yes.

3        Q.   Who won that race?

4        A.   The incumbent.

5        Q.   Was that Craig Washington?

6        A.   Correct.

7        Q.   Were there any other occasions where you've run

8   for national office?

9        A.   That I've run?

10       Q.   You, personally.

11       A.   Oh, no.

12       Q.   Okay.  For state office?

13       A.   No.

14       Q.   For municipal or local regional office?

15       A.   No.

16       Q.   Okay.  Could you help me identify the

17   approximate time of where you lived when because I've

18   seen Houston, Virginia, Florida, and I don't really know

19   any of those details, but just the approximate years and

20   places.

21       A.   I -- I own and have owned in the past multiple

22   residences --

23       Q.   Yes.

24       A.   -- that were used seasonally.

25       Q.   Yes.

EXHIBIT A, PAGE 12

Edward Blum
January 10, 2018                                    14

1          A.    So I lived in Houston beginning in 1961 off and

2    on through college and Austin and a short year in the

3    northeast.  I lived in Houston through the year 2000 at

4    which time we moved to Virginia.  We lived in Virginia

5    for about six years and purchased during that period of

6    time a home in Camden, Maine.  We divided our time

7    between Virginia and Maine seasonally.

8          Q.    Sure.  Let me guess that the winters were not

9    in Maine.

10         A.    Yes.  Yes, winters were not in Maine.  We then

11   rented a number of seasonal properties in South

12   Carolina, and during this period of time purchased an

13   apartment in New York City which we used seasonally as a

14   Pied-à-terre.  We sold the Pied-à-terre four years ago

15   and purchased a home in Tallahassee, Florida, and so now

16   my wife and I split our time between Spruce Head in

17   South Thomaston, Maine and Tallahassee, Florida.

18         Q.    No longer Virginia?

19         A.    No longer Virginia.

20         Q.    Okay.  In some of the papers that we'll be

21   looking at this morning there is an Austin address.  I

22   think it's Far West Boulevard.  Has that ever been a

23   home for you?

24         A.    That is a mail service.

25         Q.    Okay.  Good.  In the Fisher litigation, there

EXHIBIT A, PAGE 13

Edward Blum
January 10, 2018                                    15

```
 1   was a fifth circuit decision that was then reversed by
 2   the U.S. Supreme Court and remanded.  Do you recall this
 3   in about 2013?
 4        A.  I do.
 5        Q.  Am I right that your hope had -- or your
 6   intention and hope had been that the Supreme Court
 7   instead of a remand would say that there must be color
 8   blind admissions tests without regard to unusual
 9   circumstances --
10                 MR. STRAWBRIDGE:  Object to the form of
11   the --
12        Q.  (BY MR. MCKETTA) -- without regard to
13   compelling needs and narrowing tailors and other
14   opportunities perhaps have colored based admissions?
15                 MR. STRAWBRIDGE:  I'm sorry.  Object to the
16   form of the question.
17                 MR. MCKETTA:  There we go.
18        A.  I'm going to with your permission --
19        Q.  (BY MR. MCKETTA)  Of course.
20        A.  -- kind of restate the question --
21        Q.  Very fair.
22        A.  -- and then answer it in the process of doing
23   that.
24        Q.  As long as it's somewhere in the same
25   neighborhood as --
```

Edward Blum
January 10, 2018                          16

1        A.   We're going to be -- we're going to be next

2   door neighbors on this.   So the Fisher litigation never

3   asked any court including the Supreme Court to overturn

4   previous precedent in going back to Bakke and then of

5   course Grutter and Gratz.

6        Q.   Right.

7        A.   The UT lawsuit was specific to UT.   So to the

8   degree that we wanted the supreme court to strike down

9   UT's admission's policies, that was our hope and that

10  was the intention of the lawsuit.

11       Q.   Right.   Now, some would look -- some outsiders

12  reading casually may look at the 2013 decision as a

13  victory for SFFA -- for -- pardon me, for Abigail Fisher

14  because it was a reversal of a decision that had been

15  adverse to her, but am I correct that you personally

16  were disappointed with the 2013 decision?

17            MR. STRAWBRIDGE:   Object to the form of the

18  question.

19       A.   Yes, and, no.

20       Q.   (BY MR. MCKETTA)   Okay.   Fair.

21       A.   Yes, I was disappointed that the court didn't

22  use the record it had before it to apply its new

23  standard that it had just articulated and strike down

24  UT's admission's policies, but I was pleased that the --

25  the court vacated the fifth circuit opinion, applied a

Edward Blum
January 10, 2018                                    17

```
 1  new standard that it now applies nationally, and

 2  remanded it back for further consideration.

 3      Q.  Do you recall an interview that was

 4  broadcast -- released for broadcast about a month ago,

 5  December 6, 2017, in which you said that you had formed

 6  SFFA with the ultimate goal to have the Supreme Court

 7  revisit its unfortunate decision Fisher and end the use

 8  of race and ethnicity once and for all?

 9              MR. STRAWBRIDGE:  Object to the form of the

10  question.

11      A.  Yes, I do recall that.

12      Q.  (BY MR. MCKETTA)  All though the interview was

13  in December 2017, you were recollecting back to an event

14  that occurred before the 2014 formation of SFFA, were

15  you not?

16      A.  Could you remind me of which interview that

17  was.

18      Q.  December 6, 2017.  I -- it's called The

19  Architect, and it's in something called More Perfect.

20  Does that ring a bell to you?

21      A.  Yes.

22      Q.  Okay.

23      A.  Yes.

24      Q.  Okay.  Does it -- you remember that interview?

25      A.  Kind of.
```

Edward Blum
January 10, 2018                                              18

```
 1        Q.   Okay.  But its reference was the ultimate goal
 2   of SFFA which as I understand it was formed in 2014?
 3        A.   Correct.
 4        Q.   And were you remembering back during this 2017
 5   interview to a purpose that you had in mind perhaps with
 6   others in 2014 when you formed SFFA?
 7             MR. STRAWBRIDGE:  Object to the form of the
 8   question.
 9        A.   So when Fisher 1 was granted cert --
10        Q.   (BY MR. MCKETTA)  Yes.
11        A.   -- that was the seed that was planted for the
12   formation of SFFA.  So -- yes, so our thoughts started
13   to be organized -- actually, I can't recall what month
14   in 2012.  Maybe it was December of 2012 that the court
15   granted cert in Fisher 1.
16        Q.   I have the date of the decision, but I don't
17   with me have the date the cert.
18        A.   I'll never forget the date of the decision --
19        Q.   Of course, yeah.
20        A.   -- but, yes, we started -- we started thinking
21   about the next phase after -- after the Fisher
22   litigation.
23        Q.   But the reference in your interview in December
24   2017 where you said the ultimate goal was to have the
25   Supreme Court revisit its unfortunate decision in
```

EXHIBIT A, PAGE 17

Edward Blum
January 10, 2018                                        19

1   Fisher, were you referring to Fisher 1 or Fisher 2?

2              MR. STRAWBRIDGE:   Object to the form of the

3   question.

4        Q.  (BY MR. MCKETTA)   Do you understand why I'm

5   asking this time sequencing?

6        A.  I do.  I do.  Well, Fisher -- I think to

7   clarify, I think the -- the common wisdom and the belief

8   that I had -- my legal team had and I think the kind of

9   the general legal community -- was that on remand, the

10  Fifth Circuit would strike down the University of

11  Texas's plan.

12       Q.  So -- so for Fisher 1, clearly the grant of

13  certiorari in 2012 you treated as good news and not any

14  unfortunate action by the supreme court.

15       A.  Correct.

16       Q.  And as to Fisher 1, did you treat that as

17  unblemished good news, or did you treat that in any

18  fashion as an unfortunate decision?

19       A.  As I tried to explain earlier, it -- it is

20  both.

21       Q.  So that when you were interviewed in December

22  of 2017, your reference about an ultimate goal to have

23  the Supreme Court revisit its unfortunate decision in

24  Fisher was the purpose for forming SFFA, that was

25  harking back to Fisher 1?

Edward Blum
January 10, 2018                          20

```
 1              MR. STRAWBRIDGE:  Object to the form of the
 2   question.
 3        A.  Actually, the purpose for forming SFFA really
 4   did not have that much to do with the -- the -- kind of
 5   the unfortunate second decision --
 6        Q.  (BY MR. MCKETTA)  Yes --
 7        A.  -- in -- in Fisher.
 8        Q.  -- because it had already been formed.  SFFA
 9   was already up and running.
10        A.  SFFA had been formed prior to that second
11   decision, so I may have misspoken in that interview.  I
12   can tell you that when we -- there were a group of
13   lawyers and advocates who kind of noodled over what this
14   movement should do as the Fisher case was working its
15   way to argument and then post-argument.
16              The idea of a membership organization to
17   bring new lawsuits was -- was formed basically in late
18   2012 and discussions all through 2013.
19        Q.  Now, am I correct that the Project on Fair
20   Representation Inc., assisted financing of Fisher but
21   that SFFA did not?
22        A.  That's correct.
23        Q.  Or did SFFA have any role in assisting to fund
24   the legal expenses for Fisher 2?
25        A.  It did not.
```

EXHIBIT A, PAGE 19

1      A.   Yes.

2      Q.   At the time it was filed, there was the

3  capacity under Virginia code to have a membership

4  nonprofit or to have a nonmembership nonprofit.  Did the

5  corporator or the initial directors or the organizers

6  make a choice as to which of those forms to have?

7                MR. STRAWBRIDGE:  Object to the form of the

8  question.

9      A.   Well, as was explained to me by counsel at the

10  time --

11      Q.   And let's see if you can answer it in a way

12  that does not quote counsel.  So I -- I'm happy to learn

13  your belief, but I don't want to put Patrick at the

14  burden of a potential waiver of privilege.

15                MR. STRAWBRIDGE:  Yeah, and I'll just --

16  for the record, I'll -- I'll caution -- I'll caution

17  you:  You may answer the question to the extent you can

18  do so without revealing any communications that were

19  given to you by counsel in -- in -- in conveying or

20  seeking legal advice.

21      Q.   (BY MR. MCKETTA)  Perfect.  So let me just

22  rephrase the question to conform with the way that

23  Patrick has suggested.

24                I'm not asking what words were told you,

25  but I'll ask first:  Did you have any role in approving

Edward Blum
January 10, 2018                                    23

1    the selection of what form of entity Students for Fair

2    Admissions Inc would be?

3         A.   Yes.

4         Q.   And theoretically, it could have been a

5    for-profit corporation, but that was not a choice that

6    one did make or prudently would make.

7         A.   Correct.

8         Q.   Theoretically, it could be a nonprofit

9    association that was not incorporated, could it not?

10        A.   I assume so.

11        Q.   But that was not a choice that was made.

12        A.   Correct.

13        Q.   Were you aware at its formation that there was

14   the permissibility under Virginia law to have two

15   different types of nonprofit corporation?  On the one

16   hand, one with members, and on the other hand, one

17   without members.  Were you aware of that capacity?

