Confidential Transcript of the Testimony of

# Edward Blum

## Date:

February 26, 2021

## Case:

Students For Fair Admissions vs UT at Austin

EXHIBIT B, PAGE 1

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                      AUSTIN DIVISION

3   Students For Fair           )
    Admissions, INC,            )
4
                    Plaintiff,  )
5                                         CIVIL ACTION
    VS.                         )
6                                         NO.: 1:20-cv-00763-RP
    UNIVERSITY OF TEXAS AT      )
7   AUSTIN, ET AL.,             )

8                    Defendants.  )

9          ------------------------------------

10          ORAL AND VIDEOTAPED DEPOSITION OF

11                      EDWARD BLUM

12                  FEBRUARY 26, 2021

13                      VOLUME 1

14              *ATTORNEYS' EYES ONLY*

15          ------------------------------------
```

16      ORAL AND VIDEOTAPED DEPOSITION OF EDWARD BLUM,

17  produced as a witness at the instance of the DEFENDANT,

18  and duly sworn, was taken in the above-styled and

19  numbered cause on February 26, 2021, from 7:36 a.m. to

20  2:23 p.m. via Zoom, before Miah Hoffman, CSR in and for

21  the State of Texas, reported by oral stenography,

22  pursuant to the Federal Rules of Civil Procedure and the

23  provisions stated on the record or attached hereto.

24

25

EXHIBIT B, PAGE 2

```
 1               A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3        THOMAS MCCARTHY
          CONSOVOY MCCARTHY PLLC
 4        1600 Wilson Boulevard, STE 700
          Arlington, Virginia, 22209
 5        Phone:(703)243-9423
          Tom@consovoymccarthy.com
 6

 7   FOR THE DEFENDANTS UNIVERSITY OF TEXAS AT AUSTIN:

 8        MATTHEW C. POWERS
          GRAVES DOUGHERTY, HEARON &
 9        MOODY, P.C.
          401 Congress Avenue, Suite 2700
10        Austin, Texas 78701
          Phone:(512)480-5725
11        Fax:(512)539-9938
          mpowers@gdhm.com
12

13   FOR THE DEFENDANTS UNIVERSITY OF TEXAS AT AUSTIN:

14        JOHN J. (MIKE) MCKETTA III
          GRAVES DOUGHERTY, HEARON &
15        MOODY, P.C.
          401 Congress Avenue, Suite 2700
16        Austin, Texas 78701
          Phone:(512)480-5725
17        Fax:(512)539-9938
          mmcketta@gdhm.com
18

19   FOR THE DEFENDANTS INTERVENORS:

20        DAVID HINOJOSA
          LAWYERS' COMMITTEE FOR CIVIL
21        RIGHTS UNDER LAW
          1500 K. Street, NW, Suite 900
22        Washington, D.C. 20005
          Phone:(202)662-8600
23        Fax:(202)783-0857
          dhinojosa@lawyerscommittee.org

24

25
```

EXHIBIT B, PAGE 3

```
 1                   A P P E A R A N C E S

 2   FOR THE DEFENDANTS INTERVENORS:

 3         CARTER C. SIMPSON
           HUNTON ANDREWS KURTH LLP
 4         2200 PENNSYLVANIA AVENUE, NW
           Washington, D.C. 20037
 5         Phone:(202) 955-1850
           csimpson@huntonak.com
 6

 7   ALSO PRESENT:

 8

 9         JOSEPH (JODY) HUGHES: Associate Vice President For

10   Legal Affairs (UT)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                        INDEX
```

EXHIBIT B, PAGE 4

```
 1                                                           Page

 2   Appearances........................................... 2

 3   ████████████████████
             Examination by Mr. Powers....................... 6

 4           Examination by Mr. Hinojosa.................... 125

 5

 6   Signature and Changes............................... 183

 7   Reporter's Certificate..............................185

 8

 9                          EXHIBITS

10   NO.   DESCRIPTION                                      Page

11   1     Exhibit 1...........................           50
     2     Exhibit 2.......................               55
12   3     Exhibit 3...........................           60
     4     Exhibit 4...........................           60
13   5     Exhibit 27..........................           83
     6     Exhibit 28..........................           103
14   7     Exhibit 29..........................           129
     8     Exhibit 30..........................           131
15   9     Exhibit 31..........................           157

16

17                   CERTIFIED QUESTIONS
                          PAGE/LINE
18

19           148/17...159/7.....165/4....175/11.....
             150/15...159/16....165/15...176/4.......
20           151/7....160/3.....166/14...177/11.....
             151/19...162/1.....167/20...177/23......
21           153/23...162/11....168/16...178/10.....
             153/19...163/9.....168/24...178/20......
22           154/19...163/22....169/7................
             158/3....164/4.....173/15...............
23

24

25                  P R O C E E D I N G S
```

```
 1                     REPORTER:  We are on the record.  Today's
 2   date is February 26th, 2021.  The time is 7:36 a.m.
 3   This is the oral deposition of Edward Blum and it is
 4   being conducted remotely by agreement of the parties or
 5   in accordance with current emergency orders.
 6   The witness is attending from the law office of Consovoy
 7   and McCarthy located at 1600 Wilson, Arlington, Virginia
 8   22209.
 9                     My name is Miah Hoffman.  CSR number
10   11773 with Kim Tindall and Associates.  I am
11   administering the oath and recording the deposition
12   remotely by oral stenographic means.  My business
13   address is 16414 San Pedro Avenue, Suite 900, San
14   Antonio, Texas 78232.
15                     The witness has been identified to me
16   through his U.S. passport.  Would counsel please state
17   their appearances for the record?
18                     MR. POWERS:  Matt Powers for the
19   defendants.
20                     MR. MCKETTA:  Mike McKetta also for the
21   defendants.
22                     MR. HINOJOSA:  David Hinojosa for the
23   student intervenors.
24                     MS. SIMPSON:  Carter Simpson for the
25   student intervenors.
```

EXHIBIT B, PAGE 6

```
 1                   MR. MCCARTHY:  Thomas McCarthy from

 2   Consovoy McCarthy for Student For Fair Admissions, Inc.

 3                   (Witness duly sworn.)

 4                        EDWARD BLUM,

 5   having been first duly sworn, testified as follows:

 6                        EXAMINATION

 7   BY MR. POWERS:

 8                   MR. POWERS:  Mr. McCarthy, is it okay to

 9   proceed?  Did you want to say anything on the record

10   before we get started?

11                   MR. MCCARTHY:  Thanks, Mr. Powers.  I

12   would.  Consistent with, I think, our practice in the

13   other depositions in this case, I'd like to put a few

14   stipulations on the record and I'll -- I'll do so now.

15   Thanks.

16        During this deposition it's possible that the

17   University of Texas, or the intervenors, will ask

18   questions that SFFA believes infringe upon the First

19   Amendment and associational rights of SFFA and its

20   members.  SFFA may instruct the witness not to answer a

21   question on these grounds.  If a disagreement arises as

22   to whether this instruction is proper, the parties agree

23   to do their best to resolve the disagreement during the

24   deposition or, if necessary, before the Court.  SFFA

25   agrees that UT and the intervenors may have the right to
```

EXHIBIT B, PAGE 7

1   leave the deposition open to recall the witness.

2       In addition, the Court has entered a scheduling

3   order limiting the topics of this deposition.  The

4   Court's scheduling order states that right now none of

5   the discovery shall be permitted on any issue other than

6   the issues of jurisdiction or claim preclusion.  Last,

7   consistent with our practice in this case, SFFA is

8   designating the entire transcript as for counsel,

9   attorneys' eyes only.  Thanks very much, Mr. Powers.

10              MR. POWERS:  Thanks, Mr. McCarthy.

11       Q.   (BY MR. POWERS) Mr. Blum, please state your

12   name.

13       A.   Edward Blum.

14       Q.   This is not your first deposition, correct?

15       A.   Yes.

16       Q.   Is it your first deposition over Zoom?

17       A.   Yes.

18       Q.   So one of the things I want to flag is that

19   during the course of the day, as with any deposition, if

20   I ask a question that's poorly worded or otherwise

21   unclear that you let me know and I'll clarify that.

22       A.   Okay.

23       Q.   And, in addition, we have the special

24   circumstance, because we're connected remotely, over

25   Zoom, if at any point there's a break in the connection

1   or a dropout in the audio and you don't hear a question

2   in its entirety, would you please let me know that as

3   well?

4       A.   I will.

5       Q.   Mr. Blum, this is (audio indiscernible) that

6   SFFA has filed against the University of Texas to

7   challenge it's undergraduate admissions program; is that

8   right?

9       A.   Would you repeat the question?  You did freeze

10  for just a second or so.

11      Q.   Sure.   Am I right that this lawsuit that we're

12  in now is the third of three lawsuits in which SFFA has

13  sued UT to challenge its undergraduate admissions

14  program?

15      A.   Yes.

16      Q.   And in the first of the three lawsuits, do you

17  recall that you and Mr. Mcketta, who's in the Zoom call

18  with us, and I sat in a conference room and you gave

19  testimony in that case?

20      A.   I do.

21      Q.   Did you have a chance to review your prior

22  testimony from that deposition in anticipation of today?

23      A.   Yes.

24      Q.   Having reviewed that and had the chance to

25  reflect on it, is there anything that either because of

 1   of the PDF document.  Do you find a list of deposition

 2   topics?

 3        A.   I do.

 4        Q.   And are you the person designated by SFFA to

 5   speak on each of these topics?

 6        A.   Yes.

 7        Q.   And have you taken steps to review those

 8   document -- those topics and to become prepared to talk

 9   about them today?

10        A.   Yes.

11        Q.   Mr. Blum, we talked about three separate

12   lawsuits that SFFA has filed against the defendants in

13   this case.  Do you recall that the first of the three

14   lawsuits was dismissed by the Court?

15        A.   Yes.

16        Q.   And after that first lawsuit -- that first

17   lawsuit was filed in state court, correct?

18        A.   Yes.

19        Q.   After that first lawsuit was dismissed, a

20   second lawsuit was filed in state district court,

21   correct?

22        A.   Yes.

23        Q.   And do you recall how that lawsuit came to an

24   end?

25        A.   Yes.

