CAUSE NO. _____

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| UNIVERSITY OF TEXAS AT AUSTIN; | § | |
| JAMES B. MILLIKEN, in his official capacity | § | |
| as Chancellor of the University of Texas | § | |
| System; GREGORY L. FENVES, in his official | § | |
| capacity as the President of the University of | § | TRAVIS COUNTY, TEXAS |
| Texas at Austin; and DAVID J. BECK, | § | |
| CHRISTINA MELTON CRAIN, KEVIN P. | § | |
| ELTIFE, R. STEVEN HICKS, JODIE LEE | § | |
| JILES, JANIECE LONGORIA, NOLAN | § | |
| PEREZ, KELCY L. WARREN, and JAMES | § | |
| CONRAD WEAVER, in their official | § | |
| capacities as Members of the Board of Regents | § | |
| of the University of Texas System, | § | |
| *Defendants*. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION AND
## APPLICATION FOR PERMANENT INJUNCTION

TO THE HONORABLE TRAVIS COUNTY DISTRICT COURT:

NOW COMES Students for Fair Admissions, Inc. ("Plaintiff") and files this Original Petition complaining of Defendants The University of Texas at Austin ("UT Austin") and James B. Milliken ("Milliken"), Gregory L. Fenves ("Fenves"), David J. Beck ("Beck"), Christina Melton Crain ("Crain"), Kevin P. Eltife ("Eltife"), R. Steven Hicks ("Hicks"), Jodie Lee Jiles ("Jiles"), Janiece Longoria ("Longoria"), Nolan Perez ("Perez"), Kelcy L. Warren ("Warren"), and James Conrad Weaver ("Weaver") in their official capacities, and would respectfully show the Court as follows.

## DISCOVERY CONTROL PLAN

1.     Discovery in this matter will be conducted under Discovery Control Plan Level 3 pursuant to Texas Rule of Civil Procedure 190.4.

## RULE 47 STATEMENT

2.     SFFA seeks non-monetary relief and an award of its reasonable attorneys' fees and costs incurred in this action for injunctive relief pursuant to Texas Civil Practice and Remedies Code § 106.002.   Plaintiff affirmatively pleads that this suit is not governed by the expedited-actions procedure in Texas Rule of Civil Procedure 169 because Plaintiff requests injunctive relief.

## PARTIES

3.     Plaintiff Students for Fair Admissions, Inc. ("SFFA") is a voluntary membership organization formed for the purpose of defending human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means.   SFFA is a nonprofit membership group of more than 20,000 students, parents, and other individuals who believe that racial classifications and preferences in college admissions are unfair, unnecessary, and unconstitutional. SFFA has members in Texas and throughout the country.

4.     SFFA has multiple members who applied for and were denied admission to UT Austin's 2018 and 2019 entering classes ("Applicants").   Applicants were denied the opportunity to compete for admission to UT Austin on equal footing with other applicants because of Defendants' discriminatory admissions policies.   Applicants are ready and able to apply to transfer to UT Austin when it ceases the use of race or ethnicity as a factor in admissions, and when UT Austin ceases its intentional discrimination against disfavored racial groups, including Whites and Asians.

EXHIBIT F, PAGE 2

5.      Defendant UT Austin is a public educational institution authorized by Article 7, Section 10 of the Texas Constitution and is funded by the State of Texas with its principal office located in Austin, Texas.  Defendant UT Austin may be served with citation by serving its President, Gregory L. Fenves, at Main Building, 110 Inner Campus Drive, Austin, Texas 78712, or wherever he may be found within or without the State of Texas.

6.      Defendant Milliken is the Chancellor of the University of Texas System.  As Chancellor, Mr. Milliken serves as the chief executive officer of the University of Texas System charged with instituting the policies of the Board of Regents, including oversight and implementation of the admissions policies for UT Austin. Mr. Milliken may be served with citation at 601 Colorado Street, 4th Floor, Austin, Texas 78701, or wherever else he may be found within or without the State of Texas.  Mr. Milliken is sued in his official capacity as Chancellor of the University of Texas System.

7.      Defendant Fenves is the President of UT Austin.  As President, Mr. Fenves is responsible for the implementation of the policies of the Board of Regents, including oversight and implementation of the admissions policies for UT Austin.  Mr. Fenves may be served with citation at Main Building, 110 Inner Campus Drive, Austin, Texas 78712, or wherever he may be found within or without the State of Texas.  Mr. Fenves is sued in his official capacity as the President of UT Austin.

