# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

STUDENTS FOR FAIR ADMISSIONS, INC.,

        *Plaintiff*,

        v.

UNIVERSITY OF TEXAS AT AUSTIN, et al.,

        *Defendants*.

Case No. 1:20-cv-763-RP

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR DISMISSAL BASED ON LACK OF STANDING, RES JUDICATA, AND COLLATERAL ESTOPPEL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ii

INTRODUCTION.............................................................................................................................1

FACTUAL BACKGROUND .............................................................................................................3

    A.   Students for Fair Admissions ..........................................................................................3

    B.   SFFA's Litigation Against Harvard ................................................................................5

    C.   SFFA's Litigation Against the University of North Carolina at Chapel Hill ...........................8

    D.   The *Fisher* Litigation ....................................................................................................9

    E.   This Litigation ...............................................................................................................11

LEGAL STANDARD .......................................................................................................................12

ARGUMENT ...................................................................................................................................13

I.    SFFA has standing to bring its claims...........................................................................13

    A.   The indicia-of-membership test does not apply to voluntary membership organizations like SFFA. ...............................................................................................................14

    B.   SFFA has associational standing even if the Court extended the indicia-of-membership test to a voluntary membership organization like SFFA...........................................................23

II.   SFFA's claims are not barred by res judicata. ......................................................................32

    A.   SFFA is not identical to or in privity with Abigail Fisher. ..............................................32

    B.   This case and *Fisher* do not have the same claim or cause of action. ...................................35

III.  SFFA's claims are not barred by collateral estoppel.........................................................37

CONCLUSION ................................................................................................................................38

## TABLE OF AUTHORITIES

**CASES**

*AARP v. EEOC,*
226 F. Supp. 3d 7 (D.D.C. 2016) ........................................................................28

*Adams v. City of Indianapolis,*
742 F.3d 720 (7th Cir. 2014) ...........................................................................37

*Am. Legal Found. v. FCC,*
808 F.2d 84 (D.C. Cir. 1987) ...........................................................................29

*Am. Unites for Kids v. Rousseau,*
985 F.3d 1075 (9th Cir. 2021) ........................................................................30

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
627 F.3d 547 (5th Cir. 2010) ....................................................................14, 16

*Benson & Ford, Inc. v. Wanda Petroleum Co.,*
833 F.2d 1172 (5th Cir. 1987) ...................................................................33, 37

*Calif. Sportfishing Prot. All. v. Diablo Grande Inc.,*
209 F. Supp. 2d 1059 (E.D. Cal. 2002) ...........................................................18

*Carta v. Town of Fairfield,*
No. 91-2248, 1992 WL 69332 (1st Cir. Apr. 8, 1992) ......................................34

*Citizens Coal Council v. Matt Canestrale Contracting, Inc.,*
40 F. Supp. 3d 632 (W.D. Pa. 2014) ........................................23, 25, 27, 29

*Clyce v. Farley,*
836 F. App'x 262 (5th Cir. 2020) ....................................................................32

*Cullivan v. Kan. City S. R. Co.,*
No. 9-cv-685, 2010 WL 378433 (S.D. Ill. Jan. 27, 2010) ...............................24

*Dilworth v. Vance,*
95 F.3d 50 (5th Cir. 1996) ..............................................................................33

*Disability Rights Penn. v. Pa. Dep't of Human Servs.,*
2020 WL 1491186 (M.D. Pa. 2020) ................................................................23

*Extreme Lashes, LLC v. Extended Beauty, Inc.,*
576 F.3d 221 (5th Cir. 2009) ..........................................................................12

*Familias Unidas, an Unincorporated Ass'n v. Briscoe,*
619 F.2d 391 (5th Cir. 1980) .....................................................................16, 20

*Fisher v. Univ. of Tex. at Austin ("Fisher II"),*
136 S. Ct. 2198 (2016) ............................................................................. *passim*

*Fisher v. Univ. of Tex. at Austin,*
631 F.3d 213 (5th Cir. 2011) ..........................................................................36

*Fisher v. Univ. of Texas at Austin* ("*Fisher I*"),
570 U.S. 297 (2013) ........................................................................................3, 9

*Flyers Rights Educ. Fund, Inc. v. U.S. Dep't of Transp.*,
957 F.3d 1359 (D.C. Cir. 2020) ....................................................................23, 27

*Friends of the Earth, Inc. v. Chevron Chem. Co.*,
129 F.3d 826 (5th Cir. 1997) ............................................................................ *passim*

*Fund Democracy, LLC v. SEC*,
278 F.3d 21 (D.D.C. 2002) ....................................................................................24

*Funeral Consumers All., Inc. v. Service Corp. Int'l*,
695 F.3d 330 (5th Cir. 2012) ................................................................................23

*Gay-Straight All. of Okeechobee High Sch. v. Sch. Bd. of Okeechobee Cty.*,
477 F. Supp. 2d 1246 (S.D. Fla. 2007) ................................................................20

*Gratz v. Bollinger*,
539 U.S. 244 (2003) ..............................................................................................13

*Gray v. Lacke*,
885 F.2d 399 (7th Cir. 1989) ................................................................................34

*Grutter v. Bollinger*,
539 U.S. 306 (2003) ..........................................................................................9, 36

*Gulf Restoration Network v. Salazar*,
683 F.3d 15 (5th Cir. 2012) ..................................................................................16

*Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*,
434 F.3d 320 (5th Cir. 2005) ................................................................................37

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ..............................................................................................19

*Howard v. City of Coos Bay*,
871 F.3d 1032 (9th Cir. 2017) ..............................................................................36

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ............................................................................................ *passim*

*In re Hinsley*,
149 F.3d 1179 (5th Cir. 1998) .........................................................................32, 33

*Insuremax Ins. Agencies, Inc. v. Shanze Enters., Inc.*,
No. 13-cv-1231, 2013 WL 4014476 (N.D. Tex. Aug. 7, 2013) ............................35

*Jadlowe v. Town of Dartmouth*,
No. 5-cv-10516, 2006 WL 8458383 (D. Mass. Mar. 3, 2006) ..............................34

*Mayorga Santamaria ex rel. Doe Child. 1-3 v. Dallas Indep. Sch. Dist.*,
2006 WL 3350194 (N.D. Tex. Nov. 16, 2006) ....................................................20

*Meza v. Gen. Battery Corp.*,
908 F.2d 1262 (5th Cir. 1990) .........................................................................32, 33

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*,
   565 F.3d 683 (10th Cir. 2009) ................................................................................28

*NAACP v. Ala. ex rel. Patterson*,
   357 U.S. 449 (1958).........................................................................................21, 22

*NAACP v. Fordice*,
   105 F.3d 655 (5th Cir. 1996) ...............................................................................33

*Or. Advoc. Ctr. v. Mink*,
   322 F.3d 1101 (9th Cir. 2003) ........................................................................26, 27

*Package Shop, Inc. v. Anheuser-Busch, Inc.*,
   No. 83-cv-513, 1984 WL 6618 (D.N.J. Sept. 25, 1984) ......................................25

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007)..............................................................................................16

*Petro-Hunt, LLC v. United States*,
   365 F.3d 385 (5th Cir. 2004) .....................................................................35, 36, 38

*Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*,
   906 F.2d 25 (1st Cir. 1990) ..................................................................................30

*Pub. Int. Grp. of N.J., Inc. v. Magnesium Elektron, Inc. ("PIRG")*,
   123 F.3d 111 (3d Cir. 1997)..................................................................................18

*SFFA v. President & Fellows of Harvard Coll. (Harvard Corp.)*,
   261 F. Supp. 3d 99 (D. Mass. 2017) ............................................................. *passim*

*SFFA v. President & Fellows of Harvard Coll. (Harvard Corp.)*,
   397 F. Supp. 3d 126 (D. Mass. 2019)....................................................................7

*SFFA v. President & Fellows of Harvard Coll.*,
   346 F. Supp. 3d 174 (D. Mass. 2018) ...............................................................7, 12

*SFFA v. Univ. of N.C.*,
   No. 14-cv-954, 2018 WL 4688388 (M.D.N.C. Sept. 29, 2018)....................... *passim*

*SFFA v. Univ. of N.C.*,
   No. 14-cv-954, 2019 WL 4773908 (M.D.N.C. Sept. 30, 2019) ............................9

*SFFA v. Univ. of Tex. at Austin*,
   No. D-1-GN-17-2930 .............................................................................................11

*Sierra Club v. Glickman*,
   82 F.3d 106 (5th Cir. 1996)...................................................................................30

*Sierra Club v. U.S. Army Corps of Engn'rs*,
   482 F. Supp. 3d 543 (W.D. Tex. 2020) ................................................................17

*Sierra Forest Legacy v. Sherman*,
   646 F.3d 1161 (9th Cir. 2011) ..............................................................................28

*Speech First, Inc. v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) ................................................................................16

*Stratta v. Roe*,
  961 F.3d 340 (5th Cir. 2020) ................................................................................. 12, 13

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ..................................................................................... 15, 16, 23

*Sylvia's Haven, Inc. v. Mass. Dev. Fin.*,
  397 F. Supp. 2d 202 (D. Mass. 2005) ............................................................................. 26

*Taylor v. Sturgell*,
  553 U.S. 880 (2008) ............................................................................................. 33

*Test Masters Educ. Servs., Inc. v. Singh*,
  428 F.3d 559 (5th Cir. 2005) ......................................................................... 2, 32, 36

*Texas LULAC v. Abbott*,
  --- F. Supp. 3d ---, 2020 WL 5995969 (W.D. Tex. Oct. 9, 2020) ........................... 1, 16, 17

*UAW v. Brock*,
  477 U.S. 274 (1986) ............................................................................................... 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ............................................................................................... 19

*Wash. Legal Found. v. Leavitt ("WLF")*,
  477 F. Supp. 2d 202 (D.D.C. 2007) ......................................................................... 24, 25

*White v. Fox*,
  576 F. App'x 327 (5th Cir. 2014) ............................................................................. 32

*Williams v. Reeves*,
  954 F.3d 729 (5th Cir. 2020) ..................................................................................... 13

## STATUTES

Va. Code Ann. §13.1-823 ............................................................................................. 19

Va. Code Ann. §13.1-828 ............................................................................................. 19

Va. Code Ann. §13.1-837 ............................................................................................. 19

Va. Code Ann. §13.1-845 ............................................................................................. 19

Va. Code Ann. §13.1-846 ............................................................................................. 22

Va. Code Ann. §13.1-861 ............................................................................................. 19

Va. Code Ann. §13.1-933 ............................................................................................. 21

Va. Code Ann. §13.1-934 ............................................................................................. 21

## OTHER AUTHORITIES

18A Fed. Prac. & Proc. Juris. §4460 (3d ed.) ....................................................................... 34

Ann E. Carlson, *Standing for the Environment*, 45 UCLA L. Rev. 931 (1998) ....................................... 28, 29

Barbara McQuade, *Ruth Bader Ginsburg's Life and Work Propelled Women's Equality Front and
  Center*, USA Today (Sept. 18, 2020) ............................................................................... 35

Brad Knickerbocker, *A 'Hostile' Takeover Bid at the Sierra Club*, Christian Sci. Monitor (Feb. 20, 2004) ............................................................................................................................28

Brief for the State of Texas as Amicus Curiae in Support of Certiorari, *SFFA v. President & Fellows of Harvard Coll.*, No. 20-1199 (S. Ct. Mar. 30, 2021) ...................................................8

