IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| UNIVERSITY OF TEXAS AT AUSTIN; | § | |
| JAMES B. MILLIKEN, *Chancellor of the* | § | |
| *University of Texas System in his Official Capacity*; | § | |
| STEVEN LESLIE, *Executive Vice Chancellor* | § | |
| *for Academic Affairs of the University of Texas System* | § | |
| *in his Official Capacity*; DANIEL H. | § | |
| SHARPHORN, *Vice Chancellor and* | § | |
| *General Counsel of the University of Texas* | § | 1:20-CV-763-RP |
| *System in his Official Capacity*; | § | |
| JAY HARTZELL, *President of the* | § | |
| *University of Texas at Austin in his* | § | |
| *Official Capacity*; BOARD OF REGENTS | § | |
| OF THE UNIVERSITY OF TEXAS | § | |
| SYSTEM; DAVID J. BECK, CHRISTINA | § | |
| MELTON CRAIN, KEVIN P. ELTIFE, R. | § | |
| STEVEN HICKS, JODIE LEE JILES, | § | |
| JANIECE LONGORIA, NOLAN PEREZ, | § | |
| KELCY L. WARREN, and JAMES C. | § | |
| "RAD" WEAVER, *as Members of the Board* | § | |
| *of Regents in Their Official Capacities*; | § | |
| DANIEL JAFFE, *Interim Executive Vice* | § | |
| *President and Provost*; RACHELLE | § | |
| HERNANDEZ, *Senior Vice Provost for* | § | |
| *Enrollment Management and Student* | § | |
| *Success*; and MIGUEL WASIELEWSKI, | § | |
| *Executive Director for Office of Admissions*, | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Before the Court is Defendants'[1] motion for summary judgment or dismissal, (Dkt. 45), and Defendant-Intervenors'[2] motion to dismiss, (Dkt. 44). Having considered the parties' briefs, the record, and the relevant law, the Court issues the following order.

## I. BACKGROUND

Plaintiff Students for Fair Admissions, Inc. ("SFFA") alleges that UT Austin's undergraduate admissions process improperly considers race, contrary to the Fourteenth Amendment of the United States Constitution, Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*), and 42 U.S.C. §§ 1981 and 1983. UT Austin admits 75% of each entering class under the Top Ten Percent Plan, under which students in the top percentages of their high school class are admitted to UT Austin. (Am. Compl., Dkt. 13, at 17); TEX. EDUC. CODE § 51.1803(a-1). In 2018 and 2019, this applied to students in the top 8% and 7% of their high school classes respectively. (Am. Compl., Dkt. 13, at 17). The rest of its class is admitted through a "holistic-review calculus" where race is a "factor of a factor of a factor" that is considered "contextual[ly] and does not operate as a mechanical plus factor for underrepresented minorities." *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2207 (2016).

[1] Defendants are The University of Texas at Austin ("UT Austin"), the Board of Regents of the University of Texas System ("the UT System Board of Regents"), James B. Milliken, Chancellor of the University of Texas System in his Official Capacity; Steven Leslie, Executive Vice Chancellor for Academic Affairs of the University of Texas System in his Official Capacity; Daniel H. Sharphorn, Vice Chancellor and General Counsel of the University of Texas System in his Official Capacity; Jay Hartzell, President of the University of Texas at Austin in his Official Capacity; David J. Beck, Christina Melton Crain, Kevin P. Eltife, R. Steven Hicks, Jodie Lee Jiles, Janiece Longoria, Nolan Perez, Kelcy L. Warren, and James C. "Rad" Weaver, as Members of the Board of Regents in their Official Capacities; Daniel Jaffe, Interim Executive Vice President and Provost; Rachelle Hernandez, Senior Vice Provost for Enrollment Management and Student Success; and Miguel Wasielewski, Executive Director for Office of Admissions.

[2] Defendant-Intervenors are eight UT Austin students—Adaylin Alvarez, Morgan Bennett, Brianna Mallorie McBride, Liz Kufour, Desiree Ortega-Santiago, Nima Rahman, Alexandra Trujillo, and Rosaleen Xiong—("student Movants"), and three organizations—the Texas National Association for the Advancement of Colored People ("Texas NAACP"), the Black Student Alliance ("BSA"), and the Texas Orange Jackets (together, "organizational Movants"). (*See* Order, Dkt. 35).

SFFA alleges that (1) it has members who "applied for and were denied admissions to UT Austin's 2018 and 2019 entering classes;" (2) these members were "denied the opportunity to compete for admission to UT-Austin on equal footing with other applicants on the basis of race or ethnicity because of UT-Austin's discriminatory admissions policies;" and (3) these members "are ready and able to apply to transfer to UT-Austin when it stops discriminating against applicants on the basis of race and ethnicity." (Am. Compl., Dkt. 13, at ¶¶ 5-8).

This is not the first such challenge against UT Austin's admissions process. In 2008, Abigail Fisher ("Fisher") was denied admission to UT Austin and subsequently sued the university for its consideration of race in student admissions. (*Id.*, at 8). In 2013, the Supreme Court remanded the case to the Fifth Circuit to apply the correct standard of scrutiny. *See Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297 (2013) ("*Fisher I*"). On remand, the Fifth Circuit granted summary judgment to UT Austin, which the Supreme Court affirmed. *See Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) ("*Fisher II*").

