**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> UNIVERSITY OF TEXAS AT AUSTIN, et al., <br><br> *Defendants*. | Case No. 1:20-cv-763-RP |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Thomas R. McCarthy (*pro hac vice*)
J. Michael Connolly
Cameron T. Norris
Steven C. Begakis (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
steven@consovoymccarthy.com

*Counsel for Plaintiff Students for Fair Admissions, Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES........................................................................................................iii

INTRODUCTION ....................................................................................................................1

BACKGROUND .......................................................................................................................2

    I.    UT's Use of Race in Admissions ...............................................................................2

    II.   This Litigation ...........................................................................................................3

    III.  *SFFA v. Harvard*............................................................................................................4

    IV.  UT's and Other Universities' Responses to *SFFA v. Harvard*................................6

ARGUMENT.............................................................................................................................8

    I.    SFFA is entitled to summary judgment....................................................................8

        A.    UT's admissions policies and procedures are unlawful..................................8

        B.    UT's revised admissions policy is unlawful. ...............................................11

    II.   The Court should enter a permanent injunction.....................................................13

CONCLUSION........................................................................................................................17

CERTIFICATE OF SERVICE...............................................................................................18

# TABLE OF AUTHORITIES

## CASES

*Am. Beverage Ass'n v. City & Cty. of San Fran.*,
916 F.3d 749 (9th Cir. 2019) .................................................................15

*Arnold v. Barbers Hill Indep. Sch. Dist.*,
479 F. Supp. 3d 511 (S.D. Tex. 2020) ....................................................14

*Aspen Tech., Inc. v. M3 Tech., Inc.*,
569 F. App'x 259 (5th Cir. 2014) ...........................................................13

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ..............................................................15

*Brown v. Bd. of Educ.*,
347 U.S. 483 (1954)..................................................................................8

*Brown v. Plata*,
563 U.S. 493 (2011)................................................................................13

*CFTC v. Hunt*,
591 F.2d 1211 (7th Cir. 1979) ................................................................15

*Coal. to Def. Affirmative Action v. Granholm*,
473 F.3d 237 (6th Cir. 2006) ..................................................................16

*Commonwealth Sci. & Indus. Rsch. Org. v. Buffalo Tech. Inc.*,
492 F. Supp. 2d 600 (E.D. Tex. 2007)....................................................15

*De Boulle Diamond & Jewelry, Inc v. Boulle, Ltd.*,
No. 12-cv-1462, 2015 WL 5033893 (N.D. Tex. Aug. 25, 2015) ............16

*De Leon v. Perry*,
975 F. Supp. 2d 632 (W.D. Tex. 2014)....................................................15

*DOJ v. Daniel Chapter One*,
89 F. Supp. 3d 132 (D.D.C. 2015) .................................................... 14, 15

*DynaLantic Corp. v. DOD*,
885 F. Supp. 2d 237 (D.D.C. 2012).........................................................14

*EEOC v. Wilson Metal Casket Co.*,
24 F.3d 836 (6th Cir. 1994) ....................................................................13

*Fisher v. Univ. of Tex. at Austin*,
570 U.S. 297 (2013)........................................................................ 2, 3, 11

*Fisher v. Univ. of Tex. at Austin*,
579 U.S. 365 (2016)..................................................................................3

*Floyd v. City of N.Y.*,
959 F. Supp. 2d 668 (S.D.N.Y. 2013)................................................ 15, 16

*Free Speech Coal., Inc. v. Colmenero*,
No. 23-cv-917, 2023 WL 5655712 (W.D. Tex. Aug. 31, 2023)................15

*Grutter v. Bollinger*,
539 U.S. 306 (2003) ................................................................................................2

*Hopwood v. Texas*,
78 F.3d 932 (5th Cir. 1996) ....................................................................................2

*Howe v. City of Akron*,
801 F.3d 718 (6th Cir. 2015) ................................................................................13

*Jackson Women's Health Org. v. Currier*,
760 F.3d 448 (5th Cir. 2014) ................................................................................16

*Joyce v. Town of Dennis*,
720 F.3d 12 (1st Cir. 2013) ..................................................................................16

*Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*,
540 F.3d 752 (8th Cir. 2008) ................................................................................14

*MacGinnitie v. Hobbs Grp., LLC*,
420 F.3d 1234 (11th Cir. 2005) ...........................................................................15

*Miller v. Johnson*,
515 U.S. 900 (1995) ..............................................................................................11

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ..............................................................................................14

*Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas*,
903 F. Supp. 2d 446 (N.D. Tex. 2012) .................................................................14

*Opulent Life Church v. City of Holly Springs, Miss.*,
697 F.3d 279 (5th Cir. 2012) ................................................................................14