18        A.   I'll answer it this way, Mr. McKetta.

19        Q.   Sure.

20        A.   The idea behind Students for Fair Admissions

21   and the -- the predicate that -- that this organization

22   was founded --

23        Q.   Yes.  Yes.

24        A.   -- by was a membership organization.

25        Q.   So your intent on creating it was to have a

EXHIBIT A, PAGE 21

Edward Blum
January 10, 2018                                                    26

1   months prior to SFFA, but I maybe wrong on that.

2        Q.   Yeah, you are not a lawyer.

3        A.   You bet.

4        Q.   You're proud of that fact.

5        A.   I'm actually not proud of it, but -- yeah,

6   looking back --

7        Q.   Lawyers, corporate lawyers, would know that a

8   nonprofit or a corporation -- a nonprofit is created

9   upon filing the satisfaction of certain requirements

10  with a state -- secretary of state ordinarily and that a

11  501(c)(3) exemption ordinarily is at a later date upon

12  application and approval by the IRS.

13            My focus is not when was a 501(c)(3)

14  exemption granted but the formation.  Do you know which

15  of the two corporations was formed first?

16       A.   I can speculate.

17       Q.   No, that's fine.

18       A.   Okay.

19       Q.   The document Exhibit 1 does not bear your

20  signature.

21       A.   I'm sorry, Mr. McKetta, I --

22       Q.   Yes?

23       A.   -- I -- I'm -- I'm mostly confident that

24  Project on Fair Representation was incorporated prior to

25  SFFA.

EXHIBIT A, PAGE 22

Edward Blum
January 10, 2018                          27

1          Q.   I thought it was incorporated prior to Fisher

2     1, but it was not?

3          A.   It was not, no.

4          Q.   Okay.  Exhibit 1 is an article of incorporation

5     that you're familiar with for SFFA.

6          A.   Yes.

7          Q.   It does not have your signature, but instead

8     has the signature purporting to be Robert Benton.  You

9     know Mr. Benton; do you not?

10         A.   I do.

11         Q.   And it was you who retained Mr. Benton to form

12    this corporation.

13         A.   Yes.

14         Q.   Did anybody in addition to yourself retain him

15    to form this corporation?

16              MR. STRAWBRIDGE:  Object to the form of the

17    question.  Are you talking about Students For Fair

18    Admission?

19              MR. MCKETTA:  SFFA, yes.  Right.

20         A.   No, I was the only one.

21         Q.   (BY MR. MCKETTA)  Okay.  And did Mr. Benton

22    share the articles with you in a draft form before they

23    were filed with the -- with Virginia?

24         A.   I'm sure he did.

25         Q.   You can see that the second paragraph says,

EXHIBIT A, PAGE 23

Edward Blum
January 10, 2018                                    28

```
 1    "The corporation shall have no members."  Do you see
 2    that?
 3         A.  Yes.
 4         Q.  Did that concern you?
 5         A.  No, because it was explained that there is a
 6    distinction between the Virginia -- the Virginia --
 7         Q.  Code?
 8         A.  -- what's it called -- Nonstop Corporation Act
 9    and the actual organization itself.
10         Q.  And what was the distinction the way you
11    understood it?
12         A.  I think Mr. Benton explained this, that --
13              MR. STRAWBRIDGE:  I just want to caution
14    the witness --
15              MR. MCKETTA:  To speak to his
16    understanding, but not to what the lawyers said.
17              MR. STRAWBRIDGE:  Right.  Just in answering
18    his questions, you may reflect on what your
19    understanding as SFFA was, but please do so without
20    revealing communications that you had with counsel or
21    the substance of their communications with you.
22              MR. MCKETTA:  Right.  Good.
23         A.  My understanding was that under the Virginia
24    Nonstock Corporation Act there was a distinction between
25    members who fell under that Act and then members of the
```

EXHIBIT A, PAGE 24

Edward Blum
January 10, 2018                                    29

1    organization itself.

2        Q.  (BY MR. MCKETTA)  And based on that

3    understanding whether accurate or inaccurate under

4    Virginia law, you were satisfied that the articles of

5    incorporation would tell the secretary of state and the

6    world that the corporation shall have no members.

7                MR. STRAWBRIDGE:  Object to the form of the

8    question.

9        A.  I was satisfied with the counsel and advice

10   that I received.

11       Q.  (BY MR. MCKETTA)  There is a process available

12   under Virginia code to amend articles of incorporation

13   from time to time.  Has SFFA's articles of incorporation

14   ever been amended?

15               MR. STRAWBRIDGE:  Object to the form of the

16   question.

17       A.  I -- I believe they have.

18       Q.  (BY MR. MCKETTA)  The bylaws have been amended.

19   Do you believe also the charter -- the articles of

20   incorporation have been amended?

21       A.  I'm sorry, I -- I'm unclear about that.

22       Q.  Okay.  Yeah.

23               MR. MCKETTA:  Patrick, is that a matter on

24   which we have a stipulation, or is that a matter on

25   which I need to ask for some supplemental discovery in a

Edward Blum
January 10, 2018                                    32

1          A.   It's ongoing.

2          Q.   Would you look at the address given as the

3     initial -- address of initial registered agent in

4     Midlothian, Virginia.  It's on page -- I think 1 of the

5     articles of incorporation almost in the middle of

6     paragraph 5.

7          A.   Paragraph 5, yes.

8          Q.   Are you familiar with that office?

9          A.   I am not.

10         Q.   Okay.  Take a look at if you would at Exhibit

11    2.  You recognize this document, do you not, as a

12    document that on one occasion you personally signed?

13              (Exhibit No. 2 marked for identification.)

14         A.   Yes.

15         Q.   And can you look at the multiple counterpart

16    pages 4 -- and see if you can recognize both your

17    signature and Abigail Fisher's signature and Richard

18    Fisher's signature.

19         A.   Yes, I see them.

20         Q.   Okay.  On page 1 there is a designation of

21    officers, yourself as President, Ms. Fisher as

22    secretary, and Mr. Fisher as treasurer.  Have those

23    offices ever changed from the beginning of SFFA's

24    existence through today?

25         A.   No.

Edward Blum
January 10, 2018                                    33

1          Q.   And the signature that we looked at on the

2    multiple counterpart pages 4 identified each of the

3    three of you, Mr. Blum, Ms. Fisher, and Mr. Fisher as

4    director.  Was that accurate promptly following the

5    formation, and did it continue to be accurate at all

6    dates from then through today?

7          A.   Yes.

8          Q.   At a later time there was an addition of

9    directors, but these three have remained directors at

10   all times?

11         A.   Yes.

12         Q.   How did you come to know Mr. Fisher?

13         A.   Mr. Fisher is an accountant for a real estate

14   development company here in Houston, and I conducted

15   business with the principles of that company and of

16   course along the way met Mr. Fisher.

17         Q.   And approximately when did you meet Mr. Fisher?

18   I'd understood you had been in Houston up until 2000.

19   Was it prior to 2000?

20         A.   Oh, it was in the early '80's.

21         Q.   So a long time ago?

22         A.   A long time ago, yeah.

23         Q.   I'm trying to do my arithmetic.  Was it before

24   Abigail Fisher was born?

25         A.   No.

Edward Blum
January 10, 2018                                    35

```
 1    I recall from the first time I met some Fisher
 2    children -- and it may have only been one because Abby
 3    has an older sister -- was that they came to our house,
 4    and the daughter broke a little glass tchotchke -- a
 5    little glass knick-knack that my wife was very upset
 6    about.  So I thought that was Abby, but it may have been
 7    her older sister.  So forgive me if I'm -- - if I've --
 8         Q.  Ask Abby to forgive you for that --
 9         A.  Yeah.
10         Q.  -- terrible memory if it was her sister.
11         A.  Yeah.  I -- I've forgiven her for lots of
12    stuff, so -- yeah.
13         Q.  So now how would you describe the
14    communications you had prior to formation of SFFA with
15    Mr. Fisher about the possibility of his becoming a
16    director?
17         A.  Mr. Fisher and I communicate if not daily, then
18    almost daily.
19         Q.  And did back then, as well?
20         A.  Yes.
21         Q.  And had been doing so for some years?
22         A.  Yes.
23         Q.  And daily -- let's leave aside now the
24    litigation matters -- do you communicate daily or almost
25    daily on business matters, as well?
```

EXHIBIT A, PAGE 28

Edward Blum
January 10, 2018                                    36

1          A.   Yes.

2          Q.   Are you and he actually -- you are not a

3    business partner with him or a co-investor with him on

4    any projects, are you?

5          A.   Well, I'm not sure how to -- how to -- I can

6    kind of narrow some things down.

7          Q.   Please, yeah.

8          A.   There are occasionally private real estate

9    deals that are shown to Mr. Fisher --

10         Q.   Of course.

11         A.   -- and his -- his employers.  Sometimes those

12   deals are shared with me, and sometimes I will invest

13   along with that group.  Sometimes I will find

14   interesting investments and share that with Mr. Fisher

15   and his -- and his employers.

16              So to that degree, the answer to your

17   question is:  Yes, but we do not have some kind of

18   co-joined partnership in which we both have financial

19   interest.

20         Q.   And no business deals where each of you have,

21   say, as much as 10 percent that you're sharing in the

22   same project, nothing of that significance?

23         A.   I -- I don't know what Mr. Fisher does.  When

24   Mr. Fisher shows me a deal and I invest in it, all that

25   I -- all that I am assured of is that -- that Mr. Fisher

Edward Blum
January 10, 2018                                          37

1  has reviewed it for his employers.  Now, if Mr. Fisher

2  puts his own money in it, I don't know.  Yeah.

3       Q.  I'm going to look with you at Exhibit 3.

4            (Exhibit No. 3 marked for identification.)

5  Do you see that Exhibit 3 is a filing with the IRS that

6  included in turn many exhibits?

7       A.  I recognize that.

8       Q.  And in this filing, one of the exhibits was the

9  articles of incorporation that we've already reviewed

10 today.  Do you see that that was Exhibit A within this

11 trial Exhibit 3?

12      A.  Let's see.  Exhibit A, let me find it -- yes, I

13 see that on the table of contents.  Yes.

14      Q.  And the next exhibit, Exhibit B, to this trial

15 Exhibit 3 was bylaws.

16      A.  I see that here in the table of contents.

17      Q.  And the bylaws have, do they not -- and these

18 were the bylaws in effect at that time, at the time of

19 this filing with the IRS in October of 2014.

20      A.  Yes.

21      Q.  And if you turn to those bylaws with me, do you

22 see section 2 in article 1?  It has a street address in

23 Alexandria.

24      A.  Oh, yes.

25      Q.  Do you recognize that address?

EXHIBIT A, PAGE 30

Edward Blum
January 10, 2018                                           38

1         A.  I do.

2         Q.  Whose address is that if you know?

3         A.  That is the address, the former address, of a

4    donor advised group called Donors Trust.