```
 1        Q.    And what's your recollection of that?

 2        A.    We withdrew that lawsuit.

 3        Q.    And withdrew that lawsuit and then brought the

 4   lawsuit in federal court that we're here on today; is

 5   that right?

 6        A.    Yes.

 7        Q.    What was behind your decision to dismiss the

 8   state court lawsuit and to bring this lawsuit in federal

 9   court?

10              MR. MCCARTHY:  Objection on the grounds

11   of attorney/client privilege.  I just want to remind the

12   witness not to disclose any communications with counsel.

13   But you may answer the question without disclosing such

14   information then you may do so.

15              MR. POWERS:  Thank you.

16        Q.   (BY MR. POWERS)  Yes.  Setting aside any

17   conversations just your -- your deliberation, your

18   choice and -- and your understanding of the reasons.

19        A.    Mr. Powers, I cannot go into the reasons that

20   you have asked without divulging advice of counsel.

21        Q.    Let me just ask this:  What was your

22   understanding?  I don't want to hear anything about any

23   communications you had with counsel, but what was your

24   understanding of the -- the decision to change from a

25   suit in state court to a suit in federal court?
```

 1  the board and counsel.

 2      Q.    (BY MR. POWERS) Okay.  And -- and just to

 3  clarify the -- the very specific question I was asking

 4  is whether there were any other individuals involved in

 5  deliberations about whether to bring this action that

 6  did not include members of the board of SFFA or SFFA's

 7  counsel?

 8      A.    I don't believe so.

 9      Q.    You have described yourself as the architect

10  of various lawsuits, correct?

11      A.    Yes.

12      Q.    You were the architect of the -- each of the

13  three lawsuits that SFFA has filed against UT, including

14  this one, correct?

15             MR. MCCARTHY:  Objection form.

16             THE WITNESS:  Architect can have various

17  meanings, Mr. Powers, but I would -- I would

18  characterize my activities as that of laying out general

19  strategy and then turning to counsel to effectuate that

20  strategy.  I -- I hope that that's sort of the answer to

21  your question.

22      Q.    (BY MR. POWERS) Well, and -- and when you've

23  described yourself as architect before, you include more

24  than just coming up with a strategy and talking to

25  counsel, but there's several things you've -- you've

1   done to facilitate the lawsuit; isn't that right?

2            MR. MCCARTHY:  Objection form.

3            THE WITNESS:  Yes.

4        Q.   (BY MR. POWERS) And that's included

5   coordinating the fundraising and funding of the lawsuit;

6   is that right?

7        A.   Yes.

8        Q.   That's included actually (audio indiscernible)

9   a person who could serve as a plaintiff or as a standing

10  member for the lawsuit; is that right?

11       A.   Mr. Powers, you broke up there for just a

12  second.  Could you repeat that question?

13       Q.   Thank you.  Of course.  Your role as architect

14  also has you identifying individual or individuals to

15  serve as either a plaintiff or as a standing member for

16  a lawsuit, correct?

17       A.   Yes.

18       Q.   And -- and more than just speaking with

19  counsel, you have also taken on the role of identifying

20  the counsel to serve in the role as attorneys for the --

21  the plaintiff in each of the lawsuits that you

22  architected, correct?

23            MR. MCCARTHY:  Objection form.

24            THE WITNESS:  You -- you broke up just a

25  little bit again, but I think your question was have I

1   identified the lawyers that have been retained to

2   represent SFFA and the answer to that is yes.

3        Q.   (BY MR. POWERS) Now -- and then you have also

4   -- you have described yourself as the architect of very

5   many lawsuits; is that right?

6               MR. MCCARTHY:  Objection form.

7               THE WITNESS:  Well, I -- I think the

8   earliest self-description was not of architect, but of a

9   character in a broadway play named Yente the matchmaker.

10  Mr. Mcketta pursued that early on in our former or

11  earlier deposition.

12              MR. POWERS:  Yes, I remember.

13              THE WITNESS:  If there is a mash-up

14  between an architect and Yente the matchmaker.  I'm not

15  sure I ever really described myself as an architect of

16  this, but think it's -- it's apropos.

17       Q.   (BY MR. POWERS)  And when I say very many

18  lawsuits by now is it more than 30 lawsuits that you

19  have played a role as architect or Yente the matchmaker?

20       A.   I think it's over 30.

21       Q.   And in each of the lawsuits that you've served

22  in this kind of role, has your role included identifying

23  a defendant to be named in the lawsuit and a particular

24  policy to be challenged?

25              MR. MCCARTHY:  Objection form.

```
 1              THE WITNESS:  Sometimes, but other times,
 2    no.
 3        Q.   (BY MR. POWERS)  With respect to the
 4    litigation against the University of Texas over its
 5    admissions policy, that is a policy and a defendant that
 6    you identified, correct?
 7              MR. MCCARTHY:  Objection form.
 8              THE WITNESS:  Yes.
 9        Q.   (BY MR. POWERS)  And that's true not only with
10    respect to the Students for Fair Admissions lawsuits,
11    but that was also true with respect to the lawsuit that
12    Abigail Fisher brought against the University of Texas;
13    is that right?
14              MR. MCCARTHY:  Objection form.
15              THE WITNESS:  Yes.
16        Q.   (BY MR. POWERS)  You stated, in the past, that
17    you formed SFFA with the ultimate goal to have the
18    supreme court revisit its decision in Fisher versus the
19    University of Texas and end the use of race and
20    ethnicity once and for all; is that correct?
21              MR. MCCARTHY:  Objection form.
22              THE WITNESS:  No, that's -- that's not
23    correct.
24        Q.   (BY MR. POWERS)  You don't think you've stated
25    that in the past?
```

1        A.    So I don't believe I stated that.  It may have

2   been characterized in the press that way, but that is

3   not the story of the genesis of Students For Fair

4   Admissions.

5        Q.    So give me the -- the clarification on that

6   point that you think is warranted?

7        A.    Abigail Fisher filed her first lawsuit in

8   2008.  In June of 2013 Fisher one was decided.  Students

9   For Fair Admissions then became a viable -- a viable

10  idea that was then put into motion to look at and

11  challenge the use of race in higher education.

12       As you know in the Fisher case, Abigail never asked

13  the Court to revisit its earlier juris prudence so

14  Students For Fair Admissions didn't -- wasn't conceived

15  as an entity to have anything to do with the Fisher

16  litigation.

17       Q.    Am I right that the litigation that SFFA has

18  brought against the University of Texas was brought with

19  the goal in mind of achieving a different outcome with

20  respect to the permissibility of use of race and

21  ethnicity admissions than what the supreme court's

22  decision and Fisher permitted?

23              MR. MCCARTHY:  Objection form.

24              THE WITNESS:  So, Mr. Powers, I'm gonna

25  -- I'm gonna ask you break out that question because

1   it's got too many tendrals (phonetic) for me to come up

2   with --

3       Q.   (BY MR. POWERS)  That's fair.

4       A.   -- you know, a good -- good answer.  So could

5   you restate the question in little bites and I'll --

6   I'll take them as they come?

7       Q.   I'll -- I'll reframe it just a bit.

8       A.   Okay.

9       Q.   Setting aside the question of why SFFA was

10  formed, there was a time that you made the decision to

11  (audio indiscernible) SFFA, as a plaintiff, in a lawsuit

12  against the University of Texas; is that true?

13      A.   True.

14      Q.   And do you recall the moment that you knew you

15  would intend to proceed forward against the University

16  of Texas using SFFA?

17                MR. MCCARTHY:  Objection form.

18                THE WITNESS:  Pretty much.

19      Q.   (BY MR. POWERS)  And why don't you remind me

20  of how that came to pass?

21                MR. MCCARTHY:  Objection.

22  Attorney/client privilege.  I just want to caution the

23  witness not to disclose the contents of any -- or not to

24  disclose any communications with counsel, but with that

25  instruction you can certainly answer the question.

1              THE WITNESS:  So in Fisher II the Court

2    rendered its opinion I believe again in June of 2016.

3    Shortly thereafter SFFA became aware of a different

4    avenue in which to challenge UT's use of race and

5    ethnicity in its admissions policies.

6        Q.   (BY MR. POWERS)  In fact, wasn't it on the --

7    the, I think you had described at some point, at the

8    courthouse steps that the decision was made to explore

9    bringing renewed litigation against UT through a state

10   court suit by SFFA?

11             MR. MCCARTHY:  Objection form.

12             THE WITNESS:  If I said courthouse steps

13   I misspoke.  I remember distinctly where I was.  I was

14   -- when the opinion came down from the supreme court I

15   was in Houston and I was in a hotel room.

16       Q.   (BY MR. POWERS)  Okay.  But it was that day?

17             MR. MCCARTHY:  Objection form.

18             THE WITNESS:  It -- it very well may have

19   been that day.  If not that day then over a 24-hour

20   period.

21       Q.   (BY MR. POWERS)  And the lawsuit that we're

22   here on today, the third of the three lawsuits that SFFA

23   has filed against the defendants, is a continuation of

24   that effort that you conceived as soon as Fisher II was

25   decided; is that true?

EXHIBIT B, PAGE 18

Edward Blum                    CONFIDENTIAL                    February 26, 2021
                                                                    Page 22