8.      Defendants Beck, Crain, Eltife, Hicks, Jiles, Longoria, Perez, Warren, and Weaver are the members of the Board of Regents of the University of Texas System, the governing body for the University of Texas System, and may be served with citation at Ashbel Smith Hall, 201 West 7th Street, Suite 820, Austin, Texas 78701, or wherever they may be found within or without

the State of Texas.  The members of the Board of Regents are sued in their official capacities as members of the Board of Regents of the University of Texas System.

## JURISDICTION

9.      This Court has subject matter jurisdiction over this action because SFFA asserts claims for violations of the Texas Constitution and violations of Texas Civil Practice and Remedies Code section 106.001.  SFFA also seeks injunctive relief against Defendants who are state agencies and officers acting in their official capacities.  This Court has jurisdiction to determine applications for injunction.  TEX. CIV. PRAC. & REM. CODE § 65.021.  Defendants' acts and omissions constitute violations of Texas constitutional and statutory law, are not authorized by Texas law, and thus constitute ultra vires acts and omissions on the part of Defendants over which this Court has jurisdiction.

## VENUE

10.      Venue is proper in Travis County because all or a substantial part of the acts and omissions that are the subject matter of this action occurred in Travis County, Defendants are either domiciled in Travis County or have their principal office in their official capacities in Travis County, and Defendants are state agencies or officers sued in their official capacities.

## FACTS

11.      Over the past 20 years, UT Austin has modified its admissions policies, usually in response to federal judicial decisions interpreting federal law regarding the permissibility of using race as a factor in admissions decisions.  At all times, UT Austin has sought to use race as a factor in admissions decisions to the fullest extent under the law.

12.      Before 1997, UT Austin used race as part of the general admissions process, and it was frequently a controlling factor in the university's admissions decisions.  UT Austin used two

criteria when evaluating applicants: (1) the applicant's Academic Index ("AI"), which was computed from standardized test scores and high school class rank; and (2) the applicant's race. In 1996, the last year UT Austin used this particular race-based system, 4.1% of the enrolled freshmen were African American, 14.7% were Asian, and 14.5% were Hispanic.

13.     In 1996, the U.S. Court of Appeals for the Fifth Circuit issued its decision in *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996). The Fifth Circuit held that the University of Texas School of Law could not use race as a factor in deciding which applicants to admit. In response to *Hopwood*, UT Austin ceased using race as a factor in its undergraduate admissions decisions. Instead, for the 1997 admissions cycle, UT Austin instituted a race-neutral "holistic review" process in which it considered an applicant's AI score as well as a Personal Achievement Index ("PAI"). The PAI was a composite of scores from two essays and a personal achievement score. The personal achievement score, in turn, was based on a "holistic" review of an applicant's leadership qualities, extracurricular activities, honors and awards, work experience, community service, and special circumstances, such as whether the applicant came from a poor family, a single-parent household, or a home in which a language other than English was customarily spoken. This new race-neutral admissions process was known as the "AI/PAI Plan." Because the AI/PAI Plan gave an admissions preference to disadvantaged students, it had the effect of benefiting minority applicants in the admissions process. In 1997, under the AI/PAI Plan, 2.7% of the enrolled freshmen were African American, 15.9% were Asian, and 12.6% were Hispanic.

14.     In 1997, the Texas Legislature passed a law known as the "Top Ten Percent Plan," which mandated that UT Austin admit all Texas applicants who ranked in the top 10% of their high school graduating class. Tex. Educ. Code Ann. § 51.803. In 1998, UT Austin began admitting all Texas applicants who were in the top 10% of their high school graduating class, as

required by the Top Ten Percent Plan.  Because applicants admitted pursuant to the Top Ten Percent Plan did not fill UT Austin's entire incoming freshman class, UT Austin continued to use the race-neutral AI/PAI Plan to fill the remainder of its incoming freshman class.  From 1998 to 2004, UT Austin admitted applicants under this race-neutral system.