*Brown v. Board of Education; Celebrating the 66th Anniversary of LDF's Seminal Case*, LDF .......................35

*Hundreds Gather for Dueling Rallies Ahead of Trial Challenging Harvard Admissions*, The Harvard Crimson (Oct. 15, 2018) ..........................................................................................................31

NAACP 2018 Annual Report.....................................................................................................................26

Bylaws Of The Wilderness Society .............................................................................................................28

Restatement (2d) of Judgments §59 (1982) ...............................................................................................34

Shawn L. Alexander, *An Army of Lions: The Civil Rights Struggle Before the NAACP* (2012)....................26

Sierra Club 2019 Annual Report ................................................................................................................26

**RULES**

Fed. R. Civ. P. 56 ............................................................................................................................... 12, 34

## INTRODUCTION

Students for Fair Admissions' associational standing is not complicated. Indeed, multiple federal courts have concluded that SFFA has associational standing in similar actions because SFFA meets the familiar three-part test under *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977). *See SFFA v. Harvard*, 980 F.3d 157, 182-84 (1st Cir. 2020) (affirming *SFFA v. Harvard*, 261 F. Supp. 3d 99, 103-11 (D. Mass. 2017)); *SFFA v. Univ. of N.C.*, No. 14-cv-954, 2018 WL 4688388, at *3-6 (M.D.N.C. Sept. 29, 2018). SFFA's members "have standing to sue in their own right" because UT denied them the opportunity to compete for admission on an equal basis and SFFA's members are ready and able to apply as a transfer student should UT cease to use race in undergraduate admissions. *Hunt*, 432 U.S. at 343. This lawsuit is "germane to [SFFA's] purpose" of ending the use of race-based admissions in college admissions. *Id.* And this case does not "require[] the participation of individual members" because SFFA seeks only declaratory and injunctive relief. *Id.*

UT does not dispute that SFFA satisfies the three *Hunt* factors for associational standing. Yet it seeks to impose an *additional* threshold inquiry—that SFFA's members must have "indicia of membership." But as this Court has recognized, the indicia-of-membership test "is not a requirement for traditional membership organizations." *Texas LULAC v. Abbott*, --- F. Supp. 3d ---, 2020 WL 5995969, at *11 (W.D. Tex. Oct. 9, 2020) (Pitman, J.). And this Court is not alone. There have been "decades of decisions since *Hunt* that have not applied the indicia of membership test to organizations which, on their face, are voluntary membership organizations." *Harvard*, 980 F.3d at 184. That is why three courts already have rejected nearly identical challenges to SFFA's standing. *Id.* at 182-84; *Univ. of N.C.*, 2018 WL 4688388, at *3-6;  *Harvard*, 261 F. Supp. 3d 99, 103-11.

Undeterred, UT seeks to distinguish *Harvard* and *UNC* by proposing a *new* test for associational standing—one that Harvard, UNC, and three federal courts all somehow missed. According to UT, a membership organization must show indicia of membership unless it has "statutory members" under

the state law in which it is incorporated. But *no court* has ever imposed this test. Instead, the Supreme Court, the Fifth Circuit, and this Court regularly find associational standing without ever conducting the formalistic inquiry that UT demands.

Yet SFFA's members have "indicia of membership" even under UT's test.  SFFA's Standing Members "testified in [their deposition and through declarations] that they [are] members of [SFFA]" and that SFFA is acting on their behalf. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997). SFFA has a "clearly articulated and understandable membership structure," *id.*, under which the Standing Members qualify as members. The Standing Members "voluntarily associated themselves with [SFFA], in contrast to the apple growers" in *Hunt. Id.* This lawsuit "clearly is within [SFFA's] central purpose, and thus within the scope of reasons that [the Standing Members] joined the organization." *Id.* SFFA's members "finance [SFFA's] activities" through membership dues and other donations. *Id.* And SFFA's members directly "elect[] the governing body of the organization" through a member-elected board of director. *Id.* Nothing more is necessary.

SFFA's claims also are not barred by res judicata because of the *Fisher* litigation. SFFA—a 501(c)(3) membership organization that did not exist until 2014—is neither "identical" to nor in "privity" with Abigail Fisher, a former Texas student who sued UT when it denied her admission in 2008. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005). Nor are the operative facts "the same" today as they were 13 years ago when Ms. Fisher filed her lawsuit. *Id.* UT's argument that SFFA's claims are barred by collateral estoppel fails for similar reasons.

At bottom, it is clear that UT thinks that its race-based admissions policies are immune from review because it prevailed in *Fisher II*. Quite the opposite. The Supreme Court in *Fisher II* emphasized that it was reviewing the UT admissions policy in place in 2008, and it openly invited a future challenge. The Court stressed that its "affirmance of [UT's] admissions policy today does not necessarily mean the University may rely on that same policy without refinement," that UT has an "ongoing obligation

to engage in constant deliberation and continued reflection regarding its admissions policies," and that UT must "tailor its approach in light of changing circumstances, ensuring that race plays no greater role than is necessary to meet its compelling interest." *Fisher v. Univ. of Tex. at Austin* ("*Fisher II*"), 136 S. Ct. 2198, 2210, 2215 (2016). After all, the racial distinctions that UT is making "'are by their very nature odious to a free people'" and so must "'be subjected to the most rigid scrutiny.'" *Fisher v. Univ. of Tex. at Austin* ("*Fisher I*"), 570 U.S. 297, 309-10 (2013). SFFA has standing, its claims are not barred, and this case must go forward.

## FACTUAL BACKGROUND

### A.    Students for Fair Admissions

In early 2014, a group of individuals formed a membership organization dedicated to ending "the use of race in higher education" admissions. Ex. A at 34:16-35:17 (Blum UNC Depo.).[1] These individuals believed that "[m]embership organizations have a source of energy that think tanks and legal advocacy groups just don't have." *Id.* at 36:19-21. But there was "no membership organization" opposing race-based classifications in college admissions "where people could say I am a member of this group, much like I would be a member of the Sierra Club or the ACLU." *Id.* at 36:1-11. They named their new association Students for Fair Admissions ("SFFA"), *id.* at 36:12-15, and their goal was to "[e]ducate the American public about the unfair and unconstitutional uses of race by educational institutions in their admissions policies" through "[s]peeches, debates, forums, one-on-one outreach, media communications," and "litigation." *Id.* at 57:10-58:1.

On July 30, 2014, SFFA incorporated as a Virginia nonprofit corporation. Ex. F at SFFA-UT 000005 (Articles of Incorporation). SFFA's stated mission is "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any

---

[1] All Exhibit citations refer to the Exhibits referenced in and attached to the Connolly declaration.

other lawful means." Ex. G at SFFA-UT 000017 (Original Bylaws). SFFA's Bylaws set forth its membership policies, organizational structure, and leadership positions, including a board of directors and president. *Id.* at SFFA-UT 000017-21. SFFA applied to be a 501(c)(3) nonprofit organization, describing itself as "a coalition of prospective applicants and applicants to higher education institutions who were denied admission to higher education institutions, their family members, and other individuals who support the organization's purpose and mission of eliminating racial discrimination in higher education admissions." Ex. J at SFFA-UT 000094 (501(c)(3) application). The IRS approved SFFA's application. Ex. H (IRS Approval of 501(c)(3)).

SFFA's membership is open to "[a]ny individual who seeks to support the purposes and mission of [SFFA]" subject to "any additional standards that may be set from time to time by the Board of Directors." Ex. G at SFFA-UT 000017-18 (Original Bylaws). In the beginning, individuals could join through SFFA's website or by otherwise expressing an intent to join. Ex. S at 10 (SFFA Responses to Interrogatories). No membership fee was required, as the Board wanted to reduce barriers to joining the organization in its infancy. *Id.*; Ex. A at 72:1-5 (Blum UNC Depo.); Ex. I at SFFA-UT 000045-46 (Amended Bylaws).

Membership in the organization grew steadily as news of SFFA's activities spread. Ex. S at 10 (SFFA Responses to Interrogatories). By June 1, 2015, the organization's membership had grown to approximately 350 people. *Id.* In early June 2015, after Mr. Blum spoke to several Asian-American groups in California, New York, and Texas, interest in the organization grew dramatically; thousands of people joined the organization during the first week of June 2015 alone. *Id.*

As interest in SFFA increased and the association matured, SFFA amended its Bylaws to account for the rapid growth. Ex. I at SFFA-UT 000045-46 (Amended Bylaws); Ex. S at 10 (SFFA Responses to Interrogatories). To give its members "a direct voice in [its] decision-making, including the management and direction of ongoing litigation," SFFA increased the size of the Board of

Directors to five and empowered its members to directly elect one of those directors. Ex. I at SFFA-UT 000045-46, 000053 (Amended Bylaws). Since then, SFFA's members have elected three different individuals to the Board of Directors: Joe Zhou (2015), Alex Chen (2017), and Hua "Eva" Guo (2019). Ex. S at 6 (SFFA Responses to Interrogatories). In addition, SFFA now offers membership to "[a]ny individual who . . . pays membership dues as may be prescribed by the Board of Directors." Ex. I at SFFA-UT 000052-53 (Amended Bylaws). The Board voted to require new members to pay a membership fee of $10 as of July 30, 2015. *Id.* at SFFA-UT 000046. Since then, thousands of individuals have paid the membership fee and become members of SFFA. *See* Ex. K at SFFA-UT 000256 (SFFA 2018 Form 990); Dkt 45-14 at SFFA-UT 000296 (SFFA 2019 Form 990); Dkt 45-15 at 4 (SFFA Responses to State Court Interrogatories).

### B.    SFFA's Litigation Against Harvard

In November 2014, SFFA sued Harvard University under Title VI of the Civil Rights Act. *See SFFA v. President & Fellows of Harvard Coll. (Harvard Corp.)*, No. 14-cv-14176 (D. Mass.) (Dkt. 1). SFFA alleged that Harvard violates Title VI in six ways: intentionally discriminating against Asian Americans; using racial balancing; failing to use race merely as a "plus" factor in admissions decisions; failing to use race merely to fill the last "few places" in the incoming freshman class; using race where there are available and workable race-neutral alternatives; and using race as a factor in admissions. *Id.* SFFA sued on behalf of its members, including Asian-American students who were denied admission to Harvard and who stand ready and able to apply to transfer if Harvard stops racially discriminating. *Id.*

A testament to its lawyers' creativity, Harvard concocted an unusual challenge to SFFA's standing. Harvard moved to dismiss for lack of standing under Rule 12(b)(1) on the ground that SFFA's members "play no meaningful role in the organization and thus SFFA does not genuinely represent them such that it has associational standing to sue on their behalf." *Harvard*, 261 F. Supp. 3d at 106. Harvard argued that SFFA lacked standing unless its members "exhibit[ed] 'indicia of

membership.'" *Id.* (quoting *Hunt*, 432 U.S. at 344). Judge Allison Burroughs denied Harvard's motion. The court found that the indicia-of-membership test did not apply to voluntary membership organizations like SFFA. *Id.* at 106-111. Associational standing did not "turn on a subjective evaluation of whether 'members' are 'genuine' members or not, with the organization's view of its own members being only one factor in the analysis." *Id.* at 107. "Where SFFA has clearly stated its mission in its Bylaws and website, where it has consistently, and recently, in highly public ways, pursued efforts to end alleged racial discrimination in college admissions through litigation, and where its members voluntarily associate themselves with the organization, it can be presumed for the purposes of standing that SFFA adequately represents the interests of its current members without needing to test this further based on the indicia-of-membership factors." *Id.* at 109. Examining the three *Hunt* factors, the Court concluded that SFFA had associational standing to pursue its claims. *Id.* at 109-11.