Edward Blum ("Blum") was a central figure behind the *Fisher* litigation as well as in this litigation. Blum, who is not an attorney, describes his role in litigation as "identify[ing] an area of the law that [he] believes needs revising or needs to be overturned," "hir[ing] counsel," and finding plaintiffs for the litigation. (2018 Blum Depo., Dkt. 45-1, at 62). Blum also coordinates fundraising and funding of these lawsuits. (2021 Blum Depo., Dkt. 45-2, at 13).

The *Fisher* litigation was funded by the Project on Fair Representation ("POFR"), an organization founded by Blum. (*Id.* at 9, 19). POFR has three members on its board of directors, including Blum. (2018 Blum Depo., Dkt. 45-1, at 60). Blum is the president and executive director of POFR, and he does "all of the day-to-day matters for POFR." (*Id.* at 39–40, 106; *see also* 2021 Blum Depo., Dkt. 45-2, at 19). Blum met Richard Fisher in the early 1980s through business in Houston, and subsequently identified his daughter, Abigail Fisher, as a plaintiff to challenge UT

Austin's use of race in admissions. (2018 Blum Depo., Dkt. 45-1, at 27; *see* 2021 Blum Depo., Dkt. 45-2, at 65). During the litigation, Abigail Fisher had "the ultimate say in which lawyer she was going to use," but selected the one recommended by Blum. (2018 Blum Depo., Dkt. 45-1, at 66). Blum characterizes his role in the lawsuit as being "'designated' by Ms. Fisher to act as her representative in making and helping with decisions and communicating with counsel." (2018 Blum Depo., Dkt. 45-1, at 82; 2021 Blum Depo., Dkt. 45-2, at 64 (describing himself as a "conduit" for the Fisher family")). Blum had outlined the *Fisher* lawsuit before he identified Fisher as the plaintiff. (2021 Blum Depo., Dkt. 45-2, at 65). Because of his role in the lawsuit, Blum asserts attorney-client privilege with regard to any communications Blum had with Fisher or counsel in the *Fisher* litigation. (*See, e.g.*, 2018 Blum Depo., Dkt. 45-1, at 80–81).

In 2014, while the *Fisher* litigation was still ongoing, Blum created SFFA, a nonprofit corporation, with the goal of ending the consideration of race in university admissions. (*Id.* at 16, 23; Mot., Dkt. 45, at 15). The initial funding for SFFA was provided by POFR. (2021 Blum Depo., Dkt. 45-2, at 21). Today, SFFA is a nonprofit with over 22,000 members who are students, parents, and others who oppose racial classifications in college admissions. (Am. Compl., Dkt. 13, at 2; 2018 Blum Depo., Dkt. 45-1, at 45). Since July 2015, members have been required to pay one-time membership dues of $10 (which is often waived). (2018 Blum Depo., Dkt. 45-1, at 43). SFFA does not share names of its members with the public or other SFFA members. (2021 Blum Depo., Dkt. 45-2 at 50). SFFA has identified two members who applied for and were denied admission to UT Austin's 2018 and 2019 entering classes. (Am. Compl., Dkt. 13, at 2).

SFFA was created under Virginia law, and its articles of incorporation state that SFFA "shall have no members." (SFFA Articles of Incorporation, Dkt. 45-10, at 1). SFFA's original bylaws stated: "The Corporation shall have no members within the meaning of the [Virginia Nonstock Corporation] Act." (2014 Bylaws, Dkt. 45-12, § 3.01). The original bylaws provided for "one class of

affiliate members," who "have no voting rights and are not members within the meaning of the [Virginia Nonstock Corporation] Act." (*Id.* § 3.02). The bylaws were amended in 2015 to state (i) that the Corporation "shall have one class of members, referred to as General Members, which shall not be 'members' within the meaning of the [Virginia Nonstock Corporation] Act," and (ii) that the non-statutory "General Members" shall have "the right to vote for one (1) Member-Elected Director." (2015 Bylaws, Dkt. 45-13).

There were originally three members on the SFFA board of directors—Blum, Abigail Fisher, and her father Richard Fisher. (2021 Blum Depo., Dkt. 45-2, at 26–27). They are each also officers of SFFA; Blum is the president, Abigail Fisher is the secretary, and Richard Fisher is the treasurer. (2018 Blum Depo., Dkt. 45-1, at 26). In 2015, the board was expanded to include one member selected by the other board members and one member elected by SFFA's membership. (*Id.* at 45; 2021 Blum Depo., Dkt. 45-2, at 33, 45). Blum understood himself, Abigail Fisher, and Richard Fisher, to be permanent directors, although the articles of incorporation provide for their reelection by the rest of the board. (*Compare* 2018 Blum Depo., Dkt. 45-1, at 52, 55, 59, *with* 2021 Blum Depo., Dkt. 45-2, at 26–27 ("[F]rankly it never occurred to me that in reviewing the document it did require us to renominate and reelect one another through the course of [SSFA].")). Most of the day-to-day operations of SFFA, as well as POFR, are handled out of Blum's personal residence. (2021 Blum Depo., Dkt. 45-2, at 24–25). Blum describes his role in this lawsuit as "laying out general strategy and then turning to counsel to effectuate that strategy." (*Id.* at 12, 15).