*Rush v. Nat'l Bd. of Med. Exam'rs*,
268 F. Supp. 2d 673 (N.D. Tex. 2003) .................................................................16

*SFFA v. Harvard*,
600 U.S. 181 (2023) .........................................................................................*passim*

*SFFA v. Univ. of Tex. at Austin*,
37 F.4th 1078 (5th Cir. 2022) ..........................................................................4, 15

*Smith v. South Dakota*,
781 F. Supp. 2d 879 (D.S.D. 2011) ......................................................................14

*United States v. Bob Lawrence Realty, Inc.*,
474 F.2d 115 (5th Cir. 1973) ................................................................................14

*United States v. Fletcher ex rel. Fletcher*,
805 F.3d 596 (5th Cir. 2015) ................................................................................12

*United States v. Fordice*,
505 U.S. 717 (1992) ..............................................................................................12

*United States v. W.T. Grant Co.*,
345 U.S. 629 (1953) ..............................................................................................14

*Vote.org v. Callanen,*
    609 F. Supp. 3d 515 (W.D. Tex. 2022)..................................................................................14

*Williams v. Illinois,*
    399 U.S. 235 (1970)..........................................................................................................16

**STATUTES**

Tex. Educ. Code §51.803.......................................................................................................2

**OTHER AUTHORITIES**

U.S. EEOC, *Pre-Employment Inquiries and Race* ....................................................................13

## INTRODUCTION

The Supreme Court's decision in *SFFA v. Harvard*, 600 U.S. 181 (2023), makes clear that *any* continued use of race by UT in its admissions process is unlawful. Although UT has purportedly altered its admissions process in response to *Harvard*, this case is not moot for the reasons SFFA provides in its opposition to the motions to dismiss. The Court therefore should declare UT's use of race unlawful, and it should issue injunctive relief to ensure that UT never again discriminates on the basis of race in admissions.

To begin, UT's longstanding use of race is unlawful. UT's justifications for its race-based admissions—that it produces "cross-racial understanding" and "break[s] down racial and ethnic stereotypes," Dkt. 14 at 4—were the same excuses the Supreme Court rejected in *Harvard*. Nor is UT's admissions policy narrowly tailored. UT employs crude racial classifications, uses race as a negative, stereotypes applicants based on skin color, and engages in racial balancing.

UT argues that its admission policies are now lawful because it has instructed its admissions officers not to use race in the admissions process. But UT's filings with this Court discussing its new admissions policies contain two egregious omissions: (1) UT continues to give its admissions officers access to check-box information on each individual's race, refusing to take simple technological steps to blind its officers to this forbidden admission data; and (2) UT continues to provide aggregate reports (updated daily) to its admissions officers on the racial composition of the admitted class. UT has no legitimate excuse for continuing to use race in this way, and it has offered none to SFFA or this Court. Because UT continues to violate the constitution's command of "'color-blind[ness],'" *Harvard*, 600 U.S. at 230, UT's modified admissions policy remains unconstitutional.

Along with declaring UT's admissions policies unlawful, this Court must enter a permanent injunction to prevent UT from ever discriminating again. UT's litigation assurances that it won't discriminate in the future are insufficient. UT has a long history of racial discrimination, it is refusing

to blind its admissions officers to applicants' race, and its admissions office continues to review aggregate racial data. Only a permanent injunction can ensure that UT follows the Constitution.

Accordingly, the Court should grant SFFA summary judgment and declare that UT's longstanding and revised use of race in admissions is unlawful. The Court should further enter a permanent injunction (1) prohibiting UT from reinstating its prior admissions policy or using race as a factor in admissions, and (2) prohibiting any individuals in UT's admissions office from receiving or having access to racial check-box data or aggregate reports on race during the admissions process.

## BACKGROUND

### I.    UT's Use of Race in Admissions

Before 1996, UT considered two factors in the admissions process: a numerical score reflecting an applicant's test scores and academic performance in high school (Academic Index or AI), and the applicant's race. *Fisher v. Univ. of Tex. at Austin* ("*Fisher I*"), 570 U.S. 297, 304 (2013). In 1996, this system was held unconstitutional by the Fifth Circuit. *See Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996). Following *Hopwood*, UT stopped considering race in admissions and substituted instead a new holistic metric of a candidate's potential contribution to UT, to be used in conjunction with the Academic Index. *Fisher I*, 570 U.S. at 304. This "Personal Achievement Index" (PAI) measures "a student's leadership and work experience, awards, extracurricular activities, community service, and other special circumstances that give insight into a student's background." *Id.*

The Texas State Legislature also responded to the *Hopwood* decision. It enacted a law known as the Top Ten Percent Law, codified at Tex. Educ. Code §51.803. The Top Ten Percent Law grants automatic admission to any public state college, including UT, to all students in the top 10% of their class at high schools in Texas that comply with certain standards. *Fisher I*, 570 U.S. at 305.