5         Q.  Then in article 3 we have two paragraphs, one

6    titled "Members" and one titled "Affiliate Members."  Do

7    you see that?

8         A.  I do.

9         Q.  The first says that the corporation shall have

10   no members within the meaning of the Act.

11        A.  Yes.

12        Q.  And the second says that the corporation shall

13   have one class of affiliate members and says they, "have

14   no voting rights, and are not members within the meaning

15   of the Act."  Do you see that?

16        A.  Yes, let me just read this.

17             "The corporation shall have one class of

18   affiliate members with rights, privileges, and

19   obligations established by the board of directors."

20        Q.  Yes.

21        A.  "Affiliate members will have no voting rights,

22   and are not members within the meaning of the Act."  And

23   the word "Act" is capitalized.

24        Q.  And you can tell that the word "Act" in a prior

25   paragraph refers to the Virginia Nonstock Corporation

Edward Blum
January 10, 2018                              39

1   Act that you had mentioned earlier.

2        A.   Yes.

3        Q.   Why did SFFA in 2014 choose that it would have

4   no voting members?

5             MR. STRAWBRIDGE:   I'll just caution the

6   witness that you may answer the question to the extent

7   it does not require you to reveal communications that

8   you had with your attorneys for purposes of getting or

9   receiving legal advice.

10       Q.   (BY MR. MCKETTA)   And I can rephrase it if it

11  helps, too.   What was your understanding of the reason

12  SFFA selected not to have voting members in 2014?

13       A.   So at the time that we formed this group, we

14  had, I guess, you know, four or five dozen members, and

15  membership was relatively small.   And it did not seem

16  based on the size of our membership that there was any

17  -- any need to have these few members have voting

18  rights, yeah.

19       Q.   So it was a conscious decision in 2014 that to

20  the extent if any of the corporation had members, they

21  would not be voting members?

22       A.   Correct.

23       Q.   Did anybody -- and this is only a "yes" or "no"

24  question -- did anybody ever explain to you what

25  burdens, if any, there would be under the Virginia

EXHIBIT A, PAGE 32

Edward Blum
January 10, 2018                                    40

```
 1  Nonstock Corporation Act if SFFA wished to have members

 2  within the meaning of the Act?

 3              MR. STRAWBRIDGE:  I'll just caution the

 4  witness that that's a "yes" or "no" question.

 5      A.  I'm afraid I can't -- I can't recall if that

 6  was discussed.

 7      Q.  Are you today aware whether there would or

 8  would not be any burdens on SFFA to comply with the

 9  Virginia Nonstock Corporation Act if it were to have

10  statutory members?

11              MR. STRAWBRIDGE:  Object to the form of the

12  question.

13      A.  I just don't -- I just don't know.

14      Q.  (BY MR. MCKETTA)  On page -- on the next page

15  of the bylaws of this article 4, do you see section 4.03

16  has a title of "Election and Term of Directors"?

17              And here's my question for you:  I'm unable

18  in this paragraph to find any term that is in one year,

19  two year, three year and so on in term for directors.

20  Was it intended that this paragraph would be silent as

21  to the term of directors?

22      A.  It was always my understanding that the

23  directors would be -- the initial directors would be

24  permanent.

25      Q.  Okay.  And then there's a similar provision
```

EXHIBIT A, PAGE 33

Edward Blum
January 10, 2018                                    41

1   under section 6.02 a few pages further.  Section 6.02

2   refers now to officers, and it talks about term of

3   office vacancies and removal.  And I'm unable in

4   paragraph -- in section 6.02 to find any term for the

5   officers.  Was that intentional?

6        A.  It -- I -- I'll restate my earlier answer.  It

7   was always my understanding that the officers would be

8   permanent.

9        Q.  And that that would be yourself, Ms. Fisher,

10  and Mr. Fisher?

11       A.  Correct.

12       Q.  Paragraph 6.05 authorizes SFFA to have agents

13  and employees from time to time.  Has SFFA ever had any

14  employees for whom W2 compensation was given?

15       A.  No.

16       Q.  You have received compensation in recent time

17  periods from SFFA; am I not correct?

18       A.  Yes.

19       Q.  But not as a statutory employee?

20       A.  Correct.

21       Q.  What is the characterization given to that

22  compensation that's distributed to you from SFFA in

23  current time periods?

24       A.  Would you state that again.  I'm sorry.

25       Q.  Yeah, is it a director's fee -- what's the

EXHIBIT A, PAGE 34

Edward Blum
January 10, 2018                                    42

1   character that's given to that --

2        A.  Yes.

3        Q.  -- if it's not a salary?

4        A.  I -- I think it is -- I record it as a stipend

5   for work preformed.

6        Q.  Okay.  And am I correct that no other person

7   has received a stipend of that character from SFFA other

8   than yourself?

9        A.  That's correct.

10       Q.  So until a fairly recent date, you received no

11   compensation of any form from SFFA, and at all times

12   Ms. Fisher and Mr. Fisher have received no compensation

13   from SFFA.

14       A.  That's correct.

15       Q.  Thank you.  What I'm looking for now is a page

16   with your signature, and I'm just disorganized enough to

17   have to search, but let's see if we can find it

18   together.

19            I don't know the answer to whether your

20   signature is the one that appears on page 2 of form 2848

21   towards the top.  Is that your signature?

22       A.  So are we still on Exhibit No. 3?

23       Q.  Exhibit 3, and if you'll go to the third,

24   fourth, fifth, sixth page, there's a form 2848.

25            MR. STRAWBRIDGE:  Is there a Bates

EXHIBIT A, PAGE 35

Edward Blum
January 10, 2018                                              44

1        Q.  Okay.

2        A.  -- but that I recognize Brandy Zehr's name.

3        Q.  Okay.  You can see that the IRS application was

4   mailed on October 8, 2014, and that's perhaps a little

5   over two months after the formation of the corporation.

6               My question is:  Why the delay of waiting

7   to file the application for incorporation?

8               MR. STRAWBRIDGE:  Object to the form of the

9   question.

10       A.  I -- I don't know.

11       Q.  (BY MR. MCKETTA)  There is on the first page of

12   form 2848 -- with an Exhibit 3 on the first page -- an

13   address on Far West Boulevard for Students for Fair

14   Admissions Inc.

15       A.  Yes.

16       Q.  And you see that that's in Austin, Texas.

17       A.  Yes.

18       Q.  And I think you described earlier that's a mail

19   drop service.

20       A.  Correct.

21       Q.  Why did Students for Fair Admissions Inc not

22   furnish the IRS a physical location address?

23               MR. STRAWBRIDGE:  In answering this

24   question, I caution the witness not to reveal any

25   information reflecting the advice of counsel or any

EXHIBIT A, PAGE 36

Edward Blum
January 10, 2018                                    45

1    internal deliberations of SFFA.  But to the extent that

2    you can answer the question without revealing that

3    information, you can.

4              MR. MCKETTA:  Great.

5         A.  SFFA is primarily managed by myself in my

6    residence.

7         Q.  (BY MR. MCKETTA)  Right.

8         A.  And because I have -- I'm sorry about this --

9    because I have multiple residences, it's -- it's --

10             MR. MCKETTA:  Let's go off the record a

11   minute.

12             (Discussion briefly off the record.)

13             (Discussion back on the record.)

14        Q.  (BY MR. MCKETTA)  Why did SFFA not share an

15   address with the IRS that corresponded to a physical

16   location associated with its operations?

17        A.  The operation of SFFA is run out of my -- my

18   residence.  And because I have multiple residences, all

19   mail, personal and professional, go to Far West

20   Boulevard.

21        Q.  In -- there's the next IRS form in that Exhibit

22   3 packet is form 1023, and there is given a mailing

23   address for each of the three directors.  Do you see

24   that?

25        A.  Let's see.

Edward Blum
January 10, 2018                                    52

1   when we should expect after delivery to get your

2   designation?

3               MR. STRAWBRIDGE:  Can we agree to 30 days?

4               MR. MCKETTA:  What's the protective order?

5               MR. STRAWBRIDGE:  I don't know what the

6   protective order says.

7               MR. MCKETTA:  That's -- that's long.

8   That's long.

9               MR. POWERS:  I would do it shorter just to

10  accommodate the briefing schedule, so 21 days.

11              MR. STRAWBRIDGE:  Sure.  21 days is fair,

12  and, of course, we're willing to work with on -- on --

13  on, you know -- on any pleadings that need to be filed

14  in the meantime.  So, you know, we'll consider those

15  when we've worked with other counsel and we'll continue

16  to do so.

17              MR. MCKETTA:  Thank you, Patrick.

18     Q.  (BY MR. MCKETTA)  Mr. Blum, would you describe

19  the -- what you described is that after the initial few

20  months in 2014 there was no financial relationship

21  between POFR and SFFA; is that so?

22     A.  Correct.

23     Q.  And that the only relationship that you recall

24  the two organizations having was during that initial

25  year of 2014 for some organizational expenses that were

EXHIBIT A, PAGE 38

Edward Blum
January 10, 2018                                          53

1    advanced by POFR to SFFA.

2         A.  Correct.

3         Q.  Have there been funds advanced by POFR to SFFA

4    after 2014?

5         A.  No.

6         Q.  Did POFR continue to fund the Fisher

7    litigation, both Fisher 1 and 2 proceedings?

8         A.  Yes.

9         Q.  Did SFFA ever fund any portion of the Fisher

10   litigation?

11        A.  No.

12        Q.  What persons devote more than a few minutes of

13   time a month to the work of POFR beside yourself?

14        A.  Outside of legal counsel?

15        Q.  What -- what -- what officers or directors or

16   if there were any employees of POFR --

17        A.  Oh, I see.

18        Q.  -- attend to its affairs?

19        A.  The -- the -- the officers and directors of

20   POFR have no direct day-to-day contact and

21   decision-making with POFR.

22        Q.  They participate in a periodic board of

23   directors meeting perhaps annually?

24        A.  Correct.

25        Q.  And you do all of the day-to-day matters for

1   POFR?

2            MR. STRAWBRIDGE:  Object to the form of the

3   question.

4        A.  Yes.

5        Q.  (BY MR. MCKETTA)  In the role as its president?

6        A.  Correct.

7        Q.  Similarly for SFFA, how intensive would you

8   describe the time commitments required of its directors

9   and its other officers besides yourself?

10       A.  They are -- they have responsibilities, and

11  there are at least quarterly board meetings.  And some

12  of them have, I think, maybe sort of assignments that

13  fall under their purview.

14       Q.  The IRS application indicated that it was

15  anticipated that POFR will continue to be the primary

16  funder of SFFA.  I'm reading from that same page we

17  studied.  Did those plans change shortly after October

18  2014?

19       A.  They evolved.

20       Q.  And did their shift from POFR a reliance on a

21  different primary fundraiser?