```
 1                    MR. MCCARTHY:  Objection form.
 2                    THE WITNESS:  Yes.
 3          Q.    (BY MR. POWERS)  Now, the Project on Fair
 4    Representation, that is a different advocacy
 5    organization that you formed?
 6          A.    Yes.
 7          Q.    You are the president of SFFA, correct?
 8          A.    Yes.
 9          Q.    You are also the president of the Project on
10    Fair Fepresentation, true?
11          A.    Yes.
12          Q.    Am I right that you are the sole person
13    responsible for day-to-day operations of SFFA other than
14    counsel?
15                    MR. MCCARTHY:  Objection form.
16                    THE WITNESS:  I would say yes.  However,
17    our treasurer plays a role in -- if not day-to-day then
18    surely monthly activities with our finances.
19          Q.    (BY MR. POWERS)  Okay.  Thanks for that
20    clarification.  And am I right that as to the projet on
21    fair representation, you are also the sole person
22    responsible for the day-to-day operations other than
23    counsel and perhaps the treasurer as to finances?
24          A.    Yes.
25                    MR. MCCARTHY:  Objection form.
```

1        Q.    (BY MR. POWERS)   Can you describe for me how

2   the missions of the Project on FairRepresentation and

3   SFFA are the same or different?

4                    MR. MCCARTHY:   Objection form.

5                    THE WITNESS:   The -- the mission of both

6   is to eliminate racial considerations in our public

7   policies.   Students For Fair Admissions has thus far

8   focused on educational -- higher educational admissions

9   policies and I think once or twice had activities in K

10  through 12 arena.   The Project on Fair Representation no

11  longer concentrates on anything in the education policy

12  arena and instead focuses on voting issues, contracting

13  issues, employment issues and general legislation that

14  falls outside of what we believe are traditional civil

15  rights principles.

16       Q.    (BY MR. POWERS)   Did the Project on Fair

17  Representation end its focus on (audio indiscernible)

18  because you now (audio indiscernible) those issues

19  through, SS, sorry SFFA?

20                   REPORTER:   Mr. Powers, can you repeat

21  that?   You went out.

22                   MR. POWERS:   I will.

23       Q.    (BY MR. POWERS)   Did the Project on Fair

24  Representation end its focus on educational issues

25  because those issues are now being handled for you

```
 1   through SFFA?

 2                   MR. MCCARTHY:  Objection form.

 3                   THE WITNESS:  I would say that that's

 4   correct.

 5       Q.   (BY MR. POWERS)  Am I right that the Project

 6   on Fair Representation did handle those issues

 7   throughout dependency of the Fisher litigation?

 8                   MR. MCCARTHY:  Objection form.

 9                   THE WITNESS:  Correct.

10       Q.   (BY MR. POWERS)  And, in fact, the Project on

11   Fair Representation was a vehicle for all of the funding

12   for the Fisher litigation?

13                   REPORTER:  Can you repeat that?

14                   MR. MCCARTHY:  Counsel, I lost you there.

15   I'm sorry.

16                   MR. POWERS:  I'm sorry.

17       Q.   (BY MR. POWERS)  The Project on Fair

18   Representation had responsibility for coordinating all

19   of the funding for the Fisher litigation?

20       A.   Correct.

21       Q.   And the Project on Fair Representation in the

22   hand-off of the education focus of its race-conscious

23   policy challenges, it actually provided seed money to

24   Students For Fair Admissions as it got off the ground;

25   is that right?
```

```
 1                    MR. MCCARTHY:  Objection form.

 2                    THE WITNESS:  Yes.

 3          Q.    (BY MR. POWERS)  And are the two organizations

 4    now separately continuing exchange of funds between the

 5    two?

 6                    MR. MCCARTHY:  Counsel, I lost you again

 7    there.  I'm sorry.  You've just been freezing up a

 8    little bit in the middle of the long questions.

 9                    MR. POWERS:  I appreciate you letting me

10    know.

11          Q.    (BY MR. POWERS)  Are the two entities, Project

12    on Fair Representation on the one hand and Students For

13    Fair Admissions on the other, are they entirely

14    separate, financially, or are there funds still

15    exchanged between them?

16          A.    Entirely separate.

17          Q.    Are they funded by some of the same

18    institutional donors?

19                    MR. MCCARTHY:  Objection form and

20    objection on First Amendment and associational grounds.

21    I caution the witness not to disclose the identity of

22    any donors or the amount of any donations.  To the

23    extent you can follow that guidance, you may answer the

24    question.

25                    THE WITNESS:  The answer is yes, both --
```

 1   both entities occasionally receive donations from the

 2   same entities.  I'm sorry, from -- yeah, from various

 3   individuals and -- and foundations, et cetera.

 4        Q.   (BY MR. POWERS)  Am I right that the majority

 5   of both entities operating budgets is funded by

 6   foundations and institutions?

 7             MR. MCCARTHY:  You broke up there,

 8   counsel.  Can you repeat that?  Sorry.

 9        Q.   (BY MR. POWERS)  Am I right that the majority

10   of both SFFA's and POFR's operating budgets are funded

11   by foundations and institutional donors?

12             MR. MCCARTHY:  Objection form and

13   objection, First Amendment and associational privilege

14   grounds.  I instruct the client -- I instruct the

15   witness not to answer except to the extent any such

16   information has already been provided to defense.

17             THE WITNESS:  So I'm a little unclear if

18   I'm -- my instructions are to answer that question.

19   Tom, could you restate your --

20             MR. MCCARTHY:  You know what, I'm going

21   to go ahead and instruct the witness not to answer the

22   question.

23             MR. MCKETTA:  Even to a yes or no

24   question, Tom?  Yes or no discloses nothing.

25             MR. MCCARTHY:  Yes or no discloses the

EXHIBIT B, PAGE 23

Edward Blum                    CONFIDENTIAL                February 26, 2021
                                                                   Page 29

1        Q.   (BY MR. POWERS) Where do you now live and

2   work, Mr. Blum?

3        A.   I -- I live seasonally in Maine and I work in

4   my home in Maine and seasonally I live in Florida and

5   work from my home in Florida.

6        Q.   And do you -- I think you mentioned last time

7   that you also spent time in Virginia and New York and

8   South Carolina.  Do you still spend part of the year in

9   those -- in homes in those states as well?

10       A.   No.  Our New York apartment we sold, I guess,

11  maybe five years ago and we rented in South Carolina so

12  there's only two -- only two primary residential

13  domiciles.  Maine and Florida.

14            REPORTER:  Mr. Blum, you went out on your

15  answer.

16            THE WITNESS:  Okay.  So I have only two

17  primary domiciles today.  Maine and Florida.  The others

18  were in the -- in the past.

19       Q.   (BY MR. POWERS) You were ahead of the rest of

20  the country as far as remote working I guess?

21       A.   I have worked from my home since 1999.

22       Q.   And so am I right to say that most of the

23  day-to-day operations of SFFA are handled out of your

24  personal residence?

25            MR. MCCARTHY:  Objection form.

```
 1                    THE WITNESS:  Yes.
 2        Q.    (BY MR. POWERS) That's also true with respect
 3   to the Project on Fair Representation?
 4                    MR. MCCARTHY:  Objection form.
 5                    THE WITNESS:  Yes.
 6        Q.    (BY MR. POWERS) Did you have any role in
 7   approving the form of organization that SFFA would
 8   become?
 9        A.    Yes.
10        Q.    And you -- you understood that when it was
11   being formed it was to be a Virginia nonprofit
12   corporation that would have no members; is that right?
13                    MR. MCCARTHY:  Objection.
14   Attorney/client privilege.  I just want to caution the
15   witness not to disclose the communications that he's
16   ever had with counsel, but to the extent you can
17   navigate that instruction, you may answer the question.
18                    THE WITNESS:  Students For Fair
19   Admissions was conceived as a membership organization.
20   It is been to my attention, multiple times, that
21   Virginia nonprofit membership question pertains to a
22   statutory question rather than the actual individual
23   members who join Students For Fair Admissions.
24        Q.    (BY MR. POWERS)  From the outset of its
25   formation it was your understanding that you and Abigail
```

Edward Blum                      CONFIDENTIAL                    February 26, 2021
                                                                          Page 31

```
 1   Fisher and Richard Fisher would have permanent seats on

 2   SFFA's board, correct?

 3                  MR. MCCARTHY:  Objection form.

 4                  THE WITNESS:  As I described at the

 5   beginning of the deposition the word permanent was

 6   misspoken by me during the first deposition.  That the

 7   Articles of Incorporation and the amended bylaws, which

 8   were brought to my attention, provide for the election

 9   of the three of us plus now our fourth board member to

10   be elected by our fellow board members.

11        Q.   (BY MR. POWERS) Well, and my -- my focus is on

12   not what the documents may say and -- and what you

13   learned through the passage of time, but on your

14   original understanding of the plan for SFFA and do you

15   hear the distinction that I'm drawing?

16                  MR. MCCARTHY:  Objection form.

17                  THE WITNESS:  I do hear the distinction

18   (audio indiscernible).

19        Q.   (BY MR. POWERS)  With that distinction in mind

20   my question is:  Your understanding and plan, from the

21   outset, was that you and Richard Fisher and Abigail

22   Fisher would start out and remain in a position of

23   control with respect to SFFA?