15.     Between 1998 and 2004, UT Austin's race-neutral admissions process created a more racially diverse environment than existed under the race-based admissions process it had used before *Hopwood*.  In 2000, UT Austin announced that its "enrollment levels for African American and Hispanic freshmen have returned to those of 1996, the year before the *Hopwood* decision prohibited the consideration of race in admissions policies."  In 2003, UT Austin proclaimed that it had "effectively compensated for the loss of affirmative action" by bringing "a higher number of freshman minority students—African Americans, Hispanics, and Asian-Americans—to the campus than were enrolled in 1996, the year a court ruling ended the use of affirmative action in the university's enrollment process."  By 2004—the last year that UT Austin used this race-neutral system—the entering freshman class was 4.5% African American, 17.9% Asian, and 16.9% Hispanic.  The 2004 entering freshman class, in other words, had a higher percentage of African Americans, Asians, and Hispanics than the class that entered in 1996 when UT Austin last used racial preferences.

16.     Despite this success with a race-neutral admissions process, UT Austin continued to look for an opportunity to reinsert race into its admissions process.  That opportunity presented itself when, on June 23, 2003, the U.S. Supreme Court decided *Grutter v. Bollinger*, 539 U.S. 306 (2003).  That ruling upheld the University of Michigan Law School's admissions system, which used race as a factor, against a challenge under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.  The U.S. Supreme Court held that "student body

EXHIBIT F, PAGE 6

diversity is a compelling state interest that can justify the use of race in university admissions," *id.* at 325, and that enrolling a "'critical mass' of underrepresented minorities is necessary to further [a university's] compelling interest in securing the educational benefits of a diverse student body," *id.* at 333.

17.     The U.S. Supreme Court warned, however, that a university contemplating the use of race as a factor in admissions must engage in "serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." *Id*. at 340.  Despite this warning, UT Austin's then-President announced—the very same day that *Grutter* was decided—that "[t]he University of Texas at Austin will modify its admissions procedures" in light of *Grutter* by, among other things, "implementing procedures at the undergraduate level that combine the benefits of the Top 10 Percent Law with affirmative action programs."

18.     In June 2004, UT Austin formally adopted a policy to reintroduce race into the admissions process, starting with applicants in the 2004-2005 admissions cycle.  Under the new admissions system, UT Austin continued to admit applicants under the Top Ten Percent Plan and to fill the remaining seats based on an applicant's AI and PAI scores.  Unlike the year before, however, an applicant's AI/PAI score was not calculated based on race-neutral criteria.  UT Austin instead began using an applicant's race as a factor in his or her PAI score.

19.     Under this system, an applicant's race appeared on the front of every application file, and reviewers are aware of it throughout the evaluation.  UT Austin began using this new race-based admissions system to benefit African American and Hispanic applicants—groups it considered "underrepresented"—over applicants of other races, including Whites and Asians.  UT Austin did so even though there were fewer Asians than Hispanics enrolled at the university.  UT Austin deemed Asians "overrepresented" based on state demographics.  At the same time, UT

Austin continued to recognize Asians as a minority in its diversity statistics, marketing materials, and in analyzing classroom diversity.

20.    UT Austin offered two reasons for why it needed to grant a preference to African American and Hispanic applicants to achieve student-body diversity.  First, it claimed a lack of "sufficient diversity" at the classroom level.  Second, it pointed to "significant differences between the racial and ethnic makeup of the University's undergraduate population and the state's population."  UT Austin committed to reviewing its policy every five years to determine whether it was still necessary to use race in admissions in order to achieve student body diversity.  Despite the requirement that UT Austin give serious, good faith consideration to race-neutral alternatives for its admissions process, there is no indication that it has ever conducted this review.  Moreover, there is no indication that UT Austin has ever projected a date at which it will cease using race as a factor in admissions decisions.

21.    For 2016, only 33% of those admitted to the freshman class through the Top Ten Percent Plan were White.  Similarly, of all admitted students that year, only 38% of them were White.  In other words, UT Austin would be a majority-minority university without the use of racial preferences in admissions.