Moreover, even if it were to consider certain indicia-of-membership factors, the court found it indisputable that SFFA adequately represented the interests of its members. *Id.* at 110-11. Based on the record evidence, the district court found that:

- "A substantial part of SFFA's mission is to end race-based admissions policies at American universities."

- "SFFA clearly communicated its mission, which has stayed consistent since its founding, to prospective members through its website and in its outreach efforts."

- "SFFA's endeavors—both here and in North Carolina—are highly public."

- "SFFA's members voluntarily join the organization, presumably knowing its purpose, by providing their name and contact information and paying a small fee."

- "The Bylaws plainly lay out who qualifies as a member and what a member's role is and permit members to vote for one member of the Board of Directors, who participates in Board decisions, thereby granting members more direct access to SFFA's management."

- "[T]o support the organization, members can voluntarily donate funds, in addition to the one-time, ten dollar contribution (required since June 2015) as a way of influencing the organization."

- "SFFA has submitted declarations of certain members whom it specifically identifies for standing purposes. . . . [These] declarations, which show that SFFA

leadership communicates with members about this litigation and that the Standing Members have given input concerning the case, further bolster SFFA's claim that it is representing the interests of its members."

- "[T]he Standing Members each stated that . . . SFFA does in fact represent their interests."

*Id.* All these factors made clear that SFFA is "representing the interests of its members" and thus had "the associational standing necessary to pursue this litigation." *Id.* at 111.[2]

In October 2018, Judge Burroughs held a three-week bench trial on SFFA's claims. At trial, SFFA presented evidence that Harvard was discriminating against Asian Americans, used race as more than a "plus" factor, engaged in racial balancing, and failed to employ race-neutral alternatives. Judge Burroughs disagreed and ruled for Harvard. *SFFA v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 397 F. Supp. 3d 126 (D. Mass. 2019). Judge Burroughs also held—for the third time—that SFFA had standing to pursue its claims. *Id.* at 183-84.

The First Circuit affirmed. Like Judge Burroughs, the First Circuit found that "SFFA has standing to bring this suit." *Harvard*, 980 F.3d at 182-84. The First Circuit rejected Harvard's argument that "SFFA lacks standing because it is not a 'genuine' membership organization." *Id.* at 183. Because SFFA "is, on its face, a traditional voluntary membership organization, the indicia of membership test is inapplicable." *Id.* When SFFA's suit was filed, it was a "validly incorporated 501(c)(3) nonprofit with forty-seven members who joined voluntarily to support its mission." *Id.* at 184. These basic facts, as well as SFFA's bylaws and membership structure, were "sufficient to conclude that SFFA is a valid membership organization" that had "associational standing to pursue its claims." *Id.* The First Circuit affirmed the district court's ruling on the merits of SFFA's claims. *Id.* at 184-204.

---

[2] A year later, Judge Burroughs reached the same conclusions when she denied Harvard's motion for summary judgment. *See SFFA v. President & Fellows of Harvard Coll.*, 346 F. Supp. 3d 174, 190-92 (D. Mass. 2018).

On February 25, 2021, SFFA filed a petition for certiorari with the Supreme Court of the United States. *See SFFA v. President & Fellows of Harvard Coll.*, No. 20-1199 (S. Ct.), bit.ly/2PKVNnk. Eighteen amicus briefs were filed in support of SFFA's petition, including from Asian-American organizations, a coalition of States, former federal civil rights officials, and other interested parties. *See id.* Notably, the State of Texas filed an amicus brief urging the Court to overrule its decision in *Grutter v. Bollinger* and to prohibit racial preferences in higher education. *See* Brief for the State of Texas as Amicus Curiae in Support of Certiorari, *SFFA v. President & Fellows of Harvard Coll.*, No. 20-1199 (S. Ct. Mar. 30, 2021), bit.ly/3rIDOuZ. The State of Texas wrote: "Today, the University [of Texas's] admissions practices stand as a testament to failures by this Court and lower courts to enforce *Grutter*'s admonition that 'race-conscious admissions policies must be limited in time.' . . . [T]he zeal with which the University of Texas has embraced systematic racial discrimination in admissions illustrates how elite universities will not stop discriminating based on race without this Court's intervention." *Id.* at 15. A decision from the Supreme Court on SFFA's petition is expected in May or June.

### C.   SFFA's Litigation Against the University of North Carolina at Chapel Hill

SFFA sued the University of North Carolina at Chapel Hill on the same day it sued Harvard. SFFA brought three claims under Title VI of the Civil Rights Act and Sections 1981 and 1983. *SFFA v. Univ. of N.C.*, No. 14-cv-954 (M.D.N.C.) (Dkt. 1). SFFA alleged that UNC violates federal law by failing to use race merely as a "plus" factor in admissions decisions; using race where there are available and workable race-neutral alternatives; and using race as a factor in admissions. *Id.* SFFA sued on behalf of its members, including white students who were denied admission to UNC and who stand ready and able to apply to transfer if UNC stops racially discriminating. *Id.*

Like Harvard, UNC moved to dismiss for lack of standing under Rule 12(b)(1), arguing that "SFFA's members lack indicia of membership in an organization" and so "SFFA cannot clear the threshold hurdle of eligibility for representational standing." *UNC*, 2018 WL 4688388, at *3. Judge

Loretta Biggs disagreed, holding that "the indicia-of-membership test does not apply to voluntary membership associations like SFFA." *Id.* at *3 (cleaned up). UNC "cite[d] no cases where the indicia-of-membership test was applied to a voluntary membership organization like SFFA," and the Court was "not aware of any case that explicitly stands for this proposition." *Id.* at *4 (citation omitted). Moreover, "even if such a test applies, 'SFFA would easily satisfy it.'" *Id.* Because SFFA "satisfied the [three] requirements necessary for associational standing, . . . SFFA has standing to sue on behalf of its members." *Id.* at *6; *see also SFFA v. Univ. of N.C.*, No. 14-cv-954, 2019 WL 4773908, at *5 n.9 (M.D.N.C. Sept. 30, 2019) (holding at summary judgment that its prior standing holding "shall 'continue to govern' . . . in subsequent stages in this case"). In November 2020,[3] Judge Biggs held a two-week bench trial. A ruling on the merits of SFFA's claims is expected soon.

D.     The *Fisher* Litigation

In June 2016, the U.S. Supreme Court issued its second decision in the *Fisher* case. *See Fisher II*, 136 S. Ct. 2198. In that case, Abigail Fisher sued UT after the university denied her admission for the class entering in the Fall of 2008. Ms. Fisher claimed that UT discriminated against her on the basis of race in violation of her right to equal protection under the Fourteenth Amendment and federal civil rights statutes. She did not seek to overrule the Supreme Court's decision in *Grutter v. Bollinger*, 539 U.S. 306 (2003). *See Fisher I*, 570 U.S. at 303. The Supreme Court held that UT's use of racial classifications and admissions preferences—as implemented in 2008—satisfied strict scrutiny. *Fisher II*, 136 S. Ct. at 2208-15.

Although it rejected Ms. Fisher's 2008 claims, the Supreme Court warned that "[t]he Court's affirmance of the University's admissions policy today does not necessarily mean the University may

---

[3] SFFA's case against UNC was stayed from October 2015 through August 2016 after the Supreme Court granted certiorari in *Fisher II*, *see SFFA v. Univ. of N.C.*, No. 14-cv-954 (Dkts. 65, 72), and the trial was further delayed due to COVID-19, *see id.* (Dkt. 206).

rely on that same policy without refinement." *Id.* at 2215. UT has an "ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies." *Id.* In particular, the Court stressed that "studies undertaken over the eight years since" 2008, when Ms. Fisher applied to UT, "may be of significant value in determining the constitutionality of the University's current admissions policy." *Id.* at 2209. Unlike the record before the Court, which was "almost devoid of information about the students who secured admission to the University through the [Top Ten Percent] Plan," future courts would be able to assess "how students admitted solely based on their class rank differ in their contribution to diversity from students admitted through holistic review." *Id.*

Thus, the Court cautioned, "[t]he type of data collected [since 2008], and the manner in which it is considered, will have a significant bearing on how [UT] must shape its admissions policy to satisfy strict scrutiny in the years to come." *Id.* at 2210. UT's admissions policies would survive strict scrutiny only if the university "tailor[ed] its approach in light of changing circumstances, ensuring that race plays no greater role than is necessary to meet its compelling interest," and only if the university used the "valuable data" it collected to "scrutinize the fairness of its admissions program; to assess whether changing demographics have undermined the need for a race-conscious policy; and to identify the effects, both positive and negative, of the affirmative-action measures it deems necessary." *Id.* at 2210, 2214-15.[4]

---

[4] The plaintiffs' legal fees in *Fisher* were paid for by the Project on Fair Representation ("POFR"). POFR is a nonprofit legal defense foundation that supports "the facilitation of pro bono legal representation to individuals and entities that wish to challenge government distinctions and preferences made." Ex. O at 1 (POFR 2018 Form 990); Ex. C at 23:1-24:20 (Blum UT Depo.). POFR is not a parent, subsidiary, or affiliate of SFFA. Ex. S at 18 (SFFA Responses to Interrogatories). Although Edward Blum serves as an officer for both entities, SFFA is governed by different bylaws and articles of incorporation, has a different board of directors, and is a membership organization. *Id.*

### E.        This Litigation

On July 20, 2020, SFFA sued UT for racial discrimination in its admissions process.[5] In its amended complaint, SFFA alleges, among other things, that "[t]hings have changed dramatically since 2008 when Abigail Fisher was rejected by UT-Austin." Am. Compl. ¶99. For example, there has been "a steady increase in racial diversity since 2008." *Id.* ¶100. Whereas "the majority of those admitted to UT-Austin [in 2008] (51%) were white," in 2018, "barely a third of those admitted to UT-Austin (36%) were white." *Id.* ¶¶101-02. Because the "race-neutral Top Ten Percent Plan has driven this increased diversity," UT has "a ready-made formula for achieving racial diversity—maintain or increase the use of the Top Ten Percent Plan and admit the rest through race-neutral means." *Id.* ¶¶103, 111. In addition, new evidence shows that UT has been "racially balanc[ing] its entering freshman class to ensure a specific proportional representation of African-American students." *Id.* ¶168. Since 2008, UT's "admitted class was 5% African American in *nine out of the past ten years*." *Id.* ¶171. UT has also *increased* its reliance on race after *Fisher II. Id.* ¶98. From 2008 through 2017, UT publicly reported that "racial/ethnic status" was a factor that was merely "considered" in the admissions process. *Id.* ¶97. But in 2018, two years after *Fisher II*, UT began reporting that an applicant's "racial/ethnic status" is now a "very important" factor in UT's admissions decisions. *Id.* ¶98. Simply put, UT's admissions policies—as implemented today—cannot survive strict scrutiny. *Id.* ¶¶198-244.