SFFA has also filed two lawsuits challenging the admissions policies and practices of Harvard College and the University of North Carolina. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 1:14CV14176; *Students for Fair Admissions, Inc. v. Univ. of N. Carolina*, 1:14CV954.

Defendants and Defendant-Intervenors seek dismissal or summary judgment based on standing, res judicata, and collateral estoppel. (Defs'. Mot., Dkt. 45, at 9; Def. Intervenors' Mot. Dismiss, Dkt. 44). The parties participated in initial discovery focused solely on these issues. (*See* Order, Dkt. 33). The Court will first consider the motions to dismiss for lack of standing, and then the motion for summary judgment based on res judicata. Because the Court finds this lawsuit is barred under res judicata, the Court does not reach the issue of collateral estoppel.

## II. LEGAL STANDARD

### A. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

### B. Motion for Summary Judgment

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

## III. DISCUSSION

### A. Standing

To establish Article III standing, a plaintiff must demonstrate that she has (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "Standing is an issue upon which the party invoking federal jurisdiction, the plaintiff, bears the burden of persuasion." *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 361-62 (5th Cir. 1996); *see also Tex. Cable & Telecomms. Ass'n v. Hudson*, 265 F. App'x 210, 216 (5th Cir. 2008) ("The burden of establishing the elements of standing is on the party seeking jurisdiction in the federal courts.") (citing *Lujan*, 504 U.S. at 561).

Organizations can establish the first standing element, injury-in-fact, under two theories: "associational standing" or "organizational standing." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017); *Tenth St. Residential Ass'n v. City of Dall.*, 968 F.3d 492, 500 (5th Cir. 2020). SFFA argues that it has associational standing. (*See* Resp., Dkt. 49, at 8, 20).

For associational standing, "[A]n association has standing to bring suit on behalf of its members when: [1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). Defendants argue that SFFA is neither a membership organization nor does it have members that would otherwise have standing to sue on their own. The Court will consider each issue in turn.

### 1. Is SFFA a membership organization?

As a threshold matter, Defendants argue that SFFA is not a membership organization. (Mot., Dkt. 45, at 23). An association can have standing by either showing it has "traditional members," or, alternatively, by demonstrating it has "indicia of membership," that is its "members elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012) (citing *Hunt*, 432 U.S. at 344–45). Defendants argues that SFFA is not a "traditional membership" organization because its articles of incorporation state "the Corporation shall have no members." (Mot., Dkt. 45, at 24) (citing SFFA Articles of Incorporation, Dkt. 45-10).

Although other courts have found SFFA to be a traditional membership organization based on its bylaws' discussion of members, Defendants argue that those courts did not consider SFFA's articles of incorporation. (*Id.* at 25). Defendants argue that "[w]ithout statutorily authorized members, SFFA cannot be a 'traditional membership organization' for purposes of associational standing." (*Id.* at 24). Defendants argue that under Virginia state law, the articles of incorporation are controlling over SFFA's bylaws. (*Id.* at 25 – 26) (citing VA. CODE § 13.1-819(E) [Virginia Nonstock Corporation Act]) ("[W]henever a provision of the articles of incorporation is inconsistent with a bylaw, the provisions of the articles of incorporation shall be controlling."); *Leon v. Martin*, 79 Va. Cir. 434, at *2 (2009)).

In SFFA's litigation against Harvard, the First Circuit held that SFFA was a traditional membership organization and declined to apply the indicia of membership test. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157, 183–84 (1st Cir. 2020). The First Circuit found that it was sufficient that SFFA's bylaws provides for members, who by 2015 had the right to vote for one member-elected director and who "must" pay membership dues to SFFA. *Id.* at 164. Although Defendants argue that other courts have not considered SFFA's articles of

incorporation, (Mot., Dkt. 45, at 25), the district court in the Harvard litigation discuss the bylaws

and hold that SFFA was a traditional membership organization despite SFFA's "[b]ylaws . . .

specify[ing] that General Members are not 'members' within the meaning of the Virginia Nonstock

Corporation Act." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*,

261 F. Supp. 3d 99, 105 (D. Mass. 2017), *aff'd sub nom. Students for Fair Admissions, Inc. v. President &*

*Fellows of Harvard Coll.*, 980 F.3d 157 (1st Cir. 2020); *id.* at 108 ("SFFA seeks to represent individuals

who are clearly members as defined by its Bylaws."); *see also Students for Fair Admissions, Inc. v. Univ. of*

*N. Carolina*, No. 1:14CV954, 2018 WL 4688388, at *1 n.1 (M.D.N.C. Sept. 29, 2018).