Following *Grutter v. Bollinger*, 539 U.S. 306 (2003), UT "adopted a third admissions program, the 2004 program in which [UT] reverted to explicit consideration of race." *Fisher I*, 570 U.S. at 305. To award racial preferences, UT "included a student's race as a component of the PAI score." *Id.* at

306. UT "asks students to classify themselves from among five predefined racial categories on the application": "American Indian or Alaska Native," "Asian," "Black or African American," "Native Hawaiian or Other Pacific Islander," and "White." *Id.*; *see* Wasielewski Decl. at 5 ¶14, Dkt. 85-1. Although "race [was] not assigned an explicit numerical value," it was "undisputed that race [was] a meaningful factor" in the admissions process." *Fisher I*, 570 U.S. at 306.

In 2013 and 2016, the Supreme Court issued decisions in a lawsuit brought by Abigail Fisher, a white high school student from Texas who was denied admission to UT. *Id.* at 301-02; *Fisher v. Univ. of Tex. at Austin* ("*Fisher II*"), 579 U.S. 365, 375 (2016). The Supreme Court ruled for UT in *Fisher II*. Although it rejected Ms. Fisher's claims, the Court emphasized that it had resolved only the "narrow question" of whether Ms. Fisher was denied equal treatment "at the time her application was rejected" in 2008. *Fisher II*, 579 U.S. at 380. The Court warned that its "affirmance of the University's admissions policy today does not necessarily mean the University may rely on that same policy without refinement." *Id.* at 388. UT had an "ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies." *Id.*

Following *Fisher II*, UT "made no changes" to its use of race in admissions. Connolly Decl., Ex. A at 5-6. UT thus continued to consider "an applicant's race and ethnicity" as part of its "holistic review process." Wasielewski Decl. at 3 ¶11, Dkt. 85-1.

## II.   This Litigation

On July 20, 2020, SFFA sued UT, alleging that its use of race in the admissions process is unconstitutional. Dkt. 13 at 40-49. SFFA sought, among other relief, a declaration that UT's "admissions policies and procedures violate the Fourteenth Amendment . . . [and] Title VI of the Civil Rights Act" and a permanent injunction requiring UT to "conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission." *Id.* at 49.

After this Court granted UT summary judgment on res judicata grounds, the Fifth Circuit reversed. *See SFFA v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1081 (5th Cir. 2022). In July 2022, the parties asked the Court to stay the litigation pending the Supreme Court's resolution of *SFFA v. Harvard* and *SFFA v. UNC* because of their likely effect on the case. Dkt. 63 at 1. The Court granted the joint motion and stayed the case.

## III.    *SFFA v. Harvard*

In June 2023, the Supreme Court held that both Harvard's and the University of North Carolina's use of race in admissions violated the Equal Protection Clause (and thus Title VI). *SFFA v. Harvard*, 600 U.S. 181 (2023). Both Harvard and UNC used a multi-stage admissions process that considered an applicant's race at every step of the process, including the admissions decisions themselves. *See id.* at 192-97. SFFA sued Harvard and UNC, arguing that their "race-based admissions programs violated" Title VI and the Fourteenth Amendment. *Id.* at 197-98.

In ruling for SFFA, the Court reiterated its precedent that any use of race in admissions "must survive a daunting two-step . . . 'strict scrutiny,'" and that "only two compelling interests" can justify it: "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," or "avoiding imminent and serious risks to human safety in prisons." *Id.* at 206-07. Even with a compelling interest, "race-based state action" is permitted only "in the most extraordinary case." *Id.* at 208. The Court examined Harvard's and UNC's race-based admissions under this standard and held that they failed it for multiple reasons. *Id.* at 213-25.

First, Harvard and UNC failed to justify their consideration of race by identifying compelling interests capable of being "subjected to meaningful judicial review." *Id.* at 214. The Court rejected all of Harvard's and UNC's asserted interests, including:

- "'training future leaders in the public and private sectors,'"
- "preparing graduates to 'adapt to an increasingly pluralistic society,'"
- "'better educating its students through diversity,'"
- "'producing new knowledge stemming from diverse outlooks,'"

- "'promoting the robust exchange of ideas,'"
- "'broadening and refining understanding,'"
- "'fostering innovation and problem-solving,'"
- "'preparing engaged and productive citizens and leaders,'"
- "'enhancing appreciation, respect, and empathy,'"
- "'cross-racial understanding,'" and
- "'breaking down stereotypes.'"