22            MR. STRAWBRIDGE:  Object to the form of the

23  question.  I understand that to be a yes or no question.

24       A.  So the answer is, yes.

25       Q.  (BY MR. MCKETTA)  And please identify the

Edward Blum
January 10, 2018                                                    57

1  membership due to SFFA?

2       A.  Mr. McKetta, I'm a little confused.  Are you

3  asking have I ever personally paid $10 to an outside

4  party who wanted to join?

5       Q.  I'm sorry.  I must have really asked that

6  poorly.  I'm sorry.

7       A.  Yeah.  No, that's all right.

8       Q.  There came a time when the board had a

9  resolution saying we've waived dues until now --

10      A.  Yes.

11      Q.  -- but in the future, we may start charging $10

12  one time dues of nonstatutory members.

13      A.  Right.

14      Q.  I'm wondering -- prior to that time, nobody

15  paid dues, right?

16      A.  Correct.

17      Q.  After that time, did you pay $10 that was

18  designated as dues to SFFA?

19      A.  Did I, personally?

20      Q.  Yes, sir.

21      A.  I don't think so.

22      Q.  Did Mr. Fisher?

23      A.  I don't know.

24      Q.  Did Ms. Fisher?

25      A.  I don't know.

EXHIBIT A, PAGE 41

Edward Blum
January 10, 2018                                    58

1       Q.  Mr. Zhou, Z-h-o-u?

2       A.  Again, I don't know.

3       Q.  Mr. Chen?

4       A.  I don't know.

5       Q.  If you would look on this same form 1023 that

6   is within trial Exhibit 3, at page 9 which has Bates No.

7   203 at the bottom right hand corner --

8                   MR. STRAWBRIDGE:  209?

9                   MR. POWERS:  Was it 203?

10      A.  Yes, I see it here.

11      Q.  (BY MR. MCKETTA)  The -- this called upon not a

12  historic but a projected information about various

13  categories of revenue and expenses.  Do you see that on

14  this page?

15      A.  Yes, page 9?

16      Q.  (Indicating.)  And were you the primary source

17  of furnishing the numbers that would appear in these

18  projections?

19      A.  Yes.

20      Q.  And the projections were that there would be $2

21  million in gifts, grants, and contributions over a

22  two-and-a-half year period; is that so?

23      A.  Correct.

24      Q.  And the membership fees, the projection was

25  would be $0.

Edward Blum
January 10, 2018                                                   63

```
 1        Q.  (BY MR. MCKETTA)  Okay.  You're unaware -- was
 2   there ever a (indiscernible) solicitation sent out to
 3   ask prior nonstatutory members to now pay a one time $10
 4   fee?
 5        A.  No.
 6        Q.  Then the second page of this Exhibit 5 has a
 7   "be it resolved" section --
 8        A.  I'm sorry, Mr. McKetta, Exhibit 5 or Exhibit 4?
 9        Q.  4.  Thank you very much for correcting me.
10             (Exhibit No. 4 marked for identification.)
11   The second page has a "be it resolved" paragraph.  That
12   waiver of membership dues would continue until July 30,
13   2015.  Is that -- have I understand that correctly?
14        A.  Correct.
15        Q.  And after that time, individuals who became
16   "general members" or nonstatutory members on or after
17   July 30, 2015 would be required to pay a one time
18   assessment of $10 as membership dues.
19        A.  Correct.
20        Q.  Were there any waivers given after that date?
21        A.  After July --
22        Q.  30th.
23        A.  July 30, 2015?
24        Q.  Yes.
25        A.  Yes.
```

EXHIBIT A, PAGE 43

Edward Blum
January 10, 2018                                        64

1       Q.   So there have been subsequent people who were

2   given status as nonstatutory members of SFFA, and after

3   July 30, 2015 some of whom paid $10 membership fee one

4   time charge and some of whom did not?

5       A.   Yes.

6       Q.   Okay.

7       A.   Can I clarify that?

8       Q.   Oh, please.   At any time you and I don't want

9   to leave an inaccurate flavor by my poor questions or by

10  your partial answers, so thank you.

11           MR. STRAWBRIDGE:   And let me just -- let me

12  just caution the witness:   In answering that question,

13  do not reveal the identity of any particular members of

14  SFFA.

15           MR. MCKETTA:   I didn't ask for that.

16      A.   So occasionally -- and this happened a few

17  weeks ago -- three high school students wanted to join.

18  I think they were -- some of them were 16 and

19  17-years-old and did not have a credit card.   They had

20  e-mailed me and said, "We want to be members, but we

21  can't pay the $10."   And so I -- I have the -- within

22  our bylaws, the right to grant them membership without

23  the $10, so there -- there may have been, you know,

24  three or four or five kids like that over the last

25  two-and-a-half to three years.

EXHIBIT A, PAGE 44

Edward Blum
January 10, 2018                                          65

1      Q.  (BY MR. MCKETTA)  What's the current

2   membership?

3      A.  It's over 22,000.

4      Q.  In this resolution there also was attention

5   given to a change in status of the nonstatutory members,

6   so that they would have a voting power for one director,

7   correct?

8      A.  Correct.

9      Q.  And an enlargement on the board of directors

10  from three persons to five persons --

11     A.  Correct.

12     Q.  -- for it to be self-perpetuate elected by the

13  board and one by nonstatutory members?

14     A.  Correct.

15     Q.  And the newly elected fourth member of the

16  board selected by the board members was Edward Chen.

17     A.  Correct.

18     Q.  And he served from late 2015 until about

19  December 2016.

20     A.  I think that's --

21          MR. STRAWBRIDGE:  I'm sorry.  You asked

22  whether Mr. Chen was the newly elected board member by

23  the members?

24          MR. MCKETTA:  No, I said by the board.

25          MR. STRAWBRIDGE:  Okay.  Thank you.  I just

EXHIBIT A, PAGE 45

Edward Blum
January 10, 2018                                    66

1  wanted to -- I'm sorry.

2       A.  I can't really confirm the dates, but that

3  sounds generally about the time, yeah.

4       Q.  (BY MR. MCKETTA)  He no longer was a board

5  member at the time this lawsuit was filed, was he?  In

6  July of 2017.

7       A.  So --

8       Q.  You remember he became ill in --

9       A.  He became ill, and then he --

10      Q.  -- late 2016.

11      A.  He became -- he said -- I called, and he sent

12  an e-mail saying he was ill, and he wasn't sure if he

13  was going to live.  And his wife said that that's

14  malarky.  He's just feeling sorry for himself.

15            And so we said, "Ed, you know, we'll give

16  you sort of a temporary reprieve from serving on the

17  board.  You know, when you're -- when you're out of the

18  hospital and you're feeling better, please contact us

19  again."

20            He sent an e-mail.  He said, "I'm okay, I'm

21  back.  When's the next meeting?  I'm raring to go.

22  What's going on?"  So those dates are a little fuzzy to

23  me.

24      Q.  Did the board take action to approve the filing

25  of this lawsuit against the University of Texas and

EXHIBIT A, PAGE 46

Edward Blum
January 10, 2018                                     69

1       A.  Correct.

2       Q.  Now, let's go back to my earlier question.  I

3   had understood Edward Chen no longer was acting as a

4   board member by July of 2017.  Does this help you

5   remember whether by that date he no longer --

6       A.  I think that's right.  I think that's right.

7   We had a number of board meetings that Ed was not a

8   participant.  And I think according to the bylaws, at

9   least on the advice of counsel, we were able to conduct

10  those meetings.

11      Q.  You had a majority present which is all that

12  your bylaws appear to require.

13              Now, what I had notes on was that Mr. Chen

14  joined the board in December 2015 and Mr. Zhou -- have I

15  pronounced that correctly?

16      A.  (Indicating.)

17      Q.  Z-h-o-u joined the board in December 2015.  Do

18  those dates sound accurate to you?

19      A.  They do.

20      Q.  Mr. Zhou is Folsom, California --

21      A.  Correct.

22      Q.  -- and we discussed that Mr. Chen is in

23  Houston.

24      A.  Correct.

25      Q.  Mr. Chen was a former litigant for whom you

EXHIBIT A, PAGE 47

1   performed Yenta the matchmaker services; is that not so?

2         A.  Twice.

3         Q.  And --

4         A.  Actually, I take that back, Counsel.  Three

5   times.

6         Q.  Oh, three times?

7         A.  Yeah.

8         Q.  And one of those was in Judge Atlas's court in

9   the 1990's.

10        A.  Correct.

11        Q.  Describe briefly the other two.  I'm not -- I

12  don't care about great details, but roughly what were

13  the other two occasions when you identified an important

14  public issue, identified Mr. Chen as a potential person

15  to be the litigant for that, matched an appropriate law

16  firm, and gave whatever additional support was

17  appropriate?

18        A.  Mr. Chen resided in congressional district

19  number 25, and to my knowledge he still does.  So in

20  1994 when a group including Mr. Chen and myself sued the

21  State of Texas, Mr. Chen was a plaintiff in that case.

22        Q.  Right.

23        A.  Mr. Chen subsequently was dismissed from that

24  case in the Supreme Court opinion for failure to have

25  standing --

Edward Blum
January 10, 2018                                    71

1        Q.   Yes.

2        A.   -- because he resided in one of the

3   congressional districts that was not struck down as

4   unconstitutional.   Then Mr. Chen participated in a

5   challenge to the Texas Senate Plan which followed.   That

6   case was styled Thomas vs. Bush.   I think that's right,

7   Thomas vs. Bush, and that case was -- was settled with a

8   redrawing of those states' districts.

9        Q.   He was one of several plaintiffs.

10        A.   One of several, yes.

11        Q.   Have you identified each of the people who then

12   became plaintiffs to that lawsuit, or had others -- had

13   some self-selected or self -- how -- how were those

14   plaintiffs brought together for that one lawsuit?

15        A.   Which lawsuit?

16        Q.   Thomas.

17        A.   Thomas.

18             MR. STRAWBRIDGE:   Let me just caution the

19   witness that when answering his question:   Do not reveal

20   any communications that you had with -- with -- or, you

21   know, counsel for the purposes of giving or receiving

22   legal advice.

23        Q.   (BY MR. MCKETTA)   Well, you were not a client

24   for those lawsuits, were you?

25        A.   I was.

Edward Blum
January 10, 2018                                          72

1        Q.   You were also a coplaintiff --

2        A.   Correct.

3        Q.   -- in each of the two that you've described so

4   far?

5        A.   Correct.

6        Q.   Okay.  I -- I'm with you.  So my question is:

7   Did -- did all of the coplaintiffs -- yourself, Mr.

8   Chen, Ms or Mr. Thomas, and others -- were they people

9   that you identified and pulled together, or did they

10  come together from some other fashion?

11       A.   We were all friends --

12       Q.   Yeah.

13       A.   -- and active in Harris County Republican

14  activities.