24                  MR. MCCARTHY:  Objection form.

25                  THE WITNESS:  It was my understanding
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                                                      210-697-3408

EXHIBIT B, PAGE 26

 1   that they would join me on the board as board members

 2   and frankly it never occurred to me that in reviewing

 3   the document it did require us to renominate and reelect

 4   one another throughout the course of Students For Fair

 5   Admissions life.

 6        Q.   (BY MR. POWERS) And likewise it's -- it's

 7   never been a consideration for you that someone other

 8   than Edward Blum would be the chief decision maker and

 9   in charge of day-to-day operations of SFFA?

10             MR. MCCARTHY:  Objection form.

11             THE WITNESS:  So that -- that has changed

12   with time and the terrible pandemic that we're in.

13   Conversations have taken place among the board to weigh

14   out plans, God forbid, if I became ill and died or other

15   board members became ill and died as one had become very

16   ill, so there have been discussions.

17             MR. MCCARTHY:  I'd like to caution the

18   witness not to disclose the context of communications

19   with board members, between and among the board.

20        Q.   (BY MR. POWERS) So prior to the advent of

21   Covid and recent succession planning discussions am I

22   right that the concession for SFFA envisioned your

23   indefinite continuation in the role of president of SFFA

24   and the person chiefly responsible for day-to-day

25   business?

1  counsel.  My question is:  At the formation of SFFA, as

2  you were working to start the entity what persons, aside

3  from lawyers, were involved in discussions about how

4  SFFA would govern itself?

5             MR. MCCARTHY:  I'm gonna maintain the

6  objection and caution the witness not to disclose the

7  identities of any members or board members of SFFA that

8  are not already known to the University of Texas.  But

9  with that guidance, you may answer the question.

10             THE WITNESS:  So there were a handful of

11  individuals who have no affiliation with SFFA that I had

12  some discussions about the formation of SFFA and I think

13  Mr. McCarthy is allowing me to give you those name since

14  they have no formal affiliation with -- with SFFA; is

15  that right, Tom?

16             MR. MCCARTHY:  If you're certain they are

17  not members or donors to SFFA then you may answer the

18  question, but I instruct the witness not to disclose the

19  identities of any members or donors of SFFA consistent

20  with our maintaining the First Amendment associational

21  privileges that belong to SFFA and it's members in this

22  case.

23             THE WITNESS:  So there's one person who

24  is now deceased that did not join SFFA and I can

25  disclose her name.  Her name is Abigail Thurnstrom.

EXHIBIT B, PAGE 28

1        Q.    (BY MR. POWERS) Were there other people

2   besides Abigail Thurnstrom and counsel that you had

3   discussions about how SFFA would govern itself?

4        A.    Yes.

5        Q.    And can you identify those people by category?

6        A.    Oh, sure.  Scholars, law professors,

7   think-tank fellows -- I -- I -- I think that -- that

8   covers it.

9        Q.    Any -- anybody else that you discussed that

10  issue with?

11       A.    Well, I can't give you any more names because

12  I'm confident that those individuals are now members of

13  SFFA.  The only one that I -- I'm highly confident never

14  joined was Abby -- Abby Thurnstrom.

15       Q.    And when you say there -- there were members

16  about how many members do you believe were involved in

17  those discussions?

18       A.    You know, maybe seven or eight.  It could be a

19  little bit more, but I'm -- I can come up with seven or

20  eight names including -- including Abby.

21       Q.    So one of the people you include in this group

22  is Abigail Fisher?

23       A.    No, Thurnstrom.

24       Q.    Okay.

25             MR. MCCARTHY:  I'm sorry.  I didn't -- I

1  couldn't hear the witnesses answer on that.  What did

2  you say Edward?

3                    THE WITNESS:  So Mr. Powers wanted to

4  know about how many people --

5                    MR. MCCARTHY:  I'm sorry, not that.  You

6  said -- I just couldn't hear what you said the last

7  name.

8                    THE WITNESS:  Oh, Thurnstrom.

9                    MR. MCCARTHY:  Thurnstrom, thank you.

10                   THE WITNESS:  Thurnstrom.

11                   MR. MCCARTHY:  Sorry.  Sorry for the

12 interruption, counsel.

13     Q.   (BY MR. POWERS)  You said Abigail Thurnstrom

14 did not become a member, correct?

15     A.   That's -- that's correct.  I'm highly

16 confident that she did not become a member.

17     Q.   Okay.  But I think you included her in the

18 seven or eight?

19     A.   Yes.

20     Q.   Okay.  So that's -- it's -- I guess the count

21 is six or seven?

22     A.   Somewhere in though there, yeah.

23     Q.   And are -- of -- of that six or seven are any

24 of those people members of the board of SFFA?

25     A.   No.

Edward Blum                         CONFIDENTIAL                   February 26, 2021
                                                                           Page 37

1          Q.   The -- the group that you're describing are
2    any of those individuals presently seeking admission to
3    a college or university?
4                    MR. MCCARTHY:  Objection form.
5                    THE WITNESS:  No.
6          Q.   (BY MR. POWERS) Back at the time of those
7    discussions were they seeking admission or -- to a
8    college or university?
9                    MR. MCCARTHY:  Objection form.
10                   THE WITNESS:  No.
11         Q.   (BY MR. POWERS) Are -- are they individuals
12   who have completed their undergraduate studies?
13                   MR. MCCARTHY:  Objection form.
14                   THE WITNESS:  Yes.
15         Q.   (BY MR. POWERS) And had they completed their
16   undergraduate studies back at SSFA's formation?
17                   MR. MCCARTHY:  Objection form.
18                   THE WITNESS:  Yes.
19         Q.   (BY MR. POWERS) Okay.  So setting aside the
20   list that we talked about already this list of six or
21   seven anonymous individuals along with the categories:
22   Think-tanks, scholars, fellows, law professors, Abigail
23   Thurnstrom, is there any other person you can recall
24   having discussions about how SFFA would govern itself?
25                   MR. MCCARTHY:  Objection form.

1   of the discussions about how SFFA would govern itself

2   consisted of members of think-tanks, law professors, and

3   scholars and fellows; is that right?

4       A.   Correct.

5       Q.   Okay.  And had -- had any of those individuals

6   had the experience of or do you have reason to think

7   that they had the experience of being rejected by an

8   undergraduate admissions program in the past?

9                 MR. MCCARTHY:  Objection form.

10                THE WITNESS:  I really have no idea.

11      Q.   (BY MR. POWERS) Okay.  That -- that was not a

12  topic they communicated to you that they had that

13  experience of -- of having been rejected to an

14  institution that they believe was on the basis of their

15  race?

16                MR. MCCARTHY:  Objection form and

17  objection First Amendment associational privilege

18  grounds and I caution the witness not to disclose

19  concepts of communication with members of SFFA.  If you

20  can answer the question with that guidance you may do so

21                THE WITNESS:  Well, I think I already

22  answered it and that is, I -- I don't know.

23      Q.   (BY MR. POWERS) Can you describe who are the

24  current directors of SFFA?

25      A.   Yes.

EXHIBIT B, PAGE 32

1        Q.    Would you please?

2        A.    Yes, I'm -- I'm the president, Abby -- Abigail

3    Fisher is the secretary, Richard Fisher is the

4    treasurer, Joe Zhao is the other board member and our

5    member elected board member is Eva Ghao.

6        Q.    Have any -- other than Ms. Fisher, who we know

7    about from her litigation against the University of

8    Texas, have any of the other directors or officers

9    communicated to you that they were denied admission to

10   an undergraduate admissions program on the basis of --

11   of race-conscious program?

12              MR. MCCARTHY:  Objection form.  Objection

13   First Amendment associational privilege grounds.

14   Caution the witness not to disclose contents of

15   communications with board members or members of SFFA.

16   If you can answer the question without making any such

17   disclosure then you may do so.

18              THE WITNESS:  Mr. Powers, I can't -- I

19   can't then answer the question based on Mr. McCarthy's

20   objection.

21       Q.    (BY MR. POWERS) Well, as the -- as the

22   corporate representative for, SFFA, if you know, whether

23   any of those -- if SFFA knows whether any of its board

24   members were denied admission to a undergraduate program

25   other than Abigail Fisher who we've mentioned, would you

EXHIBIT B, PAGE 33

1  Abby Fisher, has -- was ever rejected from -- from a

2  college or university.

3      Q.   And if you expanded the group beyond just the

4  officers to the directors who are on the board?

5      A.   Oh, I'm -- I'm sorry.  I'm -- I'm -- Mr.

6  Powers, I'm sorry.  I conflated the two.  I'm -- I am --

7  I was speaking -- directed to all five of the board

8  member's officers of -- of SFFA.

9      Q.   Now, have their -- you consider yourself to be

10  a member of SFFA; is that right?

11      A.   Yes.

12      Q.   And view -- the same is true for the other

13  members of the board of SF -- SFFA, each is a member to

14  your understanding?

15      A.   Yes.

16      Q.   And has -- has each paid the $10.00 in

17  membership dues?

18      A.   I don't know.  I'm confident that two have

19  paid.  I'm unclear about three.

20      Q.   And -- and who -- who are the two that paid?

21      A.   Eva Ghao and Joe Zhao.

22      Q.   But unclear as to whether you or the Fishers

23  have paid?

24      A.   I'm -- I don't -- I don't know -- I don't

25  know.  I -- I don't -- I don't know.