22.    In March 2017, UT Austin released its "University Diversity and Inclusion Action Plan" ("UDIAP"), in which it outlined its plan to continue using race in its admissions decisions as a result of "the university's successful defense of its admissions policy" in *Fisher v. University of Texas at Austin* decided by the U.S. Supreme Court in 2016 under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.  The UDIAP's discussion of the need for race-based admissions was less than one page.  In it, UT Austin acknowledged that its student body (of which the vast majority of each freshman class is admitted through the race-

neutral Top Ten Percent Plan) consists of "a majority of non-white students."  Nevertheless, the UDIAP stated that UT Austin still needed to use race in its admissions decisions because certain minorities "are underrepresented in certain areas of study, including business, engineering, and the sciences" and there is a "need to include diversity within groups to break down stereotypes."  UT Austin's goal, according to the UDIAP, was to "achieve a level of enrollment whereby students from underrepresented groups no longer feel isolated."  The UDIAP did not identify the level of enrollment necessary to achieve this goal.

23.    For its most recent admissions cycles, including the 2017-2018 and 2018-2019 cycles, UT Austin used the same admissions process it had used since 2004, with two exceptions noted below.  Thus, UT Austin still asks applicants to classify themselves from among six predefined racial categories, and it discriminates on the basis of race—in favor of those categories it considers "underrepresented" and to the detriment of all other applicants—in admitting the portion of the freshman class enrolled outside the operation of the Top Ten Percent Plan. The racial categories are "Hispanic or Latino, American Indian or Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, and White."  The categories are, by their nature, arbitrary in many respects and fail to serve any educational purpose. Given the limited number of places in UT Austin's freshman class, granting a racial preference to African American and Hispanic applicants diminishes the chances of admission for White and Asian applicants.

24.    One of the few changes to the UT Austin admissions process in recent years is that the PAI score (now known as the "holistic review" or "HR" score) no longer is a composite of separate scores for essays and the holistic review.  Reviewers now may assign their own weight to essays and all the other holistic review factors—including race—when assigning an HR score.

25.     An additional change is that, in 2009, the Texas Legislature authorized UT Austin to limit automatic admissions under the Top Ten Percent Plan to 75% of the entering class. TEX. EDUC. CODE ANN. § 51.803(a-1).  Thus, a lower percentage of Texas applicants would receive automatic admission to UT Austin.  The Texas Legislature also provided, however, that if UT Austin chose to limit admission under the Top Ten Percent Plan to 75% of the entering class, which UT Austin has done, "the university must continue its practice of not considering an applicant's legacy status as a factor in the university's decisions relating to admissions for that academic year." *Id*. § 51.803(a-4).  Furthermore, UT Austin would not be entitled to limit admission under the Top Ten Percent Plan to 75% of the entering class if "a final court order applicable to the institution prohibits the institution from considering an applicant's race or ethnicity as a factor in the institution's decisions relating to first-time undergraduate admissions." *Id*. § 51.803(k).

26.     UT Austin describes its "holistic" admissions process as an objective evaluation in which "trained admissions officers" evaluate each applicant as a "whole person" to determine whether he or she has "a genuine commitment to [the university's] core values—learning, discovery, freedom, leadership, individual opportunity and responsibility."  UT Austin claims that it uses this process to, among other things, admit underrepresented minorities who have qualities that underrepresented minorities admitted under the Top Ten Percent Plan lack.

27.     The truth, however, is that UT Austin—in addition to utilizing unconstitutional racial preferences—also uses the latitude created by its admissions process to allow politically connected individuals to be admitted to UT Austin, despite having qualifications substantially below the median for other admitted students.  In the past, these beneficiaries have included the relatives or friends of donors, alumni, legislators, members of the Board of Regents, and UT Austin

officials and faculty.  This practice was not publicly known and only came to light because a former admissions officer became a whistleblower, and because public pressure forced UT Austin to independently investigate this surreptitious practice.

28.     The results of the investigation, known as the Kroll Report, revealed that UT Austin's "holistic review" process was regularly overridden through application "holds" requested by UT Austin's then-President, William Powers.  The Kroll Report found that President Powers placed "holds" on about 150 to 300 in-state applicants each year from 2009 to 2014.  If a student received a "hold," UT Austin's admissions office could not deny the student admission without first speaking with President Powers.  The Kroll Report also found that most "holds" were "based on requests from Texas legislators and members of the Board of Regents."  For example, in one "brazen" incident, a former elected official notified UT Austin that a member of an "important" committee had a strong interest in seeing an applicant admitted and that there were "political and funding implications" tied to the applicant's admission.  The applicant was then admitted to UT Austin.