SFFA's amended complaint alleges that UT violates Title VI of the Civil Rights Act and Sections 1981 and 1983 in four ways: by failing to use race merely as a "plus" factor in admissions

---

[5] SFFA previously filed two lawsuits against UT in state court. In the first case, the court found that SFFA's standing member, who was a music major, was evaluated on music factors and so race played no role in the decision to deny her admission to UT. *See SFFA v. Univ. of Tex. at Austin*, No. D-1-GN-17-2930 (Dec. 28, 2018). The court dismissed the case because the standing member lacked standing to sue in her own right. *See id.*; Dkt. 45-4. UT does not dispute that the Standing Members here have standing to sue in their own right. *See* UT Mot. 15-24. SFFA's second case in state court was nonsuited without prejudice after minimal discovery and before any dispositive motions were filed. *See* Dkt. 45-7.

decisions; using race where there are available and workable race-neutral alternatives; engaging in racial balancing; and using race as a factor in admissions. *Id.* SFFA is suing on behalf of its members, including two white students who were denied admission to UT and who are ready and able to apply to transfer if UT stops racially discriminating. *Id.* ¶¶3-8; Ex. P at ¶¶4-7, 9-11 (Blum Dec.); Ex. Q at ¶¶3-6 (Standing Member 1 Dec.); Ex. R at ¶¶3-6 (Standing Member 2 Dec.); Connolly Dec. ¶¶ 20-21; Ex. D at 106:9-12 (Standing Member 1 Depo.); Ex. E at 42:3-10, 72:2-5 (Standing Member 2 Depo.).[6] Neither standing member had anything to do with the *Fisher* litigation (they were in elementary school). Nor did SFFA (which didn't exist when the *Fisher* complaint was filed).

After UT answered SFFA's complaint, SFFA and the Standing Members were deposed and SFFA produced documents and responded to interrogatories. On March 8, 2021, UT moved for summary judgment or dismissal based on lack of standing, res judicata, and collateral estoppel. Defendant-Intervenors also moved to dismiss for lack of standing. Pursuant to the Court's Scheduling Order, *see* Dkt. 33 at 2-4, SFFA has not yet conducted any discovery into the merits of its claims.

## LEGAL STANDARD

Summary judgment is proper only if the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court is "obliged to construe all the evidence and reasonable inferences deduced therefrom in a light most favorable to [SFFA], the nonmoving party." *Extreme Lashes, LLC v. Extended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009) (citation omitted).

When reviewing a 12(b)(1) motion to dismiss, the Court must "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Stratta*

---

[6] As in the *Harvard* and *UNC* cases, SFFA anticipates that it will identify more standing members as this case progresses and UT continues to deny admission to SFFA's members. *See, e.g.*, *Harvard*, 346 F. Supp. 3d at 192 n.15 (discussing "the seven new Standing Members identified by SFFA" as the case progressed); Ex. S at 4 (SFFA Responses to Interrogatories).

*v. Roe*, 961 F.3d 340, 349 (5th Cir. 2020). Dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) is proper only if "it appears certain that the plaintiff cannot prove any set of facts in support of [its] claim that would entitle [it] to relief." *Williams v. Reeves*, 954 F.3d 729, 734 (5th Cir. 2020) (citation omitted).

## ARGUMENT

### I.      SFFA has standing to bring its claims.

A membership association has Article III standing if it satisfies three requirements: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). UT does not dispute that SFFA satisfies these requirements. Nor could it.

First, SFFA's members have standing to sue in their own right because UT denied them "the opportunity to compete for admission on an equal basis," and SFFA has "demonstrated that [its members are] 'able and ready' to apply as a transfer student should [UT] cease to use race in undergraduate admissions." *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003); *see* Am. Compl. ¶¶3-8, 86-175, 198-244; Ex. P at ¶¶4-7, 9-11 (Blum Dec.); Ex. Q at ¶¶3-6 (Standing Member 1 Dec.); Ex. R at ¶¶3-6 (Standing Member 2 Dec.); Ex. D at 106:9-12 (Standing Member 1 Depo.); Ex. E at 42:3-10, 72:2-5 (Standing Member 2 Depo.); *accord Harvard*, 980 F.3d at 183-84; *Harvard*, 261 F. Supp. 3d at 109-11; *UNC*, 2018 WL 4688388, at *5-6. Second, this lawsuit is germane to SFFA's mission "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means." Ex. I at SFFA-UT 000052 (Amended Bylaws); *accord Harvard*, 980 F.3d at 183-84; *Harvard*, 261 F. Supp. 3d at 110; *UNC*, 2018 WL 4688388, at *5. Third, this case does not require participation of individual members because SFFA seeks only

"declaratory and injunctive relief." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550-51 (5th Cir. 2010); *accord Harvard*, 261 F. Supp. 3d at 110; *Harvard*, 980 F.3d at 183-84; *UNC*, 2018 WL 4688388, at *6. Under governing law, this should be the end of the matter.

Because UT cannot refute that SFFA satisfies the three-part test for associational standing, it seeks to create new law, arguing that SFFA must satisfy a wholly separate test to establish associational standing—*i.e.*, SFFA must prove that its members exhibit "indicia of membership." UT Mot. 15-24. UT is incorrect. The indicia-of-membership test applies to organizations that *lack* members; it does not apply to voluntary membership associations like SFFA, as the First Circuit, the District of Massachusetts, and the Middle District of North Carolina have held. In any event, the facts demonstrate that even if the indicia-of-membership test somehow applied here, SFFA would easily satisfy it.

### A.     The indicia-of-membership test does not apply to voluntary membership organizations like SFFA.

Because SFFA "is, on its face, a traditional voluntary membership organization, the indicia of membership test is inapplicable." *Harvard*, 980 F.3d at 183. SFFA is a "validly incorporated 501(c)(3) nonprofit with [more than 20,000] members who joined voluntarily to support its mission." *Id.* at 184. SFFA's Bylaws create "one class of members, referred to as General Members." Ex. I at SFFA-UT 000052 (Amended Bylaws). Under the Bylaws, membership is open to "[a]ny individual who seeks to support the purposes and mission of [SFFA], pays membership dues as may be prescribed by the Board of Directors, and meets any additional standards and procedures that may be prescribed from time to time by the Board of Directors." *Id.* at SFFA-UT 000052-53. SFFA's Board of Directors has set membership dues at $10. *Id.* at SFFA-UT 000046. The Standing Members satisfied SFFA's membership requirements and are members of SFFA. *See* Ex P at ¶4 (Blum Dec.); Ex. Q at ¶¶6-7 (Standing Member 1 Dec.); Ex. R at ¶¶6-7 (Standing Member 2 Dec.). In short, "SFFA seeks to

represent individuals who are clearly members as defined by its Bylaws." *Harvard*, 261 F. Supp. 3d at

108.

These basic facts are "sufficient to conclude that SFFA is a valid membership organization"

that has "associational standing to pursue its claims." *Harvard*, 980 F.3d at 184. As Judge Burroughs

and Judge Biggs put it:

> Where SFFA has clearly stated its mission in its Bylaws and website, where it has
> consistently, and recently, in highly public ways, pursued efforts to end alleged
> racial discrimination in college admissions through litigation, and where its
> members voluntarily associate themselves with the organization, it can be
> presumed for the purposes of standing that SFFA adequately represents the
> interests of its current members without needing to test this further based on the
> indicia-of-membership factors.

*Harvard*, 261 F. Supp. 3d at 109; *UNC*, 2018 WL 4688388, at *5 (same).

UT urges this Court to impose a higher bar for associational standing. UT argues an

organization cannot be a "'traditional membership' association" under *Hunt* unless it has "statutory

members" as defined by state law. UT Mot. 16-18. Because SFFA does not have "statutory members"

under Virginia law, UT believes, SFFA has associational standing only if it satisfies the "indicia of

membership" test articulated in *Hunt*. *Id.*

No case supports UT's strange view of associational standing. Which is why it cites none. If

UT were right, there would be countless cases conducting this inquiry. Every case involving

associational standing would first examine the organization's structure under state law. If the

organization lacked "statutory members" as defined by state law, then the court would delve into the

organization's innermost workings—how it elects its leadership, makes decisions, finances its

operations, and more. Indeed, courts would be *required* to conduct this inquiry—even if the parties did

not present the argument. That is because courts have "an independent obligation to assure that

standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island

Inst.*, 555 U.S. 488, 499 (2009). Yet no court—including the Supreme Court and the Fifth Circuit—

has ever conducted this inquiry of a voluntary membership association. *See, e.g., Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 713, 718-20 (2007) (Parents Involved, a "nonprofit corporation comprising the parents of children who have been or may be denied assignment to their chosen high school in the district because of their race"); *Familias Unidas, an Unincorporated Ass'n v. Briscoe*, 619 F.2d 391, 395, 398 n.7 (5th Cir. 1980) (Familias Unidas, a "loosely structured organization of Mexican-American students and adults" formed to "seek reform and air grievances . . . with respect to the operation of the Hondo public schools"); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 322, 338 (5th Cir. 2020) (Speech First, Inc., an "organization of free-speech advocates that includes students at the University of Texas"); *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 164, 166-68 (5th Cir. 2012) (three "non-profit environmental protection organizations"—the Sierra Club, the Gulf Restoration Network, and the Center for Biological Diversity); *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 549-53 (5th Cir. 2010) (Association of American Physician and Surgeons). UT has no explanation for why these courts (and many more) have not been conducting its proposed test for associational standing. *See Harvard*, 261 F. Supp. 3d at 107 n.9 (rejecting the argument that courts would be free to "ignore the indicia-of-membership test when the issue of whether an association is a genuine membership organization is undisputed" (citing *Summers*, 555 U.S. at 499)).

This Court's opinion in *Texas LULAC v. Abbott*, --- F. Supp. 3d ---, 2020 WL 5995969 (W.D. Tex. Oct. 9, 2020) (Pitman, J.), is instructive. There, various plaintiffs—Texas League of United Latin American Citizens, National League of United Latin American Citizens, League of Women Voters of Texas, the Mexican American Legislative Caucus, the Texas Legislative Black Caucus, and the Texas Alliance for Retired Americans—sued the State of Texas to enjoin certain voting changes in advance of the upcoming election. Texas argued that the plaintiffs "must show its members 'participate in and guide the organization's efforts'" to have associational standing. *Id.* at *11. The Court correctly recognized that "this is not a requirement for traditional membership organizations." *Id.* Because the

16

plaintiffs had "testified that they have numerous participating members," *id.*, the indicia-of-membership test did not apply. At no point did the Court demand or examine each organization's articles of incorporation to determine whether it had "statutory members." *Id.* at *11-12; *see also Sierra Club v. U.S. Army Corps of Engn'rs*, 482 F. Supp. 3d 543, 553-54 (W.D. Tex. 2020) (Pitman, J.) (same).