 Defendants rely on *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*,

123 F.3d 111 (3d Cir. 1997) ("*PIRG*"), where the Third Circuit analyzed the standing of two plaintiff

nonprofits under the indicia of membership test after the defendant argued that the plaintiffs'

charters prohibited them from having members. *Id.* at 119; (Mot., Dkt. 45, at 24). More specifically,

the Court in *PIRG* stated:

> MEI's counsel also contended . . . that PIRG and FOE lacked standing because their
> charters prohibit them from having members. We do not accept this formalistic
> argument because it lacks merit. To meet the requirements of organizational standing,
> PIRG and FOE need only prove that their members possess the 'indicia of
> membership' in their organizations. Thus, in considering PIRG's standing, we will
> consider only if PIRG's members would have standing as individuals to sue MEI.

*PIRG*, 123 F.3d at 119.

 In *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir. 1997) the Fifth Circuit

found that the plaintiff was not a traditional membership organization where the board of directors

had never taken action to set membership requirements, as outlined by the bylaws. *Id.* at 827.

Relying on *PIRG*, the Fifth Circuit applied the indicia of membership test to determine, "whether a

purported corporation, despite the failure to meet state law requirements, ha[d] 'members' whose

interests it [could] represent in federal court." *Id.* at 829. The district court in *Harvard* observed that

there were "circumstances triggering the indicia-of-membership analysis" in *Friends of the Earth* that

were not present regarding SFFA's standing. *SFFA v. President & Fellows of Harvard Coll.*, 261 F. Supp. 3d at 108. The same still holds true in this case, as SFFA's bylaws state that it will have members, whereas in *Friends of the Earth* the plaintiff's bylaws provided that its board of directors would set membership requirements—which they never did. *Friends of the Earth*, 129 F.3d at 827; (2015 Bylaws, Dkt. 49-10, at 9 ("[SFFA] shall have one class of members, referred to as General Members.")).

The Court is unpersuaded that there is an impermissible inconsistency between SFFA's articles of incorporation and its bylaws that would impact SFFA's standing in this case. Defendants do not cite to any authority indicating that having no members under the meaning of the Virginia Nonstock Corporation Act precludes an organization from defining members in its bylaws or otherwise being a traditional membership organization. (*See* Mot., Dkt. 45, at 17). Indeed, SFFA's amended bylaws acknowledge this nuance in the type of members it has, by stating that it "shall have one class of members, referred to as General Members, which shall not be 'members' within the meaning of the [Virginian Nonstock Corporation] Act." (2015 Bylaws, Dkt. 49-10, at 9). SFFA's membership structure is not sufficiently analogous to the plaintiffs in *PIRG* or *Friends of the Earth* to negate SFFA's status as a traditional membership organization.

## 2. Do SFFA members have standing?

Next, Defendant-Intervenors argue that SFFA's members do not have standing to sue in their own right because they have not been harmed by UT Austin's alleged actions, their injuries are not traceable to UT Austin's actions, and those injuries are not redressable by the relief SFFA seeks in this lawsuit. (Mot. Dismiss, Dkt. 44, at 6–8). Defendant-Intervenors argue that because UT Austin's admissions program is holistic in nature and race is only a "factor of a factor of a factor," the admissions policies do not harm white students and are distinguishable from other precedent addressing affirmative-action admissions programs. (*Id.* at 11). Defendant-Intervenors argue that the

Supreme Court has only found injury in fact in other affirmative action lawsuits where there were separate admissions tracks for applicants of different races, preventing applicants from being on "equal footing." (*Id.* at 7, 11) (citing *Regents of Univ. of Ca. v. Bakke*, 438 U.S. 265, 316–18 (1978); *Gratz v. Bollinger*, 539 U.S. 244, 261-62 (2003).

However, the Supreme Court implicitly found that the plaintiff in *Fisher* had standing to challenge the use of race in UT's admission program. *See generally Fisher II*, 136 S. Ct. 2198. Although Intervenor-Defendants argue that the Supreme Court never addressed the plaintiff's standing in *Fisher*, they also acknowledge that the issue was raised before the Supreme Court in "party and amicus briefing." (Reply, Dkt. 53, at 9). As such, it is not the case that standing "was not questioned" or "passed *sub silentio*," in *Fisher*, and this Court declines to infer that the Supreme Court lacked jurisdiction over the plaintiff in *Fisher*. (*See id.*) (citing *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 38 (1952)). Considering that *Fisher* is binding precedent, without reaching the merits of SFFA's claims themselves, SFFA must also have standing to bring these claims, especially as Defendants argue that both cases concern the same claims for purposes of res judicata. (Defs.' Motion, Dkt. 45, at 38).

Similarly, Defendant-Intervenors challenge that SFFA has standing to bring each of its claims that 1) UT Austin improperly uses races as more than a "plus" factor in admissions; 2) UT Austin improperly considers race in admissions instead of using race-neutral alternatives; 3) UT Austin engages in racial balancing for each admissions class and pursues quotas; and 4) any consideration of race is unlawful. (Mot. Dismiss, Dkt. 44, at 7–13; Am. Compl., Dkt. 13, at ¶ 200, 209, 220, 230–43).