*Id.* The Court held that none of these goals was "sufficiently coherent for purposes of strict scrutiny." *Id.*

Second, Harvard and UNC did not justify their use of race by "articulat[ing] a meaningful connection between the means they employ and the goals they pursue." *Id.* at 215. Specifically, it was not "evident . . . how assigning students to these racial categories and making admissions decisions based on them furthers the educational benefits that the universities claim to pursue." *Id.* at 216. Harvard's and UNC's racial categories of "Asian" and "Hispanic," for example, were too "imprecise" and thus "undermin[e]" rather than "promot[e]" the Universities' purported interests. *Id.* at 216-17.

Third, Harvard and UNC "used [race] as a 'negative'" factor in admissions. *Id.* at 218. Because "[c]ollege admissions are zero-sum," a "benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218-19. This violates the Equal Protection Clause even if it impacts only "some . . . of the students they admit." *Id.* at 219.

Fourth, Harvard and UNC used race "as a stereotype." *Id.* at 218. "The point of [their] admissions programs [was] that there is an inherent benefit in . . . race for race's sake." *Id.* at 220. For example, "Harvard's admissions process rest[ed] on the pernicious stereotype that 'a black student can usually bring something that a white person cannot offer,'" and UNC argued that "race in itself 'says [something] about who you are.'" *Id.*

Fifth, Harvard's and UNC's use of race was a form of prohibited racial balancing. *Id.* at 221-24. While Harvard and UNC did not identify strict numerical benchmarks of minority student admissions, they sought "proportional representation" by seeking a "rough percentage of various racial groups."

*Id.* Harvard's admissions officers also would review aggregate admissions data providing a "breakdown of applicants by race" during the admissions process so they could "'trac[k] how each class is shaping up relative to previous years.'" *Id.* at 194, 222.

Sixth, Harvard's and UNC's use of race lacked a "'logical end point.'" *Id.* at 221. It was impossible to know when considering race was no longer necessary to obtain the "educational benefits of diversity." *Id.* at 224. Harvard and UNC couldn't even identify a sunset date. *Id.* at 225.

The Court also rejected Harvard's and UNC's argument that "universities are 'owed deference'" in their determination that they must "us[e] race to benefit some applicants but not others." *Id.* at 217. Harvard and UNC could not simply say, "'trust us,'" but needed to provide "an exceedingly persuasive justification that is measurable and concrete enough to permit judicial review." *Id.* In the end, because "'[o]ur Constitution is color-blind,'" all "'racial discrimination in public education,'" including the race-based holistic admissions practiced by "[m]any universities," is prohibited by the Constitution. *Id.* at 204, 230-31.

## IV.   UT's and Other Universities' Responses to *SFFA v. Harvard*

In response to *Harvard*, universities across the country have adopted a race-blind admissions process. First, they implemented safeguards to their admissions process to prevent admissions officers from receiving so-called check-box information about the race of applicants during the admissions process. *See, e.g.*, Connolly Decl., Ex. B at 2 (North Carolina universities must "firewall knowledge of an applicant's race from those who are reviewing and evaluating the applications."); *id.*, Ex. C at 1-2 ("[Yale] . . . will take technological steps to ensure that no person involved in making admissions decisions has access to check-box racial . . . at any time during the admissions review cycle."). Second, they instructed their admissions offices to never provide admissions officers with aggregated data during the admissions process identifying the racial composition of admitted students. *See, e.g.*, *id.*, Ex. C at 2 ("[Yale's] admissions office will not run any reports during the review cycle that would

provide any aggregate data with regard to the racial composition of admitted students."); *id.*, Ex. D (Haverford College is blinding staff to applicants' race and "the racial composition of the class").

UT, however, steadfastly refuses to take similar steps. In correspondence with SFFA, UT said it would "remove data on the applicant's race and ethnicity from the application files provided to reviewers during the holistic review process" and "instruct reviewers that an applicant's race and ethnicity cannot be considered in the holistic review process." *Id.*, Ex. E at 3; Wasielewski Decl. at 4 ¶12, Dkt. 85-1. But UT vowed to continue several race-conscious measures.