15       Q.   The third lawsuit with Mr. Chen?

16       A.   That was Chen vs. City of Houston --

17       Q.   That was the Nancy Atlas one?

18       A.   -- in Nancy's -- Nancy Atlas' court.

19       Q.   All right.  And were there coplaintiffs in that

20  one?

21       A.   Yes.

22       Q.   Were you a plaintiff in that one?

23       A.   I'm pretty sure I was, yeah.

24       Q.   Now, in the Fisher litigation, did Mr. Chen

25  ever have any role in discussing that litigation with

Edward Blum
January 10, 2018                              79

```
 1        Q.  How fuzzy?  Describe how it's accurate.
 2                 MR. STRAWBRIDGE:  Object to the form of the
 3   question.
 4        A.  It -- I think if you looked at the broad
 5   definition of "waived," it could include
 6   non-intentional -- a non-intentional act and an
 7   intentional act.  If you're asking me was it an
 8   intentional act to waive membership fees at the
 9   beginning of this organization, I would say, no.
10                 Is it an unintentional outcome that
11   producing or imposing a membership fee resulted in a
12   waiver, then I can -- I can answer that in the
13   affirmative.
14        Q.  (BY MR. MCKETTA)  In the -- now, I'm going to
15   go back to the bylaws which started at Bates No, page 59
16   and are part of Exhibit 4.
17        A.  Okay.
18        Q.  In section 3.02 that carries over to the next
19   page, the last sentence says that these nonstatutory
20   members, "shall have the right to vote for one
21   member-elected director pursuant to section -- "  do you
22   see that?
23        A.  I do.
24        Q.  How was it decided to have the capacity to vote
25   for only one and not for all five?
```

Edward Blum
January 10, 2018                                          80

1        A.  I'm -- I'm unaware of any not-for-profit

2   membership board that requires members to vote for each

3   and every director and officer.  We -- the three of us

4   who were original directors and officers purposefully

5   made ourselves permanent directors and officers.

6        Q.  Am I right that a single director on a five

7   member board would never alone have the power to control

8   any vote?

9        A.  Yes.

10       Q.  Am I right that three permanent directors on a

11  five member board, if they were in agreement and

12  principle with one another, would always have the power

13  to control any vote?

14       A.  Any three members, permanent or not, would have

15  the power to control a vote.

16       Q.  Right.  And I'm not now going to ask you

17  specifics of any topic on which there may have been

18  division, but I'm going to ask you:  Has there ever been

19  a vote in which you, Mr. Fisher, and Ms. Fisher voted in

20  different ways?

21              MR. STRAWBRIDGE:  I'm going to object to

22  the question and instruct the witness not to answer on

23  grounds of associational privileges.  It's to seek -- it

24  seems to seek information about the internal workings of

25  the organization.

EXHIBIT A, PAGE 52

Edward Blum
January 10, 2018                                    82

```
 1              MR. STRAWBRIDGE:  He can answer that
 2   question yes or no.
 3        A.  Yes.
 4        Q.  (BY MR. MCKETTA)  Okay.  Can you -- in the
 5   initial bylaws there was no requirement that directors
 6   be one or more of the nonstatutory members.  Here on
 7   section 403 there's a qualification requirement that all
 8   directors must be "general members" of the corporation.
 9   Do you know why that change was made?
10              MR. STRAWBRIDGE:  Object to the form of the
11   question.
12        A.  I don't know why it was made, but I can add
13   that all of the directors were members of SFFA when they
14   were appointed to that position.
15        Q.  (BY MR. MCKETTA)  What we -- we talked earlier
16   about three potential requirements to become a
17   nonstatutory member and two actual requirements because
18   the board had not prescribed additional ones to become a
19   nonstatutory member.  What are the duties, if any, of a
20   nonstatutory member of SFFA?
21        A.  So by duties if you mean some kind of activity
22   that they -- that they are required to do, there are no
23   activities that we ask our 20,000 members -- or 22,000
24   members to -- to perform.
25        Q.  What rights, if any, do nonstatutory members of
```

Edward Blum
January 10, 2018                                          83

 1   SFFA have?

 2        A.  They have the right to elect a board member.

 3   They have the right to participate in our conference

 4   calls.  They have the right to resign if they object to

 5   the direction of SFFA.  I think that's it.

 6        Q.  As to conference calls, are there regularly

 7   scheduled intervals for conference calls such as

 8   annually or quarterly or monthly and so on?

 9                  MR. STRAWBRIDGE:  And I'll just caution the

10   witness he may answer this question so you don't

11   disclose the content of any particular conference call

12   among the membership.

13        A.  The answer is, yes.

14        Q.  (BY MR. MCKETTA)  And what is that interval?

15        A.  Annually, and I believe there was one other

16   time that we -- I think this is right, Mr. McKetta, that

17   we invited our members to a conference call outside of

18   the annual -- the required annual one.  I think that's

19   right.

20        Q.  When was the first annual meeting -- annual

21   conference call?  Was it in 2014, 2015, or 2016?

22        A.  Oh, gosh.  I'm going to say it was probably

23   2015.

24        Q.  And then there was another one in 2016 and then

25   another in 2017.

EXHIBIT A, PAGE 54

Edward Blum
January 10, 2018                                    89

1    that a nonprofit corporation in Virginia only have

2    members if the authority to do so is specified in the

3    articles?

4              MR. STRAWBRIDGE:  Object to the form of the

5    question.

6         Q.  (BY MR. MCKETTA)  Are you aware?

7         A.  I'm not aware of that.

8         Q.  The -- when was the last election of any

9    director?

10        A.  December of 2017.

11        Q.  And who, if anybody, was elected?

12        A.  Mr. Alex Chen.

13        Q.  And what relation, if any, does he have to

14   Edward Chen?

15        A.  They are not related.

16        Q.  Okay.  Where does he live?

17        A.  He lives in the Silicon Valley area of

18   California.

19        Q.  Was there in December of 2017 any action to

20   reelect yourself, Ms. Fisher, or Mr. Fisher?

21        A.  No.

22        Q.  When was the last time there was any action

23   taken to consider reelection of yourself, Mr. Fisher, or

24   Ms. Fisher?

25        A.  We are permanent members.

EXHIBIT A, PAGE 55

Edward Blum
January 10, 2018                                    90

1      Q.  When was the last time that there was any

2  action taken whether to reelect Mr. Z-h-o-u, Zhou?

3      A.  Mr. Zhou was voted as the new permanent

4  director to replace Mr. Ed Chen.

5      Q.  So is Mr. Alex Chen elected by the nonstatutory

6  members?

7      A.  Yes.

8      Q.  And Mr. Zhou was elected by the board --

9      A.  Correct.

10     Q.  -- in December of 2017.

11     A.  It may have been in November.  I can't recall

12  -- or maybe perhaps a little earlier than that.

13     Q.  What was the method furnished to nonstatutory

14  members to determine whether they wished to vote?  Was

15  it e-mail communication?

16     A.  Oh, yes.  E-mails were sent repeatedly, two or

17  three times to the entire membership roll.  Instructions

18  were given about how to self-nominate.  Once those

19  self-nominated candidates had been identified, they were

20  required to provide some brief information about

21  themselves and what their motivation was for serving on

22  the board.  Then another e-mail was sent to the full

23  membership with that information, and people were asked

24  to cast a ballot.

25     Q.  Please give me the approximate number of total

EXHIBIT A, PAGE 56

1  ballots cast.  I'm not asking for which person, but only

2  a total.

3              MR. STRAWBRIDGE:  Object to the question,

4  and I instruct the witness not to answer on grounds of

5  associational privilege.

6      Q.  (BY MR. MCKETTA)  Would have the capacity to

7  answer had you not been so instructed?

8      A.  Yes, yes.

9      Q.  Would you have the capacity -- please state

10  whether as many as one half of your nonstatutory members

11  cast a vote?

12              MR. STRAWBRIDGE:  Same -- same objection.

13  Same instruction.

14      Q.  (BY MR. MCKETTA)  Would you have the capacity

15  to answer?

16      A.  Yes.

17      Q.  Please state whether ██████████████ cast a

18  vote.

19              MR. STRAWBRIDGE:  Same objection.  Same

20  instruction.

21      Q.  (BY MR. MCKETTA)  Do you know the answer?

22      A.  I don't know the answer.

23      Q.  Okay.  Do you know whether Ms. Davis, the other

24  standing person named in this case, cast a vote?

25              MR. STRAWBRIDGE:  The question is:  Does he

Edward Blum
January 10, 2018                                        93

```
 1    basically vote for themselves, and I am unclear if we
 2    have done that.
 3         Q.  Your recollection was that in December of 2017
 4    there was not any board vote taken as to the three
 5    original directors.  That -- that was your recollection;
 6    was it not?
 7         A.  I believe that's right.
 8         Q.  And I assume that if you learned that that
 9    recollection was mistaken, you'll take some steps to let
10    Mr. Strawbridge know so that he may re-advise us.
11         A.  I will.
12         Q.  Is it your intent to ask that the lawyers
13    further revise the bylaws so that the original three
14    will be stated as permanent instead of two year
15    directors?
16              MR. STRAWBRIDGE:  Object to the form of the
17    question.
18         A.  I'll seek counsel's guidance on if that's
19    necessary or not.
20         Q.  (BY MR. MCKETTA)  But your -- your desire and
21    intention with Mr. Fisher and Ms. Fisher always has been
22    the three of you would be permanent directors of this
23    organization?
24              MR. STRAWBRIDGE:  Object to the form of the
25    question.
```

EXHIBIT A, PAGE 58

Edward Blum
January 10, 2018                                        94

1     A.  Yes, we'll be permanent members and if

2  required, schedule a vote among the three of us every

3  two years.

4     Q.  (BY MR. MCKETTA) Are there certificates of

5  membership given?

6     A.  We send a welcome e-mail to everyone that --

7  that joins.  I'm not sure that we call it a certificate

8  of membership, but it is a welcome letter with

9  information and greetings.

10     Q.  For the annual telephone conference, is it

11  called as a statutory meeting of members?  Do you call

12  it a meeting or do you call it a conference?

13          MR. STRAWBRIDGE:  Object -- object to the

14  form of the question.

15     A.  I don't know.

16     Q.  (BY MR. MCKETTA) Who does the mechanics of

17  arranging for that annual teleconference to occur?

18     A.  Engage DC.

19     Q.  And the invitation to participate in the

20  teleconference is done by e-mail --

21     A.  Yes.

22     Q.  -- from that vendor?

23     A.  Yes.

24     Q.  Is an agenda package sent out with that e-mail

25  invitation?

EXHIBIT A, PAGE 59

Edward Blum
January 10, 2018                                          106

1      Q.   And I don't recall that any amount was

2  indicated in 2014.  Did that stipend commence in 2015?