EXHIBIT B, PAGE 34

Edward Blum                     CONFIDENTIAL                February 26, 2021
                                                                   Page 46

 1          Q.    You --
 2          A.    No, I -- I can speak for myself.  I don't
 3    think I -- I paid a membership fee as it is now
 4    required.  I -- I have not done that.  I'm fairly
 5    certain that Abby and Richard have not either, but I
 6    could not attest to that.
 7          Q.    And the vast majority of members of SFFA have
 8    not paid the dues; is that right?
 9                MR. MCCARTHY:  Objection form.
10                THE WITNESS:  Yes.
11          Q.    (BY MR. POWERS) And that's because a
12    substantial part of the membership had built up before
13    SFFA had a policy to collect dues; is that right?
14          A.    Yes.
15          Q.    And then even since it's had the policy.  You
16    have from time to time exercised authority to waive the
17    requirement of dues in certain cases; is that right?
18                MR. MCCARTHY:  Objection form.
19                THE WITNESS:  Yes.
20          Q.    (BY MR. POWERS) Have -- other than the
21    directors themselves, have members of SFFA ever attended
22    directr board meetings?
23                MR. MCCARTHY:  Objection.  First
24    Amendment and associational privilege grounds.  I
25    instruct the witness not to answer the question.

1   bit about some documents and so I'll add another file to

2   the dropbox if you'll bear with me for just a moment.

3   And if you could look to see in the -- in the chat

4   there's a deposition, Exhibit 1.

5                    (Exhibit No. 1, marked.)

6                    THE WITNESS:  Let's see.

7                    REPORTER:  Mr. Blum, can you have your

8   camera show your mouth?

9                    THE WITNESS:  Is that better?

10                   REPORTER:  Yeah, that's good.

11                   THE WITNESS:  Maybe I can put something

12  underneath this so that I can --  how's that?  Is that

13  better?  I'm going to go to chat and now I am going to

14  open up this document.  Okay.  I see Articles of

15  Incorporation and I'll do my best to -- to navigate

16  this.  Go --  go ahead, Mr. Powers.

17      Q.   Thank you.  And these are in fact the Articles

18  of Incorporation of SFFA that you have here at

19  Exhibit 1?

20      A.   That's correct.

21      Q.   Mr. Blum these Articles of Incorporation have

22  never been amended; is that right?

23      A.   I believe our bylaws have been amended.  I

24  don't --  don't think that our Articles of Incorporation

25  have been amended, but I'm -- I'm gonna reserve the

1   right to go back and revisit that just to make sure my

2   memory is clear.

3        Q.   Sitting here right now, your -- you memory --

4   we'll look at the bylaws later as well, but your -- your

5   memory and understanding is that though the bylaws had

6   been amended, the Articles of Incorporation have not

7   been amended?

8        A.   I believe that's right.

9        Q.   And you'll have a chance to review your

10  testimony later if you find any inaccuracies that need

11  clarification.  Mr. Blum the -- it was your

12  understanding that when formed SFFA would be a Virginia

13  Nonstock Corporation, correct?

14       A.   Yes.

15            MR. MCCARTHY:  Objection form.

16       Q.   (BY MR. POWERS) And that as -- according to

17  its Articles of Incorporation, it would have no members?

18  That's -- that's what the articles provide for, correct?

19            MR. MCCARTHY:  Objection form.

20            THE WITNESS:  So it clearly states the

21  Corporation shall have no members; however, Students For

22  Fair Admissions has always been conceived and then

23  (audio indiscernible) as a membership organization.

24  This sentence, the corporation shall have no members

25  that's -- with the statutory requirements under the

EXHIBIT B, PAGE 37

Edward Blum                         CONFIDENTIAL                    February 26, 2021
                                                                           Page 55

```
 1        Q.   It's a short document.  You're -- you're
 2   welcome to look at it briefly.
 3        A.   Okay.  I've I've scanned it again, Mr. Powers.
 4   Could you ask your question again so that I can -- I can
 5   be sure that I can address what you asked me?
 6        Q.   Yes, you -- you would -- would you agree with
 7   me that Exhibit 1, the Articles of Incorporation do not
 8   provide for the bylaws to either establish members or
 9   set requirements for becoming or serving as members?
10             MR. MCCARTHY:  Objection form.
11             THE WITNESS:  Yes.
12        Q.   (BY MR. POWERS) I want to turn to a new
13   document and so I will -- I'm placing into the chat
14   deposition Exhibit 2 and if you let me know when you've
15   been able to open that.
16             (Exhibit No. 2, marked.)
17             MR. MCCARTHY:  Mine's opening very
18   slowly.  I don't know if anybody else, but mine's going
19   very slow.
20             MR. POWERS:  I'll just wait a moment.
21   Are you able to see the document?
22             THE WITNESS:  I -- I am.  I have it here
23   in front of me.
24        Q.   (BY MR. POWERS) Okay.  Thank you.  So as to
25   Exhibit 2, do you recognize it as the unanimous written
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                                                          210-697-3408

Edward Blum                   CONFIDENTIAL                   February 26, 2021
                                                                    Page 56

```
 1   consent that was signed to adopt the bylaws of SFFA

 2   around the time of its formation?

 3        A.   Yes.

 4        Q.   And if you'll look with me at Page 8 of the

 5   PDF, do you find the -- the first Page of the bylaws

 6   that were adopted for SFFA on August 6, 2014?

 7        A.   I'm scrolling down to Page 8.

 8                  MR. MCCARTHY:  Counsel, just to make sure

 9   we're talking about Bates number 75?

10                  MR. POWERS:  Yes.

11                  MR. MCCARTHY:  Okay.  Great.  Thanks.

12                  MR. POWERS:  And thank you for that

13   clarification.

14                  THE WITNESS:  Yeah, okay.  I'm -- I'm on

15   there.  I'm on that Page.

16        Q.   Mr. Blum the -- you see in the bylaws that

17   were adopted back in 2014 in Article III on Membership?

18        A.   I do.

19        Q.   And there's two separate provisions.  One that

20   echoes what we saw in the Articles of Incorporation, no

21   members -- and then there' s a description of a

22   different category -- a class of affiliate members.  Do

23   you see that?

24        A.   I do.

25        Q.   And -- and there -- you agree with me that the
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                                                      210-697-3408

EXHIBIT B, PAGE 39

1  affiliate members were to have no voting rights and were

2  not to be considered as members within the meaning of

3  the Virginia Nonstock Corporation Act?

4      A.    Let me read it just to confirm.  Final

5  sentence reads:  "The Board of Directors shall have

6  authority to recognize any individual as an affiliate

7  member."  Yes.

8      Q.    So my -- my question was:  You agree with me

9  that the affiliate members they've got no voting rights

10  and were not to be members within the meaning of the

11  Virginia Nonstock Corporation Act?

12      A.    I -- I believe I do.

13      Q.    And -- and so is -- is this the sense in which

14  you understood there could be members of SFFA -- people

15  who would have no voting power within the organization

16  going back to 2014?

17              MR. MCCARTHY:  Objection form.

18              THE WITNESS:  To my -- yes.  To my

19  understanding that -- that although we would have

20  members of the organization -- those who expressed an

21  interest and desire to join did indeed join.  That they

22  would not not have any voting rights under these bylaws.

23      Q.    (BY MR. POWERS) Now, I want to focus on a

24  slightly different point.  Here there's a reference to

25  the fact that the board would be able to set additional

1   standards from time to time on who could become members.

2   At -- at its outsets what were the requirements to

3   become a member of SFFA?

4        A.   Quite simple.  Express your desire to join,

5   affirmatively tell me either in person or email that you

6   -- the individual want to join SFFA.

7        Q.   And other than a desire to join the entity as

8   an affiliate member was there any other requirement that

9   you could recall?

10       A.   I can't recall any other requirements.

11       Q.   And -- and since that time, my understanding

12  is that it's changed.  There has been at least one

13  additional requirement; is that right?

14       A.   That's correct.

15       Q.   And can you tell me what the current

16  requirements are to join SFFA?

17       A.   Requirement is to primarily go online to fill

18  out the application form and pay a one-time membership

19  fee.

20       Q.   Has there been any other effort to limit or

21  constrain membership of SFFA to a particular category of

22  persons who share a common circumstance?

23            MR. MCCARTHY:  Objection form.

24            The witness:  Nodding head.

25            MR. POWERS:  I think -- I think I saw you

Edward Blum                    CONFIDENTIAL                    February 26, 2021
                                                                        Page 59

1    shake your head no, but I -- I couldn't and I think even
2    so the words, but I didn't hear it.
3                    THE WITNESS:  Yeah, I'm sorry.  Yeah, no.
4    The answer -- I'm sorry.  I'm sorry, Mr. Powers.  It's
5    -- we have nothing to constrain anyone from joining the
6    organization.
7         Q.    (BY MR. POWERS) And setting aside the effort
8    to constrain, you have any reason to think that SFFA's
9    membership substantially consists of a group of persons
10   who share any common circumstance?
11                   MR. MCCARTHY:  Objection form.
12                   THE WITNESS:  I'm not sure I understand
13   the -- the question.  Could you -- could you perhaps --
14   by common circumstance -- I'm a little -- I'm a little
15   fuzzy on what you mean by that.
16        Q.    (BY MR. POWERS) So -- so by way of example,
17   one common circumstance might be individuals who have
18   sought, but been denied admission to a university.  As
19   there -- has there been an effort to determine whether
20   that circumstance is characteristic of SFFA's
21   membership?
22                   MR. MCCARTHY: Objection form.
23                   THE WITNESS:  There has been no no effort
24   to determine the predicate of people joining SFFA.
25        Q.    (BY MR. POWERS) And so -- and also no

```
 1    constraint to that either?

 2         A.    No restraints at all.

 3         Q.    Now, Mr. Blum I -- I want to look with you

 4    next at the Exhibit 3, so I'm gonna try to get this

 5    uploaded.  I'm gonna put four in at the same time.

 6    Three seems to be going slower.  If you're able to open

 7    four we might start there.

 8                     (Exhibits No. 3 and 4, marked.)

 9                     THE WITNESS:  I'm on Exhibit 4.

10                     MR. POWERS:  Okay.

11                     THE WITNESS:  Let me see if I can --

12                     MR. MCCARTHY:  If it helps, for me, four

13    is going faster.

14                     MR. POWERS:   Yeah, let's start with

15    that.

16                     THE WITNESS:  "Is unanimous consent in

17    lieu of a meeting of the Board of Directors of Student

18    For Fair Admissions Inc.  Is that what I'm looking at?

19    Amended bylaws?

20                     MR. MCCARTHY:  Is that the one you --

21                     MR. POWERS:  I -- I'm sorry.  I didn't

22    heare you.  Can you repeat that?

23                     THE WITNESS:  I -- I'm looking at a

24    document stamped: Confidential, Unanimous Written

25    Consent in lieu of a meeting of the Board of Directors
```