29.     Once these well-connected applicants received a preferential "hold" from President Powers, they then had an incredibly strong chance of receiving admission to UT Austin.  The Kroll Report found, in particular, that UT Austin admitted 72 percent of the applicants who received such "holds" and who did not qualify for automatic admission under the Top Ten Percent Plan.  By comparison, UT Austin admitted only 16 percent of all in-state applicants undergoing "holistic review" during a similar period.  These well-connected "holds" secured admission even though only 6 percent of them had above-average qualifications.  For example, two underqualified applicants were admitted because they had "close ties to state legislators," despite having "very low high school grades (GPA range of 1.8 to 2.2) combined with SAT scores in the 800s (combined

math and verbal)" and no "other obvious holistic attributes, other than positive letters of recommendation referencing the applicants' ties to the legislators." The Kroll Report found that UT Austin's admission's office admitted these "holds" because of "frequent pressure placed on [it] to admit certain applicants." When the admissions office hesitated, President Powers often overrode the purportedly "holistic review" process and ordered the applicants "admitted over the objection of the Admissions Office." For example, when the admissions director objected that one student was "so bad for so many reasons, there is no way I can admit this student," President Powers intervened and ordered that the student be admitted.

30.     The Kroll investigation also found that race played a role in many of these admissions decisions. Investigators conducted detailed reviews of 73 applicants who were admitted "despite grades and test scores substantially below the median for admitted students" and found that "[i]n approximately 29%, or 21 of the 73 files reviewed, the contents of the files suggest that ethnic, racial, and state geographical diversity may have been an important consideration." Thus, the results of UT Austin's own investigation into its admissions practices demonstrate that the university misuses its "diversity" rationale as pretext to justify the admission of underqualified, well-connected applicants. Even after instituting alleged reforms to its admissions practice, senior officials at the University retain authority to admit students even when the admissions office has rejected that applicant.

## EQUITABLE RELIEF

31.     Plaintiff incorporates the allegations and averments contained in paragraphs 1-30 as if fully set forth herein.

32.     UT Austin's use of racial preferences in admissions violates Texas law for multiple reasons. *First*, in 1972, Texas amended its Constitution to add Article I, Section 3a (the "Equal

Rights Amendment"). It provides: "Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin." The Equal Rights Amendment was designed and enacted in order to provide more expansive protection against discrimination than the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the equal-protection guarantee of the Texas Constitution provide. This is a choice that Texas, as an independent sovereign, is allowed to make. In Texas, therefore, no discrimination on the basis of "sex, race, color, creed, or national origin" is permitted—period. As a result, UT Austin's use of racial preferences in admissions is patently unconstitutional under the Texas Constitution.

33.     **Second**, Article I, Section 3 of the Texas Constitution provides: "All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." The Texas Supreme Court has referred to this as the equal protection guarantee of the Texas Constitution. Like its federal counterpart, the Texas Constitution's equal-protection guarantee requires that when the State classifies individuals on a suspect basis such as race the classification is subject to strict scrutiny and must be narrowly tailored to serve a compelling government interest. To be compelling, the interest must be constitutionally permissible and substantial. The State cannot rely on generalizations or stereotypes, it must have a logical stopping point, and it cannot be amorphous. UT Austin's use of the suspect category of race in its admissions process must serve a compelling government interest, and to satisfy strict scrutiny, UT Austin must demonstrate what the compelling government interest is.

34.     UT Austin claims that it has a compelling interest in using race in admissions in order to obtain a "critical mass" of underrepresented minorities and to achieve "the educational benefits of diversity." However, student body diversity is not a compelling state interest under

**EXHIBIT F, PAGE 13**

Article I, Section 3 of the Texas Constitution. Under Texas law, the concept of "critical mass" is so broad, vague, and imprecise that it cannot possibly justify UT Austin's use of race in admissions. The amorphous "critical mass" rationale makes it impossible for Texas courts to meaningfully evaluate whether a university's use of race advances any compelling government interest under the Texas Constitution. In short, it is impossible to subject such uses of race to strict scrutiny under Texas constitutional standards. Not surprisingly, then, UT Austin has been unable to define in anything other than the vaguest terms what it means by "critical mass." Courts cannot ensure that an admissions process serves a compelling government interest if it cannot pin down the educational goals that the process is designed to achieve.