None of UT's cases support its theory of standing. UT Mot. 16-18. In *Hunt*, the Washington State Apple Advertising Commission, a state agency, sued on behalf of the state's apple growers and dealers. 432 U.S. at 335-40. The familiar three-part test for associational standing, which the Supreme Court developed with membership organizations in mind, did not fit the Commission because it was "not a traditional voluntary membership organization such as a trade association, for it [had] no members at all." *Id.* at 342. The "question presented" thus was whether "the Commission's status as a state agency, rather than a traditional voluntary membership organization, preclude[d] it from asserting the claims of the Washington apple growers and dealers who form[ed] its constituency." *Id.* at 344. The Court found that the Commission had standing because its constituents "possess[ed] all of the indicia of membership." *Id.* But the Supreme Court never suggested that courts must apply this indicia-of-membership test to any membership organization that lacks "statutory members" as defined by state law. Precisely the opposite: *Hunt* reiterated that "[i]f the Commission were a voluntary membership organization," then "its standing to bring this action as the representative of its constituents would be clear" because it would have satisfied the traditional three-part test for associational standing. *Id.* at 342. In other words, "[i]n introducing the indicia-of-membership test, *Hunt expanded* the category of organizations that could have associational standing, rather than limiting it." *Harvard*, 261 F. Supp. 3d at 108 (emphasis added).

In *Public Interest Group of New Jersey, Inc. v. Magnesium Elektron, Inc.* ("*PIRG*"), the defendants "contended at oral argument" that the plaintiff organizations "lacked standing because their charters prohibit them from having members." 123 F.3d 111, 119 (3d Cir. 1997). The Third Circuit summarily

rejected "this formalistic argument" because the organizations' members clearly "possess[ed] the 'indicia of membership' in their organization." *Id.* (citing *Hunt*, 432 U.S. at 344). The Third Circuit simply "took membership as a given and went on to discuss the first factor identified in *Hunt*, whether the individual members would have standing to sue on their own." *Calif. Sportfishing Prot. All. v. Diablo Grande Inc.*, 209 F. Supp. 2d 1059, 1066 (E.D. Cal. 2002) (distinguishing *PIRG*). The Third Circuit said nothing at all that supports UT's argument; it did not hint that the indicia-of-membership test must apply if an organization has no "statutory members" under state law.

SFFA also is distinguishable factually to the organization in *PIRG*. All of SFFA's founding documents—as well as its amended bylaws—make clear that SFFA has "members." *See* Ex. G at SFFA-UT 000017 (Original Bylaws) (SFFA "shall have one class of affiliate members with rights, privileges, and obligations established by the Board of Directors"); Ex. J at SFFA-UT 000094 (501(c)(3) application) (noting that SFFA is "a coalition of prospective applicants and applicants to higher education institutions who were denied admission to higher education institutions, their family members, and other individuals who support the organization's purpose and mission of eliminating racial discrimination in higher education admissions" and repeatedly referencing SFFA's "members"); Ex. I at SFFA-UT-000052 (Amended Bylaws) (SFFA "shall have one class of members, referred to as General Members"). The indicia-of-membership test is unnecessary because SFFA has "actual members." *UNC*, 2018 WL 4688388, at *4 (distinguishing *PIRG*).

*Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir. 1997), likewise had "factual circumstances triggering the indicia-of-membership analysis [that] are not present here," *Harvard*, 261 F. Supp. 3d at 108 (distinguishing *Friends of the Earth*). Specifically, the organization's "bylaws provide[d] that membership requirements shall be set by the board of directors," but the organization had "never taken any formal affirmative action to comply with its responsibility and authority to determine membership requirements." *Friends of the Earth*, 129 F.3d at 827. Accordingly, the Fifth

18

Circuit considered whether the "corporation, *despite the failure to meet state law requirements*, ha[d] 'members' whose interests it can represent in federal court." *Id.* at 829 (emphasis added). As in *PIRG*, nothing in *Friends of the Earth* ever suggests that the threshold inquiry under *Hunt* is whether the organization has "statutory members" as defined by state law. *Id.* Indeed, that suggestion would have flouted the basic rule that "standing in federal court is a question of federal law, not state law." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013). Even if it wanted to, a State could not dictate to federal courts which kinds of organizations do and don't qualify for associational standing. *Id.*; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 n.8 (1977).

SFFA has not "fail[ed] to meet state law requirements" in any event. *Friends of the Earth*, 129 F.3d at 829. The Virginia Nonprofit Corporations Act authorizes nonprofit corporations to create a class of "members" who are akin to shareholders. *See* Va. Code Ann. §13.1-837 ("A corporation may issue certificates evidencing membership interests therein. Membership interests shall not be transferable."). These statutory members then have certain rights by default under state law. *See, e.g.*, Va. Code Ann. §13.1-828(B)(1) (right to challenge the actions the corporation has taken); *id.* §13.1-861 (right to challenge election results); *id.* §13.1-845(B), (D) (right to inspect and copy membership list). Although a membership organization can create these statutory "members," nothing in Virginia law *requires* membership organizations to do so. *Id.* §13.1-837. Membership organizations remain free to create a class of "members" under their bylaws and give them certain rights pursuant to the bylaws. *See id.* §13.1-823(B) ("The bylaws of a corporation may contain any provision that is not inconsistent with law or the articles of incorporation."). That is what SFFA did here. *See* Ex. I at SFFA-UT 000052 (Amended Bylaws) (SFFA "shall have one class of members, referred to as General Members, which shall not be 'members' within the meaning of the [Virginia Nonstock Corporation] Act and shall have only the rights specifically set forth in these Bylaws."); *see also* Ex. C at 51:21-52:3 (Blum UT Depo.) ("[SFFA] has always been . . . a membership organization. This sentence, ['']the corporation shall have

no members[,'] that's . . . with the statutory requirements under the Virginia Nonstock Corporation Act, but [SFFA] has always had members. It was conceived that way. And it was executed that way."); *id.* at 30:18-23, 112:16-24 (same).[7]

That no court has adopted UT's test for associational standing is not surprising. It is neither logical nor workable. Under UT's theory, no unincorporated membership organization could ever be a "traditional membership organization" because it would have no "statutory members." Yet courts, including the Fifth Circuit, regularly find that these types of membership organizations have standing without applying the indicia-of-membership test. *See, e.g.*, *Familias Unidas*, 619 F.2d at 395, 398 n.7 (Familias Unidas, a "loosely structured [unincorporated] organization of Mexican-American students and adults" was a voluntary membership organization with standing); *Gay-Straight All. of Okeechobee High Sch. v. Sch. Bd. of Okeechobee Cty.*, 477 F. Supp. 2d 1246, 1248, 1251-52 (S.D. Fla. 2007) ("unincorporated, voluntary association of [high school] students" was a voluntary membership association with standing); *Mayorga Santamaria ex rel. Doe Child. 1-3 v. Dallas Indep. Sch. Dist.*, 2006 WL 3350194, at *6, *29-30 (N.D. Tex. Nov. 16, 2006) ("unincorporated non-profit organization," Organizacion Para El Futuro de los Estudiantes, "comprised of approximately fifty (50) members who were concerned parents of Latino students enrolled at Preston Hollow," was a voluntary membership association with standing).

Membership organizations also would be entirely at the mercy of state law—no organization could be a "traditional membership organization" unless it complied with every state obligation for

---

[7] For the same reason, there is no "conflict" between SFFA's articles of incorporation and its bylaws. UT Mot. 17-18. Both make clear that SFFA has "one class of members, referred to as General Members," Ex. I at SFFA-UT 000052 (Amended Bylaws), but does not have "'members' within the meaning of the [Virginia Nonstock Corporation] Act," *id.*; Ex. F at SFFA-UT 000001 (Articles of Incorporation) (SFFA "shall have no members" within the meaning of the "Virginia Nonstock Corporation Act"); *see also* Ex. G at SFFA-UT 000017 (Original Bylaws) (SFFA "shall have no members within the meaning of the [Virginia Nonstock Corporation] Act" but "shall have one class of affiliate members with rights, privileges, and obligations established by the Board of Director").

"members," no matter how onerous. For example, under Virginia law, "a member of a corporation is entitled to inspect and copy . . . any of the records of the corporation" and "the right of inspection . . . may not be abolished or limited by a corporation's articles of incorporation or bylaws." Va. Code Ann. §13.1-933; *see also id.* §13.1-934(A) ("A member's agent or attorney has the same inspection and copying rights as the member he represents."). For obvious reasons, membership associations that bring litigation and invite the public to join the organization (like SFFA) often choose not to grant these kinds of rights to their members. The mission of an organization could be derailed by individuals who joined for the sole purpose of thwarting the organization's activities. And the privacy of the organization's members easily could be exposed if a hostile individual could join and "learn the names and address of all other members." UT Mot. 12; *see NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958) ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs.").[8]

Most confounding, because the definition of a "traditional membership organization" would turn entirely on state law, UT's theory of associational standing would not even guarantee the "indicia of membership" that UT believes all true membership organizations must possess. For example, UT believes that a critical feature of any "traditional membership organization" is that members elect and control the entire Board of Directors. UT Mot. 20-21. But under Virginia law, "[m]embers *shall not be entitled to vote* except as the right to vote shall be conferred by the articles of incorporation or . . . the bylaws." Va. Code Ann. §13.1-846(A) (emphasis added). Such contradictions underscore the arbitrariness and illogic of UT's position.

---

[8] Indeed, UT's position would put associational standing on a collision course with the First Amendment. Traditional membership organizations—including unincorporated membership associations—would be threatened with this type of attack in every case. Defendants would make much public-interest litigation intolerable by threatening improper scrutiny of organizations' membership and innermost workings. This chilling effect on First Amendment freedoms would be intolerable. *See NAACP*, 357 U.S. at 462-63.

After all, the law *favors* membership organizations bringing these kinds of suits. Associational suits are "advantageous both to the individuals represented and to the judicial system as a whole" because an association can provide a "'medium through which its individual members seek to make more effective the expression of their views.'" *UAW v. Brock*, 477 U.S. 274, 289-90 (1986) (quoting *NAACP*, 357 U.S. at 459). Forming an organization to vindicate the rights of individuals is neither unusual nor undesirable. "[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Id.* at 290. UT's high threshold for associational standing is a solution in search of a problem.

Finally, UT cannot credibly distinguish this case from *Harvard* and *UNC*. UT claims that there is "no indication" that these courts "ever considered SFFA's articles of incorporation or their dispositive impact." UT Mot. 17. But that is demonstrably wrong. Both Harvard and UNC submitted and discussed SFFA's articles of incorporation and relied on the same cases that UT does here. *See, e.g.*, Harvard Reply in Support of Motion to Dismiss at 3-4, 4 n.2, 6, *SFFA v. President & Fellows of Harvard Coll. (Harvard Corp.)*, No. 14-cv-14176 (Dkt. 220) (noting that "SFFA's own Articles of Incorporation state that it 'shall have no members'"); UNC Motion to Dismiss at 13, *SFFA v. Univ. of N.C.*, No. 14-cv-954 (Dkt. 107) (discussing SFFA's Articles of Incorporation). And the *Harvard* and *UNC* courts were fully aware of the facts. *See, e.g.*, *Harvard*, 261 F. Supp. 3d at 105 & n.7 (noting that SFFA's bylaws "further specify that General Members are not 'members' within the meaning of the Virginia Nonstock Corporation Act"); *UNC*, 2018 WL 4688388, at *1 & n.1 (same). Even if Harvard and UNC had never made these arguments, these federal courts had "an independent obligation" to consider them. *Summers*, 555 U.S. at 499. That none of these courts found UT's main argument even worth mentioning should be telling.