Whereas SFFA argues that the Supreme Court has previously found that student plaintiffs have standing to bring these types of claims. (Resp., Dkt. 50, at 10–11) (citing *Grutter*, 539 U.S. at 327–40). The Court agrees that *Grutter* addresses the types of claims that SFFA brings, and without

addressing the merits of SFFA's claims, interprets *Grutter* as standing for the proposition that student plaintiffs may have standing to bring similar claims against university admissions policies. *See, e.g.*, *Grutter*, 539 U.S. at 336 (analyzing and denying plaintiffs' claim that "that the Law School's policy conceals an attempt to achieve racial balancing"). Additionally, as discussed above, this Court is bound by the Supreme Court's implicit finding of jurisdiction in *Fisher*, which Defendants themselves argue addresses the same claims as this case. (*See* Mot., Dkt. 45, at 38).

More specifically, SFFA states that is has "at least two members" ("Standing Members") who were denied admission to UT Austin's 2018 and 2019 entering classes. (Am. Compl., Dkt. 13, at 2). SFFA states that these members are white and were "denied the opportunity to compete for admission to UT Austin on equal footing with other applicants on the basis of race or ethnicity because of UT Austin's discriminatory admissions policies." (*Id.*). The complaint further states those members are ready and able to apply to transfer to UT Austin. (*Id.*). Although not every student rejected for admission from UT Austin would have standing to bring these claims, the Intervenor-Defendants do not identify any ways in which the Standing Members' posture is materially different from that of the plaintiff in *Fisher*. The Court finds that under Supreme Court precedent, the Standing Members would have standing to sue in their own right.

Additionally, SFFA seeks an injunction to prohibit UT Austin from "be[ing] aware of or learn[ing] the race or ethnicity of any applicant for admission." (*Id.* at 49). Defendant-Intervenors argue that this relief is untethered from any of the SFFA members' alleged harms and thus SFFA lacks standing to seek this form of relief. (Mot. Dismiss, Dkt. 44, at 19–20). In response, SFFA argues that its requested injunctive relief would be appropriate if it succeeds on its claims that UT Austin discriminates on the basis of race, and more particularly, its claim that any use of race in admissions is unconstitutional. (Resp., Dkt. 50, at 12–13). Once again without addressing the merits of SFFA's claims or its requested relief, the Court finds that SFFA has standing to seek the

requested injunctive relief based on the allegations of harm suffered by the Standing Members from the use of race in UT Austin's admissions process. Having found that SFFA has standing, the Court denies Defendant-Intervenors' motion to dismiss, (Dkt. 44), and denies in part Defendants' motion, (Dkt. 45), as to standing. The Court will next turn to Defendants' motion for summary judgment based on res judicata. (Dkt. 45).

## A.   Res Judicata

Defendants argue that this action is barred under the doctrine of res judicata because of the overlap between this lawsuit and *Fisher*. "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). "[R]es judicata encompasses two separate but linked preclusive doctrines: (1) true res judicata or claim preclusion and (2) collateral estoppel or issue preclusion." *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 466–67 (5th Cir. 2013). True res judicata "bars the litigation of claims that either have been litigated or should have been raised in an earlier suit," while collateral estoppel "precludes relitigation of only those issues actually litigated in the original action, whether or not the second suit is based on the same cause of action." *Hous. Prof'l Towing Ass'n v. City of Hous.*, 812 F.3d 443, 2016 WL 456541, at *2–3 (5th Cir. Feb. 3, 2016) (internal citations omitted). "[A] motion for summary judgment . . . is the proper vehicle for raising a res judicata defense." *Grant v. Harris Cnty.*, 794 F. App'x 352, 361 n.6 (5th Cir. 2019).

"Res judicata 'has four elements: (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions.'" *Comer*, 718 F.3d at 467 (quoting *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005)).

The second and third elements of res judicata are both easily met in this case. Under the second element, in *Fisher*, the plaintiff affirmatively invoked the jurisdiction of the federal court in her case, and at every level of the litigation, the plaintiff's claims withstood the defendants' jurisdictional challenges. *See, e.g.*, *Fisher v. Univ. of Tex. at Austin,* 758 F.3d 633, 640 (5th Cir. 2014). As to the third element, there was a final judgment on the merits at the trial level, and the United States Supreme Court subsequently concluded on the merits in favor of the defendants. (Judgment, Dkt. 45-19); *Fisher I*, 570 U.S. at 315; *Fisher II*, 136 S. Ct. at 2215. However, SFFA argues that there is no privity between the plaintiffs in this case and in *Fisher*, and that the two lawsuits do not involve the same claims.

### 1. Are the plaintiffs in privity?

"To satisfy the identity element, strict identity of parties is not necessary. A non-party . . . can assert res judicata so long as it is in 'privity' with the named [party]. . . . 'Privity' is recognized as a broad concept, which requires us to look to the surrounding circumstances to determine whether claim preclusion is justified." *Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1173 (5th Cir. 1992).

Defendants are in privity with the defendants in *Fisher* because they are the same University of Texas officials as those in *Fisher*, including UT Austin, UT Austin's President, and the Chancellor and Regents of the University of Texas System. (Mot., Dkt. 45, at 33); *see Fisher v. Univ. of Texas at Austin*, 758 F.3d 633, 637 (5th Cir. 2014).