First, UT refuses to blind its admissions officers from learning an applicant's race. UT employs "about 85 full-time staff members in the admissions office," and all of them will "have access to UT Austin's database of applicant file information." Connolly Decl., Ex. F at 3. This database "contains applicants' self-reported 'check-box information' regarding race/ethnicity." *Id.* Although restricting access to this information is easy, UT refuses to implement a firewall and instead insists its staffers can simply be trusted not to "access the 'check-box information.'" *Id.*

Second, senior admissions officers will continue to have access to and receive "aggregated data showing numbers of persons who have applied to, been admitted to, and enrolled at UT" broken down by "race/ethnicity." *Id.*, Ex. E at 2. This "dashboard" of information "includes the aggregate percentages of race/ethnicity for each category: applied, admitted, and enrolled." *Id.* It is "updated daily and includes both current numbers and year-over-year changes." *Id.* Senior admissions officers will have access to this data even though they "participate in the holistic review process." *Id.*, Ex. F at 3; *see* Wasielewski Decl. at 9 ¶26, Dkt. 85-1. UT told SFFA that it would continue to provide this aggregated data to these admissions officers for race-based recruitment and to "monito[r] and repor[t] trends on the [racial] composition of the student population." Connolly Decl., Ex. F at 4-5; *see id.*, Ex. E at 2-3. When asked why it was "necessary for individuals in the Admissions Office—instead of UT officials unconnected with admissions decisions—to have access to this racial data," UT merely

repeated its assurance that these admissions officers had been told "not [to] use data concerning race or ethnicity for admissions decisions." *Id.*, Ex. F at 4-5.

## ARGUMENT

The Court should grant summary judgment to SFFA. After *Harvard*, both UT's longstanding use of race in admissions and its amended policies are unlawful. The Court should further enter a permanent injunction that prohibits UT from reinstating its prior admissions policy or using race as a factor in admissions. The Court should also enter a permanent injunction prohibiting any individuals in UT's admissions office from receiving or having access to racial check-box data or aggregate reports on race during the admissions process. This injunctive relief is essential to ensuring that UT no longer discriminates on the basis of race.

**I.      SFFA is entitled to summary judgment.**

**A.      UT's admissions policies and procedures are unlawful.**

The Supreme Court proclaimed in *Brown v. Board of Education* that the right to public education "must be made available to all on equal terms." 347 U.S. 483, 493 (1954). The Court in *Harvard* built on *Brown*'s legacy, holding that "'[o]ur Constitution is color-blind,'" and that all "'racial discrimination in public education,'" including the race-based holistic admissions practiced by "[m]any universities," is prohibited by the constitution. 600 U.S. at 204, 230-31.

Under a straightforward application of *Harvard*, UT's use of race in admissions fails strict scrutiny's "daunting two-step examination." *Id.* at 206-07. UT cannot articulate a "'compelling governmental interes[t]'" for its use of race or show that its use of race is the least restrictive means of pursuing that interest. *Id.* SFFA thus is entitled to a declaratory judgment that UT's admissions policies and procedures violate the Fourteenth Amendment and Title VI.

There are "only two compelling interests that permit resort to race-based government action." *Id.* at 207. "One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute," such as a desegregation order that "produces a distribution of students

'compar[able] to what it would have been in the absence of [any] constitutional violations.'" *Id.* at 207, 215. "The second is avoiding imminent and serious risks to human safety in prisons, such as a race riot." *Id.* at 207.

UT has offered various justifications for using race in admissions that it believes are "compelling" state interests. They include:

- "[t]he educational benefits of student body diversity";
- "preparing students to succeed in the world";
- "bringing unique and direct perspectives to the issues and topics discussed and debated in classrooms";
- "promoting cross-racial understanding";
- "breaking down racial and ethnic stereotypes";
- "creating an environment in which students do not feel like spokespersons for their race"; and
- "preparing students to participate in—and to serve as leaders within—an increasingly diverse workforce and society."

Dkt. 14 at 4.

*None* of these justifications pass constitutional muster. *Harvard* found them "elusive" and "imponderable," incapable of being objectively "measured" by courts, and thus "not sufficiently coherent for purposes of strict scrutiny." 600 U.S. at 214-15. For example, "[h]ow is a court to know whether leaders have been adequately ['prepar[ed]']; whether the exchange of ideas is ['unique']; or whether ['cross-racial understanding'] is being developed?" *Id.* "Even if these goals could somehow be measured," the extent to which racial preferences are necessary to pursue them is "a question of degree" that "no court could resolve." *Id.*

Even if UT had a compelling interest, its use of race is not narrowly tailored. It fails narrow tailoring for five main reasons.

*First*, narrow tailoring requires that UT "articulate a meaningful connection between the means [it] employ[s] and the goals [it] pursue[s]." *Id.* at 215. The Supreme Court held that the "educational benefits of diversity" cannot be achieved by "measur[ing] the racial composition of . . . classes using"

"imprecise" racial categories like "(1) Asian; (2) Native Hawaiian or Pacific Islander; (3) Hispanic; (4) White; (5) African-American; and (6) Native American." *Id.* at 215-16. Such categories are "overbroad" and "underinclusive," and thus "undermin[e], instead of promot[e]," the purported goals. *Id.* at 216-17. But UT uses the same imprecise labels. *See* Wasielewski Decl. at 5 ¶14, Dkt. 85-1.