3      A.   Yes, it did.  That's correct.

4      Q.   Okay.  There are three directors of Project on

5  Fair Representation Inc; are there not?

6      A.   Officers and directors, yes.

7      Q.   You are a director and the executive director.

8  Are you also president?

9      A.   I think I'm president now, yeah.  Yeah.

10     Q.   Mr. Pfenninger, Edward P-f-e-n-n-i-n-g-e-r, is

11  secretary and director.

12     A.   Yes.

13     Q.   Patricia Brookes is treasurer and director.

14     A.   Yes.

15     Q.   What relationship, if any, do you have with Mr.

16  Pfenninger?

17     A.   Just a friend.

18     Q.   Was he ever a plaintiff in litigation --

19     A.   He was.

20     Q.   -- for whom you performed Yenta the matchmaker?

21     A.   I -- I did, yes.

22     Q.   Describe just very briefly if you would the

23  approximate date of that litigation and the -- just the

24  general topic of what it was about.

25     A.   The styling of that lawsuit was Evenwel vs.

EXHIBIT A, PAGE 60

Edward Blum
January 10, 2018                                    111

1   that was for Fisher vs. University of Texas.  There were

2   other -- there was another major lawsuit that was argued

3   at the Supreme Court and a number of amicus briefs that

4   contributed to that sum.

5        Q.  But the only fees and costs that you believe

6   anybody paid to the Consovoy Firm for Fisher were from

7   POFR?

8        A.  That's correct.

9        Q.  Okay.  You remember we talked about an

10  interview that you engaged in that was -- I don't know

11  when it occurred, but it was released for public

12  availability around December 6, 2017.  It was called the

13  Architect.  Do you remember that?

14       A.  And would you remind me of the year of that

15  again?

16       Q.  2017.

17       A.  2017, yes.

18       Q.  It was essentially an update of an interview

19  that had occurred at an earlier date.  I don't know if

20  you remember that.

21       A.  I do.

22       Q.  Okay.  Here's my question:  The word -- the

23  title of that interview "The Architect" is from a word

24  that you have used to describe yourself; is it not?

25       A.  Yes.

Edward Blum
January 10, 2018                                             112

1        Q.  And would you help us understand how you mean

2   the word "architect" when you're referring to the Fisher

3   litigation or other litigation where you have performed

4   a role.

5                MR. STRAWBRIDGE:  Object to the form.

6        A.  In general terms because I am not an attorney,

7   the process by which I go about supporting and

8   fulfilling the mission of these organizations is to

9   identify an area of the law that I believe needs

10  revising or needs to be overturned completely.

11                I hire counsel to help me achieve that

12  goal.  I reach out and find individuals, or individuals

13  reach out and find me who would be plaintiffs in a case

14  that would further our mission.  So architect seemed to

15  be the -- the kind of general term that most people can

16  understand.  I'm not a litigator.  I'm not an attorney,

17  so that -- that seems to be -- I can draw things, but

18  it's going to require an engineer and a contractor to

19  really build it.

20       Q.  Very fair.  I prefer the phrase Yenta the

21  matchmaker, but the architect --

22       A.  It's a lot easier, yeah.

23       Q.  Each of those -- each of those gives the

24  imagery to describe the role that you have performed in

25  the couple dozen or perhaps more lawsuits.

Edward Blum
January 10, 2018                                         113

1       A.  That's accurate.

2       Q.  One of those lawsuits is the Fisher lawsuit

3  that we've talked about.

4       A.  Yes.

5       Q.  One is SFFA's lawsuit against Harvard.

6       A.  Yes.

7       Q.  One is SFFA's lawsuit against the University of

8  North Carolina.

9       A.  Yes.

10      Q.  And one is this lawsuit that we're taking this

11  deposition in SFFA against University of Texas at

12  Austin.

13      A.  Yes.

14      Q.  What I'd like to do for the next short while is

15  walk through with you perhaps a dozen or 15 Exhibits

16  that appear to be news reports typically of interviews

17  with you, and on some of them I'll have some specific

18  questions, but I think I'll always start by asking you

19  are you familiar with the interview that led to this.

20           So let me --

21           MR. MCKETTA:  Can you separate all of

22  these?  I'm going to take -- can you take one to give to

23  Patrick?

24      Q.  (BY MR. MCKETTA)  Exhibit 11 is from Mother

25  Jones.

Edward Blum
January 10, 2018                                                117

1        Q.  Well, I don't think you've gone nearly as gray

2   as some of us?

3        A.  Well, she also -- this is the first time ever

4   that I have been called dapper.

5        Q.  I like the word "dapper."

6        A.  Dapper -- that is -- that's a -- I guess I like

7   that word.  You know, it -- if I were a woman and -- and

8   I had been called matronly, that may have been a little

9   -- a little, you know, offensive.  Dapper, I don't know.

10  We're coming right up to the Cole Porter era here.

11       Q.  Well, Frank Sinatra who you had be described as

12  favoring, was it Cole Porter instead?

13       A.  Yes -- well, you -- I liked them all.  I like

14  both of those guys.

15       Q.  On the next to last page almost at the bottom

16  of the page, you'll find some yellow highlighting that

17  says, "it took" -- did you find that?

18       A.  Yes, I do.  I see this.

19       Q.  It -- it has three sentences in that paragraph.

20  Are those accurate?

21       A.  So it took -- yes, that -- that's accurate.

22       Q.  The reference there is to the Fisher lawsuit

23  rather than to the current SFFA lawsuit; is it not?

24       A.  Oh, yes.

25       Q.  And that it took you nearly three years to find

EXHIBIT A, PAGE 64

Edward Blum
January 10, 2018                                    118

1   a friendly face to file a lawsuit challenging University

2   of Texas in what became called the Fisher lawsuit.

3        A.   That's correct.

4        Q.   Okay.  And that you set up a website called

5   UTnotFair -- it actually says .com; is that not right?

6        A.   Correct.

7        Q.   Then the way this reporter wrote it is in the

8   end, "He settled on Fisher, the daughter of an

9   acquaintance."  Actually, didn't you select two people

10  as plaintiffs?

11       A.   After the lawsuit was filed --

12       Q.   Yes.

13       A.   -- we amended our complaint to add another

14  plaintiff.

15       Q.   Did that other plaintiff remain in the lawsuit

16  through the end?

17       A.   No.

18       Q.   Okay.  Now, in that lawsuit during that three

19  years of trying to identify the appropriate plaintiff to

20  use for that public policy question, at what point in

21  that three years did you ask litigation counsel to

22  become ready to be involved if and when a plaintiff were

23  identified?

24            MR. STRAWBRIDGE:  And I'll just caution the

25  witness, the answer I think he asked for is basically a

Edward Blum
January 10, 2018                                    119

```
 1   date which is --
 2              MR. MCKETTA:  The dates were arranged or an
 3   approximate date, not -- not the communication, yeah.
 4              MR. STRAWBRIDGE:  Don't disclose any actual
 5   communications regarding strategy or the --
 6        A.  So I believe Grutter was decided in 2003.  The
 7   University of Texas announced that day of their intent
 8   to reintroduce race as an admissions criteria.  Shortly
 9   thereafter, I think legal sort of informal discussions
10   started taking place about the legality of UT's
11   expressed desire.
12        Q.  (BY MR. MCKETTA)  And thank you for identifying
13   the topic, not the communications, please -- but just
14   the topic.  Was that with Wiley Rein?
15        A.  Yes, and -- and with others, yeah.
16        Q.  Right.  Did Ms. Fisher ultimately select which
17   lawyer to use in that case or did you or did someone
18   else?
19        A.  Ms. Fisher had the ultimate say in which lawyer
20   she was going to use.
21        Q.  Who selected Wiley Rein?
22        A.  I recommended Wiley Rein.
23        Q.  And then when Consovoy spin off from Wiley
24   Rein, was it you who made the recommendation that -- the
25   spin off would also provide services?
```

Edward Blum
January 10, 2018                                                120

 1        A.   Yes.

 2        Q.   And you arranged 100 percent of the funding

 3   from resources that had been raised by POFR?

 4        A.   Yes.

 5        Q.   Okay.  Do you remember approximately when the

 6   UTnotFair website was established?

 7        A.   Oh, gosh.

 8             MR. STRAWBRIDGE:  And can I clarify because

 9   I think that just -- do you mean UTnotFair.com?

10             MR. MCKETTA:  I do.

11             MR. STRAWBRIDGE:  Okay.

12        A.   Was that the first -- was UTnotFair.com --

13        Q.   (BY MR. MCKETTA)  Let's -- let's -- to -- what

14   I'd love to do is learn have there been several websites

15   with either the same or similar names that have been

16   used at different times?  So maybe that's a better way

17   to ask it.

18        A.   Good.  That will help me answer accurately

19   without having to --

20        Q.   Yes.

21        A.   -- speculate.  Mr. McKetta, what was your

22   question again?  I'm sorry.

23        Q.   Yes.  How many websites have you created or

24   used in connection with the recruiting of potential

25   plaintiffs for litigation against the University of

Edward Blum
January 10, 2018                                              123

1   and web design company often will -- will come behind

2   some activity, and then introduce a Facebook account or

3   a Twitter account.  And that's -- that's the sequence of

4   events, so conceivably that website went up a month

5   before that Twitter account was established.

6        Q.  Exhibit 12 is an article that is from the New

7   York Times.

8              (Exhibit No. 12 marked for identification.)

9   This earlier in time -- this was February 2012.  Do you

10  recall any interview with Morgan Smith in early 2012

11  that -- that led to this article?

12             Let me take it back -- do you first -- do

13  you remember this article?

14       A.  I'm pretty sure I do.

15       Q.  Yeah.

16       A.  Did it have a picture of me in New York?

17       Q.  I don't -- I don't have it with me.  I just

18  don't know.

19       A.  Yeah, that's all right.  I think this is right.

20  Yeah, I -- yeah.

21       Q.  If it had a picture, it would have been dapper;

22  would it not?

23       A.  I -- I hope so.  I -- I do remember, I think,

24  for this -- for this article The Times sent a

25  reporter -- not a reporter -- a photographer to my -- to

Edward Blum
January 10, 2018                                        124

1   my apartment, and the doorman was kind of a little

2   concerned with what was going on.  So --

3        Q.  And this is the one on the second page towards

4   the bottom that had the Yenta the matchmaker imagery

5   that I had asked you questions about earlier today.

6        A.  Yes.

7        Q.  Okay.  And do you think that that quote is

8   substantially accurate to what you told the reporter?

9        A.  It is.  It is.

10        Q.  Let me show you what's been marked as Exhibit

11   13.

12                    (Exhibit No. 13 marked for identification.)

13   Exhibit 13 is from Texas Tribune from a little shy of

14   two years ago.  Can you recall any interview with Texas

15   Tribune?

16        A.  Actually, I'm sorry.  I can't.

17        Q.  Okay.  Do you remember ever seeing this article

18   before today?