Edward Blum                          CONFIDENTIAL                    February 26, 2021
                                                                            Page 61

```
 1   of Students For Fair Admission Inc.  Is that --

 2                   MR. POWERS:  Yes.

 3                   REPORTER:  Mr. Blum, I'm getting a lot of

 4   feedback when he's starting to talk.  Is there way maybe

 5   we can stop and try to fix that?  It's overcutting.  I

 6   can barely hear his answers.

 7                   MR. POWERS:  Yeah, let's go off the

 8   record.

 9                   REPORTER:  The time is 9:26 a.m. and we

10   are off the record.

11                   (Break.)

12                   REPORTER:  The time is 9:28 a.m. and we

13   are back on the record.

14       Q.    (BY MR. POWERS) Mr. Blum do you have Exhibit 4

15   in front of you still?

16       A.    I do.

17       Q.    And is Exhibit 4 the Unanimous Consent of the

18   Board of Directors where in the -- the board adopted

19   amended bylaws and established a dues policy for general

20   members?

21       A.    Yes, this is the document that did that.

22       Q.    And that was in 2015?

23       A.    June 19th, 2015, correct.

24       Q.    And if you'll look with me at the -- Page 8 of

25   the PDF the document has 59 in the lower right-hand
```

1   corner.

2            MR. MCCARTHY;  Thank you, counsel.

3            MR. POWERS:  You find that?

4            THE WITNESS:  Stand by, yes, I have it

5   here.

6       Q.   (BY MR. POWERS) And this -- this part of the

7   document reflects the -- the amended bylaws that were

8   adopted June 19, 2015, correct?

9       A.   Yes.

10      Q.   The amended bylaws reflect the same point

11  we've seen in other documents that the members referred

12  to in Article III would not be members within the

13  meaning of the Virginia Nonstock Act, correct?

14      A.   Let me read this.  Yes.

15      Q.   It provides they have rights specifically set

16  forth in these bylaws, correct?

17      A.   Yes.

18      Q.   And the bylaws established no rights other

19  than the right to vote for one member elected director;

20  is that correct?

21      A.   Let -- let -- let me read that, Mr. Powers

22  just to confirm that.  Yes.

23      Q.   Are -- are you aware of any other action by

24  the board of directors to establish some other set of

25  rights or duties for members?

```
 1                    MR. MCCARTHY: Objection form.
 2              THE WITNESS:  Members have certain rights
 3    of course.  They have the right to elect a board member,
 4    they have the right to resign, they have the right to
 5    participate in annula discussions or periodic conference
 6    calls -- those are the general rights of members.
 7         Q.   (BY MR. POWERS) The -- the things you just
 8    described were those by a a board action or is that just
 9    some -- your -- your general understanding?
10                    MR. MCCARTHY:  Objection form.
11              THE WITNESS:  I think it's my general
12    understanding, but I think it's also the nature of a
13    membership organization, but specifically our membership
14    organization.
15         Q.   (BY MR. POWERS) Let me ask you some -- a
16    couple more specific things about the -- the nature of
17    this specific organization.  First, why did SFFA make
18    the choice to say that even these general members would
19    not be considered as members within the meaning of the
20    Virginia state law?
21                    MR. MCCARTHY:  Objection form and
22    objection attorney-client privilege.  I'm gonna caution
23    the witness not to disclose communications with counsel.
24    To the extent you can answer the question without making
25    such disclosures you may go ahead and answer the
```

```
 1   who meet the requirements of 3.03 are entitled to vote

 2   for a director in the member elected seat?

 3                   MR. MCCARTHY:  Objection form.

 4                   THE WITNESS:  Mr. Powers you -- you

 5   referenced just then Section 3.03, if I'm not mistaken.

 6                   MR. POWERS:  I'm sorry.  I'll -- I'll

 7   rephrase.

 8        Q.   (BY MR. POWERS) Am I right that only those who

 9   meet the requirements of the 3.02 are eligible to vote

10   for the member elected director position?

11        A.   I will -- I will make one small addendum to

12   that and that is there have been a handful of young

13   students who had wanted to join, but have been unable to

14   join because they didn't have a credit card and they

15   contacted me directly and asked if they could join

16   without paying the $10.00.  That question went before

17   the board and we admitted them.  So there are some

18   members now who can vote that actually haven't paid the

19   membership dues, but they were -- they were admitted as

20   members through that procedure.

21        Q.   So you're saying that there was a formal board

22   action on particular members who sought eligibility to

23   become a member and vote without having paid the dues?

24        A.   I think -- I think that's right.  There were

25   only three kids that I remember from New York that --
```

1  that did this.  And -- and I think the board -- the

2  board had approved them.  We're -- we're very much

3  moderate by counsel during this board so I think it had

4  to be voted.

5      Q.   Okay.  So  -- so far as you can recall the --

6  there were only three and those three that obtained

7  exemption on the $10.00 were expressly approved by the

8  board?

9      A.   I believe that's right.

10     Q.   Okay.  Mr. Blum would you look with me at

11 Section 4.02.

12          MR. MCCARTHY:  Same document, counsel?

13          MR. POWERS:  In the same document, yes.

14 It's just a little further down on the Page.

15          MR. MCCARTHY:  Got it.

16     Q.   Am I right that the -- give the circumstance

17 of five directors on the board of directors and only one

18 member elected director that the members do not have the

19 ability to elect or change a majority of SFFA's

20 governing body?

21          MR. MCCARTHY: Objection form.

22          THE WITNESS:  Yes.

23     Q.   (BY MR. POWERS) And as to 4.03 it provides all

24 directors must be general members of the Corporation.

25 Is it your understanding that that is the case or not?

Edward Blum                    CONFIDENTIAL              February 26, 2021
                                                                Page 68

1   actually done in the case of the current director, Eva

2   Ghao, you said an outside vendor was responsible for

3   disseminating the emails; is that right?

4        A.   Yes.

5        Q.   And I assume you received a copy of that as a

6   member?

7        A.   Yes.

8        Q.   And in the emails that are distributed to the

9   membership are -- are the email addresses of other

10  members visible in the -- kind of the top to line of the

11  email or in a CC line or not?

12             MR. MCCARTHY:   Objection form.

13             THE WITNESS:   They are not displayed.

14        Q.   (BY MR. POWERS) Do the -- is there other

15  indication in the email document whereby the recipients

16  can see and identify who the other recipients of the

17  email were?

18        A.   They are not able to identify the recipients.

19        Q.   Is that by design or by happenstance?

20        A.   Well, our membership rolls are private and the

21  vendor uses a service called Mail Chimp and the

22  membership organizations that I belong to use Mail Chimp

23  and send out notifications and updates and no other

24  fellow ever of these other organizations are ever

25  disclosed.  So Student For Fair Admissions uses the same

1    -- the same kind of format.

2         Q.   Are -- are members permitted access to a copy

3    of the membership roll?

4         A.   No.

5         Q.   Other than the happenstance of joining at the

6    same time or bumping into one another, what way would a

7    member other than -- than you have the opportunity to

8    learn the identities of the other members?

9                   MR. MCCARTHY:  Objection form.

10                  THE WITNESS:  There is no mechanism for

11   Students For Fair Admissions to share our membership

12   roll with our members or anyone outside of this

13   organization.

14        Q.   (BY MR. POWERS) What -- what is the last time

15   Students For Fair Admissions has polled its members with

16   a policy question?

17                  MR. MCCARTHY:  Objection form.

18                  THE WITNESS:  Well, we have periodic

19   conference calls that all of our members are invited to

20   -- to participate.  I think maybe the last one was a few

21   months a go and there was some, you know, some questions

22   by individual members about the state of -- of our

23   lawsuits and I -- I think that's the extent to which our

24   members can -- public way with other members present

25   discuss direction of the organization and ask questions

```
 1              THE WITNESS:  And my answer is, yes.

 2         Q.    (BY MR. POWERS) Now, Mr. Blum, you -- you said

 3    these have been periodic, when is the last time before

 4    that there had been a similar conference call?

 5              MR. MCCARTHY:  Objection form.

 6              THE WITNESS:  Typically about every 90 to

 7    120 days.  Some -- some years there are lots of

 8    newsworthy things that are happening that -- try to get

 9    together about three or four times a year.  Other years

10    it's been relatively quiet -- not that much so maybe

11    only once or twice a year.

12         Q.    (BY MR. POWERS) What -- what is the format for

13    the call?

14         A.    An email is sent by our -- our vendor.

15    Alerting people a few days prior to the conference call.

16    When it's scheduled they're invited to join -- join in

17    by calling a number.  They are reminded I think the day

18    before there's gonna be a conference call and the

19    designated hour -- counsel conducts the meeting on --

20    typically give a short update and then open it up for Q

21    and A discussion.

22         Q.    And so are you -- are you a primary speaker or

23    is it primarily counsel?

24         A.    I'm the primary speaker.

25         Q.    And do others speak at the meeting in terms of
```

1    the initial presentation?