35.     There also is not a compelling interest in student body diversity because racial preferences harm their intended beneficiaries. As Justice Clarence Thomas has remarked, "there can be no doubt that racial paternalism and its unintended consequences can be as poisonous and pernicious as any other form of discrimination. So-called 'benign' discrimination teaches many that because of chronic and apparently immutable handicaps, minorities cannot compete with them without their patronizing indulgence." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 241 (1995) (Thomas, J., concurring in part and concurring in judgment). Racial preferences "stamp minorities with a badge of inferiority and may cause them to develop dependencies or to adopt an attitude that they are 'entitled' to preferences." *Id*.

36.     "Student body diversity" is not a compelling interest, moreover, given the few crude, inaccurate, and overly simplistic racial and ethnic categories UT Austin uses to label applicants. There is no compelling interest in misleadingly labeling all applicants either "Hispanic or Latino," "Black or African American," "American Indian or Alaska Native," "Asian," "Native Hawaiian or Other Pacific Islander," or "White," particularly while giving these categories

definitions that arbitrarily combine (and separate) many cultural, racial, and ethnic groups without any rational basis. Both the favored and disfavored groups are broad and consist of students from enormously diverse backgrounds. The presumption, for example, that applicants of Mexican, Cuban, Colombian, Argentinian, and Brazilian descent (or, oddly, "other Spanish culture or origin, regardless of race") should be lumped together as "Hispanics" is unjustified and irrational. UT Austin's decision to lump together, for example, applicants of Afghan, Chinese, Indian, Japanese, and Vietnamese descent into one "Asian" category is similarly unjustified and irrational. Texas today is diverse in ways that transcend these crude and inaccurate labels.

37.    The purported rationale that UT Austin has not achieved student body diversity because its freshman class does not mirror the State's racial demographics fails strict scrutiny. UT Austin claims to be using racial preferences in admissions to achieve student body diversity, *i.e.*, ensuring that underrepresented minority students do not feel isolated or like a spokesperson for their race. Using racial preferences to achieve demographic parity is not a compelling government interest. Seeking demographic parity is designed to achieve racial balance. There is no compelling state interest under the Texas Constitution in balancing UT Austin's freshman class based on simple racial population demographics.

38.    The purported rationale that UT Austin has not achieved student body diversity because there is insufficient classroom diversity also fails strict scrutiny. UT Austin claims to be using racial preferences in admissions to achieve student body diversity, *i.e.*, ensuring there are enough underrepresented minority students in the freshman class. An interest in student body diversity does not permit UT Austin to use racial preferences to ensure that each classroom has a critical mass of underrepresented minorities. The claimed—and unattainable—goal of

demographic racial parity at the classroom level is not a compelling state interest under the Texas Constitution.

39.     The purported rationale that UT Austin has not reached critical mass because it lacks intra-racial diversity fails strict scrutiny. UT Austin claims to be using racial preferences in admissions to achieve student body diversity, *i.e.*, ensuring there are enough underrepresented minority students in the freshman class. That interest does not permit UT Austin to continue to use racial preferences after that interest is achieved to ensure there is sufficient diversity within racial groups. Indeed, this defense of UT Austin's system relies on the unsupported assumption that there is something deficient or at least radically different about the African American and Hispanic students admitted through the Top Ten Percent Plan. The only difference between minorities admitted under the Top Ten Percent Plan and those admitted outside of it is that the latter disproportionally come from families that are wealthier and better educated than the average Texas family. There is no compelling interest under the Texas Constitution in using racial preferences to favor minority applicants from wealthy, well-connected families.

40.     SFFA challenges UT Austin's use of race as a factor or component in its admissions process solely under the provisions of the Texas Constitution and Texas statutory law. SFFA does not make any complaint in this cause based on possible violations of the United States Constitution or any federal law. In addition, SFFA's challenges in this cause are based on whether the Texas Constitution and Texas statutory law allow UT Austin to use race or any sort of racial preference in its admissions process and whether UT Austin's use of race or racial preferences in its admissions process serves a compelling government interest. In the event UT Austin demonstrates a compelling government interest in the use of race or racial preferences in its admissions process that satisfies the Texas Constitution and strict scrutiny, SFFA does not, by this suit, challenge

EXHIBIT F, PAGE 16

whether UT Austin's use of race or racial preferences in its admissions process is sufficiently narrowly tailored to achieve such compelling government interest.  Should the Court find both that (1) the Texas Constitution and Texas statutory law allow the use of race in the UT Austin admissions process and (2) the use of such a suspect category serves a compelling government interest, SFFA leaves the question of whether UT Austin's method of using race or racial preferences is sufficiently narrowly tailored to achieve such compelling government interest for another day.