**B.    SFFA has associational standing even if the Court extended the indicia-of-membership test to a voluntary membership organization like SFFA.**

Even if this Court were to require SFFA to satisfy the indicia-of-membership test, despite the unbroken line of authority to the contrary, SFFA still would have standing. The indicia-of-membership test is not a demanding inquiry designed to restrict access to the federal forum. It is a "functional analysis to determine whether the nature of the relationship between the [organization] and the relevant interests of the individual[s]" who have been harmed "satisfie[s] the goals of the constitutional standing requirement." *Friends of the Earth*, 129 F.3d at 828. SFFA easily satisfies that test.[9] *See Harvard*, 261 F. Supp. 3d at 110-11; *UNC*, 2018 WL 4688388, at *3.

*First*, SFFA's Standing Members "testified in [their deposition and through declarations] that they [are] members of [SFFA]" and that SFFA is acting on their behalf. *Friends of the Earth*, 129 F.3d at 829; *see* Ex. Q at ¶¶6-8 (Standing Member 1 Dec.); Ex. R at ¶¶6-8 (Standing Member 2 Dec.); Ex. D at 106:1-8 (Standing Member 1 Depo.); Ex. E at 71:15-72:1 (Standing Member 2 Depo.). That alone is dispositive. *Compare Citizens Coal Council v. Matt Canestrale Contracting, Inc.*, 40 F. Supp. 3d 632, 643 (W.D. Pa. 2014) (approving standing because "[e]ach of the Standing Witnesses testified at their depositions that they joined [the organization] so that the lawsuit could be filed" and "knew that [the organization] was filing this lawsuit on their behalf"), *with Fund Democracy, LLC v. SEC*, 278 F.3d 21, 26 (D.D.C. 2002) (rejecting standing because no members could attest that the organization

---

[9] Contrary to UT's suggestion, *Funeral Consumers All., Inc. v. Service Corp. Int'l* did not create a rigid three-part test—in dicta in a footnote—for showing indicia of membership. 695 F.3d 330, 344 n.9 (5th Cir. 2012); *see also Disability Rights Penn. v. Pa. Dep't of Human Servs.*, 2020 WL 1491186, at *7 (M.D. Pa. 2020) ("[N]othing in *Hunt* suggests that [its] list of considerations is exhaustive."); *Flyers Rights Educ. Fund, Inc. v. U.S. Dep't of Transp.*, 957 F.3d 1359, 1362 (D.C. Cir. 2020) (listing courts that have found associational standing "even though [the organization] does not possess all three indicia of membership considered in *Hunt*"). The Fifth Circuit did nothing more than discuss how indicia of membership was shown in *Hunt*. Indeed, the Fifth Circuit specifically declined to "determine whether [the plaintiff] has members as defined by *Hunt*." *Funeral Consumers All.*, 695 F.3d at 344 n.9. Regardless, SFFA satisfies the three criteria, as discussed below.

"represented their views and that they approved of [its] activities"). There is no basis to discredit this uncontroverted testimony. *See Cullivan v. Kan. City S. R. Co.*, No. 9-cv-685, 2010 WL 378433, at *4 (S.D. Ill. Jan. 27, 2010) ("[C]ourts will take as true, and often give great weight, to uncontradicted affidavits in discerning whether subject matter jurisdiction exists.").

*Second*, SFFA has a "clearly articulated and understandable membership structure," *Friends of the Earth*, 129 F.3d at 829, under which the Standing Members qualify as members, *see supra* at 14. SFFA and its Standing Members thus are not colluding in a post-hoc attempt to "manufacture" standing. *See Wash. Legal Found. v. Leavitt* ("*WLF*"), 477 F. Supp. 2d 202, 208, 211 (D.D.C. 2007). UT cannot dispute that the Standing Members are members as defined by SFFA's bylaws.

*Third*, the Standing Members "voluntarily associated themselves with [SFFA], in contrast to the apple growers" in *Hunt. Friends of the Earth*, 129 F.3d at 829. Neither Standing Member was coerced into joining SFFA. Rather, they voluntarily joined SFFA and agreed to participate in this lawsuit. Ex. Q at ¶¶6-8 (Standing Member 1 Dec.); Ex. R at ¶¶6-8 (Standing Member 2 Dec.); Ex. D at 29:22-30:15 (Standing Member 1 Depo.) ("My mother brought [SFFA] to my attention," I "research[ed] . . . the organization," and then "[m]y mother with my approval paid the membership fee and we signed up and became members."); Ex. E at 11:21-12:10 (Standing Member 2 Depo.) ("I heard about [SFFA] from my dad," "looked it up online and then searched around a bit—spent too much time on the Internet and then I joined online."). Thus, SFFA's standing is even stronger than the Commission's in *Hunt*, which forced apple growers and dealers to "finance[] the Commission through mandatory assessments." *Friends of the Earth*, 129 F.3d at 829; *see Hunt*, 432 U.S. at 344-45. This voluntariness provides additional assurance that SFFA genuinely represents the Standing Members. *Id.*; *Citizens Coal*, 40 F. Supp. 3d at 641 n.10 (approving standing where "the Standing Witnesses came to be members of [the organization] . . . after learning about the organization, generally through community meetings, grassroots outreach events, or the website").

24

*Fourth*, this lawsuit "clearly is within [SFFA's] central purpose, and thus within the scope of reasons that [the Standing Members] joined the organization." *Friends of the Earth*, 129 F.3d at 829. When the Standing Members voluntarily associated with SFFA, they were well aware of SFFA's mission. Ex. D at 29:24-30:1 (Standing Member 1 Depo.); Ex. E at 12:4-10 (Standing Member 2 Depo.). Before they became standing members, SFFA discussed the nature of this lawsuit with them, and they agreed to participate in the litigation. Ex. C at 90:3-91:17 (Blum UT Depo.); Ex. Q at ¶¶6, 8 (Standing Member 1 Dec.); Ex. R at ¶¶6, 8 (Standing Member 2 Dec.). Both Standing Members understood the consequences of their membership and chose to go forward. *Id.* Thus, not only do the Standing Members support SFFA, but they specifically support *this* action. *See Citizens Coal*, 40 F. Supp. 3d at 641 (approving standing where the organization "met with the Standing Witnesses prior to filing . . . this action and obtained their approval to bring this action"); *cf. Package Shop, Inc. v. Anheuser-Busch, Inc.*, No. 83-cv-513, 1984 WL 6618, at *40-41 (D.N.J. Sept. 25, 1984) (rejecting standing because injured members had merely supported prior, unrelated litigation).

*Fifth*, SFFA's members "finance [SFFA's] activities" through membership dues and other donations. *Friends of the Earth*, 129 F.3d at 829; *cf. WLF*, 477 F. Supp. 2d at 209 (rejecting standing where, among other things, the organization "made no showing that [the individuals] in any way . . . financially support" the organization). SFFA has received thousands of dollars in membership fees and donations from its members. Ex. K at SFFA-UT 000256 (SFFA 2018 Form 990); Dkt. 45-14 at SFFA-UT 000296 (SFFA 2019 Form 990); Dkt. 45-15 at 4 (SFFA Responses to State Court Interrogatories).[10] UT urges the Court to impose a higher bar, such that the members must provide

---

[10] SFFA's membership fee is not "frequently waived." UT Mot. 22; *see* Ex. C at 65:11-17 (Blum UT Depo.) ("[T]here have been a handful of young students who had wanted to join, but have been unable to join because they didn't have a credit card and they contacted me directly and asked if they could join without paying the $10.00. That question went before the board and we admitted them."); Dkt 45-1 at 64:23-25 (same).

all or most of the organization's funding. UT Mot. 22-23. But no court has ever imposed such a requirement. Indeed, courts have found indicia of membership even when the constituents provided *no* funding. *See, e.g.*, *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (approving standing for a group "funded primarily by the federal government, and not by its constituents"); *Sylvia's Haven, Inc. v. Mass. Dev. Fin.*, 397 F. Supp. 2d 202, 207-08 (D. Mass. 2005) (approving standing for an organization that represented homeless children). UT's proposed test is not only legally unsupported but would shut out many organizations that serve the poor and underprivileged, as their members rarely can provide funding needed to finance an association's activities. *See id.*

That SFFA accepts donations from non-profit organizations proves nothing. SFFA is a young organization, and its members are students and their families. When the NAACP formed, it "initially set membership dues at one dollar for associates and two dollars for contributors" to "attract mass support," and it survived "due in large measure to external financial support." Shawn L. Alexander, *An Army of Lions: The Civil Rights Struggle Before the NAACP*, xv (2012). Indeed, the most well-known membership organizations in the country still rely heavily on institutional donations. *See, e.g.*, NAACP 2018 Annual Report 36-43, bit.ly/3lQ0lVo (identifying 27 corporations and 13 nonprofit foundations that each gave NAACP more than $100,000 in 2018, including four that gave more than a million dollars); Sierra Club 2019 Annual Report, bit.ly/3tYxPUH (identifying 502 nonprofit foundations that donated to the Sierra Club in 2019). No one would ever claim that these groups do not represent the interests of their members because of the substantial institutional donations they receive.

*Sixth*, SFFA's members participate in "elect[ing] the governing body of the organization" through a member-elected board of director. *Friends of the Earth*, 129 F.3d at 829. Under SFFA's election procedures, the entire membership is invited to run for the director position; interested candidates submit a short statement of why they would like to serve on SFFA's board; each candidate's personal statement is provided to the members; and SFFA's members then vote for the director of

their choice. Ex. I at SFFA-UT 000059-60 (Amended Bylaws). SFFA has had three different member-elected directors: Joe Zhou[11] (2015-2017), Alex Chen (2017-2019), and Hua "Eva" Guo (2019-2021). Ex. S at 6 (SFFA Responses to Interrogatories). These member-elected directors have given members "a direct voice in [SFFA's] decision-making, including the management and direction of ongoing litigation." Ex. I at SFFA-UT 000045 (Amended Bylaws).

No court has ever required that an organization's members elect the entire board of directors to show indicia of membership. Indeed, courts regularly find associational standing when the members had no power to elect *any* of the directors. *See Or. Advocacy Ctr.*, 322 F.3d at 1111-12 (approving standing where members serve on an "advisory council"); *Citizens Coal*, 40 F. Supp. 3d at 642 (approving standing where bylaws allowed members to "serve on an advisory committee formed directly to influence [the organization's] actions in this litigation"); *Flyers Rights Educ. Fund*, 957 F.3d at 1362 (approving standing even though "the constituents of the organization do not elect the leadership").

Imposing such a requirement would also ignore the reality of membership organizations, like SFFA, that seek to effect change in policies that are deeply controversial. Associations often limit the number of member-elected directors to prevent a "hostile takeover." *See* Brad Knickerbocker, *A 'Hostile' Takeover Bid at the Sierra Club*, Christian Sci. Monitor (Feb. 20, 2004), bit.ly/3cFCfK8 ; Ann E. Carlson, *Standing for the Environment*, 45 UCLA L. Rev. 931, 961 n.160 (1998) ("With the possible exception of the Sierra Club, members of the national environmental organizations do not exert direct influence on organizational decision making." (citation omitted)). For example, the Wilderness Society, one of the largest and oldest conservationist organizations in the country, is controlled by a Governing Council that is self-perpetuating (its directors are elected not by the members, but "at

---

[11] After Mr. Zhou's term expired, he was chosen to be one of the Board-Elected Directors. Ex. S at 5-6 (SFFA Responses to Interrogatories).

meetings of the Governing Council"), and its "[m]embers shall not have voting rights." *See* Bylaws of the Wilderness Society, art. II, §1.a; art. V, §1, bit.ly/3dadcwt. Yet courts have repeatedly found the Wilderness Society to be a "membership organization," *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1171 (9th Cir. 2011), with standing to sue on behalf of its members, *id.* at 1179-80; *see e.g.*, *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 696 n.13 (10th Cir. 2009); *see also AARP v. EEOC*, 226 F. Supp. 3d 7, 17 (D.D.C. 2016) (finding associational standing where "the wider AARP membership does not elect AARP's governing Board of Directors, [but] directors are required to be AARP members, and are chosen by other members of the Board, *i.e.*, by other AARP members").