As to whether there is privity between the plaintiffs, the Fifth Circuit has recognized privity "where the non-party controlled the prior litigation." *Clyce v. Farley*, 836 F. App'x 262, 269 (5th Cir. 2020) (quoting *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990)); *see also Taylor v. Sturgell*, 553 U.S. 880, 895 (2008) (a nonparty is bound by a judgment if they 'assume[d] control' over the litigation in which that judgment was rendered . . . [b]ecause such a person has had 'the opportunity to present proofs and argument,' he has already 'had his day in court' even though he

was not a formal party to the litigation."). "The nonparty's participation may be overt or covert, and

the evidence of it may be direct or circumstantial—so long as the evidence as a whole shows that the

nonparty possessed effective control over a party's conduct of the earlier litigation as measured from

a practical, as opposed to a purely theoretical, standpoint." *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751,

759 (1st Cir. 1994).

Defendants argue that Abigail Fisher, the plaintiff in *Fisher*, is in privity with SFFA as the

Plaintiff in this case, through Blum and Fisher's role in each lawsuit and position within SFFA.

(Defs.' Mot., Dkt. 45, at 33). The Court agrees that Blum and, to a somewhat lesser extent, Fisher

exerted sufficient control over *Fisher* and this lawsuit such that the plaintiffs are in privity.

In contrast, SFFA argues that it is controlled by a five-member board of directors and there

is no caselaw that an individual "will be in privity with an organization merely because he or she

serves on the organization's board of directors." (Resp., Dkt. 49, at 40–41) (citing 18A Fed. Prac. &

Proc. Juris. §4460 (3d ed.) ("[A] corporation cannot be bound simply because a director, officer, or

minor shareholder has lost an action pursued in an individual capacity."); Restatement (2d) of

Judgments §59, cmt. a (1982) ("[A] judgment for or against persons who are stockholders, members,

or managers of a corporation does not in general bind or redound to the benefit of the

corporation.")). SFFA further disputes the allegations that Blum was the "decision maker" in the

*Fisher* litigation because it was funded by POFR and Blum merely recommended which attorney

Fisher should choose. (Resp., Dkt. 49, at 41).

Either Blum or Fisher controlled the previous litigation in *Fisher*. SFFA suggests that it was

only Fisher, while Defendants suggest that both Blum and Fisher controlled the previous litigation.

(*Id.* at 40–41; Reply, Dkt. 52, at 22). Blum's own statements demonstrate that he had a significant

amount of control over the litigation decisions in *Fisher*. (2018 Blum Depo., Dkt. 45-1, at 82; 2021

Blum Depo., Dkt. 45-2, at 64). Fisher and Blum are now both officers and directors of SFFA. (2018

Blum Depo., Dkt. 45-1, at 26; 2021 Blum Depo., Dkt. 45-2, at 26–27). Although there are five total

board of directors, one is Fisher's father, and the three collectively have a majority vote to direct any

decisions from the board. (*See* 2018 Blum Depo., Dkt. 45-1, at 52 ("Any three members, permanent

or not, would have the power to control a vote.")). While one director is elected by SFFA's

members, courts have found "control" where a non-party's "involvement in the first action was at

least as great as would be reasonably expected from a co-party" *Am. Postal Workers Union Columbus*

*Area Local v. U.S. Postal Service*, 736 F.2d 317, 319 (6th Cir. 1984); *compare Gonzalez*, 27 F.3d at 758

(privity exists where "availability of a significant degree of effective control in the prosecution or

defense of the case—what one might term, in the vernacular, the power—whether exercised or

not—to call the shots").

　　Additionally, Blum's roles as the architect of the *Fisher* litigation and this lawsuit are

sufficient for privity. (Mot., Dkt. 45, at 35). Blum founded SFFA as well as POFR, the organization

that funded the *Fisher* lawsuit and provided the seed money for SFFA's formation. (2018 Blum

Depo., Dkt. 45-1, at 60; 2021 Blum Depo., Dkt. 45-2, at 19, 21). In both lawsuits, Blum was

responsible for identifying the plaintiffs, determined the strategy for the lawsuit, communicating

with lawyers, and raising funds for the litigation (2018 Blum Depo., Dkt. 45-1, at 80–82; 2021 Blum

Depo., Dkt. 45-2, at 12–13, 15, 62, 64–65). Blum acted as a representative for Abigail Fisher in the

*Fisher* litigation in "making and helping with decisions and communicating with counsel." (2018

Blum Depo., Dkt. 45-1, at 82; 2021 Blum Depo., Dkt. 45-2, at 64).

　　The Court finds *Ferris v. Cuevas*, 118 F.3d 122 (2d Cir. 1997) to be persuasive. There, three

attorneys formed a nonprofit corporation to challenge a campaign finance reform system. *Id.* at 124.

One of the attorneys (in his individual capacity) and the nonprofit sued the city clerk regarding

petition signatures, which the court dismissed. *Id.* Two other individuals then filed suit relating to

the ballot signatures and were represented by the same attorney who had been the plaintiff in the

previous suit. *Id.* at 125. In considering the "prior litigation and the surrounding circumstances, rather than an external contractual or pre-existing fiduciary duty," the court found that the attorney's "involvement in and control of every aspect of both . . . actions presents a connection of much greater magnitude." *Id.* at 127–28. The court observed that res judicata and privity are intended to "prevent one controlling person or entity from bringing multiple suits in the names of different plaintiffs, and controlling the litigation from the shadows." *Id.* at 128. The court found that the attorney "was a party to the prior action in both his individual and representative capacities, and guided the entire initiative campaign from its inception. He controlled the prior action as a party and counsel and continues to control the present action as counsel to Appellants." *Id.* at 128.