*Second*, the narrow tailoring requirement prohibits UT from using race as a "'negative.'" *Harvard*, 600 U.S. at 218. UT thus cannot use race as a preference in an admissions process that is "zero-sum," where a benefit "to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* at 218-19. But "UT Austin is selective in its admissions process in that the number of applicants seeking admission into its undergraduate program each year exceeds the number of available slots." Connolly Decl., Ex. G at 6 ¶25; *id.*, Ex. H at 4 ¶25. This system is the definition of zero-sum.

*Third*, UT may not use race as a "stereotype." *Harvard*, 600 U.S. at 218. For example, it "may not operate [its] admissions progra[m] on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue.'" *Id.* at 219. But UT does just that, justifying its use of race by trafficking in these prohibited racial stereotypes that students have "unique and direct perspectives" simply because of their race. Dkt. 14 at 4.

*Fourth*, UT's use of race must have an "end point." *Harvard*, 600 U.S. at 221-25. But UT never articulated one over the decades it practiced affirmative action. Indeed, when SFFA sued UT in 2020, the University described its continued use of race in admissions as "key to achieving its mission" and "critical to preparing students to succeed." Dkt. 14 at 4.

*Fifth*, starting years before *Harvard*, UT has engaged in racial balancing. "The results of the [UT] admissions process reflect [its] numerical commitment." *Harvard*, 600 U.S. at 222. For the past decade, "black students represented a tight band" of 5-6% of the admitted pool, *id.*:

| Share of Students Admitted to UT by Race | | | | | | |
|---|---|---|---|---|---|---|
| **Year** | **White** | **Hispanic** | **Black** | **Asian** | **Int'l** | **Other** |
| **2013** | 45% | 24% | 5% | 19% | 4% | 4% |
| **2014** | 43% | 23% | 5% | 21% | 5% | 4% |
| **2015** | 40% | 24% | 5% | 21% | 6% | 4% |
| **2016** | 38% | 26% | 5% | 21% | 6% | 4% |
| **2017** | 38% | 26% | 5% | 22% | 5% | 4% |
| **2018** | 36% | 27% | 6% | 23% | 5% | 4% |
| **2019** | 34% | 28% | 5% | 24% | 5% | 4% |
| **2020** | 31% | 29% | 6% | 24% | 5% | 4% |
| **2021** | 30% | 30% | 6% | 24% | 5% | 5% |
| **2022** | 28% | 31% | 6% | 25% | 5% | 5% |

*See* Connolly Decl., Ex. I; *see also id.* Exs. J-N. But "'outright racial balancing' is 'patently unconstitutional.'" *Harvard*, 600 U.S. at 223 (quoting *Fisher I*, 570 U.S. at 311). "That is so, [the Court has] repeatedly explained, because '[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).

Accordingly, because UT's use of race in the admissions process fails strict scrutiny, its admissions policies and procedures violate the Fourteenth Amendment and Title VI.

**B.    UT's revised admissions policy is unlawful.**

UT claims that it has now "eliminated race and ethnicity from the factors considered in undergraduate admissions decisions"—specifically, from its "holistic review process," the first step of

its admissions process. UT-Br. 2-3. But these purported changes have not eliminated the problem. UT's new admissions process is still unlawful.

Strict scrutiny requires a "'color-blind'" admission process. *Harvard*, 600 U.S. at 230. But UT refuses to implement one. UT admits that it gathers "check-box" racial data from every applicant and that it makes that data available to every admissions officer who reviews applications and provides "holistic" scores for each applicant. *Supra* at 7-8. UT also provides numerous "senior admissions officers" with the aggregate racial composition of the admitted class, which is updated daily. *Id.* UT has no lawful interest in continuing to infuse race into its admissions process.

Even if the Court believes that UT's new system is "race neutral," UT still hasn't brought itself into compliance with the Fourteenth Amendment. When a State abandons *de jure* racial discrimination, its "adoption and implementation of race-neutral policies alone [does not] suffice to demonstrate that the State has completely abandoned its prior . . . system." *United States v. Fordice*, 505 U.S. 717, 729 (1992). The Equal Protection Clause is "offended by 'sophisticated as well as simple-minded modes of discrimination.'" *Id.* UT must prove that it has taken "'every reasonable effort . . . to eradicate [*de jure* racial discrimination] and its insidious residue.'" *United States v. Fletcher ex rel. Fletcher*, 805 F.3d 596, 601 (5th Cir. 2015); *see Fordice*, 505 U.S. at 743. But it has not done so. By refusing to blind itself to racial data while maintaining a subjective selection process, UT has not met its burden of ending its violations of equal protection.