19        A.  Let me -- let me read this.  Just a second.

20        Q.  If it helps -- I don't mean to interrupt your

21   concentration, but at the bottom of page 3 is an

22   instance where you purport to be quoted if that helps

23   your recollection.

24        A.  You know, I'm -- I -- I don't remember this

25   interview, but I -- I -- that -- that quote, I have used

Edward Blum
January 10, 2018                                          128

1    work -- the -- the pace at which we were going to write

2    this book, and -- that's why that -- that, yeah.

3    Coauthors often are rather difficult.

4         Q.   Then on page 9, the next to last paragraph

5    talks about he set up a web address, and this is the

6    "org" address.  Do you see that?

7         A.   I -- I think that's right, yes.

8         Q.   All right.  And gave speeches, and then it

9    says, "and hounded everyone he knew at the state post."

10   That's an exaggeration; is it not?

11        A.   It is an exaggeration.

12        Q.   But is it accurate that you would bump into

13   people in restaurants and bars that you knew from high

14   school that had kids graduating from high school, and

15   you would say, "If that child doesn't get in, please let

16   me know.  I want to represent her"?

17                  MR. STRAWBRIDGE:  Object to the form of the

18   question.

19        A.   That's accurate.

20        Q.   (BY MR. MCKETTA)  Okay.  And here the part

21   that's in quotes on the interview says, "and I was such

22   a nudge.  If she doesn't get in, I want to represent

23   her."  Do you think that's substantially accurate what

24   the reporter captured?

25        A.   Yes.

Edward Blum
January 10, 2018                                        129

1       Q.   Now, many people use the word "represent"

2   either in an agency relationship like a movie agent or

3   sports agent or in a lawyer relationship.  You didn't

4   mean either of those, did you?

5       A.   I didn't.

6       Q.   What did you mean by you wanted to represent

7   her?

8       A.   I wanted to be the matchmaker.

9       Q.   Yes, back to the Yenta description we had --

10       A.   Yes.  Right.

11       Q.   Exhibit 17 purports to be an article from

12   Newsweek, and my first question to you is whether you

13   recall this article?

14              (Exhibit No. 17 marked for identification.)

15   This was from about a year -- no, about two-thirds of

16   the year ago.

17       A.   No, I'm sorry.  I don't -- I don't remember it.

18       Q.   Okay.

19       A.   I'm -- I'm happy to be guided to --

20       Q.   Sure.

21       A.   -- any area.

22       Q.   On the second page, you see Mr. Rein.

23       A.   Yes.

24       Q.   And that's Ms. Fisher.

25       A.   Yes.

EXHIBIT A, PAGE 71

Edward Blum
January 10, 2018                                          137

1   Are you familiar with this article?

2        A.   Yes.  Yes, I am.  Yes.

3        Q.   And you know Ralph Horowitz.

4        A.   I do.

5        Q.   Do you find him to be a responsible reporter?

6        A.   I do.

7        Q.   Any reason to think that this article does not

8   fairly reflect the interview that you and Mr. Horowitz

9   had?

10       A.   It was a painful time, but it -- I think, it

11  accurately reflected my conversation with Ralph.

12       Q.   So the adverse decision in Fisher 2 came down

13  in June of 2016.

14              When did you begin steps towards

15  identifying the possibility of a state court lawsuit

16  against University of Texas at Austin?

17              MR. STRAWBRIDGE:  And let me caution the

18  witness.  I think -- I think Mr. McKetta's question

19  calls for an approximate date, and that's -- please

20  confine your answer to the date.

21              MR. MCKETTA:  That's correct.

22       A.   So, Mr. McKetta, I will answer that it occurred

23  on the date Fisher came down.

24       Q.   (BY MR. MCKETTA)  And on that date you had not

25  yet identified any plaintiff for a new lawsuit?

EXHIBIT A, PAGE 72

Edward Blum
January 10, 2018                                      138

```
 1        A.  That's correct.

 2        Q.  But you had identified that this was an issue

 3   that you wish to have a rule in litigating?

 4        A.  So let me see if I can clarify this.

 5        Q.  Sure.

 6        A.  The day the opinion came down, there were

 7   dozens of conversations between myself and our legal

 8   advisors and supporters and fellow advocates, and the --

 9   the idea of a state challenge was broached on that date.

10        Q.  When did you begin efforts to identify a

11   potential plaintiff or person for purposes of standing

12   to use in a new lawsuit to challenge University of

13   Texas?

14              MR. STRAWBRIDGE:  Object to the form of the

15   question.

16        A.  Soon after admission and rejection letters went

17   out in 2017.

18        Q.  (BY MR. MCKETTA)  Why did you not look for

19   people who had been rejected in 2016?

20              MR. STRAWBRIDGE:  Let me just caution the

21   witness in responding to this question, please do not

22   reveal the discussions or communications you had with

23   counsel for the purposes of receiving or giving legal

24   advice.

25        A.  I don't think I can answer the question then.
```

Edward Blum
January 10, 2018                                          155

```
1   for SFFA printed it from POFR as responsive to one of

2   the documents --

3        A.  Okay.

4        Q.  -- even though it's not on the SFFA website.

5             MR. STRAWBRIDGE:  Let -- let me clarify,

6   Counsel.  I think there's an exhibit stamp on this which

7   indicates this document was an exhibit to a prior

8   deposition that I believe was produced to you under the

9   rules of Texas, and so I do not necessarily agree that

10  this document was purchased or provided by SFFA.  It may

11  have been used in another deposition by another -- in

12  another case.

13            MR. MCKETTA:  So the Bates No, on the

14  bottom right corner does indicate that it came to the

15  defendants from plaintiff.

16            MR. STRAWBRIDGE:  Correct.  What I'm

17  suggesting is I think it was produced as part of a

18  production in the deposition exhibits as opposed to a --

19  a direct production by SFFA.

20       Q.  (BY MR. MCKETTA)  Can you tell us what Exhibit

21  25 is?

22            MR. STRAWBRIDGE:  Me?

23            MR. MCKETTA:  No, sorry.  Mr. Blum.

24       A.  Yes.  Well, this looks like a list of the --

25  that both POFR and Students for Fair Admissions have
```

EXHIBIT A, PAGE 74

Edward Blum
January 10, 2018                                    156

1   filed.  It doesn't look like it's a complete list,

2   however.  There's a -- there's at least one lawsuit that

3   we are engaged in that is not listed here, and I know

4   there's a couple of amicus briefs that are not listed

5   here.  I'm confident of that, but I -- I -- based on the

6   first paragraph, this looks like it came from the

7   Project on Fair Representation website.

8        Q.  If one today clicks the website, one finds an

9   electronic page called "Our Cases" --

10       A.  Right.

11       Q.  -- which has substantial overlap with this

12   document, but some differences.  Does that comport with

13   your expectation?

14       A.  Yeah.  I think so, yeah.

15       Q.  And that's perhaps because this appears to have

16   been snapped back in May of 2017 --

17       A.  Okay.

18       Q.  -- so historically it's got more than half your

19   age on it.

20       A.  Yes, as of May of -- I think May of 2017 there

21   was one other case that we were engaged in that's not

22   listed here.

23       Q.  Which one is that?

24       A.  It was Students for Fair Admissions vs. The

25   Department of Education.

Edward Blum
January 10, 2018                                                              157

1        Q.  Got you.  Now, what's the phrase "Our Cases"

2   mean in Exhibit 25?

3        A.  I think it -- it's a general description for

4   visitors to the website to learn about the kinds of

5   legal activities in which we're engaged.

6        Q.  Who updates from time to time the text on the

7   page on the website for POFR called "Our Cases"?

8        A.  Well, that's my responsibility, and sometimes

9   I'm remiss in doing that.

10        Q.  But the information in Exhibit 25 probably was

11   authored by yourself?

12        A.  Let's see.  I don't think so.

13        Q.  Who do you think authored it?

14        A.  I -- I think counsel in each one of these cases

15   authored this -- this text, and I believe it came either

16   directly -- like, for instance, in the amicus brief

17   directly from the brief itself, and in the other cases I

18   think it either came from the complaint or -- no, you

19   know, some of these settled cases I probably wrote like

20   Shelby County, Alabama.  That -- that sounds like me.

21   The Northwest --

22        Q.  That was a big to do.  Congratulations.

23        A.  What's that?

24        Q.  That was a big to do.  Congratulations.

25        A.  Yes, thank you.  Northwest Austin, that sounds

Edward Blum
January 10, 2018                                    158

```
1    like me.  Evenwel vs. Abbott, that doesn't sound like
2    me.  That's -- that's really very legalese.  There's no
3    semicolons in that, and I love semicolons.  So that
4    leads me to believe that wasn't me.
5         Q.  That was a lawsuit that included your fellow
6    board member, Pfenninger?
7         A.  That's correct, yeah.
8         Q.  Now, who made the selection of which cases
9    should be assembled on this web page called "Our Cases"?
10        A.  I'm sure I did.
11        Q.  And if one today were to go on the POFR website
12   and click the corresponding "Our Cases" tab, would the
13   selection of cases that's there today also be your
14   selection?
15        A.  Yes.
16        Q.  Would it include SFFA vs. University of Texas?
17        A.  It's not on here.
18        Q.  Well, this is too early in time.
19        A.  Oh, I see.  I think I would have to be advised
20   by counsel.
21        Q.  Okay.  This Exhibit 25 did include as "Our
22   Cases" the SFFA case against Harvard --
23        A.  Yes.
24        Q.  -- and the SFFA case against UMC.
25        A.  Yes.
```

Edward Blum
January 10, 2018                                                   159

1       Q.   And this was so even though POFR was not a

2   party to those lawsuits; am I correct?

3       A.   Correct.

4       Q.   And this exhibit also includes Fisher against

5   University of Texas as one of "Our Cases"; does it not?

6       A.   It does.

7       Q.   And that's the case even though POFR was not a

8   party to that lawsuit.

9       A.   Was not a party to that lawsuit, correct.

10      Q.   Would you look with me at Exhibit 26.

11           (Exhibit No. 26 marked for identification.)

12  And I first want to tell you where I obtained this

13  because this is one that does not have Bates numbers on

14  it.

15      A.   Okay.

16      Q.   This was obtained by clicking on the POFR

17  website in the "Our Cases" section, the listing

18  corresponding to the Fisher lawsuit.  Do you follow me?

19      A.   Yes.

20      Q.   Do you recognize Exhibit 26?

21      A.   Yes.

22      Q.   Do you know who wrote Exhibit 26?

23      A.   I wrote -- I wrote this.

24      Q.   On the second page the Consovoy McCarthy Law

25  Firm is identified as attorneys for Ms. Fisher, correct?

Edward Blum
January 10, 2018                                      164

1    education.  It is not necessary as an -- as a membership

2    advocacy organization for each member to have applied to

3    a university and been rejected any more than it's

4    necessary for any other advocacy organization to have

5    suffered from a million different circumstances.