2              MR. MCCARTHY:  Objection.  First

3    Amendment and associational privilege.  I just want to

4    caution the witness not to disclose any communications

5    that might have taken place on one of the periodic

6    membership calls that are currently under discussion

7    now.

8              THE WITNESS:  I primarily make a

9    presentation.  If there is a question that is legally

10   complex then I will ask counsel to help answer that

11   question.

12        Q.    (BY MR. POWERS) These calls are typically less

13   than an hour?

14        A.    Yeah, less than an hour.  I'd say that's

15   right.

16        Q.    And the -- am I right that you've -- you've

17   kind of mentioned just a -- a generalized presentation

18   about an update followed by an inquiry, does anybody

19   have any questions about that.  Is that kind of the

20   general substance of how that precedes?

21             MR. MCCARTHY:  Objection form.

22   Objection.  First Amendment associational privilege and

23   I just want to caution the witness not to disclose any

24   contents of communications.  But if you can abide that

25   instruction you may answer the question.

 1                    THE WITNESS:  Yes.

 2          Q.    (BY MR. POWERS) Would it be fair to say that

 3   SFFA has not engaged in an effort to poll its members to

 4   determine which policy issues or which types of actions

 5   SFFA should be pursuing?

 6                    MR. MCCARTHY:  Objection form.

 7                    THE WITNESS:  We have not formatively

 8   polled our members (audio indiscernible) what you have

 9   just described.

10                    MR. POWERS:  Can you say that one more

11   time 'cause you broke up a little.

12                    THE WITNESS:  Yeah, I'm sorry.  Yes,

13   Students For Fair Admissions has never polled in a

14   informal way our members on various endeavors that they

15   believe we should undertake.  I will state that I am in

16   constant communication with the membership through phone

17   and email and receive dozens of -- of suggestions and

18   ideas in any given month on a one-to-one basis.

19          Q.    (BY MR. POWERS) There's been no effort to

20   survey the -- to survey the 20,000 plus individuals that

21   you count as members to get feedback is that right?

22                    MR. MCCARTHY:  And again, I want to make

23   the same objection on the First Amendment and

24   associational privilege grounds and caution the witness

25   not to disclose the contents of any communications with

```
 1   answer the question without making any such disclosure

 2   you may answer the question.

 3              THE WITNESS:  I have never received a

 4   petition from a group of members encouraging the

 5   organization to (audio indiscernible) any kind of

 6   direction.

 7   Q.   (BY MR. POWERS) And it's --

 8              REPORTER:  I'm sorry.  I -- I didn't get

 9   that last part, Mr. Blum.

10              THE WITNESS:  Yes.  I -- I have never

11   received a petition from a group of members encouraging

12   us to move the organization in a specific direction.

13   Q.   (BY MR. POWERS) And in fact, is there any

14   practical way that the members of SFFA could assemble a

15   petition to distribute to SFFA?

16              MR. MCCARTHY:  Objection form.

17              THE WITNESS:  As individuals they can and

18   often do petition or encourage SFFA to undertake certain

19   endeavors.

20   Q.   (BY MR. POWERS) Your -- am I right that there

21   is no practical way for a substantial number of members

22   to assemble together and coordinate on a request to SFFA

23   for any particular action or initiative?

24              MR. MCCARTHY:  Objection form.

25              THE WITNESS:  Because our membership is
```

 1   not disclosed to our fellow members, no member knows the

 2   identity of another member unless they have volunteered

 3   that information to one another.  The only way that an

 4   individual can make suggestions about the direction or

 5   activities of SFFA is to contact or go to me directly.

 6        Q.   (BY MR. POWERS) Have you ever taken steps to

 7   form a committee of members within SFFA?

 8        A.   No.

 9        Q.   Are there any committees in SFFA other than

10   the board?

11        A.   No.

12             MR. MCCARTHY:  I'm just -- sorry to

13   interrupt, but we've been going I think, for over an

14   hour here.

15             MR. POWERS:  Oh, you're right.

16             MR. MCCARTHY:  Might be a decent time to

17   take a break and if you I don't mean to break you up,

18   but if you're in a decent stopping point, might be a

19   good time.

20             MR. POWERS:  We can stop right now.

21             MR. MCCARTHY:  Okay.

22             REPORTER:  The time is 9:57 a.m. and we

23   are off the record.

24             (Break.)

25             REPORTER:  The time is 10:13 a.m. and we

```
 1                    THE WITNESS:  Mr. Powers, I'm unable to
 2    answer the question.
 3         Q.   (BY MR. POWERS) Mr. Blum the -- do you recall
 4    or have available to you now the number of votes that
 5    were cast in that election?
 6                    MR. MCCARTHY:  Objection.  First
 7    Amendment and associational privilege grounds and I'll
 8    instruct the witness not to answer the question.
 9         Q.   (BY MR. POWERS) My initial question is simply,
10    do you actually know the number either with precision or
11    by approximation, not -- I'm not asking you to tell me
12    the number, but do you know the number?
13                    MR. MCCARTHY:  You can answer a yes or no
14    question.
15                    THE WITNESS:  Yeah, approximately.
16         Q.   (BY MR. POWERS) Okay.  Will you tell me the
17    number of votes that were cast in the election of Eva
18    Ghao?
19                    MR. MCCARTHY:  I'm maintain the objection
20    and instruct the witness not to answer.
21         Q.   (BY MR. POWERS) Will you -- can -- can you
22    answer yes or no, did as many as ten percent of the
23    membership of SFFA participate in the election?
24                    MR. MCCARTHY:  Same objection and I'll
25    instruct the witness not to answer the question.
```

1              MR. POWERS:  Tom, is there any bracket

2    you will permit me to ask or you drawing the line at --

3    at any information beyond whether he knows it?

4              MR. MCCARTHY:  I will -- I'll tell you

5    this:  For now I'm gonna draw the line at any

6    information on whether he knows it.  I'll think about it

7    over the lunch break to see if there's a way we can get

8    you some bracket.  I'm -- I'm not promising that I'll

9    give you one, but I'll -- willing to consider it and

10   think it through further over the break.

11             MR. POWERS:  Thank you.  I appreciate it.

12             MR. MCCARTHY:  Sure.

13             MR. POWERS:  Mr. Blum I'm -- I'm putting

14   into the chat box what I've marked as deposition

15   Exhibit 27.  Tom, for your benefit the -- the numbering

16   that I've used so far -- well frankly, David and Carter

17   as well.  The numbering I've used so far tracks the same

18   numbering we used at the last deposition with Mr. Blum

19   and so I'm skipping substantially here because I want to

20   maintain the same numbering throughout.

21             (Exhibit 27, marked.)

22             MR. MCCARTHY:  Makes sense, thanks.

23             MR. POWERS:  Mr. Blum are you able to

24   open Exhibit 27?

25             THE WITNESS:  Is this this Form 990 from

```
 1                    MR. HINOJOSA:  You're gonna have to do
 2    the clapper.
 3       Q.   (BY MR. POWERS) So what, Mr. Blum, will those
 4    members that we just discussed who are not seeking any
 5    admission to a college or university obtain if SFFA were
 6    successful in this lawsuit?
 7                    MR. MCCARTHY:  Objection form.
 8                    THE WITNESS:  Those members would have
 9    the benefit of knowing that they participated in
10    litigation that furthered our  joint understanding of --
11    of, you know, fair and legal college admissions.
12       Q.   (BY MR. POWERS) Essentially they would achieve
13    a policy preference?
14                    MR. MCCARTHY:  Objection form.
15                    THE WITNESS:  Yes they will have
16    participated in a lawsuit in which the -- the admission
17    and advocacy of this organization had been realized.
18       Q.   (BY MR. POWERS) At least as to -- to that
19    group of members that we've talked to -- talked about
20    that have no current anticipation of seeking admission
21    at any college or university, much less the University
22    of Texas.  There -- there will be no benefit other than
23    the realization of a preference for what policy will be
24    on this issue?
25                    MR. MCCARTHY:  Objection form.
```

1        Q.   Do you recall this is a brief that SFFA filed

2   in the first lawsuit that it filed against the

3   defendants?

4        A.   I -- I have not reviewed this document in a

5   few years, but it -- it looks like the following that

6   counsel made.

7        Q.   Would you look with me at Page 13?

8        A.   Sure.

9        Q.   Okay.  And the paragraph at the top of the

10  page contains a description of SFFA's views on its

11  members for financial support of the organization.  Do

12  you see that?

13             MR. MCCARTHY:  Counsel, just to make sure

14  we're on the same page, is the first word on this page,

15  seventh in italics.

16             MR. POWERS:  Yes.

17             MR. MCCARTHY:  Okay.  Thanks.  Are -- is

18  that where you are Mr. Blum?

19             THE WITNESS:  I see it.  Let me -- let me

20  read the paragraph.  Okay.  I finished reading the

21  paragraph.

22        Q.   And SSFA made the claim in this filing from

23  three years ago that more than 1,000 of its members had

24  contributed financially to SFFA, correct?

25        A.   Correct.

 1        Q.   And if it were 1,000 or only a small -- none
 2   more than that that would correspond to less than five
 3   percent of the people it counts as members of SFFA; is
 4   that true?
 5                 MR. MCCARTHY:  Objection form.
 6                 THE WITNESS:  That seems to be about the
 7   right percentage.
 8        Q.   (BY MR. POWERS) And of the people that SFFA
 9   counts as members I want to talk about a slightly
10   different group.  Those individuals who have either been
11   denied admission to a college or a university for
12   reasons that they correlate to a race-conscious
13   admissions program or those that are -- who are then
14   seeking admission to a college or university.  Do you
15   get the group that I'm talking about?
16        A.   I -- I don't.  Perhaps you could just
17   disassemble it for me.
18        Q.   Sure.  So two -- two separate groups.  One,
19   students who are seeking admission to college or
20   university, are -- are you with me on the first group?
21        A.   And -- and Mr. Powers, that group of students
22   are you -- are you inquiring about -- are they our
23   members or what -- what characteristics other than that
24   are you ascribing to this -- to this group or seeking --
25   seeking admissions?