41.     ***Third***, Section 106.001 of the Texas Civil Practice and Remedies Code provides that "[a]n officer or employee of the state . . . who is acting or purporting to act in an official capacity may not, because of a person's race, religion, color, sex, or national origin":  (1) "refuse to permit the person to participate in a program owned, operated, or managed by or on behalf of the state"; (2) "refuse to grant a benefit to the person"; or (3) "impose an unreasonable burden on the person[.]"  Section 106.001 creates a broad statutory right to be free of official discrimination, and, accordingly, prohibits the State or its agents from discriminating against persons because of race, religion, color, sex, or national origin. Section 106.001 relates to, but is independent of, the equal protection guarantees of the Texas Constitution.

42.     Section 106.001 fully applies to the use of racial preferences in education, including university admissions.  If it did not, the statute's exemption for "a public school official who is acting under a plan reasonably designed to end discriminatory school practices" would be unnecessary.  The use of racial preferences in admissions to promote "diversity" is not a plan reasonably designed to end discriminatory school practices. UT Austin is not using race as part of a desegregation plan.

43.     Any discrimination on the basis of race, including in university admissions, violates Section 106.001. Discrimination "because of a person's race" occurs when the decision-maker treats some people less favorably on that basis.  UT Austin treats some applicants for admission less favorably because of their race.   Section 106.001 does not exempt from its statutory prohibition the use of racial preferences in admissions to promote "diversity."   Otherwise, the statute's proviso that it "does not prohibit the adoption of a program designed to increase the participation of businesses owned and controlled by women, minorities, or disadvantaged persons in public contract awards" would be unnecessary.

44.     By using race as a factor in admissions to the detriment of some applicants, Defendants are: (1) "refus[ing] to permit" non-preferred applicants to "participate in a program owned, operated, or managed by or on behalf of the state"; (2) "refus[ing] to grant a benefit to" non-preferred applicants; and (3) "impos[ing] an unreasonable burden" on non-preferred applicants because of their race.

45.     Defendants have acted outside of their authority by using race as a factor in admissions at UT Austin.  This failure to comply with their constitutional and statutory duties is causing and will continue to cause constitutional and statutory harm to SFFA and its members. SFFA and its members have suffered and will continue to suffer irreparable harm due to the acts and omissions of Defendants in violating Texas constitutional and statutory law.  The use of race as a factor in the admissions process at UT Austin causes certain applicants to be treated less favorably than other applicants based on their race.  The harm to non-favored applicants, which includes members of SFFA, is irreparable absent injunctive relief enjoining Defendants from using race as a factor in admissions.

46.     SFFA and its members have no adequate remedy at law for Defendants' failure to comply with their constitutional and statutory duties not to use race as a factor in admissions.  No award of damages or other legal remedy will compensate applicants, including members of SFFA, from being denied equal treatment on the basis of race that Texas law guarantees them.  SFFA thus is entitled to permanent injunctive relief enjoining Defendants from using race as a factor in admissions decisions at UT Austin and from allowing any person employed by UT Austin to use race as a factor in admissions decisions at UT Austin.  This relief is necessary to ensure that Defendants no longer illegally discriminate against applicants, including members of SFFA, on the basis of race.

47.     SFFA is entitled to mandatory injunctive relief to require Defendants to conduct the admissions decision process at UT Austin in a manner that does not permit those engaged in that process to be aware of or learn the race or ethnicity of any applicant for admission to UT Austin.  This relief is necessary to ensure that Defendants no longer illegally discriminate against applicants, including members of SFFA, on the basis of race.

48.     Because Defendants are not complying with Texas law, SFFA has hired counsel to prepare, file, and prosecute this cause and pursue SFFA's legal remedies. SFFA requests this Court award SFFA its reasonable attorneys' fees incurred in this cause and costs of court under Texas Civil Practice and Remedies Code section 106.002.

## REQUEST FOR PERMANENT INJUNCTION

49.     SFFA asks the Court to set its request for a permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against Defendants.