UT argues that SFFA is "operated and controlled by its founder, Edward Blum." UT Mot. 19. But that is not true. SFFA is controlled by its five-person Board of Directors, only one of whom is Mr. Blum. Ex. I at SFFA-UT 000053-55 (Amended Bylaws). The Board appointed Mr. Blum to his position as President of SFFA, but he "may be removed [by the Board of Directors] with or without cause at any time."[12] *Id.* at SFFA-UT 000055. Nor are SFFA's members denied a "meaningful opportunity to participate in SFFA's operations." UT Opp. 21-22. To the contrary, SFFA's president is "in constant communication with the membership through phone and email and receive[s] dozens of . . . suggestions and ideas in any given month on a one-to-one basis." Ex. C at 73:15-18 (Blum UT Depo.). SFFA's members "can and often do petition or encourage SFFA to undertake certain endeavors." *Id.* at 75:17-19 (Blum UT Depo.). SFFA also regularly schedules members-only conference calls "where members can ask questions, provide guidance, and comment on SFFA's activities and priorities." Ex. S at 13 (SFFA Responses to Interrogatories).[13] Nothing requires SFFA

---

[12] SFFA's four board-elected directors are not "permanent" directors. UT Mot. 20; *see* Ex. C at 30:24-31:6 (Blum UT Depo.); Ex. B at 186:15-187:4 (Blum UT State Depo.). They serve two-year terms and must be reappointed by the Board of Directors. Ex. I at SFFA-UT 000053 (Amended Bylaws).

[13] This is far more participation than members of environmental groups such as the NRDC and the Environmental Defense Fund that regularly sue on behalf of their members.  Those groups have

to create the formal structures for member input, such as polling and committees, that UT demands. UT Mot. 21.

*Seventh*, SFFA's standing members have "control" over this litigation. *Citizens Coal*, 40 F. Supp. 3d at 639-40. If all the standing members "chose to terminate their membership in [SFFA], that would in effect terminate this litigation as associational standing would then be lacking." *Id.* at 641. Their ability to resign is a powerful mechanism of control over SFFA. *Compare id.* at 643 (approving standing because "the Standing Witnesses here do possess the means to influence the priorities and activities that [the organization] has undertaken, specifically, through this litigation, as there would be no lawsuit without the Standing Witnesses"), *with Am. Legal Found. v. FCC*, 808 F.2d 84, 87-88, 92 (D.C. Cir. 1987) (rejecting standing where a nonprofit media law center sought to represent "all members of the public who regularly watch ABC News").

Finally, no case supports UT's argument that SFFA *must* serve a "specialized segment" of society in order to show indicia of membership. UT Mot. 23-24; *see e.g.*, *Friends of the Earth*, 129 F.3d at 827, 829 (finding that a plaintiff dedicated to "promot[ing] a broad agenda of environmental awareness and improvement projects" had indicia of membership without analyzing whether the organization served a "specialized segment" of the population). Regardless, SFFA undoubtedly serves this "specialized segment" of society. SFFA openly promotes itself as a "membership group of more than 20,000 students, parents, and others who believe that racial classifications and preferences in college admissions are unfair, unnecessary, and unconstitutional." Ex. N at SFFA-UT 000409 ("About" SFFA), and it is the only membership organization in the country dedicated to this mission,

---

"virtually no contact with the members," "do not consult with or even know the members," and often "'cold-call[]' membership lists" to find standing members. Carlson, *Standing for the Environment*, 45 UCLA L. Rev. at 961-62.

Ex. P at ¶2 (Blum Dec.).[14] These students and parents "are the primary beneficiaries of [SFFA's] activities, 'including the prosecution of this kind of litigation.'" *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) (quoting *Hunt*, 432 U.S. at 344).

SFFA's leaders also are not simply "concerned bystanders" with no connection to the organization's mission. UT Mot. 23-24. Director Abigail Fisher was denied admission under a race-based admissions system; Directors Richard Fisher and Joe Zhou are parents whose children were denied admission under race-based systems; and Director Hua "Eva" Guo is a parent whose children will soon be subject to this type of discrimination because of their race. Ex. L at SFFA-UT 000401; Ex. M at SFFA-UT 000403. Indeed, SFFA board members have spoken eloquently about how they and their children have been harmed by race-based preferences in higher education. As Director Zhou has written:

> As [a] first generation Asian immigrant to the United States, my U.S. born child has experienced unfair treatment by Harvard University. With perfect testing scores in ACT (36) and SAT II Math (800) and SAT II History (800), an Intel STS national semi-finalist award and several state level medals, my child was very active in community services and student leadership activities. He was a student writer and an invited speaker to the Senate Education Committee, the State Board of Education on Common Core Standard and he worked for the city youth camp as an assistant tennis coach during the last two years in the high school. However, he was denied the admission by Harvard and three other Ivy universities despite his leadership, community service, employment and his academic achievement. . . .
>
> I still believe [in] diversity and pluralism in highly selective college and at all levels of leadership positions. The diversity can be achieved by income level or other social economic status, such as first generation college applicants. Using race to achieve diversity artificially hurts Asian American immigrants. Many policy makers are aware of the case by now, but [are] unwilling to change the status quo in order to protect the beneficiaries under the existing system. . . . It is a time to make some changes for Asian Americans to be treated fairly. It is my strong believe [*sic*] that our hard work and our

---

[14] Whether the majority of SFFA's members "would . . . be eligible in their own names to serve as a plaintiff in this case," UT Mot. 24, is irrelevant. *See Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 34 (1st Cir. 1990) ("[T]he Supreme Court has never required that *every* member of an association have standing before it can sue on behalf of its members."); *Sierra Club v. Glickman*, 82 F.3d 106, 110 (5th Cir. 1996) (same). Indeed, such a requirement likely would exclude every national membership organization in the country from ever having associational standing.

children's hard work should be recognized and awarded fairly.

Ex. M at SFFA-UT 000403-404; *see also* Ex. L at SFFA-UT 000401 (Director Hua "Eva" Guo) ("In my humble opinion on academic admissions, all students are supposed to be treated equally and judged by their characters and academic performance regardless of their race. . . . [so] my son will not have to worry about being denied by [gifted and talented] programs just because of his race."); Ex. T at SFFA-UT 000377 (Director Abigail Fisher) ("I was taught from the time I was a little girl that any kind of discrimination was wrong. And for an institution of higher learning to act this way makes no sense to me. What kind of example does it set for others?"). To describe SFFA as nothing more than Edward Blum's one-man vendetta against UT, *see* UT Mot. 9-12, 14, 19-20, is not only untrue but offensive to SFFA's board and the thousands of students and parents who joined and support SFFA. *Cf. Hundreds Gather for Dueling Rallies Ahead of Trial Challenging Harvard Admissions*, The Harvard Crimson (Oct. 15, 2018), bit.ly/3dRSFgj.

In sum, the record demonstrates that SFFA has associational standing even under UT's "indicia-of-membership" test. The Standing Members were injured by UT's admissions policies, voluntarily became SFFA members, want SFFA to represent them, support SFFA's mission, are involved in this litigation, and financially support SFFA through membership fees. Nothing more is required to meet the indicia-of-membership test.

## II.     SFFA's claims are not barred by res judicata.

Claim preclusion under federal law requires four elements: "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Test Masters Educ. Servs.*, 428 F.3d at 571. Because UT cannot satisfy either the first or fourth element, SFFA's claims are not barred by res judicata.

### A.      SFFA is not identical to or in privity with Abigail Fisher.

As UT concedes, SFFA is not "identical" to Abigail Fisher. Ms. Fisher was a Texas high school student who was denied admission to UT in 2008, and SFFA is a thousands-strong 501(c)(3) nonprofit membership association that did not exist until 2014. *Supra* 3-5, 9. Despite these obvious differences, UT argues that SFFA is in "privity" with Ms. Fisher. UT Mot. 25-28. This argument fails.

Privity for res judicata purposes is a high bar because "[i]t is a fundamental principle of American jurisprudence that a person cannot be bound by a judgment in litigation to which he was not a party." *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990). "The prohibition against using the result of prior judicial proceedings to determine the rights of strangers to those proceedings is required by the due process guarantees of the Fifth and Fourteenth Amendments." *Id.* "The popular expression of this principle is that 'everyone is entitled to his own day in court.'" *Id.*

Because of these "constitutional rights and basic fairness," the Fifth Circuit has recognized privity in only "three 'narrowly-defined' situations . . . : (1) where the non-party is a successor in interest to a party's interest in property; (2) where the non-party controlled the prior litigation; and (3) where the non-party's interests were adequately represented by a party to the original suit." *Clyce v. Farley*, 836 F. App'x 262, 269 (5th Cir. 2020) (quoting *Meza*, 908 F.2d at 1266); *see, e.g., White v. Fox*, 576 F. App'x 327, 331-32 (5th Cir. 2014) (finding no privity under this narrow test); *In re Hinsley*, 149 F.3d 1179, *8-10 (5th Cir. 1998) (unpublished) (same); *NAACP v. Fordice*, 105 F.3d 655, *2-3 (5th Cir. 1996) (unpublished) (same); *Dilworth v. Vance*, 95 F.3d 50, *1-2 (5th Cir. 1996) (unpublished) (same).

UT ignores this precedent and never attempts to show any of the "three narrowly-defined situations" for privity. For good reason. SFFA is not a "successor-in-interest to [Ms. Fisher's] interest in property." *Meza*, 908 F.2d at 1266. SFFA did not "control" the *Fisher* litigation because SFFA— which did not even exist until more than five years after the complaint was filed—did not have "effective choice as to the legal theories and proofs to be advanced on behalf of the party to the

action" and "control over the opportunity to obtain review." *Benson & Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172, 1174 (5th Cir. 1987); *see supra* 3-5; Ex. C at 115:21-116:14 (Blum UT Depo.) (the "ultimate decision to move forward with the [*Fisher*] litigation was made by Abby and her family"); Ex. B at 53:6-11 (SFFA UT State Depo.) (SFFA never "fund[ed] any portion of the *Fisher* litigation"). And SFFA's "interests were [not] adequately represented" by Ms. Fisher because she did not have "'an express or implied legal relationship in which [she was] accountable to [SFFA].'" *Meza*, 908 F.2d at 1272 (citation omitted). UT thus cannot satisfy *any* of the Fifth Circuit's three "narrowly defined" situations for finding privity.

Undeterred, UT urges this Court to consider all the "'surrounding circumstances'" and simply conclude that "'preclusion is proper.'" UT Mot. 25-28. But the Supreme Court has rejected this type of "heavily fact-driven," "amorphous," and "close enough" approach to res judicata. *Taylor v. Sturgell*, 553 U.S. 880, 898-901 (2008); *see id.* at 901 ("An all-thing-considered balancing approach might spark wide-ranging, time-consuming, and expensive discovery tracking factors potentially relevant under seven- or five-prong tests. And after the relevant facts are established, district judges would be called upon to evaluate them under a standard that provides no firm guidance.").