Similarly here, Fisher and Blum both exerted control over the litigation in *Fisher* and exert control over this lawsuit as directors of SFFA—the organization they founded and operate. This applies to Fisher as a former plaintiff in the previous litigation, and to Blum as a "conduit" in both lawsuits. (2021 Blum Depo., Dkt. 45-2, at 64); *see Ferris*, 118 F.3d at 128 ("[P]rivity exists between actual parties and those who control the action without being formal parties to it."); Wright & Miller, 18A Fed. Prac. & Proc. Juris. § 4451 (3d ed.) ("[I]t should be enough that the nonparty has the actual measure of control or opportunity to control that might reasonably be expected between two formal coparties.") (citing *Phelps v. Hamilton*, 122 F.3d 1309, 1319 (10th Cir. 1997)). Even with the understanding that SFFA is a membership organization where members elect one of the board members, Fisher and Blum still effectively control at least three, if not four, of the five board seats and exert immense control over the litigation at hand. (*See, e.g.*, 2018 Blum Depo., Dkt. 45-1, at 52; 2021 Blum Depo., Dkt. 45-2, at 51 (Blum explaining that he is the primary speaker during SFFA conference calls)). Because of the control that Fisher and Blum have exerted both over *Fisher* and SFFA's litigation here, the Court finds there is privity between the plaintiffs in *Fisher* and this lawsuit.

<u>2. Are the causes of action the same?</u>

As to the fourth element of res judicata, the Fifth Circuit applies a transactional test to determine "whether two suits involve the same claim or cause of action." The transactional test focuses on whether the two cases "are based on the same nucleus of operative facts." *United States v. Davenport*, 484 F.3d 321, 326 (5th Cir. 2007) (internal quotation omitted). "[F]actual similarity" is not enough—there must be "sameness of operative facts." *Petro-Hunt, LLC v. United States*, 365 F.3d 385, 396 (5th Cir. 2004).

Defendants argue that both cases have the same nucleus of operative facts. Defendants point to the pleadings in both cases, which both recount the history of UT's admissions policy. (Mot., Dkt. 45, at 38); (*compare Fisher* Compl., Dkt. 45-8, at ¶¶ 27, 35, 39, 49, 68, 76–80, 142–164, *with* Am. Compl., Dkt. 13, at ¶¶ 19, 22, 29–31, 39, 42–45, 176–243). Defendants argue that SFFA is challenging the same admissions program at issue in *Fisher*. (Mot., Dkt. 45, at 38) (citing Am. Compl., Dkt. 13, ¶ 86 ("Since *Fisher II* was decided, UT Austin has repeatedly acknowledged that it continues to use race in the admissions process.")). The claims in *Fisher* and SFFA's claims in this lawsuit both challenge UT Austin's consideration of race in its holistic review process, both allege discrimination and assert equal protection violations, and both seek injunctive relief to prevent UT Austin from using race as a factor in admissions decisions. (Mot., Dkt. 45, at 38, 39; *Fisher* Compl., Dkt. 45-8, at 32; Am. Compl., Dkt. 13, at p. 49).

SFFA argues this case does not have the same operative facts as *Fisher*, because the previous lawsuit only looked at the "process employed by UT to admit freshmen . . . for the class entering fall 2008." (Resp., Dkt. 49, at 42) (citing *Fisher v. Univ. of Tex. at Austin*, 631 F.3d 213, 217 (5th Cir. 2011)). Whereas in this case, SFFA is suing on behalf of its members who were denied admission to UT Austin in 2018 and 2019. (*Id.*). SFFA argues that in the years since the operative facts in *Fisher*, there "has been an enormous increase in racial diversity and new research into race-neutral

alternatives, making UT's use of race unnecessary." (Resp., Dkt. 49, at 43). SFFA also argues that

during this time, UT Austin has "been racially balancing its freshman class," and UT Austin "has

*increased* its use of race as a factor in admissions." (*Id.*).

Generally speaking, although SFFA's complaint in this case focuses on UT Austin's Fall

2018 and 2019 classes, which postdate *Fisher*, judgments bar litigation over later occurring events,

where the substance of the alleged discrimination is the same and "all of [the] events were directly

related to each other in terms of motivation and common purpose . . . ." *Havercombe v. Dep't of Educ.*

*of Com. of P.R.*, 250 F.3d 1, 6 (1st Cir. 2001); *see also Adams v. City of Indianapolis*, 742 F.3d 720, 723–24

(7th Cir. 2014) ("[A]lthough the challenged promotion decisions occurred at different times, the

second suit raises the same core of factual allegations as the first."); *Walgreen Co. v. La. Dep't of Health*

*& Hosps.*, 220 F. App'x 309, 312 (5th Cir. 2007) ("[T]he 2000 litigation established that the

regulation was facially valid such that future applications of the regulations are legal. The only way to

establish the unlawful application of these regulations in these circumstances is to directly challenge

the outcome of the 2000 litigation, the precise situation that res judicata is designed to avoid.").