UT has never provided a legitimate justification for its continued use of racial data in the admissions process. If UT's admissions officers will never use race in the admissions process, why does UT continue to give them access to this data? Why not take simple technological steps to prevent them from accessing this constitutionally forbidden data? And even assuming UT needs aggregate racial data for legitimate, non-admissions purposes, why provide these data to *admissions officers* instead

12

of individuals outside the admissions office? UT has no answer to these questions, which dooms its belated, halfway effort to survive strict scrutiny of its long-held commitment to the use of race.[1]

## II.    The Court should enter a permanent injunction.

After granting summary judgment to SFFA, the Court should further enter a permanent injunction (1) prohibiting UT from reinstating its prior admissions policy or using race as a factor in admissions, and (2) prohibiting any individuals in UT's admissions office from receiving or having access to racial check-box data or aggregate reports on race during the admissions process.

"'Once liability for racial discrimination has been established, a district court has the duty to render a decree that will eliminate the discretionary effects of past discrimination and prevent like discrimination in the future.'" *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015). Courts "must not shrink from their obligation to enforce the constitutional rights of all persons." *Brown v. Plata*, 563 U.S. 493, 511 (2011) (cleaned up). Courts should enjoin both conduct that "has been found to have been pursued" and conduct that is "related to the proven unlawful conduct." *Howe*, 801 F.3d at 753 (quoting *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994)).

To receive a permanent injunction, a plaintiff must demonstrate: "'(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balances of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 272-73 (5th Cir. 2014).

---

[1] Indeed, a race-blind process isn't unique to admissions but is required elsewhere like in employment decisions. *See, e.g.*, U.S. EEOC, *Pre-Employment Inquiries and Race*, https://bit.ly/47Qy4ov ("In general, it is assumed that pre-employment requests for information will form the basis for hiring decisions. . . . If an employer legitimately needs information about its . . . applicants' race . . . it may obtain the necessary information and simultaneously guard against discriminatory selection by using a mechanism, such as 'tear-off' sheets. This allows the employer to separate the race-related information from the information used to determine if a person is qualified for the job").

SFFA's requested injunction would be proper and effective whether the Court grants summary judgment based on UT's old or new admissions policy, because the injunction would simultaneously work as a prophylactic against UT resurrecting its old policy while also prohibiting UT under its new policy from giving its admissions officers access to racial data in violation of *Harvard*. The Court may enjoin UT's admissions policies "in whole or in part." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 144 (2010).

SFFA satisfies all four requirements for a permanent injunction. *First*, a constitutional violation is irreparable harm. *See, e.g.*, *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012); *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762-63 (8th Cir. 2008); *Vote.org v. Callanen*, 609 F. Supp. 3d 515, 539 (W.D. Tex. 2022); *Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas*, 903 F. Supp. 2d 446, 470-71 (N.D. Tex. 2012). That rule "includes violation[s] of . . . the Equal Protection Clause." *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 529 (S.D. Tex. 2020); *see, e.g.*, *DynaLantic Corp. v. DOD*, 885 F. Supp. 2d 237, 292 (D.D.C. 2012); *Smith v. South Dakota*, 781 F. Supp. 2d 879, 887 (D.S.D. 2011).

That UT has modified its admissions policies in response to *Harvard* does not eliminate the need for a permanent injunction. "A 'court's power to grant injunctive relief survives discontinuance of the illegal conduct,' and because the 'purpose . . . is to prevent future violations,' injunctive relief is appropriate when there is a 'cognizable danger of recurrent violation, something more than the mere possibility.'" *DOJ v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)); *accord United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 126 (5th Cir. 1973) ("The purpose of an injunction is to prevent future violations, and, of course, it can be utilized even without a showing of past wrongs."). "Once a violation is demonstrated, all that need be shown is that 'there is some reasonable likelihood of future violations,' and past unlawful

conduct is 'highly suggestive of the likelihood of future violations.'" *Daniel Chapter One*, 89 F. Supp. 3d at 143 (quoting *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).

Here, there is a "'cognizable danger of recurrent violation.'" *Id.* UT provides every person in the admissions office with access to each applicant's race, and it provides every senior admissions officer with a report containing *daily* aggregated racial data. UT's assurances that admissions officers will be instructed not to use race doesn't come close to curing the problem. They have used race before and they still have the practical ability to do so in the future with ease. UT also provides no legitimate reason for refusing to implement these simple reforms. This contrasts with the many universities that have modified their policies to remove the use of race in admissions in response to *Harvard. Cf. Floyd v. City of N.Y.*, 959 F. Supp. 2d 668, 675 (S.D.N.Y. 2013) (issuing permanent injunction and contrasting the defendant with the "many municipalities that ha[d] reached settlement agreements or consent decrees when confronted with evidence of police misconduct").

*Second*, SFFA's constitutional injury cannot be compensated with money damages. *See De Leon v. Perry*, 975 F. Supp. 2d 632, 663-64 (W.D. Tex. 2014). SFFA's members are "being denied the 'opportunity to compete for admission on an equal basis.'" *SFFA*, 37 F.4th at 1086. This denial of equal protection is not "capable of calculation or estimation." *Free Speech Coal., Inc. v. Colmenero*, No. 23-cv-917, 2023 WL 5655712, at *28 (W.D. Tex. Aug. 31, 2023); *see, e.g., MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005) ("[L]ost opportunities . . . are difficult, if not impossible, to quantify."); *Commonwealth Sci. & Indus. Rsch. Org. v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 604 (E.D. Tex. 2007) ("[T]he harm of lost opportunities is irreparable.").

*Third*, the balance of hardships favors a permanent injunction. The public always has a "'profound and long-term interest in upholding an individual's constitutional rights.'" *Awad v. Ziriax*, 670 F.3d 1111, 1131-32 (10th Cir. 2012); *Am. Beverage Ass'n v. City & Cty. of San Fran.*, 916 F.3d 749, 758 (9th Cir. 2019). And if UT is no longer using race in the admissions process, it will suffer no harm

by being forced to do what it already claims to be doing. *See Joyce v. Town of Dennis*, 720 F.3d 12, 25 (1st Cir. 2013) ("[N]o apparent harm would befall defendants from . . . following a policy that they already have adopted.").

Nor would it be problematic to force UT to make minor administrative changes to stop making racial check-box data and aggregate racial data available to its admissions staff. *Cf. Coal. to Def. Affirmative Action v. Granholm*, 473 F.3d 237, 252 (6th Cir. 2006) (finding "the Universities' interest in preserving their current admissions and financial-aid programs during this enrollment cycle" insufficient to justify a preliminary injunction). UT has *never* explained why it would be infeasible for it to take these steps—the same steps countless peer universities are implementing now. Implementing these simple procedures "creates a safe distance" between admissions officers and racial data, and guards against "any attempts by [UT] to circumvent" the constitutional bar against using race. *De Boulle Diamond & Jewelry, Inc v. Boulle, Ltd.*, No. 12-cv-1462, 2015 WL 5033893, at *5 (N.D. Tex. Aug. 25, 2015); *Floyd*, 959 F. Supp. 2d at 671 (issuing injunction to "ensure that the practice [of 'stop and frisk'] is carried out in a manner that protects the rights and liberties of all New Yorkers"). By contrast, the benefit of a permanent injunction would be significant, ensuring that applicants are free from "'governmentally imposed discrimination based on race.'" *Harvard*, 600 U.S. at 206.

*Fourth*, the public interest favors a permanent injunction. "'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014). Indeed, "the constitutional imperatives of the Equal Protection Clause must have priority over the comfortable convenience of the status quo." *Williams v. Illinois*, 399 U.S. 235, 245 (1970); *see also Rush v. Nat'l Bd. of Med. Exam'rs*, 268 F. Supp. 2d 673, 679 (N.D. Tex. 2003) ("[T]he public interest [is] in prohibiting discrimination by public entities.").

## CONCLUSION

The Court should grant SFFA summary judgment and declare that UT's longstanding and revised use of race in admissions is unlawful. The Court should further enter a permanent injunction (1) prohibiting UT from reinstating its prior admissions policy or using race as a factor in admissions, and (2) prohibiting any individuals in UT's admissions office from receiving or having access to racial check-box data or aggregate reports on race during the admissions process.

Dated: November 27, 2023                          Respectfully submitted,

                                                  */s/ J. Michael Connolly*
                                                  Thomas R. McCarthy (*pro hac vice*)
                                                  J. Michael Connolly
                                                  Cameron T. Norris
                                                  Steven C. Begakis (*pro hac vice*)
                                                  CONSOVOY MCCARTHY PLLC
                                                  1600 Wilson Blvd., Suite 700
                                                  Arlington, VA 22209
                                                  (703) 243-9423
                                                  tom@consovoymccarthy.com
                                                  mike@consovoymccarthy.com
                                                  cam@consovoymccarthy.com
                                                  steven@consovoymccarthy.com

                                                  *Counsel for Plaintiff Students for Fair Admissions, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served on counsel of record via the Court's electronic filing and service on November 27, 2023.

/s/ J. Michael Connolly