6         Q.  (BY MR. MCKETTA)  In fact, you believe that

7    many, many of SFFA's members never were rejected for

8    admission by a college or university?

9         A.  I'd hate to speculate, Counsel.

10        Q.  You know that many were not?

11        A.  I -- I have no understanding of that.

12        Q.  On your board of the five board members, you

13   think that probably four have not had that experience?

14             MR. STRAWBRIDGE:  Object to the form of the

15   question.

16        A.  I -- I am unaware of it.

17        Q.  (BY MR. MCKETTA)  Yeah.

18        A.  Yeah.

19        Q.  Okay.

20        A.  I know Mr. Fisher never considered going to any

21   other school other than the University of Texas.

22        Q.  Right.  And you can't imagine Edward Chen

23   having being turned down by anybody, can you?

24             MR. STRAWBRIDGE:  Object to the form of the

25   question.

EXHIBIT A, PAGE 79

Edward Blum
January 10, 2018                                          179

1    discuss off the record, and I can determine whether or

2    not he can answer the question consistent with my

3    instruction.

4                  MR. MCKETTA:  We'll do that in just a

5    minute.

6                  MR. STRAWBRIDGE:  Okay.

7         Q.  (BY MR. MCKETTA)  I want to now go back to the

8    Fisher lawsuit.  In the Fisher lawsuit you were not a

9    party, were you?

10        A.  I was not.

11        Q.  You were not a lawyer, were you?

12        A.  I was not.

13        Q.  Did you have discussions with the trial lawyers

14   and appellate lawyers in the Fisher lawsuit at the

15   district court stage?

16        A.  Yes.

17        Q.  At the court of appeals stage?

18        A.  Yes.

19        Q.  At the Supreme Court stage?

20        A.  Yes.

21        Q.  I'm going to ask you about the discussions you

22   had with Ms. Fisher's lawyers concerning their

23   projections of the outcome of the district court level.

24   What did they will you?

25                  MR. STRAWBRIDGE:  Okay.  I'm going to

Edward Blum
January 10, 2018                                   180

1    object -- the witness -- and instruct -- instruct him

2    not to answer.

3                  MR. MCKETTA:  And I'm waiting to hear the

4    privilege.

5                  MR. STRAWBRIDGE:  On grounds of attorney

6    client and work product privilege.

7         Q.  (BY MR. MCKETTA)  Were you the client?

8         A.  No.

9                  MR. STRAWBRIDGE:  Well --

10                 MR. MCKETTA:  Do you have a different view

11   now?

12                 MR. STRAWBRIDGE:  No, no.  I --

13                 MR. MCKETTA:  Are you claiming he was a

14   client?

15                 MR. STRAWBRIDGE:  I don't think he's been

16   asked whether he -- whether -- whether he or

17   (indiscernible) -- were clients of Wiley Rein at the

18   time.  You can ask him if he was the -- if he was a

19   client for purposes of that lawsuit, but those are two

20   different questions.

21                 Anyway, I'm asserting the privilege covers

22   discussions that were had with Mr. Blum during the

23   pendency of that lawsuit before product and attorney

24   client.  Just as I would note it frequently does with

25   respect to any third party pay or in litigation.

Edward Blum
January 10, 2018                                                182

```
1  while acting in the scope of employment for Ms. Fisher?
2       A.  When you reach the -- the word "employment," I
3  got a little -- I got a little hazy, but I think the
4  answer is, yes.
5       Q.  You think that you were employed for
6  Ms. Fisher?
7                 MR. STRAWBRIDGE:  Object to the form of the
8  question.
9       A.  Well, the -- the word "employ" seems a little
10  -- if you had used the word "designated" by Ms. Fisher
11  to act as her representative in making and helping with
12  decisions and communicating with counsel, then the
13  answer to that would be, yes.
14      Q.  (BY MR. MCKETTA)  Your belief is that in the
15  Fisher litigation from 2008 through 2016 you were a
16  person designated by Ms. Fisher to assist and facilitate
17  her communications with lawyers and her receiving and
18  acting on advice from lawyers.
19                 MR. STRAWBRIDGE:  Object to the --
20      Q.  (BY MR. MCKETTA)  Is that what you're telling
21  me?
22                 MR. STRAWBRIDGE:  Object to the form of the
23  question.  I'll just note that the witness has
24  repeatedly stated --
25                 MR. MCKETTA:  No, you won't -- you won't
```

EXHIBIT A, PAGE 82

Edward Blum
January 10, 2018                                    183

```
 1   talk beyond that.
 2               MR. STRAWBRIDGE:  -- he is not a lawyer.
 3               MR. MCKETTA:  If you want to comply with
 4   Texas rules, you limit yourself to the words you're --
 5   you know of.  So --
 6        A.  Okay.  Mr. McKetta, could you -- would you
 7   state it again, yeah.
 8        Q.  (BY MR. MCKETTA)  I sure will.  Are you
 9   claiming that you believed that you from 2008 to 2016
10   were designated by Ms. Fisher to serve as her
11   representative for purpose of facilitating and receiving
12   legal communications for her benefit?
13               MR. STRAWBRIDGE:  Object to the form of the
14   question.
15        A.  Yes.
16               MR. MCKETTA:  Let's go off the record.
17   There was one topic you wanted to discuss to see if he
18   could answer concerning --
19               MR. STRAWBRIDGE:  I think he had some
20   confusion about his ability to answer.
21               MR. MCKETTA:  We're off the record.
22               THE VIDEOGRAPHER:  All right.  We're off
23   the record at 2:30.
24        (Off the record from 2:30 p.m. to 2:37 p.m.)
25               THE VIDEOGRAPHER:  Back on the record at
```

EXHIBIT A, PAGE 83

Edward Blum
January 10, 2018                              190

 1  other role has POFR played in the cases on this list?

 2      A.  Some of the cases on this list POFR has not

 3  played any role at all.  In other cases on this list

 4  POFR has provided funding for -- for the litigation.

 5      Q.  Okay.  And I believe you testified earlier

 6  today that POFR did provide some funding to SFFA in its

 7  initial year of operation?

 8      A.  Yes.

 9      Q.  Okay.  And your testimony is that POFR has not

10  done so with respect to -- since the initial year of its

11  operation?

12      A.  Yes.

13      Q.  Okay.

14             MR. STRAWBRIDGE:  Just give me one second,

15  Mr. McKetta.

16      Q.  (BY MR. STRAWBRIDGE)  You were asked a number

17  of questions with respect to -- by Mr. McKetta about

18  communications that you had with the attorneys

19  representing Ms. Fisher in the federal litigation of

20  this case; is that correct?

21      A.  Yes.

22      Q.  At the time that you had those communications,

23  was it your understanding and expectation that the

24  communications were privileged?

25      A.  Yes.

```
 1              CAUSE NO. D-1-GN-17-002930
   STUDENTS FOR FAIR         )   IN THE DISTRICT COURT OF
 2 ADMISSIONS INC.           )
                             )
 3     Plaintiff             )
                             )
 4 VS.                       )
                             )
 5 UNIVERSITY OF TEXAS AT    )
   AUSTIN; WILLIAM MCRAVEN,  )
 6 in his official capacity  )
   as Chancellor of the      )
 7 University of Texas        )
   System; GREGORY L. FENVES, )   TRAVIS COUNTY, TEXAS
 8 in his official capacity  )
   as the President o the    )
 9 University of Texas at    )
   Austin; and ERNEST        )
10 ALISEDA, DAVID J. BECK,   )
   KEVIN P. ELTIFE, PAU L.   )
11 FOSTER, R. STEVEN HICKS   )
   JEFFREY D. HILDEBRAND,    )
12 JANIECE LONGORIA, SARA    )
   MARTINEZ TUCKER, and JAMES )
13 CONRAD WEVER, in their    )
   official capacities as    )
14 Members o the Board of    )
   Regents of the University  )
15 of Texas Systems,,        )   53RD JUDICIAL DISTRICT
                             )
16     Defendants
               REPORTER'S CERTIFICATION
17          ORAL/VIDEOTAPED DEPOSITION OF
                     EDWARD BLUM
18                JANUARY 10, 2018

19          I, Michelle Rodriguez, Certified Shorthand

20 Reporter in and for the State of Texas, hereby certify

21 to the following:

22          That the witness, EDWARD BLUM, was duly sworn

23 by the officer and that the transcript of the oral

24 deposition is a true record of the testimony given by

25 the witness;
```

EXHIBIT A, PAGE 85

1          That the deposition transcript was submitted on

2    _____, 2017, to the witness, or to the

3    attorney for the witness, for examination, signature,

4    and return to US Legal Support, by _____, 2017;

5          That the amount of time used by each party at the

6    deposition is as follows:

7               Mr. Strawbridge - 00HRS:07 MIN
                Mr. McKetta - 05HRS:05 MIN
8

9
          That pursuant to information given to the
10   deposition officer at the time said testimony was taken,
     the following includes counsel for all parties of
11   record:
                Mr. Strawbridge,
12                   ATTORNEY FOR PLAINTIFF
                Mr. McKetta,
13                   ATTORNEY FOR DEFENDANTS.

14        I further certify that I am neither counsel for,
     related to, nor employed by any of the parties or
15   attorneys in the action in which this proceeding was
     taken, and further that I am not financially or
16   otherwise interested in the outcome of the action.
          Further certification requirements pursuant to Rule
17   203 of TRCP will be certified to after they have
     occurred.
18        Certified to by me this the 30th day of January
     2018;
19

20

21

22        _____
          MICHELLE RODRIGUEZ, CSR No. 9244
23        Expiration Date:  12-31-19

24   US Legal Support
     Firm Registration No. 122
25   363 N. Sam Houston Pkwy E, Suite 1200
     Houston, Texas 77060

EXHIBIT A, PAGE 86

Edward Blum
January 10, 2018                                              200

```
 1          FURTHER CERTIFICATION UNDER RULE 203 TRCP

 2       The original deposition was _____ was not _____

 3   returned to US Legal Support, on _____, 20_____.

 4       If returned, the attached Corrections and Signature

 5   page contains any changes and the reasons therefor;

 6       If returned, the original deposition was delivered

 7   to Mr. McKetta, Custodial Attorney;

 8       That $_____ is the deposition officer's charges

 9   to the Attorney for the Defendants, Mr. McKetta, for

10   preparing the original deposition transcript and any

11   copies of exhibits;

12       That the deposition was delivered in accordance

13   with Rule 203.3, and that a copy of this certificate was

14   served on all parties shown herein on _____

15   and filed with the Clerk.

16       Certified to by me this _____ day of _____,

17   20_____.

18

19

20

21       _____

22       MICHELLE RODRIGUEZ,CSR No. 9244
         Expiration Date:  12-31-19

23   US Legal Support
     Firm Registration No. 122
24   363 N. Sam Houston Pkwy E,  Suite 1200
     Houston, Texas 77060
25
              JOB NO. 1-HOU-258482
```

EXHIBIT A, PAGE 87