EXHIBIT B, PAGE 60

1    in your mind are the obvious reasons that SFFA had for

2    choosing to organize itself in a way so as to not have

3    members within the meaning of Virginia state law?

4                    MR. MCCARTHY:  Objection form and

5    objection attorney-client privilege.  I caution the

6    witness not to disclose communications with counsel.

7                    THE WITNESS:  The answer is, I don't

8    know.

9         Q.    (BY MR. POWERS) I want to turn now to another

10   topic.  Am I correct that it was you who identified the

11   Wiley Rein firm as counsel or as the set of lawyers that

12   should serve as counsel for the Fisher lawsuit?

13                   MR. MCCARTHY:  Objection form.

14                   THE WITNESS:  I recommended Wiley Rein to

15   Abby and her father.

16        Q.    (BY MR. POWERS) Now, to be clear you actually

17   identified Wiley Rein as -- as your expected or

18   preferred counsel before you had even identified Ms.

19   Fisher as the plaintiff, correct?

20                   MR. MCCARTHY:  Objection form.

21                   THE WITNESS:  I spoke to a number of

22   lawyers and number of different law firms about this

23   case -- about the idea of bringing a lawsuit against the

24   University of Texas.  My roots at Wiley Rein -- were

25   deep and they expressed the most, you know, interest in

Edward Blum                     CONFIDENTIAL                     February 26, 2021
                                                                Page 114

1   representing a future plaintiff.

2       Q.   (BY MR. POWERS) And so are you indicating that

3   you had identified other candidates as possible

4   litigation counsel once you had a plaintiff selected for

5   the suit?

6                MR. MCCARTHY:  Objection form and

7   objection attorney-client privilege.  I think the

8   question is probably fine, but I just want to caution

9   the witness not to disclose any communications with

10  counsel.

11               THE WITNESS:  I talked to a number of

12  different lawyers about -- about this, you know -- I

13  challenged the universities reintroduction of race back

14  in 2000 and I guess it was five.

15      Q.   (BY MR. POWERS) 2005, you said?

16      A.   2005.  I think that's the year that UT

17  implemented race base criteria once again.

18      Q.   I think you described before that -- that you

19  spent about three years looking for a plaintiff who --

20  who could be the face of your challenge to UT's

21  admission policy?

22               MR. MCCARTHY:  Objection form.

23               THE WITNESS:  It may have been close to

24  three years, that's right.

25      Q.   (BY MR. POWERS) And so during that period you

Edward Blum                    CONFIDENTIAL                    February 26, 2021
                                                                    Page 115

1   talked with a number of different counsel about the

2   possibilities for her going forward with this suit and

3   before you had identified the plaintiff?

4                     MR. MCCARTHY:  Objection form.  And

5   again, I just caution the witness not to disclose

6   communications with counsel.

7                     THE WITNESS:  The answer to your

8   question, Mr. Powers, is yes.

9        Q.    (BY MR. POWERS) And it was you who identified

10  the University of Texas as the target defendant for that

11  lawsuit, correct?

12                    MR. MCCARTHY:  Objection form.

13                    THE WITNESS:  Yes.

14       Q.    (BY MR. POWERS) And you ultimately were the

15  one, both to find and approve that she was the right

16  person with respect to Abby Fisher?

17                    MR. MCCARTHY:  Objection form and I'm

18  gonna object again on attorney-client privilege and just

19  caution the witness not to disclose any communications

20  with counsel.

21                    THE WITNESS:  The -- the ultimate

22  decision to move forward with the litigation was made by

23  Abby and her family.  But the counsel that Abby selected

24  was based upon my recommendation and my experience with

25  Wiley Rein.

1          Q.   (BY MR. POWERS) And -- and in fact, you

2    actually regarded yourself and were regarded by Ms.

3    Fisher as her representative in connection with that

4    litigation?

5                    MR. MCCARTHY:  Objection form.

6                    THE WITNESS:  Well, I think the -- I'm

7    close to the Fisher family.  I'm a family friend so

8    representative may not be the -- the term that I would

9    agree with it or they would agree with, but I was a

10   family friend and consequently they could call me night

11   or day.  So I was a -- I was a conduit, if you will, on

12   -- a source -- a source of information -- limited

13   information that Abby and her mother and father could --

14   could call and -- and discuss.

15         Q.   (BY MR. POWERS) There were calls with counsel

16   that you participated in throughout the lawsuit?

17                   MR. MCCARTHY:  Objection.

18                   THE WITNESS:  Yes.

19         Q.   (BY MR. POWERS) And in fact, you had outlined

20   the lawsuit before Ms. Fisher had ever been identified

21   as the plaintiff for the lawsuit?

22                   MR. MCCARTHY:  I'm sorry, counsel.  You

23   broke up a little bit.

24                   THE WITNESS:  You -- you were breaking up

25   a little bit.

```
 1                    MR. POWERS:  I'll -- I'll All repeat it.
 2        Q.    (BY MR. POWERS) You had outlined the lawsuit
 3   before you had ever even identified Abby Fisher as the
 4   plaintiff for the lawsuit, correct?
 5                    MR. MCCARTHY:  Objection form.
 6                    THE WITNESS:  Yes.
 7        Q.    (BY MR. POWERS) And the -- am I right that
 8   that work was your responsibility for the -- for the
 9   Project on Fair Representation?
10                    MR. MCCARTHY:  Objection form.
11                    THE WITNESS:  You -- you broke up a
12   little bit again, Mr. Powers, if you would just say that
13   one more time.
14        Q.    (BY MR. POWERS) Am I right that that work you
15   did related to the lawsuit was through your
16   responsibility for the Project on Fair Representation?
17                    MR. MCCARTHY:  Objection form.
18                    THE WITNESS:  Yes.
19        Q.    (BY MR. POWERS) And -- and who was it that was
20   responsible for overseeing funding for the Fisher
21   lawsuit?
22                    MR. MCCARTHY:  Objection form.
23                    THE WITNESS:  I was.
24        Q.    (BY MR. POWERS) And then at some point during
25   the Fisher litigation lawyers from Wiley Rein with whom
```

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION

 3  Students For Fair          )
    Admissions, INC.,          )
 4                             )
                               )
 5          Plaintiff,         )
                               ) CIVIL ACTION
 6  VS.                        )
                               ) NO:  1:20-cv-00763-RP
 7  UNIVERSITY OF TEXAS AT     )
    AUSTIN, ET AL.,            )
 8                             )
            Defendants.        )
 9

10

11              REPORTER'S CERTIFICATE
                  OF EDWARD BLUM

12

13       I, Miah Hoffman, CSR, do hereby certify that the

14  foregoing deposition is a full, true and correct

15  transcript;

16       That the foregoing deposition of Witness, Edward

17  Blum, the Witness, hereinbefore named was at the time

18  named, taken by me in oral stenograph on February 26,

19  2021, the said Witness having been by me first duly

20  cautioned and sworn to tell the truth, the whole truth,

21  and nothing but the truth, and the same were thereafter

22  reduced to typewriting by me or under my direction.  The

23  charge for the completed deposition is $ _____ due from

24  Defendant;

25              ( ) That pursuant to the Federal Rules of
```

**EXHIBIT B, PAGE 66**

 1   Civil procedure, the Witness shall have 30 days after

 2   being notified by certified mail, return receipt

 3   requested, by the deposition officer that the original

 4   deposition transcript is available in her office for

 5   review and signature by the Witness and if any

 6   corrections made are attached hereto;

 7           ( ) That by agreement of counsel, a reading

 8   condensed copy of the deposition transcript along with

 9   the full-sized original Changes and Signature Sheet has

10   been sent to _____ on _____ for review

11   and signature within 30 days and if any corrections

12   returned are attached hereto;

13           ( ) That by agreement of counsel, the

14   deposition officer is instructed to release the original

15   deposition transcript to

16   _____ on _____ for review and

17   signature, and the deposition officer is thereafter

18   released of any further responsibility with regard to

19   the original;

20           ( ) That the witness shall have thirty (30)

21   days for review and signature of the original transcript

22   and if any corrections returned are attached hereto;

23           ( ) That the signed transcript ( ) was ( ) was

24   not received from the Witness within 30 days;

25           ( ) That the examination and signature of the

1   Witness is waived by the Witness and the parties;

2           That the amount of time used by each party at

3   the deposition is as follows:

4       Mr. Powers:    03 HOURS:31 MINUTE(S)
        Mr. Hinojosa:  01 HOURS:24 MINUTE(S)
5       Mr. McCarthy:  00 HOURS:00 MINUTE(S)

6       I further certify that I am neither counsel for,

7   related to, nor employed by any of the parties or

8   attorneys in this action in which this proceeding was

9   taken, and further that I am not financially or

10  otherwise interested in the outcome of the action.

11          Certified to by me this 2nd day of March, 2021.

12

13

14                      _____

15                      MIAH HOFFMAN, CSR 11773
                        Expiration Date:  2/28/2023
16                      Firm Registration No. # 631
                        Kim Tindall & Associates, LLC
17                      16414 San Pedro, Suite 900
                        San Antonio, Texas 78232
18                      Phone 210-697-3400
                        Fax 210-697-3408

19

20

21

22

23

24

25

EXHIBIT B, PAGE 68