EXHIBIT F, PAGE 19

## CONDITIONS PRECEDENT

50.     All conditions precedent to Plaintiff's claim for relief have been performed or have occurred.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Students for Fair Admissions, Inc. respectfully requests the following relief:

a.     That Defendants the University of Texas at Austin, James B. Milliken, Gregory L. Fenves, David J. Beck, Christina Melton Crain, Kevin P. Eltife, R. Steven Hicks, Jodie Lee Jiles, Janiece Longoria, Nolan Perez, Kelcy L. Warren, and James Conrad Weaver be cited to appear and answer herein;

b.     That Defendants the University of Texas at Austin, James B. Milliken, Gregory L. Fenves, David J. Beck, Christina Melton Crain, Kevin P. Eltife, R. Steven Hicks, Jodie Lee Jiles, Janiece Longoria, Nolan Perez, Kelcy L. Warren, and James Conrad Weaver be permanently enjoined from using race as a factor in admissions decisions at the University of Texas at Austin;

c.     That Defendants the University of Texas at Austin, James B. Milliken, Gregory L. Fenves, David J. Beck, Christina Melton Crain, Kevin P. Eltife, R. Steven Hicks, Jodie Lee Jiles, Janiece Longoria, Nolan Perez, Kelcy L. Warren, and James Conrad Weaver be permanently enjoined from allowing any person employed by the University of Texas at Austin to use race as a factor in admissions decisions at the University of Texas at Austin;

d.     That Defendants the University of Texas at Austin, James B. Milliken, Gregory L. Fenves, David J. Beck, Christina Melton Crain, Kevin P. Eltife, R. Steven Hicks, Jodie Lee Jiles, Janiece Longoria, Nolan Perez, Kelcy L. Warren, and James Conrad Weaver be permanently mandatorily enjoined to conduct the admissions decision process at the University of Texas at

EXHIBIT F, PAGE 20

Austin in a manner that does not permit those engaged in the admissions decision process to be aware of or learn the race or ethnicity of any applicant for admission to the University of Texas at Austin;

e.     That Plaintiff Students for Fair Admissions, Inc. have judgment for its reasonable attorneys' fees incurred in this cause pursuant to Texas Civil Practice and Remedies Code section 106.002;

f.     That Plaintiff Students for Fair Admissions, Inc. be awarded court costs as otherwise provided by law;

g.     That Plaintiff Students for Fair Admissions, Inc. be awarded post-judgment interest as provided by law; and

h.     That Plaintiff Students for Fair Admissions, Inc. be awarded all other relief to which it may be entitled.

Respectfully submitted,

By: _____

Paul M. Terrill, III
State Bar No. 00785094
G. Alan Waldrop
State Bar No. 20685700
TERRILL & WALDROP
810 West 10th Street
Austin, Texas 78701
Tel (512) 474-9100
Fax (512) 474-9888
pterrill@terrillwaldrop.com
awaldrop@terrillwaldrop.com

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
(703) 243-9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA  02109
(617) 227-0548
patrick@consovoymccarthy.com

ATTORNEYS FOR PLAINTIFF STUDENTS FOR FAIR
ADMISSIONS, INC.

**VERIFICATION**

STATE OF _Maine_ §

COUNTY OF _Knox_ §                §

    Before me, the undersigned authority, on this day personally appeared Edward Blum, President of Students for Fair Admissions, Inc., who being sworn, on his oath stated that he has reviewed Plaintiff's Original Petition and Application for Permanent Injunction, that he is personally familiar with and has reviewed the sources of the factual statements contained in Plaintiff's Original Petition and Application for Permanent Injunction, that the factual statements are either within his personal knowledge or are contained in publicly available information, that the factual statements are either statements by the Defendants, statements contained in published judicial opinions, statements contained in materials published by the Defendants, or inferred from such statements, that based on those sources, his review of those sources and his investigation of facts based on those sources, the statements of fact in Plaintiff's Original Petition and Application for Permanent Injunction are true and correct.

 

Edward Blum
In his capacity as President of
Students for Fair Admissions, Inc.

Sworn to and subscribed before me on the _____ day of May, 2019, to certify which witness my hand and seal of office.

 

Notary Public in and for
the State of _Maine_
My commission expires: _12/30/2021_

PHILIP VERRILL
Notary Public
Maine
My Commission Expires Dec 30, 2021