UT's arguments fail in any event. First, UT argues that SFFA and Ms. Fisher are in privity because "Fisher herself is both an officer and a director of SFFA." UT Mot. 26. But UT provides no case holding that an individual will be in privity with an organization merely because he or she serves on the organization's board of directors. *See id.* The law is the opposite. *See* 18A Fed. Prac. & Proc. Juris. §4460 (3d ed.) ("[A] corporation cannot be bound simply because a director, officer, or minor shareholder has lost an action pursued in an individual capacity."); Restatement (2d) of Judgments §59, cmt. a (1982) ("[A] judgment for or against persons who are stockholders, members, or managers of a corporation does not in general bind or redound to the benefit of the corporation."). This makes sense. Ms. Fisher is just one of five directors on SFFA's board and she alone has no control over

SFFA. Ex. I at SFFA-UT 000053 (Amended Bylaws). SFFA should not be precluded from bringing its own suit merely because one of its directors had an earlier suit in her personal capacity against the same defendant. Ms. Fisher, after all, brought the prior suit as an individual, not in her official capacity as a member of SFFA's board, and sought damages in a personal capacity. *See Carta v. Town of Fairfield*, No. 91-2248, 1992 WL 69332, at *3 n.4 (1st Cir. Apr. 8, 1992) (board members suing in their personal capacities are not in privity with the corporation itself (citing *Gray v. Lacke*, 885 F.2d 399, 405-06 (7th Cir. 1989)); *Jadlowe v. Town of Dartmouth*, No. 5-cv-10516, 2006 WL 8458383, at *8 (D. Mass. Mar. 3, 2006) (collecting similar cases).

Second, UT argues that "the relationship between [Ms.] Fisher, Blum, and SFFA warrant[s] treating Fisher and SFFA as being in privity." UT Mot. 26. As an initial matter, UT's factual assertions are incorrect—and certainly not "undisputed." Fed. R. Civ. P. 56(a). Mr. Blum was not "the decision-maker" in the *Fisher* litigation, UT Mot. 28; Ms. Fisher was, Ex. C at 115:21-116:14 (Blum UT Depo.). Mr. Blum did not "fund[]" the [*Fisher*] litigation," UT Mot. 4; the Project on Fair Representation did, Ex. C at 24:17-20 (Blum UT Depo.). Mr. Blum did not "select[] . . . the attorneys [to] represent the plaintiff[s]," UT Mot. 27; he made recommendations as to which attorneys Ms. Fisher should hire, Ex. C at 113:14-15 (Blum UT Depo.); Ex. B at 119:16-22 (Blum UT State Depo.). Mr. Blum does not "control" SFFA, UT Mot. 28; SFFA is controlled by a five-person board of directors, Ex. I at SFFA-UT 000053 (Amended Bylaws).[15]

---

[15] UT's veiled attacks on Mr. Blum—as "Yenta the Matchmaker" who works merely to "advance his view[s]" and "continue his quest" to "eliminate the consideration of race in college admissions policies"—are disappointing. UT Mot. 4, 10, 14, 19. Many landmark civil rights cases in this country occurred only because of the sustained efforts of dedicated individuals. *See, e.g., Brown v. Board of Education; Celebrating the 66th Anniversary of LDF's Seminal Case*, LDF, bit.ly/3wk4gyP (*Brown* "occurred only after a hard-fought, multi-year campaign" that was "conceived in the 1930s by Charles Hamilton Houston, then Dean of Howard Law school, and brilliantly executed . . . by his star pupil, Thurgood Marshall"); Barbara McQuade, *Ruth Bader Ginsburg's Life and Work Propelled Women's Equality Front and Center*, USA Today (Sept. 18, 2020), bit.ly/3fBhy3P ("Ruth Bader Ginsburg dedicated her career to gender equality.").

Regardless, SFFA is not in privity with Ms. Fisher even if the Court accepts UT's factual assertions. As explained, none of the facts UT has asserted meet the Fifth Circuit's three "narrowly defined" situations for privity. Nor does UT cite a single case in which a court found privity merely because one individual—who was not a party in either litigation—was involved in some capacity in both cases. SFFA is neither "identical" to nor in "privity" with Ms. Fisher.

**B.      This case and *Fisher* do not have the same claim or cause of action.**

Res judicata is also improper because SFFA's claims are not the same as those in *Fisher*. To determine "whether two suits involve the same claim or cause of action," the Fifth Circuit applies "the transactional test of the Restatement (Second) of Judgments, § 24.54." *Petro-Hunt, LLC v. United States*, 365 F.3d 385, 395 (5th Cir. 2004). This test asks "whether the two actions under consideration are based on the same nucleus of operative facts." *Id.* at 396. "[F]actual similarity" is not enough—there must be "sameness of operative facts." *Id.*; *see, e.g.*, *Insuremax Ins. Agencies, Inc. v. Shanze Enters., Inc.*, No. 13-cv-1231, 2013 WL 4014476, at *5 (N.D. Tex. Aug. 7, 2013).

SFFA's claims do not share the same "operative facts" with the claims in *Fisher*. In *Fisher*, the plaintiffs sued UT after the university denied them admission for the class entering in the Fall of 2008. *Fisher II*, 136 S. Ct. at 2207. The question was whether UT—as of 2008—had "satisf[ied] the burden of strict scrutiny." *Id.* at 2210; *see also Fisher v. Univ. of Tex. at Austin*, 631 F.3d 213, 217 (5th Cir. 2011) (Because "Fisher and Michalewicz lack standing to seek injunctive or forward-looking declaratory relief" and "only have standing to challenge their rejection and to seek money damages for their injury[,] [o]ur focus will be upon the process employed by UT to admit freshmen when Fisher and Michalewicz applied for the class entering fall 2008."). Here, SFFA is suing on behalf of its members, the earliest of whom was denied admission in 2018—*ten years* after Ms. Fisher was denied admission. *Supra* 9-12. "[R]es judicata does not apply to events post-dating the filing of the initial complaint." *Howard v. City of Coos Bay*, 871 F.3d 1032, 1039 (9th Cir. 2017) (collecting cases). Moreover, "things

have changed dramatically since 2008 when Abigail Fisher was rejected by UT-Austin." Am. Compl. ¶99. There has been an enormous increase in racial diversity and new research into race-neutral alternatives, making UT's use of race unnecessary; UT has been racially balancing its freshman class; and UT has *increased* its use of race as a factor in admissions. *Supra* 10-11; Am. Compl. ¶¶68-146, 168-75. The "operative facts" here are different than they were more than a decade ago in *Fisher*. *See, e.g.*, *Test Masters Educ. Servs.*, 428 F.3d at 569, 571-72 (second action is not precluded where the later action involved different material factual disputes and new material allegations); *Petro-Hunt*, 365 F.3d at 396-97 (same).

UT argues that the operative facts are the same because both lawsuits "attack any consideration of race in UT's holistic review," "allege discrimination and assert equal protection violations," and "look to the same history of UT admissions from 1996 [to 2008]." UT Mot. 31. But these general similarities are insufficient for res judicata purposes. "'Observations of factual similarity . . . are not relevant to res judicata.'" *Test Masters Educ. Servs.*, 428 F.3d at 752 (quoting *Petro-Hunt*, 365 F.3d at 395). More important, UT improperly assumes that because it prevailed in *Fisher II* its admissions policy is now immune from future challenge. It is not. "[R]ace-conscious admissions policies must be limited in time" because racial classifications "are potentially so dangerous that they may be employed no more broadly than the interest demands." *Grutter*, 539 U.S. at 342. As the Supreme Court in *Fisher II* made clear, UT has a "continuing obligation to satisfy the burden of strict scrutiny in light of changing circumstances." 136 S. Ct. at 2209-10. Simply put, any of the "operative facts" that saved UT in *Fisher II* are insufficient to do so now. SFFA's claims are not barred by res judicata.[16]

---

[16] UT's citations, *see* UT Mot. 30-31, all had far more factual similarity than here, *see, e.g.*, *Adams v. City of Indianapolis*, 742 F.3d 720, 723-27, 736 (7th Cir. 2014) (the same plaintiffs brought a new lawsuit immediately after the first and "[t]he allegations in the second suit [were] almost identical to those in

**III.    SFFA's claims are not barred by collateral estoppel**

"Collateral estoppel applies when, in the initial litigation, (1) the issue at stake in the pending litigation is the same, (2) the issue was actually litigated, and (3) the determination of the issue in the initial litigation was a necessary part of the judgment." *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d 320, 323 (5th Cir. 2005). Because "[a] litigant has a due process right to a full and fair opportunity to litigate an issue, . . . the conclusive effect of a prior judgment may only be invoked against a party or a privy." *Benson & Ford*, 833 F.2d at 1174. UT argues that SFFA is estopped from contesting "whether UT-Austin's interest in 'student body diversity' is a sufficiently clear and compelling interest that it satisfies strict scrutiny" and whether UT "has already achieved a 'critical mass' of students from historically underrepresented groups." UT Mot. 32. This argument is meritless.

First, as explained above, SFFA was not a party to the *Fisher* litigation and was not in privity with Ms. Fisher. *See supra* 32-35. Accordingly, *Fisher II* has no collateral estoppel effect. *Benson & Ford*, 833 F.2d at 1174. Applying collateral estoppel here would violate SFFA's "due process right to a full and fair opportunity to litigate an issue." *Id.*

Second, the issues at stake in this case are not "the same" as in *Fisher*. *Harvey Specialty & Supply*, 434 F.3d at 323. The Court's decision in *Fisher II* was "necessarily limited to the narrow question" whether UT violated the Constitution "at the time her application was rejected." *Fisher II*, 136 S. Ct. at 2210. Whether UT's interest in "student body diversity" was sufficient as of 2008 to satisfy strict scrutiny is different from whether UT's interests are sufficient today. *See id.* at 2209-10 (UT has a "continuing obligation to satisfy the burden of strict scrutiny in light of changing circumstances," "affirmance of the University's admissions policy today does not necessarily mean the University may rely on that same policy without refinement" in the future, and UT must "shape its admissions policy

---

the first"). And of course, the Supreme Court made clear that its decision in *Fisher II* does not shield UT's use of race from judicial scrutiny in future years. *See supra* 9-10.

to satisfy strict scrutiny in the years to come."). Similarly, whether UT needed to use race in 2008 to achieve a "critical mass" of underrepresented minorities is different from whether UT needs to do so today. *See id.* These questions of fact and law "are not 'identical' to the issues raised in [*Fisher*]." *Petro-Hunt*, 365 F.3d at 398. Collateral estoppel does not apply.

## CONCLUSION

For the foregoing reasons, UT's motion should be denied.

Respectfully submitted,

*/s/ J. Michael Connolly*

William S. Consovoy (*pro hac vice*)
Thomas R. McCarthy (*pro hac vice*)
J. Michael Connolly
Cameron T. Norris
Steven C. Begakis (*pro hac vice*)
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
steven@consovoymccarthy.com

Dated: April 5, 2021                    *Counsel for Plaintiff Students for Fair Admissions, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served on counsel of record for Defendants and Defendant-Intervenors via the Court's electronic filing and service on April 5, 2021.

*/s/ J. Michael Connolly*

J. Michael Connolly