The Court next turns to the specific changes that SFFA argues distinguish this lawsuit from

*Fisher*. (*See* Resp., Dkt. 49, at 43). "In order for new facts to constitute a new cause of action and

thus allow a claim to be relitigated, those facts must be both 'significant' and create 'new legal

conditions.'" *Wilson v. Lynaugh*, 878 F.2d 846, 851 (5th Cir. 1989) (quoting *Hernandez v. City of*

*Lafayette*, 699 F.2d 734, 737 (5th Cir. 1983)); *see Hous. Prof'l Towing Ass'n*, 812 F.3d at 449 ("[T]he

critical question is not whether any facts or law have changed between SafeClear II and this suit, but

whether there have been any significant changes—whether the factual and legal basis undergirding

HPTA's claim of preemption has changed."). None of the factual changes that SFFA alleges are

either significant or indicate that there are new legal conditions regarding the applicability of *Fisher* to

UT Austin's admissions program that would allow relitigation of the same claims.

SFFA alleges that UT Austin has changed its admission policies since *Fisher* in two ways. First, SFFA alleges that UT Austin has publicly referred to "racial/ethnic status" as a "very important factor" in the aftermath of *Fisher*, as opposed to referring to it as a factor that was "considered" prior to 2017. (Am. Compl., Dkt. 13, at 18). This difference in semantics in how UT's policy is described does not indicate that the use of race in admissions has changed in a way that would merit relitigation of its constitutionality. *See Shults v. State of Tex.*, 762 F.2d 449, 452 (5th Cir. 1985) ("[T]he primary right asserted (the right to a timely hearing) and the primary wrong complained of (the absence of a timely hearing provision) are the same in both actions. That the pertinent provisions of the 1983 amendments at issue here are not identical in other respects to the pertinent provisions of the 1981 amendments at issue in *Atkins* is irrelevant.").

Second, SFFA alleges that UT Austin has engaged in racial balancing of its admitted classes because its admission of African American students has been "remarkably stable" at either 5% or 6% from 2009 to 2018. (Am. Compl., Dkt. 13, at 34). SFFA again does not sufficiently show how this allegation equates to a new factual or legal condition differentiating its challenge from the one in *Fisher*. Instead, the Supreme Court in *Fisher* observed that the number of African American freshman enrolled each year had showed "stagnation" and was 4.1% in both 1996 and in 2003. *Fisher II*, 136 S. Ct. at 2212. The Court considered this only as a "gauge of the University's ability to enroll students who can offer underrepresented perspectives," without a finding of racial balancing. *Id.*

SFFA also argues there have been changes external to UT Austin's admissions policies. Namely, it argues that there has been an increase in racial diversity in UT Austin's admitted classes and that there is now additional research about race-neutral alternatives available. (Resp., Dkt. 49, at 43). As to the first change, an increase in non-white students in UT Austin's student body is not a new factual or legal condition, as the Supreme Court stated in *Fisher* that while "[i]ncreasing minority enrollment may be instrumental to . . . educational benefits . . . it is not, as petitioner seems to

suggest, a goal that can or should be reduced to pure numbers." *Fisher II*, 136 S. Ct. at 2210. As to research regarding other race-neutral alternatives, SFFA proposes many of the same changes to UT Austin's admissions policy as the Supreme Court addressed in *Fisher*. For instance, SFFA suggests "placing greater emphasis on socioeconomic factors." (Am. Compl., Dkt. 13, at 22). However, this was also proposed in *Fisher*, to which the Supreme Court responded that the "proposal ignores the fact that the University tried, and failed, to increase diversity through enhanced consideration of socioeconomic and other factors." *Fisher II*, 136 S. Ct. at 2213.

SFFA has brought essentially the same claims against the same university admissions policy as in *Fisher*. The alleged changes that SFFA brings forward about UT's admissions program do not rise to the level of being "significant" such that they "create 'new legal conditions,'" that would allow for relitigation of these claims. *See Wilson*, 878 F.2d at 851. The Supreme Court in *Fisher* observed that UT Austin may not necessarily rely on the same policies "without refinement" and that UT Austin has an "ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies," *Fisher II*, 136 S. Ct. at 2213. However, the Court does not understand UT Austin's ongoing obligation to override res judicata and allow essentially the same plaintiffs to bring the same claims against UT Austin that they alleged in *Fisher* without a greater showing of some factual or legal change. As such, the Court finds that SFFA's claims are barred by res judicata and does not reach the issue of collateral estoppel.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Defendant-Intervenors' motion to dismiss, (Dkt. 44), is **DENIED** and Defendants' motion, (Dkt. 44), is **DENIED IN PART** as to standing.

**IT IS FURTHER ORDERED** that Defendants' motion, (Dkt. 45), is **GRANTED IN PART** as to summary judgment based on res judicata. SFFA's claims are **DISMISSED WITH PREJUDICE** because they are barred under the doctrine of res judicata.

**IT IS FINALLY ORDERED** that this action is **CLOSED**. Final judgment will be entered in a separate order.

**SIGNED** on July 26, 2021.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE